## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOSHUA L. HOLLADAY, TERAY A. BUNDY, EVAN W. BYLER, TINA L. HOUCHINS INDIVIDUALLY, AND FOR THE ANTICIPATED ESTATE OF AARON D. GAUTIER, GREGORY E. HOGANCAMP, TARA K. HUTCHINSON, JERALD J. JENSEN, JONATHAN F. KUNIHOLM, MICHELE TERESE QUINN, S.K., a minor, MELINA ROSE NOLTE INDIVIDUALLY, AND FOR THE ANTICIPATED ESTATE OF NICHOLAS S. NOLTE, A.N., a minor, ANITA NOLTE, JESSICA NOLTE, TIMOTHY J. O'SULLIVAN, PEGGY J. PORTWINE INDIVIDUALLY, AND FOR THE ANTICIPATED ESTATE OF BRIAN L. PORTWINE, MARK J. PRATT, SONJA RUHREN INDIVIDUALLY, AND FOR THE ANTICIPATED ESTATE OF DAVID ALLAN RUHREN, BRIAN R. SCHAR, BRAD LEE SCHWARZ, TRAVIS M. STRONG, TAYLER HESTON, ANTHONY J. DURKACS, BRIMA TURAY, GRANT BLANEY VON LETKEMANN II, KELLY LYNN VON LETKEMANN, SEAN LEE WILLIAMS, SUE ANN WILLIAMS, JOSHUA B. WOLFE, JEFF M. WRIGHT, <br><br> Plaintiffs, <br><br> v. <br><br> THE ISLAMIC REPUBLIC OF IRAN, <br><br> Defendant. | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | **PLAINTIFFS' COMPLAINT** <br><br> **Case No.:** _____ |

**TABLE OF CONTENTS**

I.      NATURE OF THE CASE ...................................................................................1

II.     JURISDICTION AND VENUE ........................................................................3

          A.  This Court has Jurisdiction Over All Claims and All Parties ................................3

               1.  This Court May Exercise Jurisdiction over the Subject Matter of All Claims Asserted Herein ...............................................................3

               2.  This Court May Exercise Personal Jurisdiction Over All Parties to this Action ............................................................................4

          B.  Venue is Proper in this Court ............................................................5

III.    LEGISLATIVE BACKGROUND.......................................................................5

IV.    THE DEFENDANT.............................................................................................7

V.      FACTUAL ALLEGATIONS ...........................................................................13

        A.    Iran's Long History of Materially Supporting and Encouraging Acts of International Terrorism ......................................................14

        B.    Iran's Sponsorship and Material Support of Terrorism in Iraq............................19

             1.    Islamic Revolutionary Guard Corps (IRGC) .............................................22

             2.    Islamic Revolutionary Guard Corps – Qods Force (IRGC-QF) ................24

             3.    Hezbollah .....................................................................................26

             4.    Iran's Ministry of Defense and Armed Forces Logistics...........................32

             5.    Ansar al Islam .............................................................................34

         C.    Special Groups...................................................................................40

             1.    The Badr Corps/Badr Organization ..........................................................45

             2.    Kata'ib Hizballah .....................................................................................47

             3.    Jaysch al Mahdi & The Promised Day Brigades .......................................52

             4.    Asa'ib Ahl Al Haq .....................................................................................53

         D.    Iranian Signature Weapons Used in the Terrorist Attacks....................................54

1. Explosively Formed Penetrators ................................................................55

2. Improvised Rocket Assisted Munitions ...................................................61

E. Iran Evades Sanctions Through Agents ..........................................................62

1. Islamic Republic of Iran Shipping Lines ..................................................63

2. Mahan Air .....................................................................................................66

3. National Iranian Oil Company (NIOC) ....................................................68

VI. THE TERRORIST ATTACKS & PLAINTIFFS ..........................................................69

A. The November 20, 2009 Attack – Supply Route of Kalzoo .................................71

1. Plaintiff Joshua Lionel Holladay ...............................................................71

B. The November 22, 2008 Attack – En Route to FOB Kalsu.................................73

1. Plaintiffs The Williams Family.....................................................................73

C. The April 4, 2008 Attack – Victory Base Complex, Baghdad .............................75

1. Plaintiffs The Von Letkemann Family ......................................................75

D. The March 2, 2008 Attack – Basra ....................................................................77

1. Plaintiff Timothy Joseph O'Sullivan .........................................................77

E. The September 19, 2007 Attack – Kadhimiya...................................................79

1. Plaintiff Brian Robert Schar........................................................................79

F. The August 22, 2007 Attack – Baghdad/Sadr City Border ................................80

1. Plaintiff Jerrald J. Jensen ............................................................................80

G. The May 28, 2007 Attack – Sadr City ................................................................81

1. Plaintiff Gregory Edward Hogancamp ....................................................81

H. The May 17, 2007 Attack – Baghdad ................................................................83

1. Plaintiffs The Gautier/Houchins Family ...................................................83

I. The February 25, 2007 Attack – CSC Scania ....................................................84

1. Plaintiff Joshua Bradley Wolfe...................................................................84

J.      The December 4, 2006 Attack – Baghdad ...........................................85

    1.      Plaintiffs The Portwine Family ...................................................85

K.      The November 27, 2006 Attack – Shula...........................................87

    1.      Plaintiffs The Strong Family .......................................................87

L.      The February 14, 2006 Attack – Baghdad ........................................89

    1.      Plaintiff Tara Kathleen Hutchison .............................................89

M.      The August 13, 2005 Attack – Sadr City, Iraq .................................90

    1.      Plaintiff Brad Lee Schwarz ........................................................90

N.      The January 1, 2005 Attack – Haditha, Iraq ....................................91

    1.      Plaintiffs The Kuniholm Family .................................................91

O.      The December 21, 2004 Attack – FOB Marez, Mosul .....................93

    1.      Plaintiffs The Ruhren Family......................................................93

    2.      Plaintiff Mark Joseph Pratt ........................................................94

    3.      Plaintiff Evan Wayne Byler ........................................................96

    4.      Plaintiff Teray Anton Bundy ......................................................97

    5.      Plaintiff Jeff McKinley Wright....................................................98

    6.      Plaintiff Brima Charles Turay ....................................................99

P.      The November 9, 2004 Attack – Iskandariva, Iraq...........................101

    1.      Plaintiffs The Nolte Family .........................................................101

VII.    ALL OF THE TERRORIST ATTACKS WERE ACTS OF INTERNATIONAL
TERRORISM...................................................................................................103

VIII.   THE ACTS OF IRAN CAUSED PLAINTIFFS' INJURIES AND DEATHS .............105

IX.     CLAIMS ...........................................................................................................105

A.      Claim 1: Provision of Material Support for Acts of Extrajudicial Killing,
Torture, and Hostage Taking Under 28 U.S.C. § 1605A....................105

X.      PRAYER FOR RELIEF ....................................................................................108

# INDEX OF ACRONYMS

**AAH** – Asa'ib Ahl Al Haq or the "League of the Righteous"

**AAI** – Ansar al Islam

**AEDPA** – Antiterrorism and Effective Death Penalty Act of 1996

**AIO** – Aerospace Industries Organization

**AQI** – Al Qaeda in Iraq

**ASV** – Armored Security Vehicle

**ATA** – Anti-terrorism Act, 18 U.S.C. § 2333, *et seq.*

**BBC** – British Broadcasting Company

**BFV** – Bradley Fighting Vehicle

**DIO** – Defense Industries Organization

**EFP** – Explosively formed penetrators

**FOB** – Forward Operating Base

**FSIA** – Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.*

**FTO** – Foreign Terrorist Organization

**HAMAS** – Ḥarakat al-Muqāwamah al-ʾIslāmiyyah Islamic Resistance Movement

**HMMWV** – High Mobility Multipurpose Wheeled Vehicle

**IAIO** – Iran Aviation Industries Organization

**IAV** – Interim Armored Vehicle

**IED** – Improvised explosive device

**IFV** – Infantry Fighting Vehicle

**IRAM** – Improvised Rocket Assisted Munitions

**IRGC** – Islamic Revolutionary Guard Corps

**IRGC-QF** – Islamic Revolutionary Guard Corps-Qods Force

**IRISL** – Islamic Republic of Iran Shipping Lines

**ISIL** – Islamic State of Iraq and the Levant aka "ISIS" or "Daesh"

**JAM** – Jaysch al Mahdi or the "Mahdi Army"

**JASTA** – Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, Sept. 28, 2016, 130 Stat. 852

**KH** – Kata'ib Hizballah

**KRG** – Kurdistan Regional Government

**MNF-I** – Multi National Forces in Iraq

**MODAFL** – Iran's Ministry of Defense and Armed Forces Logistics

**MSR** – Main Supply Route

**MTC** – Medium Transport Company

**NIOC** – National Iranian Oil Company

**PDB** – Promised Day Brigades

**PTSD** – Post Traumatic Stress Disorder

**RJF** – Reformation and Jihad Front

**RPG** – Rocket Propelled Grenade

**SDGT** – Specially Designated Global Terrorist

**SDN** – Specially Designated National

**SDT** – Specially Designated Terrorist

**TBI** – Traumatic Brain Injury

**WMD** – Weapons of Mass Destruction

## I.      NATURE OF THE CASE

1.      There can be no question the Islamic Republic of Iran ("Iran") is, and at all relevant times has been, actively engaged in materially supporting and promoting violence against U.S. nationals[1] in Iraq, that its efforts began even before the U.S. invasion in 2003, that such support includes the provision of money, weapons, training, and advisors, and that it has solidified an organizational/operational relationship between Lebanese Hizbollah (or "Hezbollah") and various "Special Groups."

2.      Iran's aforementioned agents included the U.S.-designated Foreign Terrorist Organization ("FTO") (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")) Hezbollah;[2] the Islamic Revolutionary Guard Corps ("IRGC"), whose subdivision known as the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF") is a U.S.-designated Specially Designated Global Terrorist ("SGDT"); and other terrorist agents that included a litany of Iraqi Shi'a terror groups referred to herein collectively as "Special Groups."[3]

3.      The acts of international terrorism[4] at issue in this Action (the "Terrorist Attacks")

---

[1]      As used herein, the terms "United States' nationals," "nationals of the United States," and "U.S. nationals" shall have the same meaning as set forth in the Immigration and Nationality Act, codified at 8 U.S.C. § 1101(a)(22), which defines the term "national of the United States" as ". . . (A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States."

[2]      The pronunciation and spelling of "Hezbollah" (also known as "Hizbollah" and "Hizbu'llah), is based on region and dialect, but all translate to the "Party of Allah." As used herein, Hezbollah and Hizbollah refer to a Shiite Muslim political party and militant group the United States and European Union consider a foreign terrorist organization.

[3]      Discussed in more detail below, Special Groups are terrorist organizations established and funded by Iran.

[4]      As used herein, the term "international terrorism" shall have the same meaning as set forth at 18 U.S.C. § 2331(1), which defines international terrorism as "activities that (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of

were perpetrated by Special Groups that are agents of Iran, Ansar al Islam and other terrorists all of whom were materially (and substantially) supported, directly and/or indirectly, by Iran.

4.   The Terrorist Attacks resulted in the deaths, maiming, and/or otherwise injury to Plaintiffs and/or Plaintiffs' family members.

5.   This is a civil action pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611 (hereinafter "FSIA") for wrongful death, personal injury and related torts, by the estates and families of United States' nationals and/or members of the U.S. armed forces (as defined in 10 U.S.C. § 101) who were killed or injured by Iran and/or its agents in Iraq from 2003 to 2011 (the "Relevant Period").

6.   None of the Terrorist Attacks were an act occurring in the course of (A) declared war; (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin.

7.   Iran serves as a command, financial and/or logistical conduit for various terrorist groups, including the Special Groups, and their terrorist activities, specifically including the Terrorist Attacks which killed or injured Plaintiffs or Plaintiffs' family members. Iran knew it was supporting FTOs.

8.   At all relevant times, Iran intentionally, knowingly and/or recklessly provided material support, directly or indirectly, to the Special Groups, Ansar al Islam and other terrorists, that, at all relevant times, engaged in acts of international terrorism against the United States and

---

the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; (B) appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination or kidnapping; and (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the person they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum."

nationals of the United States, including Plaintiffs.

9.      At all relevant times, Iran intentionally, knowingly and/or recklessly contributed substantial and material support and/or resources, directly and/or indirectly, to persons and/or organizations that posed a significant risk of committing acts of terrorism that threatened the security of nationals of the United States.

10.     Plaintiffs' claims arise from sixteen separate acts of international terrorism that occurred throughout Iraq between approximately November 9, 2004 and November 20, 2009.

## II.     JURISDICTION AND VENUE

11.     Jurisdiction and venue are proper in this Court.

### A.     THIS COURT HAS JURISDICTION OVER ALL CLAIMS AND ALL PARTIES.

12.     This Court may exercise jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1330(a)–(b).

13.     This Court may exercise personal jurisdiction over all parties to this Action.

### 1.     This Court May Exercise Jurisdiction over the Subject Matter of All Claims Asserted Herein.

14.     This Court may exercise its original jurisdiction over claims against the Islamic Republic of Iran pursuant to 28 U.S.C. § 1330(a). This is a nonjury civil action for relief *in personam* in the form of money damages against a foreign state as defined in 28 U.S.C. § 1603(a)[5] for personal injury or death that was caused by an act extrajudicial killing or the provision of material support or resources for such an act.

---

[5]      28 U.S.C. § 1603(a) defines "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." The statute defines an "agency or instrumentality" as any entity (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of the foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by the foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e), nor created under the laws of any third country.  28 U.S.C. § 1603(a)–(b).

### i.    *Foreign Sovereign Immunities Act*

15.    28 U.S.C. § 1605A(c) excepts the Islamic Republic of Iran from foreign sovereign immunity because it is a designated State Sponsor of Terrorism. Further, 28 U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that is or was a State Sponsor of Terrorism, and also against any official, employee or agent of that foreign state while acting within the scope of his or her office, employment or agency, for wrongful death, personal injury, and related torts.

16.    The United States officially designated Iran a State Sponsor of Terrorism on January 19, 1984, pursuant to § 6(j) of the Export Administration Act, § 40 of the Arms Export Control Act, and § 620A of the Foreign Assistance Act, and has renewed said designation annually.

17.    Iran was designated as a State Sponsor of Terror at all times during the Relevant Period.

18.    At all relevant times, Plaintiffs were nationals of the United States under 28 U.S.C. § 1605A(c)(1).

19.    None of the attacks alleged herein occurred within the territory of the Islamic Republic of Iran. This fact renders inapplicable the FSIA's requirement that Plaintiffs afford Defendant an opportunity to arbitrate.

### 2.    This Court May Exercise Personal Jurisdiction over All Parties to this Action.

20.    Plaintiffs consent to this Court's exercise of personal jurisdiction over them.

21.    This Court has jurisdiction over this matter and over the Defendant pursuant to 28 U.S.C. §§ 1330(a)–(b), 1331, 1332(a)(2), and 1605A(a)(1), which create subject-matter and personal jurisdiction for civil actions for wrongful death and personal injury against State

Sponsors of Terrorism and their officials, employees and agents.

22.     This Court may exercise personal jurisdiction over the Islamic Republic of Iran pursuant to 28 U.S.C. § 1330(b) and the applicable exception to immunity in 28 U.S.C. § 1605A(c). Together, these provide for personal jurisdiction over the Iran for claims arising under 28 U.S.C. § 1330(a) upon valid service of process under 28 U.S.C. § 1608.

23.     Further, that exercise of personal jurisdiction is reasonable; foreign sovereigns and their extensively controlled instrumentalities are not "persons" under Fifth Amendment's Due Process Clause. That exercise of personal jurisdiction is consistent with the forum's manifest interest in providing effective means of redress for its residents.

### B.     VENUE IS PROPER IN THIS COURT.

24.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(f).

25.     Venue is proper in this district as to the Islamic Republic of Iran pursuant to 28 U.S.C. § 1391(f)(4), which provides that civil actions against a foreign state may be brought in the United States District Court for the District of Columbia.

## III.   LEGISLATIVE BACKGROUND

26.     This case is brought by and/or on behalf of U.S. nationals and/or family members of such U.S. nationals who were injured and/or killed in certain acts of international terrorism caused by Iran.

27.     Iran materially and substantially supported the IRGC, IRGC-QF, Hezbollah, Special Groups, Ansar al Islam, and other terrorists for the purpose of killing, maiming, and/or otherwise injuring U.S. nationals, including Plaintiffs.

28.     In 1996, as part of the AEDPA, Congress amended the FSIA to allow U.S. victims of terrorism to sue designated State Sponsors of Terrorism, such as Iran, for their

terrorist acts.[6]  Pursuant to the National Defense Authorization Act for Fiscal Year 2008, Public

L. No. 110-181, members of the United States armed forces, employees of the U.S. government

and individuals performing a contract awarded by the United States Government, acting within

the scope of the employee's employment may also bring private claims against State Sponsors of

Terrorism.[7]

29.     Congress's purpose in lifting the sovereign immunity under the AEDPA was to

"affect the conduct of terrorist states outside the U.S. [by promoting] safety of U.S. citizens who

travel overseas."[8]

30.     As a result of the AEDPA, foreign states, such as Iran, cannot assert sovereign

immunity where a victim claims money damages for personal injuries or death caused by, among

other things, the provision of material support or resources.[9]

31.     Pursuant to 28 U.S.C. § 1605A(a)(1), "[a] foreign state shall not be immune from

the jurisdiction of courts of the United States … in any case … in which money damages are

sought against a foreign state for personal injury or death that was caused by an act of torture,

extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or

resources for such an act if such act or provision of material support or resources is engaged in

---

[6]      28 U.S.C. § 1605A(a)(1).

[7]      28 U.S.C. §1605A(c)

[8]      44B Am. Jur. 2d, *International Law* § 140 (2013).

[9]      While Plaintiffs do not bring claims under the Anti-Terrorism Act, 18 U.S.C. §§ 2331–2339D, the Act does define the term "material support or resources" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safe houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b). The Act further defines the term "training" as "instruction or teaching designed to impart a specific skill, as opposed to general knowledge," and defines the term "expert advice or assistance" as "advice or assistance derived from scientific, technical or other specialized knowledge." *Id.*

by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."

32.     If a foreign State satisfies one of these, or the several other exceptions to immunity, it may be liable "in the same manner and to the same extent as a private individual under like circumstances."[10]

33.     The FSIA provides an exception to sovereign immunity of foreign states where, *inter alia*, a foreign state is a designated state sponsor of terrorism (such as Iran) that has engaged in acts of international terrorism, and was so designated at the time of the alleged wrongful conduct and is still so designated when the claim is filed.

34.     Specifically, the FSIA permits U.S. courts to maintain jurisdiction over a foreign State where that State engages in an act of terrorism or provides "material support or resources" to a terrorist organization.[11]

35.     The FSIA provides that Plaintiffs may bring an action against non-immune foreign states, such as Iran, in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.[12]

36.     During the Relevant Period, including when the Terrorist Attacks occurred and when this Action was filed, Iran was designated a State Sponsor of Terror by the United States.

## IV.     THE DEFENDANT

37.     Plaintiffs assert causes of action against Iran. Iran directed acts of torture, extrajudicial killing, hostage taking, and provided material support or resources to Hezbollah, Special Groups, Ansar al Islam, and other terrorists that perpetrated the Terrorist Attacks

---

[10]     28 U.S.C. § 1606.

[11]     28 U.S.C. § 1605(a)(7).

[12]     28 U.S.C. § 1391(f).

specifically for the purpose of carryout out those Attacks. Iran's actions proximately and/or directly caused the murders and injuries to Plaintiffs and Plaintiffs' family members in those Terrorist Attacks.

38.     Plaintiffs' deaths and/or injuries were a natural and probable consequence of Iran's actions as set forth herein. Moreover, such deaths and/or injuries should have been, and, in fact, were foreseeable considering the circumstances.

39.     At all times relevant to this Complaint, Iran is and was a foreign state within the meaning of 28 U.S.C. § 1603 and designated a State Sponsor of Terrorism pursuant to § 6G of the Export Administration Act of 1979, 50 U.S.C. app. § 2405G.

40.     Iran provided material support and resources for the commission of acts of extrajudicial killing, torture and/or hostage taking within the meaning of 28 U.S.C. § 1605A, including the Terrorist Attacks in which Plaintiffs were killed, injured, or maimed, and performed actions that caused the Terrorist Attacks and the harm to Plaintiffs herein.

41.     The Government of Iran is politically and ideologically hostile to the United States and its allies, and has consistently provided material support for acts of international terrorism, including extrajudicial killings, torture, and hostage takings, particularly through its Islamic Revolutionary Guard Corps and its Lebanese-based FTO, Hezbollah, which historically has served as Iran's proxy and agent, enabling Iran to project extremist violence and terror throughout the Middle East and around the globe.

42.     Both before and during the U.S. liberation and occupation of Iraq and its subsequent peacekeeping mission, Iran supported a massive terror campaign against Iraqi citizens, and U.S. nationals including Plaintiffs.

43.     As detailed herein, Iran provided funds, arms, equipment, and material support to

Hezbollah, the IRGC, and the IRGC-QF, which, in turn, trained, armed, supplied and funded Iran's terrorist agents in Iraq in carrying out their attacks against Plaintiffs and their family members.

44.     Iran's efforts to kill and maim U.S. nationals in Iraq, and to thwart U.S. policy objectives in Iraq, were readily apparent and widely reported.

45.     In fact, Iran's role in funding militant groups that target and kill Coalition[13] and Iraqi forces and innocent American, British, Iraqi and other civilians was a matter of public record.

46.     For example, on October 5, 2005, at a press briefing at the Foreign Office on London, William Patey, the British ambassador to Baghdad, accused the Iranian Revolutionary Guard of helping to supply the technology and weapons which has been used in bomb attacks against British troops in the south which claimed the lives of eight British soldiers and two British civilians.

47.     On October 10, 2005, the British Broadcasting Company ("BBC") reported that:

An armour-piercing version of the bomb—blamed for the deaths of eight British soldiers this year—marks the latest advance in the insurgents' arsenal. *The UK has accused Iran of supplying the new weapon to militants in southern Iraq, via the Lebanese Hezbollah militia group,* although Tehran has denied this.

(Emphasis added).

48.     The BBC followed up with multiple reports in 2006 describing the details from military briefings about Iran's material support to Shi'a militia groups that were targeting and

---

[13] "Coalition Forces" refers to the "[…]multinational force under unified command to take all necessary measures to contribute to the maintenance of security and stability in Iraq, including for the purpose of ensuring necessary conditions for the implementation of the timetable and programme as well as to contribute to the security of the United Nations Assistance Mission for Iraq, the Governing Council of Iraq and other institutions of the Iraqi interim administration, and key humanitarian and economic infrastructure[.]" *See* S.C. Res. 1511, ¶ 13, U.N. SCOR, U.N. Doc. S/RES/1511, at 3 (Oct. 16, 2003).

killing British and U.S. forces in Iraq, including Plaintiffs.

49.     For example, on June 23, 2006, the BBC reported:

BBC world affairs correspondent, Paul Reynolds, says both the American and British military in Iraq have claimed for some time that Iran, or factions within the Iranian government, have been supporting Shias politically and militarily…

…"Since January we have seen an upsurge in their support, particularly to the Shia extremist groups," Gen Casey said.

"They are using surrogates to conduct terrorist operations both against us and against the Iraqi people."

"We are quite confident that the Iranians, through the special operations forces, are providing weapons, IED [improvised explosive device] technology and training to Shia extremist groups in Iraq," he said.

50.     In another example, on September 26, 2008, CNN reported that U.S. officials claimed Iran had provided Shi'a militias in Iraq with "millions of dollars" in funding and that:

The official said that high-grade military explosives and specialized timers are among the "boutique military equipment" moving from Iran into Iraq. Some of the equipment is of the same type that Hezbollah, an Iranian-backed Shiite militia, used against Israeli forces in Lebanon during the summer, the official said. The origin of the weapons was easy to discern because of *Iranian markings* on it, he said. Because Iran maintains tight control over armaments, he said, shipment of the weapons into Iraq had to involve "*elements associated with the Iranian government*."

(Emphasis added).

51.     The IRGC is nominally comprised of five branches (Ground Forces, Air Force, Navy, Basij militia, and Qods Force special operations IRGC-QF) in addition to a counterintelligence directorate and representatives of the Supreme Leader. Several of the IRGC's leaders have been sanctioned under U.N. Security Council Resolution 1747.

52.     According to the U.S. State Department's 2005 Country Reports on Terrorism: "[t]he IRGC was increasingly involved in *supplying lethal assistance* to Iraqi militant groups, which destabilizes Iraq ... Senior Iraqi officials have publicly expressed concern over Iranian

interference in Iraq, and there were reports that *Iran provided funding, safe passage, and arms to insurgent elements*." (Emphasis added).

53.     The IRGC-QF's "Department 2000" manages Iran's relationship with Hezbollah, which includes the flow of some of Iran's most sophisticated weapon systems, including military grade Explosively Formed Penetrators ("EFPs"), anti-tank guided missiles, and various rockets, such as the Fajr-5.

54.     Explosively Formed Projectiles ("EFP") (discussed in more detail at Section V(D)1, below), along with other munitions and tactics, were used to injure and kill Plaintiffs. Such bombs are sometimes inaccurately called "improvised explosive devices" ("IEDs"); in reality, the EFPs were not "improvised" but professionally manufactured and specifically designed by Iran and its agents to target and penetrate Plaintiffs and Coalition Forces' armor, and sow terror within the borders and amongst the citizens of Iraq.

55.     Because Iran (a State Sponsor of Terror) routinely provided material support to FTOs and Special Groups, Ansar al Islam and other terrorists, including those Special Groups and FTOs responsible for the Terrorist Attacks that resulted in the death, maiming, or injury to Plaintiffs and/or Plaintiffs' family members, to advance the terrorist activities of those FTOs and Special Groups and other terrorists, Iran is directly and/or vicariously liable for the personal injuries caused by those FTOs and Special Groups.

56.     Further, Iran's objectives were not secret. Its pursuit and development of weapons of mass destruction—including IEDs, EFPs, mines and similar explosive munitions — were the subject of hundreds of news reports, U.S. government reports, and Congressional testimony, as well as U.N. Security Council resolutions and European Union regulations.

57.     Nevertheless, Iran worked diligently and purposefully to conceal and/or deny its

presence and influence in Iraq and its material support for Special Groups, Hezbollah, Ansar al Islam and other terrorists, including the Foreign Terrorist Organizations ("FTO"), Specially Designated Global Terrorists ("SDGT"), Specially Designated Terrorists ("SDT"), Specially Designated Nationals ("SDN") operating in Iraq.

58.     For example, on August 14, 2006, the Washington Post reported that Iran was providing support to Shiite Militias in Iraq, including "weapons, bomb technology, and training," and yet "Iran's Shiite theocratic government, which has long-standing ties to Iraq's Shiite political and religious leaders, has *repeatedly denied* that it foments instability in Iraq and instead has blamed the United States."[14] (Emphasis added).

59.     Similarly, in February 2007, when the United States displayed a range of weapons seized in Iraq that that it claimed had originated in Iran and were responsible for at least 170 U.S. and British soldiers' deaths, Iranian President Mahmoud Ahmadinejad denied that Iran had supplied weapons to insurgents in Iraq.[15] This denial, as well as many other denials by senior Iranian officials during 2003-2011, was indispensable and a key component of the Iranian use of terrorism strategy, which sought to maximally hide any Iranian footprints.

60.     Further, in June 2008 the Iraqi Prime Minister visited Iran to discuss security and other issues with Iranian president Mahmoud Ahmadinejad. The visit was intended to address growing concerns among Iraqis and Americans that Iranian agents are training and arming Shiite militants in Iraq. The diplomatic effort to address and document Iranian involvement in Iraq came after an Iraqi delegation confronted Iranian officials in Tehran with evidence that Iran is

---

[14]     Sudarsan Raghavan, *Iran Said to Support Shiite Militias in Iraq*, WASHINGTON POST, Aug. 15, 2006, *http://www.washingtonpost.com/wp-dyn/content/article/2006/08/14/AR2006081400477.html*.

[15]     Thomas Harding, *Iraqi insurgents using Austrian rifles from Iran*, THE TELEGRAPH, Feb. 13, 2007, *http://www.telegraph.co.uk/news/worldnews/1542559/Iraqi-insurgents-using-Austrian-rifles-from-Iran.html*.

smuggling weapons into Iraq and training Iraqi militants. The Iranians vehemently denied the assertions.[16]

61.     On April 15, 2010, the Associated Press reported that, "[t]he U.S. has repeatedly accused Iran of meddling in politics and supporting violence in Iraq, but Tehran denies the allegations, saying it supports the democratic process in the war[-]torn country."[17]

62.     Despite the fact that both the Iraqi government and the U.S. military have stated that Iran backed various Shia terror groups inside Iraq, including elements of the Mahdi Arm, the Iranian regime has routinely denied the charges. Even when confronted with the fact that Iraqi and U.S. forces detained dozens of Iranian Qods Force officers and operatives, captured numerous Shia terrorist leaders under Iranian command, and found ample documentation as well as Iranian-made and Iranian-supplied weapons.

## V.     FACTUAL ALLEGATIONS

63.     International terrorism, as that term is defined in 18 U.S.C. § 2331(1), is a serious and deadly problem that threatens the vital interests of the United States.[18]   It affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States' citizens, as well as foreign visitors to the United States.[19]

64.     The United States has a clear interest in combating terrorism both within its borders and abroad, and in the protection of its nationals at home and abroad.

---

[16]     *Iraqi Leader Heading Back to Iran for Security Talks*, CNN.COM, June 3, 2008, *http://edition.cnn.com/2008/WORLD/meast/06/03/iraq.main/index.html*.

[17]     Nasser Karimi, *Iran says it wants inclusive Iraqi government*, THE SAN DIEGO UNION-TRIBUNE, Apr. 15, 2010, *http://www.sandiegouniontribune.com/sdut-iran-says-it-wants-inclusive-iraqi-government-2010apr15-story.html*.

[18]     Justice Against Sponsors of Terrorism Act, § 2(a)(1), Public L. No. 114-222.

[19]     *Id*. at § 2(a)(2).

65.     Iran committed and continues to commit violent attacks against the U.S. nationals. Iran commits these attacks via proxy terrorist organizations made up of Iranian, Lebanese, Iraqi, Afghani, and Yemeni citizens and citizens of other countries.

66.     According to the CIA, Iranian leaders view terrorism as an important instrument of foreign policy they use both to advance national goals and to export the regime's Islamic revolutionary ideals.[20]

67.     Further, Iran supports and directs terrorist operations by Hezbollah and it is the desire of Iran to keep the United States and U.S. nationals as primary terrorist targets.[21]

68.     In June 2007, U.S. Department of State spokesman, Sean McCormack, delivered a press briefing on Iran and its ties to international terrorism. When asked what changes he was looking for concerning Iran and its ties to terrorism, he responded, "Well, for starters, stop supplying *money, technology, and training* for people who are trying to kill [U.S. nationals]..."[22] (Emphasis added).

   **A.    IRAN'S LONG HISTORY OF MATERIALLY SUPPORTING AND ENCOURAGING ACTS OF INTERNATIONAL TERRORISM**

69.     For decades, and despite its stated public policy condemning acts of international terrorism, Iran has made the funding of terrorist organizations (including the Special Groups and other terrorists that perpetrated the Terrorist Attacks) and the commodification of international acts of terrorism its business. Simply put, Iran's actions and currently-available evidence clearly demonstrate Iran's support for terrorist groups, including those groups that perpetrated the

---

[20]     Central Intelligence Agency, Directorate of Intelligence, *Iran: The Uses of Terror*, Oct. 22, 1987 (approved for release June 1999), *http://www.foia.cia.gov/sites/default/files/document_conversions/89801/DOC_0000259360.pdf*

[21]     *Id.*

[22]     Sean McCormack, U.S. Department of State Daily Press Briefing (June 27, 2007).

Terrorist Attacks.

70.     Iran has a history of financing, supporting and training terrorists and their affiliates in the perpetration of terrorist attacks against the United States, its citizens and its allies. For example, Hon. Judge John D. Bates found in a lawsuit brought by U.S. victims of the bombing of the U.S. embassies in Nairobi and Dar es Salaam that, "[s]upport from Iran and Hezbollah was critical to al Qaeda's execution of the 1998 embassy bombings…Prior to its meetings with Iranian officials and agents, al Qaeda did not possess the technical expertise required to carry out the embassy bombings."[23]

71.     Similarly, Iran has been lavish with its support to all groups (including Sunni groups with ties to al Qaeda) engaged in acts of international terrorism against Iraqi citizens, Coalition Forces and U.S. nationals, including Plaintiffs.

72.     Since the Iranian Revolution in 1979, Iran has been a principal source of extremism and terrorism throughout the Middle East and the rest of the world, responsible for bombings, kidnappings, hostage-taking torture, extrajudicial killings and assassinations across the globe.

73.     On January 19, 1984, the United States designated Iran a State Sponsor of Terrorism. That designation has remained in force throughout the Relevant Period to this Action.

74.     Iran prefers not to be directly implicated in acts of international terrorism against U.S. nationals, but instead acts through co-conspirators and/or agents and offers bounties for killing U.S. nationals, shooting down U.S. helicopters, and destroying American tanks. Reports suggest that in fall 2003 "a senior Iranian cleric in Tehran set up a special 100-member army, known as al Saqar, which means eagle in Arabic, to . . . carry out [acts of international

---

[23]     Memorandum Opinion at 13–14, *Wamai v. Republic of Sudan et. al.*, No. 1:08-cv-01349-JDB-JMF (D. D.C. Nov. 30, 2011), ECF No. 55.

terrorism]."[24]

75.     Countries determined by the Secretary of State to have repeatedly provided support for acts of international terrorism receive such a designation pursuant to three laws: (1) section 6(j) of the Export Administration Act; (2) section 40 of the Arms Export Control Act; and (3) section 620A of the Foreign Assistance Act.

76.     Taken together, the main categories of sanctions resulting from designation under these authorities include: (1) restrictions on U.S. foreign assistance; (2) a ban on defense exports and sales; (3) certain controls over exports of dual use items; and (4) miscellaneous financial and other restrictions.

77.     Designation under the above-referenced authorities also implicates other sanctions laws that penalize persons and countries engaging in certain trade with state sponsors. Currently there are three recidivist countries designated under these authorities: Iran, Sudan, and Syria.[25]

78.     In Iraq, the policies of Iran have been largely successful, "giving Iran an unprecedented degree of influence there at the expense of the United States…" An Iran-friendly Iraq "serves as an opportunity for Iran to evade the increasingly harsh international sanctions regime and to continue financing [FTOs]."[26]

79.      Iranian diplomatic, political, and economic networks within Iraq are highly developed and closely linked both to Hezbollah and to the IRGC-QF.

80.     Unclassified Iraqi government Harmony records, collated by the Combating

---

[24]     Edward T. Pound, *Special Report: The Iran Connection*, U.S. News and World Report, Nov. 14, 2004.

[25]     U.S. Department of State, *State Sponsors of Terrorism*, *available at* https://www.state.gov/j/ct/list/c14151.htm (last visited March 24, 2017).

[26]     Frederick W. Kagan et. al., *Iranian Influence in the Levant, Egypt, Iraq, and Afghanistan*, at 6, May 2012, *available at* http://www.aei.org/wp-content/uploads/2012/05/-iranian-influence-in-the-levant-egypt-iraq-and-afghanistan_171235465754.pdf.

Terrorism Center at West Point, as well as information provided to the Coalition Forces through interrogation of detainees of the Shite militias, illustrate how Iran sponsored terrorist groups, directly and through Hezbollah (Iran's proxy for more than 30 years), operated in Iraq, including supporting and directing the terrorist groups responsible for the Terrorist Attacks which killed or injured Plaintiffs or their family members.[27]

81.     Planning and preparation by Iran and its agents, including Hezbollah, for their active involvement in supporting terrorist groups and encouraging sectarian violence in Iraq has been underway since at least 2002.

82.     At least as early as the 2003 U.S. overthrow of Saddam Hussein's regime in Iraq, Iran has assiduously worked to expand its influence in Iraq and throughout the region in a variety of ways, including by fomenting violence and terrorism when such activities have served its diplomatic, political, and economic ambitions.

83.     When Coalition Forces liberated Iraq in 2003, Iran's IRGC formed the counter-Coalition Ramazan Corps and ordered it to attack U.S. and Iraqi forces. Saddam Hussein's 24-year rule ended on April 9, 2003. The U.S. Department of State reported that, shortly thereafter, individuals with ties to the IRGC may have attempted to infiltrate southern Iraq, and elements of the Iranian regime helped members of Ansar al Islam (previously known by several different names, including Ansar Al-Sunnah) transit and find safe haven in Iran. In a Friday prayers sermon in Tehran in May 2003, secretary general of Iran's powerful Guardian Council Ayatollah Ahmad Jannati publicly encouraged Iraqis to stage and participate in suicide operations against

---

[27]     Joseph Felter and Brian Fishman, *Iranian Strategy in Iraq: Politics and 'Other Means'*, Combating Terrorism Center, West Point, 2008.  *See* Appx. B, which contains Ba`ath-era intelligence documents.

U.S. nationals, including Plaintiffs, and Coalition Forces.[28] He went on to encourage the so-called "holy fighters" to "maintain good relations with the coalition forces" but at the same time create "a secret group that would conduct attacks against American troops."[29]

84. In 2005, the Department of State reported that Iran was a safe haven in that known terrorists, extremists, and sympathizers are able to transit its territory and cross the long and porous border into Iraq. Iran also equips terrorists with technology and provides training in extremist ideology and militant techniques.[30]

85. In 2008, William Burns, U.S. Undersecretary of State for Political Affairs, testified before Congress that it is "Iran's… support for terrorist groups…its efforts to sow violence and undermine stability in Iraq and Afghanistan, including lethal support for groups that are directly responsible for hundreds of U.S. casualties."[31]

86. As recently as 2015, the State Department stated that "Iran's state sponsorship of terrorism worldwide remained undiminished through the … IRGC-QF, its Ministry of Intelligence and Security, and Tehran's ally Hezbollah, which remained a significant threat to the stability of Lebanon and the broader region."[32]

---

[28] Patterns of Global Terrorism U.S. Department of State, Office of the Coordinator for Counterterrorism, Apr. 29, 2004, *available at* http://www.state.gov/j/ct/rls/crt/2003/31644.htm.

[29] Edward T. Pound, *Special Report: The Iran Connection*, U.S. News and World Report, Nov. 14, 2004.

[30] U.S. Department of State, Office of the Coordinator for Counterterrorism, *Country Reports on Terrorism 2005*, Apr., 2006, at 21, *available at* https://www.state.gov/documents/organization/65462.pdf.

[31] *U.S. Policy Towards Iran: Hearing Before S. Comm. on Foreign Relations and H. Comm. on Foreign Affairs*, Testimony by William J. Burns, Undersecretary for Political Affairs, U.S. Department of State (July 9, 2008).

[32] U.S. Department of State, Office of the Coordinator for Counterterrorism, *Country Reports on Terrorism 2015*, June 2016, at 166, *available at* https://www.state.gov/documents/organization/258249.pdf.

**B.      IRAN'S SPONSORSHIP AND MATERIAL SUPPORT OF TERRORISM IN IRAQ**

87.      Iran is the world's foremost exporter of global terrorism, and uses various FTOs, Special Groups, and other agents or proxies to distribute and deliver this deadly product around the globe.

88.      Iran utilizes Special Groups and other terrorists that coordinated with Hezbollah and the IRGC, as front groups to perpetrate terrorist acts, including those that killed or injured Plaintiffs or members of Plaintiffs' families.

89.      Iran's command and control over IRGC, FTOs and Special Groups that routinely perpetrate terrorist attacks, including the Terrorist Attacks at issue in this Action, is best illustrated by diagramming the command and control Iran exercises over those entities:



90.     Iran's support of terrorist groups in Iraq was described in the U.S. State

Department's 2005 Country Reports on Terrorism, which observed:

> Iran has provided political and ideological support for several terrorist and
> militant groups active in Iraq. Attractive to terrorists in part because of the limited
> presence of the United States and other Western governments there, Iran is also a
> safe haven in that known terrorists, extremists, and sympathizers are able to
> transit its territory and cross the long and porous border into Iraq. Iran also equips
> terrorists with technology and provides training in extremist ideology and militant
> techniques.

91.     Iran furthers its terrorism-based foreign policy through the following key Iranian

Proxies: Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL"), the IRGC, the IRGC-QF, Hezbollah/Hizbollah, and Special Groups.

92.     In 2008, Pentagon Press Secretary Geoff Morrell reported on the "smuggling system in which the Iranians are providing their allies within Iraq, these special groups, with the munitions that are then used to take on us, whether it be EFPs or rockets or conventional arms. These are being used by these special groups and being provided by the Iranians."

93.     On January 9, 2008, the U.S. Treasury Department designated four individuals and one entity under E.O. 13438 for threatening the peace and stability of Iraq and the government of Iraq. Three of the individuals, Ahmed Foruzandeh (a Brigadier General in the IRGC-QF), Abu Mustafa Al-Sheibani, and Isma'il Hafiz Al Lami (a/k/a "Abu Dura") were all based in Iran and/or received funding from Iran.

94.     Regarding the designation of Abu Mustafa Al-Sheibani, the Treasury Department press release stated:

> Iran-based Abu Mustafa Al-Sheibani leads a network of Shia extremists that commit and provide logistical and material support for acts of violence that threaten the peace and stability of Iraq and the Government of Iraq. Al-Sheibani's Iran-sponsored network was created to affect the Iraqi political process in Iran's favor. The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers. Its second objective is to eliminate Iraqi politicians opposed to Iran's influence. *Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network.*
>
> Al-Sheibani's network – consisting of several hundred members – conducted IED attacks against Americans in the Baghdad region. As of March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran. *As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad.* In early May 2007, Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.
>
> Additionally, Al-Sheibani commands several pro-Iranian insurgent groups in

southern Iraq that work to destabilize Iraq and sabotage Coalition efforts. These groups use a variety of weapons, to include mortars, Katyusha rockets, and anti-tank landmines. *Ordered by IRGC headquarters to create disorder, the task of these groups is to attack bases of Coalition Forces in southern Iraq, particularly British forces.*

(Emphasis added).

95.     To that end, Iran (with Hezbollah's aid) has armed, trained, and funded a variety of Special Groups and infiltrated and co-opted Iraqi security forces in an effort to kill or maim U.S. nationals, including Plaintiffs, and to coerce the United States into withdrawing those forces and to terrorize Iraq's civilian population in order to increase Iran's own influence.

96.     According to a 2010 report by the Combatting Terrorism Center at West Point, Iran paid Iraqi "insurgent" groups "between $4,000 and $13,000 per rocket or roadside bomb, depending on the circumstances."

97.     Iran did not just act on its own. As part of its strategy of sophisticated and clandestine use of terrorism, Iran preferred not to act directly against the Coalition Forces in Iraq. Rather, Iran relies on various other entities to act on Iran's behalf and at Iran's discretion and guidance. Moreover, without the funding provided to these organizations by Iran, they would not be able to carry out the volume, consistency, frequency, scale, and lethality of the acts of international terrorism they currently, and in the past, routinely perpetrated, including the Terrorist Attacks that killed, maimed, or otherwise injured Plaintiffs or Plaintiffs' family members.

### 1.     Islamic Revolutionary Guard Corps (IRGC)

98.     Even before the U.S. invasion of Iraq in 2003, the IRGC had long cultivated ties to Shi'a opposition groups opposed to Saddam Hussein's brutal regime, including the Badr Corps (discussed in more detail below) that was headquartered in Iran throughout Iraq in the

1980s and the1990s.

99.     The IRGC was founded in the wake of the 1979 revolution as a branch of the Iranian Armed Forces tasked with protecting the country's Islamic system. Since its origin as an ideologically driven militia, the IRGC has taken an ever more assertive role in virtually every aspect of Iranian society. The IRGC is a special entity unto itself, part military force, part paramilitary force, and part business conglomerate.[33] Its expanded social, political, military, and economic role has led many analysts to argue that its political power has surpassed even that of the Shia clerical system.[34]

100.    The IRGC is now a vast conglomerate. It controls Iran's missile batteries, its nuclear program, and a business empire.

101.    The IRGC's subversion of Iraq has not been limited to terrorism.

102.    The IRGC is the spine of the current political structure and a major player in the Iranian economy.[35] It has expanded well beyond its mandate into a socio-military-political-economic force that deeply penetrates Iran's power structure.[36] The IRGC is a central participant in Iran's concerted efforts to sow terror in Iraq.

103.    The IRGC has also infiltrated Iraqi society, providing "political and ideological support" via charitable associations such as the Khomeini Social Help Committee – in Karbala, Najaf, Kut, and Sadr City – and the Imam Mohammad Bagher Institute in Najaf.

---

[33]     ROBER BAER, THE DEVIL WE KNOW: DEALING WITH THE NEW IRANIAN SUPERPOWER 127 (2008).

[34]     Abdo, Geneive, *The Rise of the Iranian Dictatorship*, Foreign Policy Magazine, Oct. 7, 2009.

[35]     Khalaji, Mehdi, *Iran's Revolutionary Guards Corps, Inc.*, Washington Institute for Near East Policy, Aug. 17, 2007.

[36]     Bruno Greg and Jayshree Bajoria, Iran's Revolutionary Guards, Council on Foreign Relations, Oct. 12, 2011.

104.    The IRGC also purchased or developed seven television stations in Iraq, and at least three radio stations.

## 2.    Islamic Revolutionary Guard Corps—Qods Force (IRGC-QF)

105.    The highest echelons of the Iranian government and the highest echelons of Hezbollah have worked together to organize a violent, Shia resistance movement in Iraq. The IRGC-QF, with direct assistance from Iran, has established and funded this movement.

106.    Ayatollah Khomeini established the IRGC-QF in 1979 to protect Iran's Islamic Revolution and export it beyond Iran's borders. The commander of the IRGC-QF reports directly to Iran's Supreme Leader, Ayatollah Ali Khomeini.

107.    The Qods Force is the IRGC unit tasked with extraterritorial operations. It trains and equips Islamic revolutionary groups around the Middle East. The IRGC-QF typically provides this paramilitary instruction in Iran or Sudan. At times, the IRGC-QF plays a more direct role in the military operations of the forces it trains, including pre-attack planning and other operation-specific military advice.

108.    Since 2003, Iran has been materially supporting acts of international terrorism by advising, organizing, training, funding, and equipping FTOs, Special Groups, Ansar al Islam and other terrorists to kill, maim, or otherwise injure U.S. nationals, among others. To do this, Iran enlisted (and continues to enlist) the IRGC-QF to provide such support to these FTOs and Special Groups.

109.    This material support has made these FTOs, Special Groups, Ansar al Islam and other terrorists more effective and lethal than they ever could have been without such assistance.

110.    In October 2007, the United States designated the IRGC-QF a SDGT pursuant to E.O. 13324, explaining that:

The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.

*In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.*

(Emphasis added).

111.    In 2004, the Qods Force began flooding Iraq with EFPs – lethal roadside bombs that fire a molten copper slug capable of piercing armor. These EFPs wreaked havoc on American troops, accounting for nearly twenty percent of U.S. service personnel deaths. EFPs require skilled assembly and rely on sophisticated sensors. According to General Stanley McChrystal, then head of Joint Special Operations Command, "[t]here was zero question where [the EFPs] were coming from. We knew where all the factories were in Iran. The EFPs killed hundreds of Americans."[37]

112.    On October 25, 2007, when the U.S. Department of Treasury designated IRGC-QF as SDGT under E.O. 13224, the Department cited the IRGC-QF's material support to the Taliban, Lebanese Hezbollah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command as evidence of Iran seeking to inflict casualties on U.S. and NATO forces.[38]

113.    IRGC-QF controls and commands Hezbollah, the Lebanese terrorist organization

---

[37]    Dexter Filkins, *The Shadow Commander*, THE NEW YORKER, Sept. 30, 2013, http://www.newyorker.com/magazine/2013/09/30/the-shadow-commander.

[38]    U.S. Department of The Treasury, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism*, Oct. 25, 2007, *available at* https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx.

(described below). Pursuant to instructions from IRGC-QF to form Unit 3800. Unit 3800 was tasked by the IRGC-QF with recruiting, radicalizing and training Iraqi militants and organizing several Iraqi terrorist/insurgency militias, called Special Groups.

114.     According to Brigadier Gen. Kevin J. Bergner, a U.S. military spokesman who previously served as the Deputy Commanding General for MNF-I in Mosul, Iraq, "the Qods Force has provided armor-piercing weapons to extremist groups in Iraq, funneling them up to $3 million a month and training Iraqi militiamen at three camps near Tehran." General Bergner added, "[t]he Iranian Qods Force is using Lebanese Hezbollah essentially as a proxy, as a surrogate in Iraq ... Our intelligence reveals that senior leadership in Iran is aware of this activity."

### 3.     Hezbollah

115.     Iran has had a long, deep, strategic partnership with the Lebanese-based Foreign Terrorist Organization Hezbollah, which historically has served as Iran's proxy and agent, enabling Iran to project extremist violence and terror throughout the Middle East and around the globe.

116.     Hezbollah is probably the most prominent group developed with the assistance of the IRGC-QF.

117.     From its inception, Hezbollah has enjoyed significant financial and material aid from Iran. The IRGC-QF, in particular, played a critical role in Hezbollah's foundation and its funding and training.

118.     On June 25, 2016, the leader of Hezbollah, Sheikh Hassan Nasrallah, claimed that "We are open about the fact that Hezbollah's budget, its income, its expenses, everything it eats and drinks, its weapons and rockets, come from the Islamic Republic of Iran." Nasrallah stated

that, "[a]s long as Iran has money, we have money… Just as we receive the rockets that we use to threaten Israel, we are receiving our money. No law will prevent us from receiving it…"[39]

119.    Through its proxy, agent, and strategic partner Hezbollah, Iran orchestrated a series of kidnappings of Westerners in Lebanon, including several Americans, in the 1980s; killed more than two hundred U.S. Marines at their barracks in Beirut, Lebanon, in 1983; hijacked TWA flight 847 in 1985; and launched two major attacks in the 1990s on Jewish targets in Buenos Aires, Argentina, namely the 1992 bombing of the Israeli Embassy (killing twenty-nine people) and the 1994 bombing of a Jewish community center (killing eighty five people). Hezbollah assisted al Qaeda affiliated terrorists in the Khobar bombings in Saudi Arabia on June 25, 1996 (which killed 19 U.S. service members) and in the bombing of the U.S. embassies in Nairobi and Dar es Salaam on August 7, 1998 (which killed 224 and injured approximately 5000 people).

120.    Hezbollah is a Shi'a Islamist militant group based in Lebanon, funded by Iran, and formed in 1982. Its leaders are followers of Ayatollah Khomeini and Ayatollah Khamenei, and its forces are trained and organized by a contingent of 1,500 Revolutionary Guards. Hezbollah's military strength has grown so significantly that its paramilitary wing, the Jihad Council, is considered more powerful than the Lebanese Army. Hezbollah relied almost exclusively on Iranian largesse, which funds at least $100 to $200 million a year or more.[40] The U.S. Department of State estimates that Hezbollah has tens of thousands of supporters and members worldwide. While Hezbollah is based in the southern suburbs of Beirut, the Bekaa

---

[39]    Majid Rafizadeh, *In first, Hezbollah confirms all financial support comes from Iran*, AL ARABIYA ENGLISH, June 25, 2016, https://english.alarabiya.net/en/2016/06/25/In-first-Hezbollah-s-Nasrallah-confirms-all-financial-support-comes-from-Iran.html

[40]    U.S. Department of Defense, *CDA—Military Power of Iran, Unclassified Report on Military Power of Iran*, Apr. 2010, http://www.fas.org/man/eprint/dod_iran_2010.pdf.

Valley, and southern Lebanon, its activities make evident the group is capable of operating around the globe, particularly in Iraq.

121.    Hezbollah received "massive material and technical support from the Iranian government"[41] in the planning and perpetrating the terrorist attack which killed 241 Marines in Beirut in 1983.

122.    The Iranian regime provides "extensive financial support for terrorists generally and in support for al Qaeda and Hezbollah in particular"[42]

123.    Iran "created Hizballah…[and] has been the sponsor of Hizballah since its inception, providing funding, training, leadership and advice via Hizballah's leadership councils…Hizballah has received from Iran $100 million to $500 million in direct financial support annually…Hizballah served as a terrorist proxy for Iran, created specifically for the purpose of serving as a front for Iranian terrorism, in effect, a cover name for terrorist operations run by Iran's IRGC around the world."[43]

124.    As a result of its mission, conduct, and terrorist activities, on January 25, 1995, Hezbollah was designated a SDT by the United States. It has maintained that designation since that time.

125.    Hezbollah was designated an FTO by the United States on October 8, 1997, and it has retained that designation since that time.

126.    On October 31, 2001, pursuant to E.O. 13224, Hezbollah was designated SDGT by the United States. It has maintained that designation since that time.

---

[41]    *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d. 46, 58 (D. D.C. 2003).

[42]    *In re Terrorist Attacks on September 11, 2001*, No. 03 MDL 1570 (GBD), 2011 U.S. Dist. LEXIS 155899, at *97–98 (S.D.N.Y Dec. 22, 2011).

[43]    *Id.*

127.     According to a December 20, 2004 *Washington Post* article, "Western diplomats and political analysts in Beirut estimated that Hezbollah received *$200 million a year from Iran*." (Emphasis added).

128.     Sometime after the 2003 U.S. invasion of Iraq, Hezbollah created "Unit 3800," an entity dedicated to supporting Iraqi Shi'a terrorist groups targeting Iraqi citizens, and Multi National Forces in Iraq ("MNF-I").

129.     At Iran's request, Hezbollah leader Hassan Nasrallah established Unit 3800.

130.     Unit 3800 has trained and advised various Shi'a militias in Iraq, later termed the Special Groups.

131.     By early 2005, the presence of Hezbollah operatives in Iraq became an open secret when Iraqi Interior Minister Falah al-Naquib announced the arrest of eighteen Lebanese Hezbollah members on terrorism charges.

132.     According to U.S. intelligence estimates—and following the 2007 arrest and interrogation of Hezbollah's senior operative in Iraq—in 2007 the IRGC-QF provided Hezbollah and one of its local trainers, Ali Musa Daqduq (who is discussed in greater detail below), up to $3,000,000.00 in U.S. currency *every month*.

133.     Hezbollah's terrorist attacks include the suicide truck bombings of the U.S. Embassy and U.S. Marine barracks in Beirut in 1983; the U.S. Embassy annex in Beirut in 1984; and the 1985 hijacking of TWA flight 847, during which U.S. Navy diver Robert Stethem was murdered. Elements of the group were responsible for the kidnapping, detention, and murder of Americans and other Westerners in Lebanon in the 1980s. Hezbollah was implicated, along with Iran, in the 1992 attacks on the Israeli Embassy in Argentina and in the 1994 bombing of the Argentine-Israeli Mutual Association in Buenos Aires. In 2000, Hezbollah operatives captured

three Israeli soldiers in the Shebaa Farms area and, separately, kidnapped an Israeli non-combatant in Dubai. Although the non-combatant survived, on November 1, 2001, Israeli Army Rabbi Israel Weiss pronounced the soldiers dead. The surviving non-combatant and the bodies of the Israeli soldiers were returned to Israel in a prisoner exchange with Hezbollah in 2004.[44]

134.    Hezbollah carried out two attacks against UN Interim Force Peacekeepers in Lebanon; an attack in late July 2011 that wounded six French citizens, and a second attack, days later, which injured three French soldiers. Also in 2011, four Hezbollah members were indicted by the UN-based Special Tribunal for Lebanon, an international tribunal investigating the 2005 assassination of Lebanese Prime Minister Rafik Hariri. A fifth Hezbollah member, Hassan Habib Merhi, was indicted in October 2013.

135.    In January 2012, Thai police detained Hezbollah operative Hussein Atris on immigration charges as he was attempting to depart Thailand. Atris, a SDGT, was convicted of possessing bomb-making materials by a Thai court in September 2013 and sentenced to two years and eight months in prison. He was released in September 2014 and is believed to reside in Lebanon. In July 2012, a suspected Hezbollah operative was detained by Cypriot authorities for allegedly helping plan an attack against Israeli tourists on the island. On March 21, 2013, a Cyprus court found the operative guilty of charges based on his surveillance activities of Israeli tourists.

136.    Hezbollah was also responsible for the July 2012 attack on a passenger bus carrying 42 Israeli tourists at the Sarafovo Airport in Bulgaria, near the city of Burgas. The explosion killed five Israelis and one Bulgarian, and injured 32 others.

---

[44]    U.S. Department of State, Office of the Coordinator for Counterterrorism, *Country Reports on Terrorism 2015*, June 2016, at 369, *available at* https://www.state.gov/documents/organization/258249.pdf.

137.    In May 2013, Hezbollah publicly admitted to playing a significant role in the ongoing conflict in Syria, rallying support for Syrian President Bashar al-Assad. Hezbollah's support for the Assad regime continues in 2017.

138.    In 2015, the group also continued its operations against Israel. In January, Hezbollah fired rockets on an Israeli convoy, killing two Israeli soldiers. In a speech in Tehran in August, Hezbollah Deputy Secretary General Shaykh Na'im Qasim declared Israel, the United States, and Takfiri groups as enemies of Islam and urged Muslims to fight against these enemies. In December, Hezbollah leader Nasrallah threatened attacks in revenge for the death of senior Hezbollah militant Samir Kuntar. Nasrallah claimed orders had already been given and fighters on the ground were preparing attacks.

139.    In May 2015, Cypriot authorities arrested dual Lebanese-Canadian national Hussein Bassam Abdallah after finding 8.2 tons of liquid ammonium nitrate in the basement of a residence in Larnaca. Abdallah admitted to Cypriot authorities he was a member of Hezbollah. He was charged on five offenses, including participation in a terrorist organization and providing support to a terrorist organization, by the Republic of Cyprus and sentenced to six years in prison on June 29, 2015.

140.    Iran continues to provide Hezbollah with funding, training, weapons, and explosives, as well as political, diplomatic, monetary, and organizational aid. Such support and material is crucial to Hezbollah's continued terrorist operations. Moreover, the support is substantial.

141.    United States District Courts have found in numerous lawsuits related to international acts of terrorism sponsored or directed by Iran that Hezbollah is, in fact, an arm of the IRGC and a key component to Iran's *modus operandi* of sponsoring and/or directing

international terrorism aimed primarily against the United States and its allies.[45]

142.    Hezbollah training camps in southern Lebanon and Iran, and Hezbollah's expertise in the use of EFPs, kidnapping, communications and small-unit operations, were critical to the IRGC's operations in Iraq during the Relevant Period.

### 4.    Iran's Ministry of Defense and Armed Forces Logistics

143.    In October 2007, the United States designated Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL") as a FTO stating it controls the Defense Industries Organization, an Iranian entity identified in the Annex to UN Security Council Resolution 1737 and designated by the United States under E.O. 13382 on March 30, 2007.

144.    MODAFL is the principal procurement arm of Iran's military and terror apparatus.

145.    MODAFL operates the [Iran] Aviation Industries Organization ("IAIO"), the Aerospace Industries Organization ("AIO") and the Defense Industries Organization ("DIO"). MODAFL was designated by the United States on October 25, 2007.

146.    The AIO was designated on June 28, 2005 for weapons proliferation.

147.    The MAPNA group is also a key component of MODAFL and the IRGC's procurement chain.

148.    Abbas Aliaabadi, Chairman of MAPNA International FZE and President of the MAPNA Group, is a former member of the Iranian Ministry of Construction Jihad and of the Iranian Air Force. Aliaabadi was also a key member of the Ministry of Culture & Islamic Guidance instrumental in the creation of Hezbollah and has close links to the IRGC.

---

[45]    *See, e.g., Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 135–36 (D. D.C. 2011); *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 55 F. Supp. 3d 189, 197 (D. D.C. 2014).

149.     Pursuant to the Arms Export Control Act and the Export Administration Act, MODAFL was sanctioned in November 2000 for its involvement in missile technology proliferation activities.

150.     The U.S. government explained the basis for the designation as follows:

The Ministry of Defense and Armed Forces Logistics (MODAFL) controls the Defense Industries Organization, an Iranian entity identified in the Annex to UN Security Council Resolution 1737 and designated by the United States under E.O. 13382 on March 30, 2007. MODAFL also was sanctioned, pursuant to the Arms Export Control Act and the Export Administration Act, in November 2000 for its involvement in missile technology proliferation activities.

MODAFL has ultimate authority over Iran's Aerospace Industries Organization (AIO), which was designated under E.O. 13382 on June 28, 2005. The AIO is the Iranian organization responsible for ballistic missile research, development and production activities and organizations, including the Shahid Hemmat Industries Group and the Shahid Bakeri Industries Group, which were both listed under UN Security Council Resolution 1737 and designated under E.O. 13382. The head of MODAFL has publicly indicated Iran's willingness to continue to work on ballistic missiles. Defense Minister Brigadier General Mostafa Mohammad Najjar said that one of MODAFL's major projects is the manufacturing of Shahab-3 missiles and that it will not be halted. MODAFL representatives have acted as facilitators for Iranian assistance to an E.O. 13382-designated entity and, over the past two years, have brokered a number of transactions involving materials and technologies with ballistic missile applications.

151.     Formally, the IRGC is a subordinate directorate of MODAFL.

152.     The IRGC uses MODAFL to both procure and develop weapons and equipment for its use.

153.     The DIO, the AIO, and Defense Technology and Science Research Centre are all subordinate to MODAFL, giving it operational control over Iran's ballistic missile development program.[46]

154.     MODAFL entities' illicit procurement activities have resulted in a series of

---

[46]     STEVEN R. WARD, *Immortal: A Military History of Iran and Its Armed Forces* 320 (2009).

ongoing U.S. sanctions.[47]

155.    Moreover, Iran continues to provide material support, including resources and guidance, to multiple terrorist organizations and Special Groups, including all of the terrorist groups that perpetrated the acts of international terrorism complained herein, that undermine the stability of the Middle East and Central Asia. [48] The Special groups that Iran provides material resources and support to include multiple Shia, and some Sunni, terror groups in Iraq, including but not limited to, Kata'ib Hizballah ("KH"); Asa'ib Ahl Al Haq ("AAH"); Jaysch al Mahdi ("JAM"); Badr Organization ("Badr"); and The Taliban. Tellingly, Hamas, Lebanese Hezbollah, and the Palestinian Islamic Jihad maintain representative offices in Tehran, in part to help coordinate Iranian financing and training.[49]

### 5.    Ansar al Islam

156.    From its beginning, Iran did not confine its support of anti-U.S. national fighters to Shia groups. Iran also supported Ansar al Islam ("AAI"), a radical terrorist group with close ties to al Qaeda.

157.    In the 1990s, al Qaeda developed a close relationship with Iran and the IRGC. Usama bin Laden and Ayman al Zawahiri held clandestine meetings with Imad Mughniyah and AHMAD Vahidi (then commander of IRGC Qoods Force) which "lead to an informal agreement to cooperate in providing support for actions carried out primarily against Israel and the United States…Thereafter, senior al Qaeda operatives and trainers traveled to Iran to receive training in explosives. Usama bin Laden also sent senior aides to Iran for training with the IRGC and to

---

[47]    The United States has sanctioned MODAFL pursuant to the Arms Export Control Act, the Export Administration Act (in November 2000), and Executive Order 13382 (in October 2007).

[48]    United States Department of State, *2016 International Narcotics Control Strategy Report*, https://www.state.gov/j/inl/rls/nrcrpt/2016/vol2/253407.htm.

[49]    *Id.*

Lebanon for training with Hizballah.[50]

158.    AAI is a Kurdish Sunni Muslim insurgent group and separatist movement in Iraq with well-established ties to al-Qaeda and Iran. Although the group's initial membership was primarily Kurdish, it grew to comprise a large number of Sunni Arabs, including Iraqis, Saudis, and Yeminis.

159.    Mullah Krekar, aka Faraj Ahmad Najmuddin, reportedly founded Ansar al Islam in December 2001 (at that time, with funding and logistical support from al-Qaeda and Usama bin Laden). However, the group has significant, life-sustaining ties to Iran.

160.    AAI seeks to transform Iraq into an Islamic state. AAI operates primarily in northern Iraq, but maintains a presence in western and central Iraq. AAI expanded its operations into Syria in 2011.

161.    AAI has a number of aliases, including Ansar al-Sunna; Ansar al-Sunna Army; Devotees of Islam; Followers of Islam in Kurdistan; Helpers of Islam; Jaish Ansar al-Sunna; Jund al-Islam; Kurdish Taliban; Kurdistan Supporters of Islam; Partisans of Islam; Soldiers of God; Soldiers of Islam; Supporters of Islam in Kurdistan

162.    AAI was established in 2001 in Iraqi Kurdistan with the merger of two violent Kurdish extremist factions that traced their roots to the Islamic Movement of Kurdistan. AAI seeks to expel western interests from Iraq and establish an independent Iraqi state based on its interpretation of Sharia law. AAI has been mostly active in the northern party of Iraq, western Iraq-Anbar province, and in the areas surrounding and including Mosul and Kirkuk since 2003.

163.    In 2001, AAI seized control of several villages near the town of Halabja and established an administration ruled by Shari'a Law. As part of Operation Iraqi Freedom,

---

[50]    *In re Terrorist Attacks on September 11, 2001*, 2011 U.S. Dist. LEXIS 155899, at *110–11.

Coalition and Kurdish forces routed AAI from northern Iraq.

164.     Coalition airstrikes destroyed AAI's base in northern Iraq (Iraqi Kurdistan) in late March 2003, and the majority of AAI members fled across the border and regrouped in Iran with the assistance of the IRGC and the Iranian regime. Counterterrorist operations suggest many of those fighters reentered Iraq and took active part in anti-Coalition activities. From Iran, the group continued to operate under leader Abu Abdullah Shafi's leadership and was temporarily renamed Ansar al-Sunna (although it officially re-adopted the name Ansar al-Islam in 2007).

165.     Shortly after the U.S.-led invasion of Iraq in March 2003, the Kurdistan Regional Government ("KRG") and Coalition troops launched an offensive against Ansar al Islam in Iraqi Kurdistan. The majority of AAI members were captured, killed, or fled to neighboring Iran. Mullah Krekar fled to Norway where he has remained ever since. In his place, Abu Abdullah al-Shafi, also known as Warba Holiri al-Kurdi, assumed command of the remnants of the organization. From Iran, the group continued to operate under Shafi's leadership and was temporarily renamed Ansar al-Sunna (it officially re-adopted the name Ansar al Islam in 2007).

166.     During the summer of 2004, the jihadists began migrating back into Iraq. A large number of the returning jihadists chose to settle in Mosul. In October 2004, coalition forces in Mosul captured a senior Ansar leader, Aso Hawleri. A week later, Lt. Gen. Norton Schwartz, who at the time was Director, the Joint Staff, Pentagon (and from 2008-2012 was Chief of Staff of the Air Force), warned that Ansar al Islam had reemerged as the coalition's "principal organized terrorist adversary in Iraq."

167.     From 2003-2007, AAI continued to target Coalition Forces and U.S. Nationals, including Plaintiffs. Its deadliest attack during this period occurred on February 1, 2004, when it launched multiple simultaneous suicide car bombings at PUK offices in Erbil, killing over 100

civilians and injuring over 130 more. By February 2007, AAI had claimed responsibility for over 1,600 attacks in Iraq, including against American nationals AAI openly cooperated with Al Qaeda in Iraq ("AQI"); however, it adamantly refused to formally join the Islamic State of Iraq, which was an umbrella organization established by AQI. Instead, in May 2007, AAI joined with the Mujahideen Army, the Islamic Army in Iraq, and Ansar al-Sunna Shariah (a splinter group that had broken from AAI in early 2007 because its members wished to take a harder line against AQI) to form an anti-Coalition umbrella organization called the Reformation and Jihad Front ("RJF"). The RJF was a pan-Islamist organization that challenged AQI for leadership of the Iraqi Sunni Islamist movement.

168.    AAI claimed responsibility for the beheading of 12 Nepalese hostages and the kidnapping and beheading of an Iraqi who was employed as a mechanic for the American forces at the Mosul airport. AAI targeted Iraqi Kurds for alleged collaboration with the U.S. In September 2003, members of the Jaysch Ansar al-Sunna beheaded three Iraqi Kurdish militiamen in retaliation for the cooperation by Kurdish political parties with the U.S. in Iraq.

169.    U.S. and British intelligence reports in 2004 "concluded that [AAI] was working closely with Iran, and also al Qaeda, in its terrorist attacks against coalition forces." One British defense report noted "Intelligence indicates that elements of Iran's [IRGC-QF] 'are providing safe haven and basic training to Iran-based [AAI] cadres.'" (brackets in original).[51]

170.    On December 21, 2004, AAI subgroup Jamaat Ansar al-Sunna launched a suicide bomb attack on Forward Operating Base Marez in Mosul, Iraq. AAI insurgent Abu Museli, disguised as an Iraqi Security Services officer, entered the base mess tent and detonated the explosive vest he was wearing. The blast killed fourteen U.S. soldiers, four U.S. citizen

---

[51]    Edward T. Pound, *Special Report: The Iran Connection*, U.S. News and World Report, Nov. 14, 2004.

Halliburton employees, and four Iraqi soldiers allied with the U.S. military. An additional fifty-one U.S. soldiers and twenty-one others sustained non-fatal injuries. AAI, through Jamaat Ansar al-Sunna, claimed credit for the attack. This Terrorist Attack resulted in the death, maiming or injury of certain Plaintiffs, who are referred to below.

171.    Another British intelligence source "said that Iranian government agencies were also secretly helping [AAI] members cross into Iraq from Iran, as part of a plan to mount sniper attacks against coalition forces."[52] American sources confirmed this information, adding that "an Iranian was aiding [AAI] 'on how to build and set up' IED's.[53]

172.    In February 2004, Kurdish intelligence officials uncovered a cache of Syrian, Yemeni, and Saudi passports—all bearing Iranian entry stamps—in an Ansar al Islam safe-house on the Iranian side of the border. The fact the passports found had Iranian stamps on them indicated the terrorists did not secretly infiltrate into Iran, but that they entered with the cognizance and full knowledge of the Iranian authorities. According to Iraqi intelligence officers, captured Ansar al-Sunna militants have admitted to receiving assistance from Iranian officials.

173.    Iran played a significant role in supporting Ansar al Islam. Iran openly allowed the group to operate along its borders despite the group's alleged affiliation with the al-Qaeda network. Ansar al Islam was tasked with conducting checks on cars leaving their stronghold to going into Iran, indicating coordination with the Islamic Republic.

174.    According to a document from Iraqi intelligence dated June 13, 2002, and seized by U.S. forces in Iraq, it was reported from a trust worthy source that Mullah Kraykar (Krekar), the head of the Ansar al Islam organization arrived in Iran for negotiations with several Iranian officials. The information indicated that the purpose of the visit was to confirm a unified strategy

---

[52]     *Id*.

[53]     *Id*.

and to guarantee continuous Iranian support to that group.

175. According to other sources Mullah Krekar, spent many years in Iran and was arrested in Amsterdam after a flight from Tehran.

176. AAI operations decreased substantially by 2006, but the group continued to maintain an extensive support and financial infrastructure in Europe that it used to recruit and send jihadis to Iraq.

177. Over the course of 2007-2008, AAI moved increasingly away from the RJF and strengthened its ties to AQI. It coordinated with AQI on several attacks against U.S. and PUK troops and began to adopt AQI's hardline attitude against Sunni Iraqis who worked for the U.S. or Iraqi governments.

178. On May 4, 2010, AAI's leader Abu Abdullah al-Shafi was captured by U.S. forces in Baghdad and remains in prison. On December 15, 2011, AAI announced a new leader: Abu Hashim Muhammad bin Abdul Rahman al Ibrahim. In March 2012, a Norwegian court convicted Iraqi citizen and AAI founder Mullah Krekar (aka Najmuddin Faraj Ahmad) of issuing threats and inciting terrorism, and sentenced him to six years in prison. Living in Norway on a long-term resident permit, Krekar appealed, and in December 2012, an appeals court affirmed his convictions for issuing threats and intimidating witnesses, but reversed his conviction for inciting terrorism. The appeals court reduced his prison sentence to two years and 10 months. He was released from prison in late January 2015, but was arrested again shortly after for praising the January 2015 Charlie Hebdo attacks in Paris in a TV interview.

179. AAI has conducted attacks against a wide range of targets including Iraqi government and security forces, as well as U.S. and Coalition Forces and U.S. nationals, including Plaintiffs. AAI has conducted numerous kidnappings, executions, and assassinations of

Iraqi citizens and politicians. The group has either claimed responsibility or is believed to be responsible for attacks in 2011 that resulted in 24 deaths and wounded 147. In 2012, the group claimed responsibility for the bombing of the Sons of Martyrs School in Damascus, which was occupied by Syrian security forces and pro-government militias; seven people were wounded in the attack. In 2014, AAI claimed responsibility for attacks near Kirkuk, Tikrit, and Mosul, Iraq; primarily directed against Iraqi police and security forces and, in one instance, an oil field.

180.    The U.S. Department of Treasury designated AAI a Specially Designated Terrorist Group under E.O 13224 on 20 February 2003. The U.S. Department of State designated AAI a FTO on March 22, 2004.

181.    Australia, New Zealand, Canada, and the European Union have designated AAI as terrorist organization. The U.S. Treasury Department designated Mullah Krekar an individual providing assistance to terrorism and thus subject to having all international assets frozen in December 2006.

## C.    Special Groups

182.    Iran opposes U.S. peacekeeping efforts and initiated acts of international terrorism against U.S. nationals, Coalition Forces, and Iraqi citizens with the goals of destabilizing Iraq and increasing Iranian influence in that country.

183.    Iran, through its proxies and/or agents acting within the scope of their employment, agency, and direction from Iran, provided substantial material support and/or resources that facilitated acts of torture, extrajudicial killing and hostage taking that caused personal injury or death to more than one thousand Americans in Iraq.

184.    Iran's support for the Special Groups is both clear and disturbing. The IRGC-QF attempted to develop the Special Groups into a network similar to Hezbollah – a highly-lethal

network that relied upon the Iranian regime to survive.[54] The purpose of the IRGC-QF in developing these Special Groups was to create highly lethal networks that relied upon the Iranian regime to survive, and thus, were controlled, either directly or indirectly, by Iran.

185.    Iran leveraged (and continues to do so) its control and dominion over the IRGC, the IRGC-QF, and Hezbollah, and through those entities, provided the Special Groups with training (in Iran), weapons, safe harbor, U.S. currency, and intelligence, including those Special Groups responsible for the Terrorist Attacks which killed, maimed, or otherwise injured Plaintiffs.[55] The training provided to the Special Groups while they were in Iran included tactics and technology to conduct kidnappings, small unit tactical operations, and employ sophisticated IEDs.[56]

186.    These Special Groups returned to Iraq after receiving their Iran-supported training, maintaining their group's organization. Thus, each Special Group consisted of Iraqi civilians who train together in Iran in how to use IEDs, EFPs, mortars, rockets, as well as intelligence, sniper, and kidnapping operations.[57]

187.    The Special Groups operate throughout Iraq and, at all relevant times, remained under the control of Iran, through its proxies and/or agents, the IRGC, the IRGC-QF, and Hezbollah.

188.    During the Relevant Period, the IRGC-QF supplied the Special Groups with an estimated funding stream of *at least* between $750,000 to $3 million (U.S. Dollars) a month.

---

[54]    Press Briefing by Multi-National Force-Iraq Deputy Chief of Staff for Strategic Effects Brigadier General Kevin Bergner, Security Operations in Iraq.

[55]    U.S. Department of Defense, *CDA—Military Power of Iran, Unclassified Report on Military Power of Iran*, at 3, Apr. 2010, http://www.fas.org/man/eprint/dod_iran_2010.pdf.

[56]    U.S. Department of Defense, *Iranian Government Behind Shipping Weapons to Iraq*, http://www.defense.gov/news/newsarticle.aspx?id=1289.

[57]    July 2, 2007 Press Briefing by Brigadier General Kevin Bergner.

189.    Utilizing the training, weapons and funding provided by Defendant, either directly or indirectly, the Special Groups planned and executed a string of bombings, kidnappings, sectarian murders, and more against Iraqi civilians, Coalition Forces and U.S. nationals, including Plaintiffs.

190.    Although U.S. policy (supported by U.N. Security Council resolutions) was to establish peace and stability in Iraq in the hopes of establishing a democratic government, Iran viewed the U.S. and international peacekeeping efforts in Iraq as a potential threat to its regime.

191.    Rather than cooperate with the United States and Coalition Forces authorized by the U.N. to bring peace, democracy and stability to Iran, or alternatively to openly and directly engage in armed conflict with the U.S. or other Coalition Forces, Iran chose to undermine U.S. and U.N. peacekeeping efforts by unleashing massive waves of terrorism and sectarian violence in Iraq and, in part, by targeting U.S. Nationals, including Plaintiffs, through the Special Groups that Iran controlled.

192.    President Bush declared on May 1, 2003, that "major combat operations in Iraq have ended."

193.    On May 23, 2003, the Coalition Provisional Authority established as the interim government for Iraq disbanded the Iraqi military forces.

194.    The U.N. Security Council authorized the post-conflict occupation of Iraq by Coalition Forces in October 2003 to maintain "security and stability." S.C. Res. 1511, ¶ 13, U.N. Doc. S/RES/1511 (Oct. 16, 2003).

195.    After 2003, the IRGC inserted hundreds of its Iranian-trained operatives into Iraq's state security organs (notably the Ministry of Interior intelligence structure) in part

through its influence within the Badr Organization (discussed further below).

196.     In addition to its coordination with the Badr Organization, Iran, through its agent the IRGC-QF, formed the Ramezan Corps intended to operate specifically in Iraq.

197.     The Ramezan Corps cultivated, armed, trained and supported several Shi'a terror groups in Iraq that the U.S. military later termed "Special Groups."

198.     Although a June 7, 2004 U.N. Security Council Resolution (S.C. Res. 1546, U.N. Doc. S/RES/1546) expressly assigned Coalition Forces in Iraq the task of helping Iraq "*by preventing and deterring terrorism*," Iran set out to target Coalition Forces and U.S. nationals, including Plaintiffs, and force them out of Iraq.

199.     After Coalition Forces invaded, Iranian intelligence services penetrated Iraq rapidly and thoroughly. The thrust of their collection efforts was finding out what weapons U.S. troops were carrying and what kind of body armor they were wearing. Iranian agents also sought information on the location of U.S. Army and intelligence bases; on the routes traveled by U.S. convoys; on the operations of the Special Forces' elite Delta Force; and on the plans of the U.S. military and intelligence inside Iraq. The Iranians preferred not to be directly implicated in attacks on U.S. forces, but instead offered bounties to Iraqis for killing Americans, shooting down U.S. helicopters, and destroying American tanks.[58]

200.     The number and sophistication of Special Groups increased in 2005, as the Iranian regime deployed Hezbollah to train Iraqi civilians in Iran.

201.     In 2007, the Special Groups further escalated the number of mortar and rocket attacks against U.S. national targets, including Plaintiffs, in the Baghdad International Zone. The accuracy of this indirect fire improved because of the training and weapons these Special Groups

---

[58]     *See supra* fn. 24.

received from Iran. [59]

202.    In sum, from October 16, 2003 onward, even though U.S. military personnel in Iraq were participants in an internationally recognized peace keeping mission, Iran embarked on a policy of terrorism, extrajudicial killings and murder, kidnapping and torture to thwart those efforts.

203.    During the Relevant Period, the conduct of, the IRGC, the IRGC-QF, Hezbollah, Ansar al Islam, the Special Groups and other Iranian supported terrorists in the extrajudicial killing, injuring, and kidnapping and hostage taking of U.S. nationals, Coalition Forces, and civilians were conducted by operatives who did not carry fixed distinctive signs recognizable at a distance, carry arms openly, conduct their operations in accordance with the laws and customs of war, or enjoy any form of combatant immunity for their acts. In fact, Hezbollah, the IRGC, IRGC-QF, Ansar al Islam, the Special Groups and other Iranian supported terrorists acted in flagrant violation of, *inter alia*, the Geneva Convention Articles 48, 51(2)[60] and 52(2) of Additional Protocol I; Article 4(2)(d) of Additional Protocol II[61] and Article 147 of the Geneva Convention on the Protection of Civilian Persons in Time of War (Fourth Geneva Convention 1949) as well as United Nations Security Council Resolution 1373.[62]

---

[59]    U.S. Department of Defense Special Briefing by Lieutenant General Ray Odierno, U.S. Army, Commander, Multi-National Corps-Iraq, *Operation Phantom Thunder* (June 22, 2007).

[60]    Article 51(2) of Additional Protocol I prohibits acts or threats of violence the primary purpose of which is to spread terror among the civilian population.

[61]    The prohibition of acts or threats of violence aimed at terrorizing the civilian population is further supported by the wider prohibition of acts of terrorism in Article 4(2)(d) of Additional Protocol II. The UN Secretary-General noted that violations of Article 4 of Additional Protocol II have long been considered violations of customary international law.  UN Secretary-General, *Report on the establishment of a Special Court for Sierra Leone*; ICTR Statute, Article 4(d) (cited in Vol. II, Ch. 1, § 545).

[62]    Prevention and Suppression of Financing Terrorist Acts, passed unanimous by the

204.    Because of the perceived unreliability and value of the post-Hussein regime Iraqi currency, Special Groups and other terrorists in Iraq used U.S. currency almost exclusively.

205.    Iran facilitated and enabled the terrorist attacks launched against U.S. Nationals, including the Plaintiffs, and others on a massive scale which would not have been possible without Iran's provision of hundreds of thousands of munitions, advanced technologies, training, funding, intelligence, safe harbor and other material support detailed herein.

206.    Without the massive Iranian funding and material support, Special Groups and other Iranian proxies would not have been able to conduct the thousands of acts of international terrorism on the scale and with the lethality they achieved, including the Terrorist Attacks which resulted in the deaths, maiming, or otherwise injuring of Plaintiffs and Plaintiffs' family members.[63]

### 1.    The Badr Corps/Badr Organization

207.    The Badr Corps was established in 1982 in Iran as the military wing of the Supreme Council for Islamic Revolution in Iraq.

208.    From its headquarters in Iran, the Badr Corps operated extensive networks throughout Iraq in the 1990s. The group smuggled men and weapons into Iraq to conduct attacks against the Iraqi regime of Saddam Hussein.

209.    Like Hezbollah, the Badr Corps established clandestine offices in businesses and social organizations in Iraq.

210.    The Badr Corps also used Iraqi front companies to recruit operatives, collect intelligence, and circulate propaganda materials in Shi'a populated areas.

---

U.N. Security Council on September 28, 2001.

[63]    Press Briefing by Brigadier General Kevin Bergner, *Security Operations in Iraq* (July 2, 2007).

211.     Before 2003, the Badr Corps served as Iran's most important surrogate inside Iraq, acting as a *de facto* arm of the IRGC-QF.

212.     The Badr Corps received training and weapons from Iraq through the IRGC and Hezbollah.

213.     After Saddam Hussein's overthrow in 2003, the Badr Corps renamed itself the Badr Organization, and many of its operatives joined the newly formed Iraqi security forces.

214.     Published reports indicate that thousands of members of the Badr Organization remained on the IRGC-QF payroll after 2004.

215.     Several senior BADR Corps operatives later emerged as key conduits for funneling weapons to Iranian Proxies in Iraq from 2004 through at least 2011, including Abu Mustafa al-Sheibani, a key smuggler of deadly Iranian IEDs, and Jamal Ja'far Muhammad, a/k/a Abu Mahdi al-Muhandis (a/k/a "The Engineer"), who later led Kata'ib Hizballah.

216.     "Department 1000" of the IRGC-QF, known as the Ramezan Corps, is in charge of Iraqi operations and remains the largest Qods Force command outside of Iran. It coordinated, armed, and influenced the Badr Organization.

217.     Although the Badr Organization evolved into a major political organization with seats in the new Iraqi parliament, it also played a significant role in facilitating Special Groups' operations in Iraq. A number of Special Groups commanders such as Al-Muhandis are, or were, Badr Corp agents and operatives.

218.     It was through the Badr Corp that the IRGC inserted hundreds of its Iranian-trained operatives into Iraq's state security organs (e.g. the Iraqi Ministry of Interior Intelligence structure) during the Relevant Period.

## 2.    Kata'ib Hizballah

219.    Kata'ib Hizballah ("KH") has functioned as Iran's go-to terror group in Iraq and received support from Lebanese Hezbollah, including training in weapons use; IED construction and operation; and sniper, rocket, and mortar attacks. KH is a radical Shia Islamist group, an Iraqi terrorist organization, and an anti-Western establishment responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since 2007. KH has ideological ties to Lebanese Hezbollah and may have received support from that group.

220.    KH has a number of aliases, including Hezbollah Brigades; Hezbollah Brigades in Iraq; Hezbollah Brigades-Iraq; KH; Kata 'ib Hezbollah; Kheta'ib Hezbollah; Khattab Hezballah; Hezbollah Brigades-Iraq of the Islamic Resistance in Iraq; Islamic Resistance in Iraq; Kata'ib Hizballah Fi al-Iraq; Katibat Abu Fathel al-A'abas; Katibat Zayd Ebin Ali; Katibut Karbalah.

221.    KH was formed in 2006 and came to prominence in 2007 for attacks against Coalition Forces and U.S. nationals, including Plaintiffs, and its online propagandizing of those attacks. The IRGC-QF established it as a vehicle to deploy its most experienced operators and its most sensitive equipment. Historically, KH operated mainly in Shi'a areas of Baghdad, such as Sadr City, and throughout the south.

222.    The IRGC-QF positioned one of its own, Abu Mahdi al-Muhandis (aka Jamal al-Ibrahimi), as the leader of KH. Under al-Muhandis, KH developed as a compact movement of less than 400 personnel that is firmly under IRGC Qods Force control and maintains relatively good operational security.

223.    In June 2011, five U.S. soldiers were killed in a rocket attack in Baghdad when KH assailants fired between three and five rockets at U.S. military base Camp Victory.

224.    In 2015, Iran continued to be deeply involved in the conflict in Syria, working

closely with the Assad regime to counter the Syrian opposition, and also in Iraq where Iran continued to provide support to militia groups, including the FTO KH. Iranian-backed groups, including KH, continued to operate in Iraq during 2015, which exacerbated sectarian tensions in Iraq and contributed to human rights abuses against primarily Sunni civilians. KH and other Iraqi Shia militias associated with the IRGC have been brought into the Iraqi government's Popular Mobilization Forces. The inclusion of KH, a designated FTO, in the Popular Mobilization Forces enlisted by the Iraqi Government in the effort against the Islamic State of Iraq and the Levant ("ISIL" aka "ISIS" or "Daesh"), threatens to undermine counterterrorism objectives.

225.    On June 24, 2009, the United States designated KH an FTO.

226.    The State Department's notice of KH's FTO designation stated that:

The organization has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks, and sniper operations. Kata'ib Hizbollah [sic] also targeted the International Zone in Baghdad in a November 29, 2008 rocket attack that killed two UN workers. In addition, KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.

227.    KH was simultaneously designated an SDGT under E.O. 13224, because it was "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since 2007."

228.    The U.S. Treasury Department also designated KH pursuant to E.O. 13438. The Treasury Department's 2009 press release announcing KH's designation explained that KH had "committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces...." The press release also quoted then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey as stating "[t]hese designations play a critical role in our efforts to protect Coalition troops, Iraqi security forces, and civilians from those who use violence against innocents to intimidate and to undermine a free and prosperous Iraq." The Treasury press release also stated: "[f]urther, the IRGC-Qods Force

provides lethal support to KH and other Iraqi Shia militia groups who target and kill Coalition and Iraqi Security Forces." The 2009 press release further reported that between March 2007 and June 2008, KH led a number of attacks against U.S. forces in Iraq, advising:

> As of 2008, Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training--to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks--to Kata'ib Hizballah members in Iran.

229.    Furthermore, the 2009 U.S. Treasury Department press release noted:

> Recordings made by Kata'ib Hizballah for release to the public as propaganda videos further demonstrate that Kata'ib Hizballah conducted attacks against Coalition Forces. In mid-August 2008, Coalition Forces seized four hard drives from a storage facility associated with a Kata'ib Hizballah media facilitator. The four hard drives included approximately 1,200 videos showing Kata'ib Hizballah's sophisticated planning and attack tactics, techniques, and procedures, and Kata'ib Hizballah's use of the most lethal weapons--including RPG-29s, IRAMs, and EFPs--against Coalition Forces in Iraq.

230.    One of the hard drives contained 35 attack videos edited with the KH logo in the top right corner. Additionally, between February and September 2008, Al-Manar in Beirut, Lebanon, broadcast several videos showing KH conducting multiple attacks against U.S. nationals and Coalition Forces in Iraq.

231.    Immediately preceding the Government of Iraq's approval of the United States-Iraq security agreement in late November 2008, KH posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks against the Government of Iraq if it signed the security agreement with the United States.

232.    In 2008, the U.S. Department of Defense described the linkages it found between KH, Iran, and multiple terrorist attacks against U.S. nationals in Iraq—including KH's use of EFPs:

> [A]lso known as Hezbollah Brigades, is a terrorist group believed to receive

49

funding, training, logistics and material support from Iran to attack Iraqi and coalition forces using what the military calls 'explosively formed penetrators' – roadside bombs designed to pierce armor-hulled vehicles – and other weapons such as rocket-assisted mortars.

233.    As noted above—and as stated by the U.S. Treasury Department in its July 2009 press release—throughout 2008, Al-Manar, Lebanon Hezbollah's official television outlet in Lebanon (and itself a designated SDGT since May 2006), played numerous videos of KH launching rocket and IED attacks against U.S. troops. In this manner, Hezbollah helped publicize KH's activities and increase its profile among leading Shi'a terrorist groups.

234.    Although KH's leadership remains in flux, one individual reportedly associated with the group is Abu Mahdi al-Muhandis. According to an inquiry published by Kuwaiti daily al-Rai on June 4 2016, during the 80's, Abu Mahdi al-Muhandis received an Iranian citizenship from the Iranian regime as part of his prominent role in the Badr Corps.[64]

235.    KH's leader, Abu Mahdi al-Muhandis, is wanted in Kuwait for his alleged role in the 1983 bombings of the American and French embassies in Kuwait City, as well as for his alleged involvement in the assassination attempt on the Kuwaiti Emir in 1985. In an interview to Hezbollah-affiliated media on January 3 2017, Abu Mahdi al-Muhandi admitted himself that he cooperated with Hezbollah top commanders Imad Moughniyeh and Mustafa Badreddine from the early 80's. According to him, this cooperation included training opposition Iraqi Shiite groups to fight Saddam Hussein regime and the U.S. troops in Iraq from 2003.[65]

236.    The U.S. Treasury Department designated al-Muhandis an SDGT in July 2009, and announced the designation in the same press release announcing KH's designation. That

[64]    http://www.alraimedia.com/ar/article/special-reports/2016/06/04/684698/nr/nc (Arabic translation available).
[65]    Middle East Media Research Institute TV Monitor Project, Clip #5829, *available at* https://www.memri.org/tv/abu-mahdi-al-muhandis-deputy-commander-popular-mobilization-units-optimism-over-liberation-mosul.

press release stated:

> As of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The groups received training in guerilla warfare, handling bombs and explosives, and employing weapons--to include missiles, mortars, and sniper rifles. In another instance as of September 2007, al-Muhandis led networks that moved ammunition and weapons--to include explosively formed penetrators (EFPs)--from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces. As of mid-February 2007, al-Muhandis also ran a weapons smuggling network that moved sniper rifles through the Iran-Iraq border to Shia militias that targeted Coalition Forces. Al-Muhandis also provided logistical support for attacks against Iraqi Security Forces and Coalition Forces conducted by JAM Special Groups and certain Shia militias. In one instance, in April 2008, al-Muhandis facilitated the entry of trucks--containing mortars, Katyusha rockets, EFPs, and other explosive devices--from Iran to Iraq that were then delivered to JAM Special Groups in Sadr City, Baghdad. Additionally, al-Muhandis organized numerous weapons shipments to supply JAM Special Groups who were fighting Iraqi Security Forces in the Basrah and Maysan provinces during late March-early April 2008.

> In addition to facilitating weapons shipments to JAM Special Groups and certain Shia militias, al-Muhandis facilitated the movement and training of Iraq-based Shia militia members to prepare them to attack Coalition Forces. In one instance in November 2007, al-Muhandis sent JAM Special Groups members to Iran to undergo a training course in using sniper rifles. Upon completion of the training course, the JAM Special Groups members had planned to return to Iraq and carry out special operations against Coalition Forces. Additionally, in early March 2007, al-Muhandis sent certain Shia militia members to Iran for training in guerilla warfare, light arms, marksmanship, improvised explosive devices (IED) and anti-aircraft missiles to increase the combat ability of the militias to fight Coalition Forces.

> In addition to the reasons for which he is being designated today, al-Muhandis participated in the bombing of Western embassies in Kuwait and the attempted assassination of the Emir of Kuwait in the early 1980s. Al-Muhandis was subsequently convicted in absentia by the Kuwaiti government for his role in the bombing and attempted assassination.

237.   In a July 2010 press briefing, U.S. General Ray Odierno identified KH as the group behind increased threats to U.S. bases in Iraq. General Odierno confirmed that KH operatives had gone to Iran for special training and then returned to Iraq. General Odierno stated, "[T]hey are clearly connected to Iranian IRGC."

### 3.      Jaysch al Mahdi &The Promised Day Brigades.

238.      Jaysh al Mahdi ("JAM" or the "Mahdi Army") was established by radical Shi'a cleric Muqtada al-Sadr in June 2003. On April 18, 2004, it led the first major armed confrontation by Shi'a militia against U.S.-led forces in Iraq.

239.      JAM was co-founded by Imad Mughniyah, once the terrorism chief of Hezbollah and "an agent of Iran and a direct role in Iran's sponsorship oif terrorist activities."[66]   Prior to September 11, 2001, Mughniyah was ranked number one on the FBI's most wanted list for leading the attacks which killed 183 Marines in the bombing of the Holiday Inn in Beirut, the hijacking of a TWA plane and murder of a U.S. Navy diver, and the bombing of the U.S. Embassy in Beirut (replaced as number one most wanted by Usama bin Laden).

240.      JAM expanded its territorial control of mixed or predominantly Shi'a neighborhoods and displaced or killed the local Sunni population.

241.      JAM was able to gain initial control in many of the neighborhoods in and around Baghdad (such as Sadr City) by offering the Shi'a population protection and social services.

242.      In a Department of Defense news briefing on August 24, 2007, General Rick Lynch confirmed that on August 7, 2006, the 3rd Brigade Combat Team "conducted a raid on a militant house . . . about 20 miles east of Baghdad . . . They arrested one of our division's most valued targets, . . . [who] acted as a link between Iran and the [JAM]. He was the main Shia

---

[66]      "Imad Fayez Mughniyah (a/k/a Hajj Radwan) was, for decades prior to his death in February 2008, the terrorist operations chief of Hizballah. Mughniyah played a critical role in a series of imaginative high-profile terrorist attacks across the globe, and his abilities as a terrorist coordinator, director, and operative was an order of magnitude beyond anything comparable on the scene between 1980-2008.

Mughniyah was, since the early 1980s, an agent of the Islamic Republic of Iran, where he lived for many years.

Imad Mughniyah had a direct reporting relationship to Iranian intelligence and a direct role in Iran's sponsorship of terrorist activities." *In re Terrorist Attacks on September 11, 2001*, 2011 U.S. Dist. LEXIS 155899, at *106–07.

conduit in that region for getting Iranian EFPs and rockets into Baghdad, . . .”[67]

243.    Al-Sadr dissolved part of his militia after 2007, but maintained a small group of Iranian-supported militants called the Promised Day Brigades (“PDB”) to carry out terrorist attacks against Coalition Forces and U.S. nationals, including certain Plaintiffs.

244.    The PDB has received funding, training, and weapons from the IRGC and is one of the Special Groups.

245.    The PDB actively targeted U.S. nationals, including Plaintiffs and U.S. forces, in an attempt to disrupt security operations and further destabilize Iraq.

246.    For example, on June 28, 2011, the PDB issued a statement claiming responsibility for ten (10) mortar and Katyusha rocket attacks against U.S. Military convoys in which U.S. officials confirmed that three U.S. troops were killed.

### 4.    Asa'ib Ahl Al Haq

247.    Asa'ib Ahl Al Haq (“AAH” or the “League of the Righteous”) terrorist organization is a Shi'a Special Group supported by Hezbollah and the IRGC-QF that conducted assassinations and operations in Iraq against Coalition Forces and various individuals and U.S. nationals.

248.    AAH was originally established by Senior Sadrist and MDF-I detainee Qais al-Khazali. His brother, Laith Khazali, also helped lead the organization.

249.    AAH split from al-Sadr's JAM in 2006. Since that time, AAH has conducted: thousands of IED attacks against U.S. and Iraqi forces; targeted kidnappings of Westerners and Iraqis; rocket and mortar attacks on the U.S. Embassy; murders of American and British soldiers; and assassinations of Iraqi officials.

---

[67]    KIMBERLY KAGAN, THE SURGE: A MILITARY HISTORY (ENCOUNTER BROADSIDES) (2010).

250.     During the Relevant Period, AAH received significant funding from Iran, and had links to Iran's IRGC-QF and Hezbollah.

251.     Senior Lebanese Hezbollah operative Ali Musa Daqduq provided training to AAH terrorists.

252.     Daqduq reported to Youssef Hashim, the head of Lebanese Hezbollah Special Operations, and the latter reported to Abdul Reza Shahlai, the director of the IRGC-QF External Operations.

253.     Hezbollah and the IRGC-QF provided JAM, PDB, KH, AAH, and other Shi'a groups with a variety of weapons and training used to target U.S. nationals, including Plaintiffs, and Coalition Forces engaged in their post-2003 peacekeeping mission.

254.     These weapons included signature Iranian munitions such as EFPs and Improvised Rocket Assisted Munitions ("IRAMs"), as well as 107 mm rockets (often used as part of IRAMs), 120 mm and 60 mm mortars, RPG launchers and other small arms.

255.     The training provided by Iran and its agents resulted in an increased lethality and effectiveness of the Terrorist Attacks, and included sophisticated tell-tale tactics that had not previously been seen in Iraq prior to infusion of Iranian agents, Hezbollah and the IRGC-QF in 2003.

### D.     IRANIAN SIGNATURE WEAPONS USED IN THE TERRORIST ATTACKS

256.     A variety of Iranian weapons flowed into Iraq through direct purchases by Iran. The number of EFPs used against Coalition Forces and U.S. nationals rose "at a rate of 150 percent" between January 2006 and December 2006, and increased every month between November 2006 and January 2007.[68]

---

[68]     Press Briefing by Multi-National Force-Iraq Deputy Chief of Staff for Strategic

### 1. Explosively Formed Penetrators

257. One of Iran's primary forms of material support and/or resources that facilitated extrajudicial killings of U.S. citizens in Iraq was the financing, manufacturing and deployment of EFPs and IEDs.

258. IED is a term commonly used by the U.S. military as shorthand for a roadside bomb. AAI consistently sought to attempt to improve IED effectiveness and sophistication.[69]

259. EFPs, IEDs, and other WMDs were typically smuggled from Iran to Iraq, and the IRGC-QF played a vital role in that process.[70]

260. Additionally, in Iraq, the IRGC and Hezbollah supplied and trained various Special Groups to deploy EFPs.

261. EFPs are a particularly effective form of manufactured IED and are sometimes known as a "shaped charge," usually made with a manufactured concave copper disk and a high explosive packed behind the liner.

262. The EFPs deployed by the IRGC and Hezbollah in Iraq were not truly "improvised" explosive devices but professionally manufactured and specifically designed to target U.S. nationals, including Plaintiffs, and Coalition Forces' armor. These EFPs cannot be made without specific machinery, access to which Iran controls, and without which Special Groups and other terrorist organizations could not obtain or use these munitions.

263. EFPs constitute "weapons of mass destruction" as that term is defined in 18 U.S.C. § 2332a(2)(A).

---

Effects. Brigadier General Kevin Bergner, *Security Operations in Iraq*, Slide 4.

[69]    Edward T. Pound, *Special Report: The Iran Connection*, U.S. News and World Report, Nov. 14, 2004.

[70]    Press Briefing by Multi-National Force-Iraq Deputy Chief of Staff for Strategic Effects Brigadier General Kevin Bergner, *Security Operations in Iraq*, Slide 4.

264.    In Iraq, EFPs were often triggered by various technologies, including passive infra-red sensors (tripped by the engine heat of passing vehicles) and radio frequency modules (triggering the weapon when high-powered radio waves were generated by Coalition Forces' jamming devices), ultimately setting off an explosion within the steel casing of the EFP, forcing the copper disk forward, and turning it into a high-velocity molten slug, traveling at over a mile per second, that could pierce the military-grade armor of most U.S. vehicles deployed in Iraq even up to 300 feet away.

265.    Metallurgic analysis by U.S. technicians helped confirm the high-purity copper EFP liners were not generally produced in Iraq.

266.    Differences in the liners indicated the kind of press that was required to fabricate them—a heavy (hydraulic) press not commonly seen in Iraq.

267.    To produce these weapons, copper sheets are often loaded onto a punch press to yield copper discs. These discs are annealed in a furnace to soften the copper. The discs are then loaded into a large hydraulic press and formed into the disk-like final shape.

268.    The hydraulic press machinery was transported to Iran by Iran's national maritime carrier, Islamic Republic of Iran Shipping Line ("IRISL").

269.    This munitions manufacturing process is critical to the design and concomitant lethality of the weapon and is controlled by Iran.

270.    EFPs are far more sophisticated than homemade explosive devices such as traditional improvised explosive devices, and they are designed specifically to target vehicles such as armored patrols and supply convoys, though Hezbollah and the Special Groups have deployed them against U.S. and Iraqi civilians as well.

271.    *One of the ways* in which the IRGC provided "militants with the capability to

assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles" included providing them with manufacturing supplies such as copper and steel, as well as machinery—including hydraulic presses used to form copper into the shape of disks used in EFPs.

272.    Iran propagated its specialized weapons knowledge up and down its network of terror proxies in Iraq, as the U.S. State Department documented in its 2006 *Country Reports on Terrorism* regarding Iran's specific efforts to provide terrorists with lethal EFPs to ambush and murder U.S. nationals, including Plaintiffs, and other Coalition Forces:

> Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks. Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hezbollah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. *These individuals then passed on this training to additional militants in Iraq.*

(Emphasis added)

273.    Although Iran's use of EFPs was publicly disclosed by U.S. and British officials in 2005, the official identification of specific attacks as EFP attacks was not first publicly disclosed until 2010.

274.    In 2006, the U.S. State Department's Country Reports on Terrorism further documented Iran's specific efforts to provide terrorists with lethal EFPs to ambush and murder U.S. nationals, including Plaintiffs, and other Coalition Forces:

> Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah [sic]. The Iranian Revolutionary

Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hezbollah [sic], implemented training programs for Iraqi militants in the construction and use of sophisticated lED technology. *These individuals then passed on this training to additional militants in Iraq.*

(Emphasis added).

275.   Also in 2006, Brigadier Gen. Michael Barbero, Deputy Chief of Staff for Strategic Operations of the Multi-National Force-Iraq stated: "Iran is definitely a destabilizing force in Iraq. I think it's irrefutable that Iran is responsible for training, funding and equipping some of these Shi'a extremist groups and also providing advanced IED technology to them, and there's clear evidence of that."

276.   Brigadier Gen. Kevin Bergner commented on Iran funding of Hezbollah operatives in Iraq:

Actions against these Iraqi groups have allowed coalition intelligence officials to piece together the Iranian connection to terrorism in Iraq [...] Iran's Qods Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups. [...] It shows how Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities. And it paints a picture of the level of effort in funding and arming extremist groups in lraq.... The groups operate throughout Iraq. They planned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel. They receive arms – including explosively formed penetrators, the most deadly form of improvised explosive device – and funding from Iran. They also have received planning help and orders from Iran.

277.   In May 2007, the Commander of the Multinational Division-Center, U.S. Army Major General Richard Lynch, confirmed that "[m]ost of our casualties have come from improvised explosive devices. That's still the primary threat to our soldiers—IEDs. And we have an aggressive campaign to counter those IEDs, but they still are taking a toll on our soldiers: 13 killed, 39 soldiers wounded. *What we're finding is that the technology and the financing and the training of the explosively formed penetrators are coming from Iran*. The EFPs are killing our

soldiers, and we can trace that back to Iran." (Emphasis added.)

278.    That same year, the Deputy Chief of Staff for Intelligence with the MNF-I, U.S.

Army Major General Richard Zahner, declared that:

> Labels on weapons stocks seized inside and outside Iraq point to Iranian government complicity in arming Shiite militias in Iraq […] Iran is funneling millions of dollars for military goods into Iraq […] You'll find a red label on the C-4 [explosive] printed in English and will tell you the lot number and name of the manufacturer.

Major General Zahner further added:

> [T]he control of military-grade explosives in Iran is controlled through the state apparatus and is not committed through rogue elements right there. It is a deliberate decision on the part of elements associated with the Iranian government to affect this type of activities.

279.    According to the U.S. State Department's 2007 Country Reports on Terrorism:

> Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups that target Coalition and Iraqi security forces and Iraqi civilians. In this way, Iranian government forces have been responsible for attacks on Coalition forces. The Islamic Revolutionary Guard Corps (IRGC) -Qods Force, continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs), and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to additional militants inside Iraq, a "train-the-trainer" program. In addition, the Qods Force and Hezbollah have also provided training inside Iraq. In fact, Coalition Forces captured a Lebanese Hezbollah operative in Iraq in 2007.

280.    Other U.S. Government reports, such as the Department of Defense's December

2007 "Measuring Stability and Security in Iraq" quarterly report to Congress, similarly

concluded that:

> Iranian Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) efforts to train, equip, and fund Shi'a extremists also continue despite reported assurances

to Prime Minister Maliki that Iran will cease lethal aid.

281.     These observations continued in 2008. According to the U.S. State Department's

2008 Country Reports on Terrorism:

> The Qods Force, an elite branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and supporting terrorists abroad. The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hezbollah, Iraq-based militants, and Taliban fighters in Afghanistan ...

> Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian- produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was responsible for some of the lethality of anti-Coalition attacks by providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force, in concert with Lebanese Hezbollah, provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

282.     Similarly, in 2011, the U.S. Ambassador to Iraq, James F. Jeffrey, was quoted as

saying "[F]resh forensic testing on weapons used in the latest deadly attacks in the country

bolsters assertions by U.S. officials that Iran is supporting Iraqi insurgents with new weapons

and training. […] We're not talking about a smoking pistol. There is no doubt this is Iranian."

283.     Further, the State Department's 2011 *Country Reports on Terrorism* reported:

> Despite its pledge to support the stabilization of Iraq, Iran continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi Shia militant groups targeting U.S. and Iraqi forces, as well as civilians. Iran was responsible for the increase of lethal attacks on U.S. forces and provided militants with the capability to assemble explosives designed to defeat armored vehicles. The IRGC-QF [Islamic Revolutionary Guard Corps-Qods Force], in concert with Lebanese Hezbollah, provided training outside of Iraq as well as advisors inside Iraq for Shia militants in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry.

284.     Iran also introduced other weapons into Iraq for the purpose of supporting

terrorist attacks on U.S. nationals and coalition personnel, including Plaintiffs. These included 81 mm mortars (the remainder of the region uses 82 mm mortars), repainted 107 mm rockets imported into Iran from China and marked for sale in the open markets, 60 mm canisters filled with Iranian-manufactured mortar rounds; 240 mm rockets, IRAMs, RPG-7s, RPG-29s, and RKG-3 armor penetrating anti-tank grenades deployed by Special Groups in various acts of international terrorism, including the Terrorist Attacks wherein Plaintiffs and/or Plaintiffs' family members will killed, maimed, or otherwise injured.

285.    The presence of these weapons shows a high level of sophistication in the Iranian arms flow into Iraq as the purchases are made by the Iranian regime.

## 2.    Improvised Rocket Assisted Munitions

286.    In addition to EFPs, Iran also provided material support for Special Groups by providing them with IRAMs.

287.    Along with EFPs, Improvised Rocket Assisted Munitions were a signature weapon of terrorists in Iraq that were supplied by the IRGC.

288.    An IRAM is a rocket-fired improvised explosive device made from a large metal canister—such as a propane gas tank—filled with explosives, scrap metal and ball bearings and propelled by rockets, most commonly 107 mm rockets launched from fixed or mobile sites by remote control. They are designed to cause catastrophic damage and inflict mass casualties.

289.    According to The Joint Improvised Explosive Device Defeat Organization of the U.S. Department of Defense, IRAMs were first introduced by Iran in November 2007 against U.S. personnel in Iraq.

290.    Although Iran's use of IRAMs was publicly disclosed by U.S. officials after their introduction in 2007, systematic identification of specific attacks as IRAM attacks was not

publicly disclosed until 2010.

291.   IRAM attacks occurred primarily in Baghdad and in the Shi'a dominated areas in southern Iraq, where Iranian-backed militias primarily operate.

292.   All of the foregoing material support provided to Special Groups, including those Special Groups that perpetrated the Terrorist Attacks that resulted in the death, maiming, or otherwise injuring of Plaintiffs and Plaintiffs' family members, was provided by Iran for attacks on Coalition Forces and U.S. nationals, including Plaintiffs, was financed and facilitated in substantial part by Iran.

293.   Because Iran is under numerous sanctions issued by other countries, it continues to evade those sanctions by operating clandestinely through agents of Iran, including the Islamic Republic of Iran Shipping Lines, Mahan Air, and the National Iranian Oil Company.

## E.   IRAN EVADES SANCTIONS THROUGH ITS AGENTS/PROXIES

294.   Iran obtains weapons and other material support it provides to Special Groups through agents and/or proxies that are nothing more than extensions of the Iranian regime.

295.   Congress and successive Administrations have enacted several laws and executive orders that imposed sanctions on countries and firms that sell Weapons of Mass Destruction technology and military equipment to Iran. Despite these efforts, Iran continued to evade sanctions.

296.   In order to thwart U.S. sanctions efforts, Iran cultivated close relationships with foreign arms suppliers, including Russia, China, and North Korea.

297.   In addition, Iran sought to clandestinely acquire dual-use technologies from European manufacturers, and certain export-controlled defense products, aircraft parts, dual-use technologies and materials from the United States.

### 1. Islamic Republic of Iran Shipping Lines

298. As Iran's national maritime carrier, IRISL[71] is an agent and instrumentality of Iran.

299. IRISL has a long history of facilitating arms shipments on behalf of the IRGC and the Iranian military, including copper discs that are a key component in EFPs (discussed below) used to kill and maim many of the Plaintiffs herein.[72]

300. For example, a November 2007 State Department cable noted:

Washington remains concerned about on-going conventional arms transfers from China to Iran, particularly given Iran's clear policy of providing arms and other support to Iraqi insurgents and terrorist groups like the Taliban and Hezbollah….

We have specific information that Chinese weapons and components for weapons transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern.

301. The diplomatic cable went on to note that an IRISL-flagged vessel was loaded at a Chinese port with multiple containers of cargo bound for delivery at the port of Bandar Abbas, Iran.

302. The cargo included DIO[73] manufactured ammunition cartridges (7.62 x 39 rounds

---

[71]     IRISL is Iran's national maritime carrier: a global operator of merchant vessels with a worldwide network of subsidiaries, branch offices and agent relationships. It provides a variety of maritime transport services, including bulk, break-bulk, cargo and containerized shipping.

[72]     Improvised Explosive Device is a term commonly used by the U.S. military as shorthand for a roadside bomb. However, unlike IEDs, the EFPs deployed by the IRGC, Hezbollah and the Special Groups in Iraq were not "improvised," but, instead, these advanced weapons were professionally manufactured and specifically designed to defeat the armor plating that protected the vehicles used by U.S. and Coalition Forces.

[73]     DIO was designated an SDN by the U.S. on March 30, 2007. IRGC Brigadier-General Seyyed Mahdi Farahi was the Managing Director of DIO and has been sanctioned by the European Union since 2008 (*see*, http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex%3A32010D0644). He was later sanctioned by the U.S. on January 17, 2016.

for AK-47 assault rifles).

303.    DIO is an Iranian government-owned weapons manufacturer controlled by MODAFL.

304.    An April 2008 State Department cable warned of an IRISL shipment of chemical weapons precursors from China aboard the IRISL-leased, Iranian flagged merchant vessel ("M/V") *Iran Teyfouri*.

305.    In September 2008, the U.S. Treasury Department designated IRISL a SDN, stating: "Not only does IRISL facilitate the transport of cargo for U.N. designated proliferators, it also falsifies documents and uses deceptive schemes to shroud its involvement in illicit commerce."

306.    The Treasury Department further noted that:

[i]n order to ensure the successful delivery of military-related goods, IRISL has deliberately misled maritime authorities through the use of deception techniques. These techniques were adopted to conceal the true nature of shipments ultimately destined for MODAFL [Iran's Ministry of Defense and Armed Forces Logistics].

307.    In January 2009, a former Russian merchant ship chartered by IRISL—named the M/V *Monchegorsk* and flying a Cypriot flag—was spotted leaving the Iranian port of Bandar Abbas and heading for the Suez Canal.

308.    Egyptian authorities were alerted by the U.S. Navy, and the M/V *Monchegorsk* was forced into an Egyptian port to be searched. Iran's DIO was later determined to be the shipper of the military-related cargo.

309.    Munitions, believed headed for Gaza, were found hidden in the cargo, including components for mortars and thousands of cases of powder, propellant, and shell casings for 125mm and 130mm guns.

310.    In October 2009, U.S. troops boarded a German-owned freighter, the M/V *Hansa*

*India*, in the Gulf of Suez and found eight containers full of ammunition that were headed to Syria from Iran.

311.    The vessel carried seven containers of small arms ammunition (including 12 million bullet casings), as well as one container containing copper discs of the type used in EFPs to kill and maim Coalition Forces and U.S. nationals, including Plaintiffs.

312.    The acronym "IRISL" was painted in large block letters on the exterior side walls of each shipping container, and the barrels of munition parts discovered inside the containers were marked with the inscription "SAEZMANE SANAYE DEFA," a common transliteration from Farsi to English of the name for Iran's Defense Industries Organization.

313.    The M/V *Hansa India* was registered to the Hamburg-based shipping company Leonhardt & Blumberg, but had been under charter to IRISL for several years.

314.    In November 2009, the Government of Israel intercepted an IRISL-flagged ship, the M/V *Francop*, headed for Beirut, Lebanon and then Latakia, Syria. The vessel was loaded with munitions crates that were either stamped "IRISL" or included documentation marked with the IRGC-QF logo.

315.    The munitions found onboard included over two thousand 107mm "Katyusha" rockets, more than six hundred 122mm "Grad 20" rockets, and also various rocket fuses, mortar shells, rifle cartridges, fragment grenades and 7.62mm bullets.

316.    The M/V *Francop*, owned by the Cypriot shipping company UFS, was carrying shipping containers clearly marked IRISL.

317.    Because the DIO, as discussed *infra*, was one of MODAFL's three main weapons systems manufacturers, it was required to use IRISL for most of its illicit shipments of military-related raw-materials, parts and finished products for, and from, foreign suppliers, Iranian arms

dealers and terrorist organizations.

318.    Iran's DIO was listed as an entity of concern for military procurement activities in an early warning document distributed by the German government to industry in July 2005.

319.    The DIO was also designated by the United Nations in 2006 for its involvement in Iran's Weapons of Mass Destruction ("WMD") program.

320.    During 2006 and 2007, weapons caches seized by Coalition Forces from the Special Groups in Iraq contained large quantities of weapons produced by Iran; including many 107 millimeter artillery rockets with closely clustered DIO lot numbers and production dates between 2005 and 2007, as well as rounds and fuses for 60 millimeter and 81 millimeter mortars with DIO lot markings and 2006 production dates.

321.    There can be no question that IRISL facilitated shipments of military cargo to FTOs and Special Groups, including those responsible for carrying out the Terrorist Attacks that killed, maimed, and/or injured Plaintiffs or Plaintiffs' family members.

322.    IRISL *did*, in fact, facilitate shipments of military cargo to Hezbollah, one of the organizations controlled and/or otherwise substantially and materially supported by Iran responsible for acts of international terrorism that killed and injured American citizens in Iraq, including the Plaintiffs. However, IRISL was not Iran's only means of obtaining weapons to pass on to Special Groups charged by Iran with committing acts of international terrorism, including the Terrorist Attacks carried out against Plaintiffs and/or Plaintiffs' family members.

### 2.    Mahan Air

323.    On October 12, 2011, the United States designated the Iranian commercial airline Mahan Air as a SDGT for "providing financial, material and technological support to the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF)."

324.     According to the U.S. government, Mahan Air (1) "facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq;" (2) "facilitated IRGC-QF arms shipments"; and (3) "transported personnel, weapons and goods on behalf of Hezbollah. [sic]." (Brackets in original).

325.     The Treasury Department explained Mahan Air's direct involvement with terrorist operations, personnel movements and logistics on behalf of the IRGC-QF:

> Mahan Air also facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq by bypassing normal security procedures and not including information on flight manifests to eliminate records of the IRGC-QF travel.

> Mahan Air crews have facilitated IRGC-QF arms shipments. Funds were also transferred via Mahan Air for the procurement of controlled goods by the IRGCQF.

> In addition to the reasons for which Mahan Air is being designated today, Mahan Air also provides transportation services to Hezbollah [sic], a Lebanon-based designated Foreign Terrorist Organization. Mahan Air has transported personnel, weapons and goods on behalf of Hezbollah [sic] and omitted from Mahan Air cargo manifests secret weapons shipments bound for Hezbollah [sic].

326.     Under Secretary of Commerce Eric L. Hirschhorn described this supply chain as "egregious conduct by… foreign companies and individuals who have endangered the lives of U.S. and coalition forces in Iraq."

327.     Mahan Air was also later identified as the conduit to Iran of thousands of radio frequency modules recovered by Coalition Forces in Iraq from IEDs that were used to target U.S. nationals, including Plaintiffs, and Coalition Forces.[74]

328.     Coalition Forces recovered these modules in Iraq from IED devices that were used to target U.S. nationals, including Plaintiffs, and Coalition Forces.

329.     The modules had encryption capabilities and a particularly long range that

---

[74]     *See* Superseding Indictment in *United States v. Larijani*, *available at* https://www.justice.gov/opa/file/837996/download.

allowed Special Groups operatives to operate them across significant distances.

330.    In 2008, Mahan Air transported the IED components from Singapore and Thailand to Tehran, Iran.

331.    In short, at the direction of Iran, Mahan Air transported weapons, personnel, and technology into Iraq on behalf of the IRGC-QF and Hezbollah, and did, in fact, transport modules used to control and activate IEDs and EFPs deployed against Coalition Forces in Iraq.

332.    Mahan Air, in its supporting albeit crucial role of exporting terrorism, and the materials and instruments thereof, for Iran, is an agent and instrumentality of Iran.

333.    Due to the role played by Mahan Air, Iran was able to effectuate global jihad and commit acts of terrorism much more effectively and conveniently during the Relevant Period, including the time in which the Terrorist Attacks at issue were committed.

### 3.    National Iranian Oil Company (NIOC)

334.    The NIOC is not a state agency, operation, or program of the Iranian Government. Rather, it is nothing more than a front-company for the IRGC, and therefore and agent and instrumentality of Iran.

335.    At all relevant times, the NIOC was controlled by Iran through the IRGC.

336.    NIOC is an "agency or instrumentality" of the Government of Iran as defined by 28 U.S.C. § 1603(b).

337.    In 2008, the Treasury Department identified NIOC (and other Iranian agencies) as "centrally involved in the sale of Iranian oil, as entities that are owned or controlled by the [Government of Iran]."

338.    Pursuant to E.O. 13382, the U.S. Government designated NIOC as an SDN.

339.    The U.S. Government has identified NIOC as an agent or affiliate of the IRGC.

340.    Under the Iran Threat Reduction and Syria Human Rights Act of 2012 (ITRSHRA), the U.S. government determined that that NIOC is an agent or affiliate of the IRGC under section 104(c)(2)(E)(i) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (CISADA) and section 302 of ITRSHRA. As part of that 2012 certification, NIOC was formally determined to be part of the Government of Iran.

341.    During the Relevant Period, the NIOC not only was under IRGC control, but it also served a critical function in supporting the IRGC's activities.

342.    The Iranian Helicopter Aviation Company, Ahwaz Pipe Mill Co., and Kala Naft[75] are all subsidiaries of the NIOC.

343.    As early as February 1998, Kala Naft was identified by the UK government "as having procured goods and/or technology for weapons of mass destruction programs."

344.    Kala Naft was also publicly identified as a NIOC subsidiary in a 2003 Commerce Department action that further stated that Kala Naft was a recipient of illegally exported U.S. origin oilfield equipment from the U.S.

## VI.    THE TERRORIST ATTACKS & PLAINTIFFS

345.    At issue in this case are sixteen (16) separate attacks perpetrated by Special Groups and other terrorist organizations, including the FTOs, SDGTs, SDTs, SDNs and other terrorists with known links to Iran which killed or injured Plaintiffs (the "Terrorist Attacks").

346.    During the Relevant Period, the injuries and deaths caused by Iran to Plaintiffs were the result of acts of international terrorism committed, planned, or authorized by organizations designated as foreign terrorist organizations pursuant to Section 219 of the

---

[75]    Kala Naft was designated as a Specially Designated Nations (DN) by the United States Treasury on June 16, 2010. U.S. Department of the Treasury, *Recent OFAC Actions – June 16, 2010, available at* https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20100616.aspx.

Immigration and Nationality Act (8 U.S.C. § 1189), as of the date on which such acts of international terrorism were committed, planned, and/or authorized. Further, Iran funded, aided and abetted such foreign terrorist organizations by, at least, knowingly providing funding and other substantial and material support to the terrorist groups who committed such acts of international terrorism.

347.    Further, none the Terrorist Attacks occurred in the course of (1) a declared war; (2) an armed conflict, whether or not war had been declared between two or more nations; or (3) an armed conflict between military forces of any origin.

348.    All Plaintiffs physically injured or killed in Iraq were, at the time of their injury or extrajudicial killing, participating in a peacekeeping mission intended to contribute to the security of the United Nations Assistance Mission for Iraq, the Governing Council of Iraq and other institutions of the Iraqi interim administration, and key humanitarian and economic infrastructure.

349.    Without Iran's conduct, support, control and authority described herein, the Special Groups, including the FTOs, SDGTs, SDTs, and/or SDNs responsible for the Terrorist Attacks would not have had the funding or material support necessary to carry out these Terrorist Attacks.

350.    Seventeen (17) plaintiffs are individuals who were injured in sixteen (16) different Terrorist Attacks that occurred in Iraq between November 9, 2004 and November 20, 2009 and who, as a result, experienced physical and mental pain and suffering and emotional distress. Four (4) plaintiffs are decedents, whose anticipated Estates bring claims for individuals who were killed in those attacks, as well as all heirs thereof. The remaining thirteen (13) plaintiffs are family members of the victims of those attacks and have experienced injuries

including anxiety, severe mental anguish, extreme emotional distress, and loss of companionship as a result of their relatives' injuries or death.

351.    Iran goes to great lengths to hide the fact it funds terrorism, including funding the Special Groups that perpetrated the terrorist attacks that resulted in the death or injury of Plaintiffs.

352.    Additionally, even utilizing the utmost diligence, it can take months or even years before the terrorist group who perpetrated an act of international terrorism, or the type of weapon/explosive used by a terrorist group in a terrorist attack, can be identified.

353.    Here, Plaintiffs did not know and did not have reason to know of their potential claims against Defendant until very recently, certainly not more than five years from the date of filing this Action.

354.    As it concerns Plaintiffs' claims, and as outlined above, Iran has fraudulently concealed its involvement with any of the Special Groups responsible for perpetrating the Terrorist Attacks. Iran has further denied the fact it provided material support and resources to the Special Groups responsible for perpetrating the Terrorist Attacks. As such, the doctrine of equitable tolling applies to this Action and all Plaintiffs.

355.    The following Plaintiffs are United States' nationals injured or killed in the acts of international terrorism complained of herein, and estates and/or family members of such U.S. nationals:

A.    THE NOVEMBER 20, 2009 ATTACK – SUPPLY ROUTE OF KALZOO

1.    **Plaintiff Joshua Lionel Holladay**

356.    Plaintiff Joshua Lionel Holladay is a citizen of the United States and is domiciled in the State of Alabama.

357.     In the early morning of November 20, 2009, Joshua Lionel Holladay, age 26, was serving as a peacekeeping serviceman in the U.S. Army National Guard, 41st Brigade Combat Team, 1-186th Infantry Regiment. At the time, Mr. Holladay held the rank of Private First Class.

358.     Mr. Holladay was performing his duties as an infantryman in a M1117 Armored Security Vehicle ("ASV") while escorting a convoy of fuel tankers from Baghdad to Imam Ali Air Base (a.k.a. COB Adder) along "Supply Route Kalzoo." Half way into the mission, as it traveled at 50 MPH, an explosion ripped through the armored vehicle, knocking Mr. Holladay unconscious.

359.     The weapon used to attack and injure Mr. Holladay was an Iranian-manufactured EFP provided by Iran and/or one of its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

360.     As a result of the November 20, 2009 Terrorist Attack, he sustained significant injuries due to the concussive blast of the explosion and shrapnel impacting his right arm, right lower extremities, and hands. Mr. Holladay also suffered a left tibial plateau fracture and nerve damage.

361.     Mr. Holladay was treated at five different hospitals in the days following the attack and was eventually transferred to the Charlie Norwood VA Hospital in Augusta, Georgia where he continued to be hospitalized and received intensive treatment for 18 months due to the severity of his injuries. He will require further treatment and care.

362.     As a result of the November 20, 2009 Terrorist Attack, and the injuries he suffered, Joshua Lionel Holladay has experienced, and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

363.     Mr. Holladay has received a disability rating of 100% by the Veteran's

Administration.

### B.    THE NOVEMBER 22, 2008 ATTACK- EN ROUTE TO FOB KALSU

#### 1.    Plaintiffs The Williams Family

364.    Plaintiff Sean Lee Williams is a citizen of the United States and is domiciled in the State of Missouri.

365.    On November 22, 2008, Sean Lee Williams, age 36, was serving as a peacekeeping serviceman and Combat Engineer in the U.S. Army 555 Brigade, 5th Engineers Battalion ("The Fightin' Fifth"), 515th Sapper Company, 1st Platoon. At the time, Mr. Williams held the rank of Staff Sergeant, E-5.

366.    On the evening of November 22, 2008, Mr. Williams was the gunner in a "Cougar," a Mine Resistant Ambush Protective ("MRAP") vehicle as part of a convoy en route to Forward Operating Base ("FOB") Kalsu. During the mission, the convoy was hit by a sophisticated "3 array" EFP. The explosion struck and caused extensive damage to the vehicles in the convoy, including that in which Mr. Williams was a passenger. Mr. Williams, as the gunner, was externally exposed to the blast forces of the explosion. Mr. Williams sustained physical injuries from the blast and concussive forces of the explosion. In the aftermath of the attack, despite his own injuries, Mr. Williams treated and witnessed the injuries to the men under his command.

367.    The weapons used to attack and injure Mr. Williams during the November 22, 2008 Terrorist Attack were Iranian-manufactured EFPs provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

368.    Upon information and belief, the Special Groups known as Kata'ib Hizballah and JAM were operating in the area around FOB Kalsu at the time of the November 22, 2008

Terrorist Attack, and have claimed responsibility for attacks against U.S. Forces at the time of the attack that injured Mr. Williams. Upon information and belief, Iranian-supported Special Group(s) perpetrated the Terrorist Attack that resulted in Plaintiff Sean Lee Williams' injuries.

369.    Mr. Williams sustained physical injuries as a result of the November 22, 2008 Terrorist Attack that were caused by the concussive blast forces of the explosion including being dazed and disoriented from the blast, migraine headaches, tinnitus or ringing in his ears, and Traumatic Brain Injury ("TBI").

370.    As a result of the November 22, 2008 Terrorist Attack, Mr. Williams also sustained significant emotional and psychological injuries due to his proximity to the concussive blast forces of the explosion, including but not limited to Posttraumatic Stress Disorder ("PTSD"), anxiety, depression, social anxiety disorder, and social and occupational impairment.

371.    As a result of the November 22, 2008 Terrorist Attack, Mr. Williams underwent significant medical treatment, including care for these ongoing injuries at Ft. Leonard Wood Hospital, and Harry S. Truman Veteran's Memorial Hospital in Missouri, as well as healthcare facilities in Salt Lake City, Utah.

372.    As a result of the November 22, 2008 Terrorist Attack, Mr. Williams will require further medical treatment and care.

373.    As a result of the November 22, 2008 Terrorist Attack, and the injuries he suffered, Sean Lee Williams experienced, and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

374.    Mr. Williams has received a disability rating of 90% by the Veteran's Administration.

375.    Plaintiff Sue Ann Williams is a citizen of the United States and is domiciled in the

State of Missouri. She is the wife of Sean Lee Williams.

376.    As a result of November 22, 2008 Terrorist Attack, and the injuries suffered by Sean Lee Williams, Plaintiff Sue Ann Williams has experienced, and continues to experience, severe mental anguish, extreme emotional pain and suffering.

C.    THE APRIL 4, 2008 ATTACK – VICTORY BASE COMPLEX, BAGHDAD

1.    Plaintiffs The Von Letkemann Family

377.    Plaintiff Grant Blaney Von Letkemann II is a citizen of the United States and is domiciled in the State of Colorado.

378.    On April 4, 2008, Grant Blaney Von Letkemann II, age 35, was serving as a peacekeeping serviceman and Military Police Officer, in the MNF-1 Commanding General/Multinational Force Iraq, as part of the Personal Security Detail for U.S. General David Petraeus. At the time, Mr. Von Letkemann held the rank of Sergeant First Class, E-7.

379.    At approximately 20:15 p.m. on April 4, 2008, Grant Blaney Von Letkemann II, was standing on a porch of Building 82 in Camp Victory, Baghdad, Iraq. The Incoming Alarm began to sound, indicating the base was in imminent danger of being hit by incoming fire. The C-RAM rocket mortar defense system began firing rounds and tracers towards the incoming munitions. Mr.Von Letkemann could tell by the direction of the tracer fire that the incoming projectiles were headed toward him. He immediately sought cover in the stairwell of the building. After entering the building, it was rocked by a loud explosion, shaking the walls, and causing metal, debris, dust and smoke to envelope the area and Mr. Von Letkemann. The area where he had been standing was blasted and covered in debris. Mr. Von Letkemann was hit with such concussive blast forces that his watch face, camera display, and water bottle were shattered or cracked. As a result of the blast, he was disoriented, nauseous, and was unable to hear. After

confirming that his men were safe, Mr. Von Letkemann received medical treatment on the base related to concussive injuries and TBI.

380. Upon information and belief, an investigation into the attack determined that Mr. Von Letkemann and his unit had been attacked with a 107mm rocket. The remains of the rocket bore markings and stamps indicated the rocket had been manufactured in Iran just months before being used in Iraq.

381. Further investigation revealed the April 4, 2008 Terrorist Attack was committed by individual associated the Special Group JAM, which was trained and armed by Iran's IRGC-QF with the assistance of Hezbollah.

382. The weapon used to attack and injure Mr. Von Letkemann during the April 4, 2008 Terrorist Attack was Iranian-manufactured Rocket provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

383. Mr. Von Letkemann sustained physical injuries as a result of the April 4, 2008 Terrorist Attack that were caused by the concussive blast forces of the explosion including being dazed and disoriented from the blast, migraine headaches, tinnitus or ringing in his ears, and TBI.

384. As a result of the April 4, 2008, Terrorist Attack, Mr.Von Letkemann also sustained significant emotional and psychological injuries due to his proximity to the concussive blast forces of the explosion, including but not limited to PTSD, anxiety, depression, social anxiety disorder, nightmares, and insomnia.

385. As a result of the April 4, 2008 Terrorist Attack, Mr. Von Letkemann underwent significant medical treatment, and he will require further treatment and care. Mr. Von Letkemann sought medical treatment at Evans Army hospital, FT Carson, Colorado, Veterans

Administration Hospital, Denver, Colorado, and Kaiser Permanente Medical Offices at Rock Creek, Lafayette, Colorado.

386.    As a result of the April 4, 2008 Terrorist Attack, and the injuries he suffered, Grant Blaney Von Letkemann II, has experienced, and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

387.    Grant Blaney Von Letkemann II has received a disability rating of 70% by the Veteran's Administration.

388.    Plaintiff Kelly Lynn Von Letkemann is a citizen of the United States and is domiciled in the State of Colorado. She is the wife of Grant Blaney Von Letkemann II.

389.    As a result of April 4, 2008 Terrorist Attack, and the injuries suffered by Grant Blaney Von Letkemann II, Plaintiff Kelly Lynn Von Letkemann has experienced, and continues to experience, severe mental anguish, extreme emotional pain and suffering.

### D.    THE MARCH 2, 2008 ATTACK – BASRA

#### 1.    Plaintiff Timothy Joseph O'Sullivan

390.    Plaintiff Timothy Joseph O'Sullivan is a citizen of the United States and is domiciled in the State of Ohio.

391.    On March 2, 2008, Timothy Joseph O'Sullivan, age 36, was serving in the U.S. Air Force as a peacekeeping serviceman and Senior Advisor to British Forces stationed in Basra, Iraq. At the time in this area, Iranian-sponsored terror groups were awarding bounties for the killing, kidnapping, or maiming of Coalition service members. At the time, Mr. O'Sullivan held the rank of Captain, O-3.

392.    At the time of the March 2, 2008 Terrorist Attack , Mr. O'Sullivan was performing his duties as the Senior Advisor to British forces while traveling in an armored

Warrior Infantry Fighting Vehicle ("IFV") as part of a five vehicle convoy. Due to the high bounties being paid by and to Iranian-affiliated terrorists for American casualties, Mr. O'Sullivan was traveling in a British vehicle when it was hit and destroyed by a massive EFP explosion.

393.    During Mr. O'Sullivan's time in Basra, from approximately 2007 through 2008, his unit was attacked approximately 800 – 1,100 times with Iranian IRAM rockets that were manufactured in or provided by Iran.

394.    As result of these rocket attacks, Mr. O'Sullivan suffers from ("PTSD").

395.    The weapons used to attack and injure Mr. O'Sullivan were an Iranian-manufactured EFP, and Iranian-manufactured and supplied rockets, provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

396.    Upon information and belief, the Special Group JAM has claimed responsibility for the EFP attack that resulted in injury to Mr. O'Sullivan.

397.    As a result of the March 2, 2008 attack, Mr. O'Sullivan sustained significant physical and psychological injuries due to the concussive blast of the EFP explosion including TBI, internal bleeding, and injuries to his upper extremities.

398.    Mr. O'Sullivan underwent extensive healthcare treatment for his injuries, including orthopedic surgical procedures to his right wrist and hand. He received treatment at various hospitals in Basra, Iraq; Kuwait City, Kuwait; Landstuhl, Germany; Tampa, Florida; and Dayton, Ohio. Mr. Sullivan is currently being treated for TBI.

399.    As a result of the March 2, 2008 attack and multiple rocket attacks, Timothy Joseph O'Sullivan has experienced severe physical and mental anguish and extreme emotional pain and suffering.

400.    Timothy Joseph O'Sullivan has received a disability rating of 80% by the

Veteran's Administration.

      E.      THE SEPTEMBER 19, 2007 ATTACK – KADHIMIYA

      1.      **Plaintiff Brian Robert Schar**

401.    Plaintiff Brian Robert Schar is a citizen of the United States and is domiciled in the State of Colorado.

402.    On September 19, 2007, Brian Robert Schar, age 25, was serving as a peacekeeping serviceman and Sergeant in the U.S. Army, 1st. Infantry Division, 2nd Brigade Combat Team, 9th Engineer Battalion, 1st Alfred Company Platoon. At the time, Mr. Schar held the rank of Buck Sergeant, E-5.

403.    On that evening, Mr. Schar was riding in the front passenger seat in the lead vehicle of an Army convoy. As the convoy headed north on "Route Senator" along 14th of July Street it approached an Iraqi checkpoint located near a bridge. As Mr. Schar's vehicle traversed the bridge an EFP (hidden behind a light post and disguised as a rock) exploded, devastating the vehicle and knocking Mr. Schar unconscious. Upon awakening, Mr. Schar realized he had no use of his hands. While awaiting rescue, he continued to lose and regain consciousness, and during the lucid moments realized that both his right and left legs had been severed from his body. Mr. Schar and his unit continued to come under automatic weapons fire as he was evacuated from the scene of the attack.

404.    The weapon used to attack and injure Mr. Schar on September 19, 2007 was an Iranian-manufactured EFP provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

405.    As a result of the September 19, 2007 Terrorist Attack, Mr. Schar sustained significant injuries, including the loss of both legs and a portion of his right pinky finger.

Shrapnel and debris form the blast embedded in wounds to his colon, stomach, and upper extremities. Mr. Schar also suffered burns and permanent scarring from the blast and from acid because of the battery that was mounted below his seat.

406.    Mr. Schar underwent significant medical treatment for the injuries he sustained during the September 19, 2007 Terrorist Attack, and will require further treatment and care for those injuries.

407.    As a result of the September 19, 2007 Terrorist Attack, and the injuries he suffered, Brian Robert Schar has experienced, and continues to experience, severe physical and mental anguish and extreme emotional pain and suffering.

408.    Mr. Schar has received a disability rating of 100% by the Veteran's Administration.

F.    THE AUGUST 22, 2007 ATTACK – BAGHDAD/SADR CITY BORDER

1.    Plaintiff Jerrald J. Jensen

409.    Plaintiff Jerrald J. Jensen is a citizen of the United States and domiciled in the State of Colorado.

410.    On August 22, 2007, Jerrald J. Jensen, age 37, was serving as a peacekeeping serviceman in the U.S. Army 3rd Squadron, 61st Cavalry Regiment, as the personal driver for Major Keith Brace. At the time, Mr. Jensen held the rank of Specialist, E-4.

411.    On this date, Mr. Jensen was performing his duties as the driver for Major Brace, driving an M1165 Up-Armored High Mobility Multipurpose Wheeled Vehicle ("HMMWV") combat vehicle in a six-vehicle convoy. As the convoy slowed to pass through a gate, three EFPs fastened to a concrete barrier simultaneously exploded.

412.    As a result of the August 22, 2007 Terrorist Attack, Mr. Jensen was pierced with

metal and shrapnel from the explosion in his knee, head, and face. He also suffered chemical burns from an exploding battery. Despite these injuries, Mr. Jensen was able to drive the vehicle he was in away from the blast site, through a fence, and behind a wall. Upon exiting the vehicle, Mr. Jensen was then shot by his attackers in the right arm, shattering his elbow and entering his back.

413.    The weapons used to attack and injure Mr. Jensen were Iranian-manufactured EFPs provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

414.    As a result of the August 22, 2007 Terrorist Attack, Mr. Jensen sustained significant injuries due to the concussive blast of the explosion including TBI, and shrapnel wounds that torn his lower jaw from his face, resulting in loss of his lower mandible, and severing his tongue.

415.    Mr. Jensen underwent significant and multiple reconstructive surgeries and other medical treatment related to his injuries. He will require further medical treatment and care.

416.    As a result of the August 22, 2007 Terrorist Attack, and the injuries he suffered during that attack, Jerrald J. Jensen experienced, and continues to experience, severe physical and mental anguish and extreme emotional pain and suffering.

417.    Mr. Jensen has received a disability rating of 80% by the Veteran's Administration.

G.    THE MAY 28, 2007 ATTACK – SADR CITY

1.    Plaintiff Gregory Edward Hogancamp

418.    Plaintiff Gregory Edward Hogancamp is a citizen of the United States and is domiciled in the State of Florida.

419.     On May 28, 2007, Gregory Edward Hogancamp, age 24, was serving as a peacekeeping serviceman in the U.S. Army, 1st Battalion, 8th Cavalry Regiment, 2nd Brigade Combat Team, 1st Cavalry Division. At the time, Mr. Hogancamp held the rank of Corporal, E-4.

420.     At approximately 1400hrs on May 28, 2007, Mr. Hogancamp was performing his duties as a member of a tank crew in a M1A2 Battle Tank traveling in a convoy through Sadr City, Iraq, when an explosion tore apart the tank. The inside of the tank was engulfed in smoke and flames, causing the halon fire suppression system to activate. Mr. Hogancamp remained conscious and attempted to exit the tank but was unable to reach the hatch due to the severity of his wounds. He then lost consciousness. He was rescued by other members of his unit and evacuated to safety.

421.     The weapon used to attack and injure Mr. Hogancamp during the May 28, 2007 Terrorist Attack was an Iranian-manufactured EFP provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

422.     Upon information and belief, several days after the May 28, 2007 Terrorist Attack, Mr. Hogancamp's unit captured an individual known to have perpetrated the EFP attack on the convoy. This person was taken into custody by U.S. Special Forces and it was determined that he was Iranian and/or affiliated with Iran's Qods Force.

423.     As a result of the May 28, 2007 Terrorist Attack, Mr. Hogancamp sustained significant injuries due to the explosion and resulting fire, including 3rd degree burns and a shattered right leg. Shrapnel from the explosion imbedded in Mr. Hogancamp's right leg, chest, and stomach. His left index finger was partially amputated. He suffered a concussion resulting in TBI, and to this day has hearing loss and permanent scarring.

424.     Mr. Hogancamp underwent significant medical treatment and will require further treatment and care, as a result of the May 28, 2007 Terrorist Attack.

425.     As a result of the May 28, 2007 Terrorist Attack, and the injuries he suffered, Gregory Edward Hogancamp has experienced severe physical and mental anguish and extreme emotional pain and suffering.

426.     Mr. Hogancamp has received a disability rating of 80% by the Veteran's Administration.

### H.     THE MAY 17, 2007 ATTACK – BAGHDAD

#### 1.     Plaintiffs The Gautier/Houchins Family

427.     Plaintiff Aaron Daniel Gautier was a citizen of the United States and was domiciled in the State of Virginia at the time of his death.

428.     On May 17, 2007, Aaron Daniel Gautier, age 19 was serving as a peacekeeping serviceman in the U.S. Army as an Infantryman in the 4th Brigade Combat Team, 23rd Infantry 2nd Battalion, Bravo Company. At the time, Mr. Gautier held the rank of Private First Class, E-3. He was promoted to Corporal after his death.

429.     On this date, Mr. Gautier was the gunner in a Stryker Interim Armored Vehicle ("IAV") that was traveling through a marketplace in Baghdad, Iraq. An IED detonated near the IAV, killing Mr. Gautier.

430.     The weapon used to attack and injure Mr. Gautier was an Iranian-manufactured IED provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

431.     Upon information and belief, the Special Group known as Kata'ib Hizballah ("KH") has claimed responsibility for the attack that resulted in injury to Mr. Gautier.

432.    Plaintiff Tina Louise Houchins is a citizen of the United States and is domiciled in the state of Virginia. She is the mother of Aaron Daniel Gautier.

433.    Plaintiff Louise Houchins brings an action individually, and on behalf of the anticipated Estate of Daniel Gautier, and all heirs thereof, as its anticipated legal representative.

434.    As a result of the May 17, 2007 Terrorist Attack, and the injuries and death suffered by Aaron Daniel Gautier, Plaintiff Tina Louise Houchins has experienced, and continues to experience, severe mental anguish, and extreme emotional pain and suffering.

I.    THE FEBRUARY 25, 2007 ATTACK – CSC SCANIA

1.    Plaintiff Joshua Bradley Wolfe

435.    Plaintiff Joshua Bradley Wolfe is a citizen of the United States and is domiciled in the State of Washington.

436.    On the night of February 25, 2007, Joshua Bradley Wolfe, age 27, was serving as a peacekeeping serviceman in the U.S. Army National Guard, 593 Medium Transportation Company ("MTC"). At the time, Mr. Wolfe held the rank of Specialist, E-4.

437.    At the time of the February 25, 2007 Terrorist Attack, Mr. Wolfe was performing his duties as a Motor Transport Operator. The 593rd MTC was conducting convoy security along with members of the 260th Quartermaster Battalion, 3rd Sustainment Troop Brigade, 3rd Infantry Division, stationed in Fort Stewart, Georgia. The convoy was heading south on Main Supply Route ("MSR") Tampa to Tallil Air Base in Southern Iraq. After passing "SCANIA," a small U.S. Military installation, Mr. Wolfe's convoy was hit by an EFP.

438.    The weapon used to attack the convoy on February 25, 2007, and resulting in injury to Mr. Wolfe, was an Iranian-manufactured EFP provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

439.    As a result of the February 25, 2007 Terrorist Attack, Mr. Wolfe sustained significant injuries to his back and shoulder, and a concussion.

440.    As a result of the February 25, 2007 Terrorist Attack, Mr. Wolfe underwent multiple orthopedic surgeries, and significant medical treatment. He will require further medical treatment and care.

441.    As a result of the February 25, 2007 Terrorist Attack, and the injuries he suffered, Joshua Bradley Wolfe has experienced, and continues to experience, severe physical and mental anguish and extreme emotional pain and suffering.

442.    Mr. Wolfe has received a disability rating of 90% by the Veteran's Administration.

J.      **DECEMBER 4, 2006 ATTACK – BAGHDAD**

1.      **Plaintiffs The Portwine Family**

443.    Plaintiff Brain Lee Portwine was a citizen of the United States and was domiciled in the State of Florida at the time of his death.

444.    On December 4, 2006, Brain Lee Portwine, age 18, was serving as a peacekeeping serviceman in the U.S. Army, 2nd Brigade, One Eight Bravo Company, 1st Platoon, 8th Mechanized Infantry Division. At the time, Mr. Portwine held the rank of Private First Class, E-3.

445.    At the time of the December 4, 2006 Terrorist Attack, Mr. Portwine was riding in the rear of an M2 Bradley Infantry Fighting Vehicle as part of a mounted patrol in Baghdad, Iraq, when his vehicle was struck by an EFP. The explosion caused fuel to spray into the troop compartment, in turn igniting the interior on fire. The explosion also caused such damage to the vehicle that the occupants were unable to open the doors to immediately open the doors and

escape the burning vehicle. Mr. Portwine remained trapped in the vehicle as it burned and filled with smoke. Eventually, although injured, Mr. Portwine and the other occupants were able to escape the burning vehicle.

446.    The weapon used to attack and injure Mr. Portwine was an Iranian-manufactured EFP provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

447.    As a result of the attack, Mr. Portwine sustained significant injuries due to concussive blast forces, including shrapnel wounds and lacerations to his head and face, and a concussion. Mr. Portwine also had shrapnel and fragments of human bone imbedded in his body when the unit's interpreter's legs were eviscerated by the explosion resulting from the December 4, 2006 Terrorist Attacks.

448.    As a result of the December 4, 2006 Terrorist Attack, Mr. Portwine underwent medical treatment for his wounds in Baghdad, Iraq, and continued receiving treatment for his injuries in the United States.

449.    As a result of the December 4, 2006 Terrorist Attack, and the injuries he suffered, Brian Lee Portwine experienced severe physical and mental anguish and extreme emotional pain and suffering.

450.    On May 27, 2011, after being diagnosed with PTSD and TBI resulting from the December 4, 2006 Terrorist Attack, Brian Lee Portwine committed suicide.

451.    The December 4, 2006, Terrorist Attack, during which Mr. Portwine was injured, was the direct and proximate cause and/or a substantial contributing factor to his PTSD diagnosis and his TBI, as well as his mental anguish and extreme emotional pain and suffering that resulted in his suicide.

452.     Plaintiff Peggy Jean Portwine is a citizen if the United States and is domiciled in the state of Georgia. She is the mother of Brian Lee Portwine.

453.     Plaintiff Peggy Jean Portwine brings an action individually, and on behalf of the anticipated Estate of Brian Lee Portwine, and all heirs thereof, as its anticipated legal representative.

454.     As a result of the December 4, 2006, Terrorist Attack and the injuries suffered by, and death of, Brian Lee Portwine, Plaintiff Peggy Jean Portwine has experienced, and continues to experience, severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

### K.     THE NOVEMBER 27, 2006 ATTACK – SHULA

#### 1.     Plaintiffs The Strong Family

455.     Plaintiff Travis MacCody Strong is a citizen of the United States and domiciled in the State of Colorado.

456.     On the night of November 27, 2006, Travis MacCody Strong, age 29, was serving as a peacekeeping serviceman in the U.S. Army, 123rd Infantry Regiment, Fort Lewis, Washington. At the time, Mr. Strong held the rank of Staff Sargent, E-6.

457.     Mr. Strong was performing his duties as the Vehicle Commander and Controlled Gunner in his Stryker IAV while leading a mission along Creek Road in the Shula neighborhood of Baghdad, Iraq. Mr. Strong was seated inside the vehicle, in the center seat, when an explosion struck the convoy. The explosion completely severed his right leg, and nearly severed his left leg. Mr. Strong suffered enormous blood loss and was found to be asystole ("flat-lined") multiple times as medics worked to stabilize him.

458.     The weapon used to attack and injure Mr. Strong on November 27, 2006 was an

Iranian-manufactured EFP provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

459.    As a result of the November 27, 2006 Terrorist Attack, Mr. Strong sustained significant injuries due to the explosion, including massive blast damage to his legs and extensive shrapnel wounds.

460.    Mr. Strong underwent surgery to treat his leg wounds, resulting in bi-lateral above-the-knee amputations. He received medical and hospital care and treatment at Walter Reed Medical Hospital, Bethesda, Maryland; Balboa Naval Hospital in San Diego, California; Denver Veteran's Center, Colorado; University of Colorado Hospital, Denver, Colorado; and Denver Health, Colorado.

461.    As a result of the November 27, 2006 Terrorist Attack, and the injuries he suffered, Travis MacCody Strong has experienced, and continues to experience, severe physical and mental anguish and extreme emotional pain and suffering.

462.    Mr. Strong has received a disability rating of 100% by the Veteran's Administration.

463.    Plaintiff Tayler Heston is a citizen of the United States and is domiciled in the state of Arizona. She is the mother of Travis MacCody Strong.

464.    Plaintiff Anthony Joseph Durkacs is a citizen of the United States and is domiciled in the State of Nevada. He is the brother of Travis MacCody Strong.

465.    As a result of the November 27, 2006 Terrorist Attack, and the injuries suffered by Travis MacCody Strong, Plaintiffs Tayler Heston and Anthony Joseph Durkacs have experienced, and continue to experience, severe mental anguish and extreme emotional pain and suffering.

### L.     THE FEBRUARY 14, 2006 ATTACK – BAGHDAD

#### 1.     Plaintiff Tara Kathleen Hutchison

466.    Plaintiff Tara Kathleen Hutchison is a citizen of the United States and is domiciled in the State of Texas.

467.    On the morning of February 14, 2006, Tara Kathleen Hutchison, age 29, was serving as a peacekeeping servicewoman and Military Police in the U.S. Army, 463rd Military Police, Bravo Company. At the time, Ms. Hutchinson held the rank of Staff Sergeant, E-6.

468.    On February 14, 2006, Ms. Hutchinson's unit was providing military support for three Iraqi police stations near Race Track Road in Baghdad. The unit was dispatched to pick up an interpreter. After leaving the FOB, Ms. Hutchison, serving as the squad leader, was sitting in the right front passenger seat of an M1165 Up-Armored HMMWV combat vehicle. As the vehicle reached the end of an overpass an EFP detonated, destroying the vehicle.

469.    The weapon used to attack and injure Ms. Hutchison was an Iranian-manufactured IED provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

470.    As a result of the February 14, 2006 Terrorist Attack, Ms. Hutchison sustained significant injuries. Ms. Hutchison's right leg was severed three inches above the knee, and she experienced third degree burns and shrapnel wounds to her left leg. Due to blood loss, Ms. Hutchison flat-lined and was without a heartbeat for several minutes, resulting in anoxic brain injury.

471.    Ms. Hutchison underwent significant medical treatment for her injuries and will require further treatment and care.

472.    As a result of the February 14, 2006 Terrorist Attack, and the injuries she

suffered, Tara Kathleen Hutchison, has experienced, and continues to experience, severe physical and mental anguish and extreme emotional pain and suffering.

473.    Ms. Hutchison has received a disability rating of 100% by the Veteran's Administration.

### M.    THE AUGUST 13, 2005 ATTACK – SADR CITY, IRAQ

#### 1.    Plaintiff Brad Lee Schwarz

474.    Plaintiff Brad Lee Schwarz is a citizen of the United States and is domiciled in the State of Illinois.

475.    On August 13, 2005, Brad Lee Schwarz, age 20, was serving as a peacekeeping serviceman as a M1 Armor Crewman in the U.S. Army 3rd Infantry Division 315 Infantry. At the time, Mr. Schwarz held the rank of Private, E-1.

476.    On August 13, 2005, Mr. Schwarz was in the third Bradley Fighting Vehicle ("BFV") in a convoy of four BFV's and was serving as the troop carrier seated behind the gunner. The convoy was on the way to relieve a company from a security detail and was crossing over a major four lane highway. After three BFV's crossed the highway, a dual stacked EFP was detonated. The impact of the explosion caused significant damage to the fourth BFV and the impact of the explosion and concussive forces blasted Mr. Schwarz and other personnel in the third BFV. Reports over the radio that "the Bradley was on fire" resulted in Mr. Schwarz and the crew rapidly exiting the Bradley. Mr. Schwarz sustained physical injuries from the pressures of the blast and concussive forces of the explosion.

477.    The weapons used to attack and injure Mr. Schwarz in the August 13, 2005 Terrorist Attack were Iranian-manufactured EFPs provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

478.   As a result of the August 13, 2005 Terrorist Attack, Mr. Schwarz underwent medical treatment at Camp Buehring in Kuwait, Winn Army Community Hospital, Ft. Stewart, Georgia; North Chicago VA, Chicago, Illinois; and Northern Illinois Medical Center, McHenry, Illinois. He will require further treatment and care.

479.   As a result of the August 13, 2005 Terrorist Attack, Mr. Schwarz sustained physical injuries from the forces of the explosion including being dazed or disoriented from the blast, headaches, tinnitus or ringing in his ears, and TBI. He also sustained significant emotional and psychological injuries due to his proximity to the concussive blast forces of the explosion, including but not limited to PTSD, anxiety, depression, social anxiety disorder, nightmares, and insomnia.

480.   As a result of the August 13, 2005 Terrorist Attack, and the injuries he suffered, Brad Lee Schwarz has experienced, and continues to experience, severe physical and mental anguish and extreme emotional pain and suffering.

481.   Mr. Schwarz has received a disability rating of 100% by the Veteran's Administration.

### N.   JANUARY 1, 2005 ATTACK – HADITHA, IRAQ

#### 1.   Plaintiffs The Kuniholm Family

482.   Plaintiff Jonathan F. Kuniholm is a citizen of the United States and is domiciled in the State of Oregon.

483.   On the morning of January 1, 2005, Jonathan F. Kuniholm, age 33, was serving as a peacekeeping serviceman as the Engineer Officer in charge of 2nd Platoon, Charlie Company, 4th Combat Engineer Battalion attached to 1st Battalion 23rd Marines, U.S. Marine Corps. At the time, Mr. Kuniholm held the rank of Captain, O-3.

484.     On January 1, 2005, Mr. Kuniholm and his fellow Marines were stationed in Haditha, Iraq, and tasked with providing convoy security to maintain supply lines between Baghdad and Camp Anaconda, and with conducting engineering operations for security, mobility and counter-mobility of the infantry battalion.

485.     On this date, Mr. Kuniholm was with the small craft platoon, headed south on the Euphrates River. The unit was responding to a report of small arms fire against a patrol in the area. The unit dismounted their boats and continued on foot on the western shore of the Euphrates. The platoon arrived at the site on the bank from which the previous patrol had been attacked with small arms. At this point, Mr. Kuniholm noticed an olive oil can sitting on top of a wall in the middle of the clearing. As he pointed at the can and informed the Lieutenant, the can was remotely detonated, causing a massive explosion. The shrapnel from the blast nearly severed his right arm, blew apart his rifle, and penetrated his body armor, wounding his right side. Following the explosion, the unit was attacked in a sophisticated L-shaped ambush, with shooters lined up south and west side of the clearing. Taking multi-directional fire from small arms and rocket propelled grenades, the Marines returned fire.

486.     The weapon used to attack and injure Cpt. Kuniholm during the January 1, 2005 Terrorist Attack was an Iranian-manufactured IED provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

487.     Upon information and belief, the Special Group known as Ansar al Islam (AAI) was operating in the area around Haditha, and has claimed responsibility for attacks against U.S. Forces at the time of the attack that injured Mr. Kuniholm. Upon information and belief, Ansar al Islam was responsible for the January 1, 2005 Terrorist Attack that injured Mr. Kuniholm.

488.     Mr. Kuniholm was evacuated by helicopter and taken to Al Asad Hospital where

his right arm was amputated. The next day, Mr. Kuniholm was sent to the field hospital at Balad Air Force Base, Landstuhl Germany, and then Bethesda, Maryland, and finally Durham, North Carolina, for further medical treatment related to this Terrorist Attack.

489.    Mr. Kuniholm will require further medical treatment and care as result of the January 1, 2005 Terrorist Attack.

490.    As a result of the January 1, 2005 Terrorist Attack, and the injuries he suffered, Jonathon F. Kuniholm has experienced, and continues to experience, severe physical and mental anguish and extreme emotional pain and suffering.

491.    Mr. Kuniholm has received a disability rating of 100% by the Veteran's Administration.

492.    Plaintiff Michele Terese Quinn is a citizen of the United States and is domiciled in the state of Oregon. She is the wife of Jonathan F. Kuniholm.

493.    Plaintiff S.K., a minor, represented by his legal guardians Jonathan F. Kuniholm and Michele Terese Quinn, is a citizen of the United States and is domiciled in the state of Oregon. He is the son of Jonathan F. Kuniholm and Michelle Terese Quinn.

494.    As a result of the January 1, 2005 Terrorist Attack, and the injuries suffered by Jonathan F. Kuniholm, Plaintiffs Michele Terese Quinn, and S. K have experienced, and continue to experience, severe mental anguish, extreme emotional pain and suffering.

O.    THE DECEMBER 21, 2004 ATTACK – FOB MAREZ, MOSUL

1.    Plaintiffs The Ruhren Family

495.    Plaintiff David Alan Ruhren was a citizen of the United States and was domiciled in the State of Virginia at the time of his death.

496.    On the morning of December 21, 2004, David Alan Ruhren, age 20, was serving

as a peacekeeping serviceman as a Combat Engineer in the U.S. Army National Guard, 276th Engineer Battalion, Charlie Company. At the time, Mr. Ruhren held the rank of Sergeant, E-4.

497.    On December 21, 2004, Mr. Ruhren was standing in line with others in his unit at the mess hall getting food to take with them on a mission. An individual disguised as an Iraqi officer walked in, sat down, and detonated a suicide bomb. Mr. Ruhren sustained mortal injuries as a result of the explosion.

498.    The weapon used to attack and kill Mr. Ruhren during the December 21, 2004 Terrorist Attack was an Iranian-manufactured IED provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

499.    Upon information and belief, the terrorist group known as Ansar al Islam has claimed responsibility for the December 21, 2004 Terrorist Attack that resulted in injury to Mr. Ruhren.

500.    Plaintiff Sonja Ruhren is a citizen of the United States and domiciled in the state of Virginia. She is the mother of David Alan Ruhren.

501.    Plaintiff Sonja Ruhren, brings an action individually, and on behalf of the anticipated Estate of David Alan Ruhren, and all heirs thereof, as its anticipated legal representative.

502.    As a result of the December 21, 2004 Terrorist Attack, and the injuries suffered by, and death of, David Alan Ruhren, Plaintiff Sonja Ruhren has experienced, and continues to experience, severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

### 2.    Plaintiff Mark Joseph Pratt

503.    Plaintiff Mark Joseph Pratt is a citizen of the United States and is domiciled in the

State of Virginia.

504.    On the morning of December 21, 2004, Mark Joseph Pratt, age 39, was serving as a as a peacekeeping serviceman as a Combat Engineer in the U.S. Army National Guard, 276th Engineer Battalion, Charlie Company. At the time, Mr. Pratt held the rank of Staff Sergeant, E-6. Mr. Pratt served in both the United States Army and Marines. When honorably discharged from the U.S. Marine Corps, Mr. Pratt held the rank of E-4, Corporal.

505.    On December 21, 2004, Mr. Pratt reported to the dining hall for lunch. After sitting down with his food, a suicide bomber detonated an explosive device and the explosion tore through the dining area. The explosion killed two people next to Mr. Pratt, and knocked Mr. Pratt unconscious.

506.    The weapon used to attack and injure Mr. Pratt during the December 21, 2004 Terrorist Attack was an Iranian-manufactured IED provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

507.    Upon information and belief, the terrorist group known as Ansar al Islam has claimed responsibility for the December 21, 2004 Terrorist Attack that resulted in injury to Mr. Pratt.

508.    As a result of the December 21, 2004 Terrorist Attack Mr. Pratt sustained significant injuries due to the concussive blast forces, including TBI, and injuries to his back and left hip. Mr. Pratt also suffers from PTSD.

509.    Mr. Pratt underwent extensive medical treatment for both his physical and psychological injuries, including surgery on his back.

510.    As a result of the December 21, 2004 Terrorist Attack, and the injuries he suffered, Mark Joseph Pratt has experienced, and continues to experience, severe physical and

mental anguish and extreme emotional pain and suffering.

511.    Mr. Pratt has received a disability rating of 100% by the Veteran's Administration.

### 3.    Plaintiff Evan Wayne Byler

512.    Plaintiff Evan Wayne Byler is a citizen of the United States and is domiciled in the State of Idaho.

513.    At the time of the December 21, 2004 Terrorist Attack, Evan Wayne Byler, age 27, was serving as a peacekeeping serviceman as a Unit Supply Specialist in the U.S. Army National Guard, 276th Engineer Battalion, Company. At the time, Mr. Byler held the rank of Sergeant, E-5.

514.    Mr. Byler was present in the dining hall when the Iranian-affiliated suicide bomber detonated an explosive device and the explosion tore through the dining area. The explosion knocked Mr. Byler unconscious.

515.    The weapon used to attack and injure Mr. Byler during the December 21, 2004 Terrorist Attack was an Iranian-manufactured IED provided by Iran and/or its agent to Iranian-funded and Iranian-trained terror operatives in Iraq.

516.    Upon information and belief, the terrorist group known as Ansar al Islam has claimed responsibility for the December 21, 2004 Terrorist Attack that resulted in injury to Mr. Byler.

517.    As a result of the December 21, 2004 Terrorist Attack, Mr. Byler sustained significant injuries due to the concussive blast forces, including TBI with seizure disorder, speech aphasia, and short-term memory loss. Mr. Byler also suffers from migraine headaches, insomnia, anxiety and various side-effects from seizure medication prescribed as a result of these

injuries.

518.    Mr. Byler has received medical treatment at St. Alphonsus Hospital, Nampa, Idaho; VA Medical Centers in Boise, Idaho, and in Martinsburg, Virginia, and continues to seek treatment at VA Medical Centers for his seizures and complications relating to his TBI and PTSD.

519.    As a result of the December 21, 2004 Terrorist Attack, and the injuries he suffered, Evan Wayne Byler has experienced, and continues to experience severe physical and mental anguish and extreme emotional pain and suffering.

520.    Mr. Byler has received a disability rating of 100% by the Veteran's Administration.

### 4.    Plaintiff Teray Anton Bundy

521.    Plaintiff Teray Anton Bundy is a citizen of the United States and is domiciled in the State of Virginia.

522.    On December 21, 2004, Mr. Bundy, age 22, was serving as a peacekeeping serviceman as a 63B Light Wheel Mechanic in the U.S. Army National Guard, 276th Engineer Battalion, Charlie Company. At the time, Mr. Bundy held the rank of Specialist, E-4.

523.    On December 21, 2004, Mr. Bundy was present near the dining hall when the Iranian-affiliated suicide bomber detonated an explosive device and the explosion tore through the dining area. Mr. Bundy was hit by the concussive forces of the explosions, and witnessed the devastating damage and the aftermath. Despite suffering from shock and confusion, Mr. Bundy provided first aid to the injured.

524.    The weapon used to attack and injure Mr. Bundy during the December 21, 2004 Terrorist Attack was an Iranian-manufactured IED provided by Iran and/or its agents to Iranian-

funded and Iranian-trained terror operatives in Iraq.

525.    Upon information and belief, the terrorist group known as Ansar al Islam has claimed responsibility for the December 21, 2004 Terrorist Attack that resulted in injury to Mr. Bundy.

526.    As a result of the December 21, 2004 Terrorist Attack, Mr. Bundy sustained significant emotional and psychological injuries due to his proximity to the explosion including PTSD, flashbacks, nightmares, and frequent intense migraine headaches.

527.    Mr. Bundy underwent medical treatment for his injuries and will require further treatment and care due the injuries caused by the December 21, 2004 Terrorist Attack

528.    As a result of the December 21, 2004 Terrorist Attack, and the injuries he suffered, Teray Anton Bundy has experienced, and continues to experiences, severe physical and mental anguish and extreme emotional pain and suffering.

529.    Mr. Bundy has received a disability rating of 50% by the Veteran's Administration.

### 5.    Plaintiff Jeff McKinley Wright

530.    Plaintiff Jeff McKinley Wright is a citizen of the United States and is domiciled in the State of Virginia.

531.    On December 21, 2004, Mr. Wright, age 20, was serving as a peacekeeping serviceman as a Combat Engineer in the U.S. Army National Guard, 276th Engineer Battalion, Charlie Company. At the time, Mr. Wright held the rank of Specialist, E-4.

532.    On December 21, 2004, Mr. Wright was present in the dining hall when an Iranian-affiliated suicide bomber detonated an explosive device and the explosion tore through the dining area. The explosion threw Mr. Wright 20 feet and knocking him to the ground. As the

smoked cleared, Mr. Wright took action and began assisting with the injured. After helping evacuate several of his fellow soldiers, Mr. Wright grew weak and faint. At this time, he realized that he had been hit by shrapnel in the stomach and legs. Upon realizing the extent of his wounds, Mr. Wright was ordered to evacuate with the other wounded.

533.   The weapon used to attack and injure Mr. Wright during the December 21, 2004 Terrorist Attack was an Iranian-manufactured IED provided to Iranian-funded and Iranian-trained terror operatives in Iraq.

534.   Upon information and belief, the terrorist group known as Ansar al Islam has claimed responsibility for the December 21, 2004 Terrorist Attack that resulted in injury to Mr. Wright.

535.   As a result of the December 21, 2004 Terrorist Attack, Mr. Wright sustained significant injuries due to the concussive blast forces, including shrapnel wounds in his stomach, chest, and legs. He suffered a right ankle injury, and now suffers from progressive hearing loss.

536.   Mr. Wright underwent medical treatment to remove the shrapnel from his body. A total of 24 pieces of shrapnel were found in and removed from his stomach and legs.

537.   As a result of the December 21, 2004 Terrorist Attack, and the injuries he suffered, Jeff McKinley Wright has experienced, and continues to experience, severe physical and mental anguish and extreme emotional pain and suffering.

538.   Mr. Wright has received a disability rating of 60% by the Veteran's Administration.

### 6.    Plaintiff Brima Charles Turay

539.   Plaintiff Brima Charles Turay is a citizen of the United States and is domiciled in the State of Virginia.

540.     Mr. Turay, age 21 at the time, was serving as a as a peacekeeping serviceman as a Combat Engineer in the U.S. Army National Guard, 276th Engineer Battalion, Alpha Company. At the time of December 21, 2004 Terrorist Attack, Mr. Turay held the rank of Specialist, E-4.

541.     On December 21, 2004, Mr. Turay was walking to the dining hall and, as he was nearing the facility, an Iranian-affiliated suicide bomber detonated an explosive device and the explosion tore through the dining area. Shrapnel was flying everywhere. After the explosion and in the chaos, Mr. Turray attempted to provide first aide to others injured, including the squadron leader.

542.     The weapon used to attack and injure Mr. Turay was an Iranian-manufactured IED provided by Iran and/or one of its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

543.     Upon information and belief, Ansar al Islam has claimed responsibility for the attack that resulted in injury to Mr. Turay.

544.     As a result of the December 21, 2004 Terrorist Attack, Mr. Turay sustained significant emotional and psychological injuries due to the concussive blast forces of the explosion, including, but not limited to, psychological injuries, PTSD, nightmares, reenactments, night sweats, headaches, insomnia, depression, anxiety, and other severe psychological and emotional complications.

545.     As a result of the injuries sustained by him during the December 21, 2004 Terrorist Attack, Mr. Turay has undergone counseling, therapy classes for treatment of PTSD, and was prescribed medication at Washington D.C. Veteran's Affairs Medical Center.

546.     As a result of the December 21, 2004 Terrorist Attack, and the injuries he suffered, Brima Charles Turay has experienced, and continues to experience, severe mental

anguish and extreme emotional pain and suffering.

547.    Mr. Turay has received a disability rating of 70% by the Veteran's Administration.

P.    **NOVEMBER 9, 2004 ATTACK – ISKANDARIYA, IRAQ**

1.    **Plaintiffs The Nolte Family**

548.    Plaintiff Nicholas S. Nolte was a citizen of the United States and domiciled in the State of Nebraska at the time of his death.

549.    On the morning of November 9, 2004, Nicholas S. Nolte, age 25, was serving as a peacekeeping serviceman and Sergeant in the 2nd Low Altitude Air Defense Battalion, 2nd Marine Aircraft Wing, Marine Expeditionary Force, U.S. Marine Corps. At the time, Mr. Nolte held the rank of E-5

550.    Prior to his service in Iraq, Mr. Nolte served in the Presidential Helicopter Squadron HMX-1, guarding both President George W. Bush and President Bill Clinton.

551.    On November 9, 2004,, Mr. Nolte was stationed at FOB Kalsu, in Iskandariya, Iraq. Mr. Nolte was traveling in a High Mobility Multipurpose Wheeled Vehicle (HMMWV) that was hit by a "daisy chain" IED that was remote detonated by three individuals later determined to be responsible for the Terrorist Attack.

552.    Mr. Nolte was gravely injured. He was medically evacuated from the scene to a field hospital in Baghdad, Iraq. On November 11, 2009, Mr. Nolte was medevac'd to the U.S. Army Medical Center, in Lundstuhl, Germany. On November 19, 2004, Mr. Nolte was transported to the National Naval Medical Center in Bethesda, Maryland.

553.    On November 24, 2004, Mr. Nolte died as result of his wounds.

554.    The weapon used to attack and kill Sgt. Nolte on November 9, 2004 was an

Iranian-manufactured IED provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

555.    Upon information and belief, the Special Group known as Kata'ib Hizballah was operating in the area around FOB Kalsu, and has claimed responsibility for attacks against U.S. Forces at the time of the attack that killed Mr. Nolte. Upon information and belief, Kata'ib Hizbalah perpetrated the Terrorist Attack that resulted in Plaintiff Nicholas S. Nolte's injuries and resultant death.

556.    Plaintiff Melina Rose Nolte is a citizen of the United States and domiciled in the state of Colorado. She is the widow of Nicholas S. Nolte.

557.    Plaintiff Melina Rose Nolte, brings an action individually, and on behalf of the Estate of Nicholas S. Nolte, and all heirs thereof, as its anticipated legal representative.

558.    Plaintiff A.N., a minor, represented by her legal guardian Melina Rose Nolte, is a citizen of the United States and domiciled in the state of Colorado. She is the daughter of Melina Rose Nolte and Nicholas S. Nolte.

559.    Plaintiff Anita Nolte is a citizen of the United States and domiciled in the state of Nebraska. She is the mother of Nicholas S. Nolte.

560.    Plaintiff Jessica Nolte is a citizen of the United States and domiciled in the state of Nebraska. She is the sister of Nicholas S. Nolte.

561.    As a result of the November 9, 2004 Terrorist Attack, and the injuries suffered by, and the death, Nicholas S. Nolte, Plaintiffs Melina Nolte, A.N., Anita Nolte, and Jessica Nolte have experienced, and continue to experience, severe mental anguish, extreme emotional pain and suffering, and loss of Nicholas S. Nolte's society, companionship, comfort, advice and counsel.

## VII.   ALL OF THE TERRORIST ATTACKS WERE ACTS OF INTERNATIONAL TERRORISM

562.   At no time during the Relevant Period, nor due to actions of United States and Coalition Forces in Iraq, did the United States declare war or enact an Authorization for the use of military force against Iran, nor did the United States or Coalition Forces engage in an armed conflict with the military forces of Iran, nor did Iran's military forces or their agents engage in lawful acts of war against Coalition Forces or U.S. nationals, including Plaintiffs.

563.   At no time relevant to this Action did the United States engage in an armed conflict with the military forces of Iran, nor did Iran's military forces or their agents engage in lawful acts of war against Coalition Forces and U.S. nationals, including Plaintiffs.

564.   At no time relevant to this Action did the operatives of Hezbollah, the IRGC, the IRGC-QF, the Special Groups, Ansar al Islam and/or other Iranian-sponsored terrorists who killed and injured Plaintiffs carry fixed distinctive signs recognizable at a distance, carry arms openly, conduct their operations in accordance with the laws and customs of war, or enjoy any form of combatant immunity for their acts.

565.   The specific attacks alleged herein were all carried out by terrorists and terrorist organizations, including designated FTOs, SDGTs, SDTs, and/or SDNs (all with the substantial and material support of Defendant), and not by armed forces of recognized governments or military forces.

566.   The conduct of Iran, IRGC, IRGC-QF, Hezbollah, Ansar al Islam, the Special Groups and/or other Iranian-supported terrorists, including the FTOs, SDGTs, SDTs, and/or SDNs, including those responsible for perpetrating the Terrorist Attacks which resulted in the injuries or deaths of Plaintiffs, violated the laws of armed conflict (including, *e.g.*, AAH operatives masquerading as members of U.S. armed forces, targeting civilians and torturing and

executing defenseless hostages), and the widespread and intentional attacks upon U.S. nationals (including Plaintiffs), British, Iraqi, and other civilians and United Nations personnel, constituted a substantial, rather than an incidental, part of their objectives and conduct.

567.    The deaths and injuries Plaintiffs sustained were not the result of, nor did they occur in the course of, a declared war with Iran, or an armed conflict between the United States and Iran.

568.    The acts of the IRGC, IRGC-QF, Hezbollah, and/or the Special Groups (including the FTOs, SDGTs, SDTs, and/or SDNs responsible for perpetrating the Terrorist Attacks) that injured or killed Plaintiffs were acts of international terrorism within the meaning of 18 U.S.C. § 2331, involving violent acts intended to influence the United States and the United Nations by coercion (by coercing the withdrawal of Coalition Forces from Iraq) and to intimidate and coerce the Iraqi population, and were also acts constituting terrorist activities within the meaning of 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or engaging in terrorism within the meaning of 22 U.S.C. § 2656f.

569.    The acts of Iran, the IRGC, IRGC-QF, Hezbollah, Ansar al Islam, Special Groups and/or other Iranian-sponsored terrorists that injured the Plaintiffs were acts of torture, hostage taking and extrajudicial killing as defined by 28 U.S.C. §§ 1605A(h)(2) and 1605A(h)(7), and acts of international terrorism as defined by of 18 U.S.C. § 2331.

570.    The Terrorist Attacks at issue here were acts of international terrorism that were enabled by Defendant's provision of massive financial and material support and resources as defined by 28 U.S.C. § 1605A(h)(3) and 18 U.S.C. § 2339A, which caused the injuries to and/or deaths of Plaintiffs. Without Iran's provision of such material support, on the scale that such support was provided, the IRGC, IRGC-QF, Hezbollah, the Special Groups, Ansar al Islam

and/or other Iranian proxies would not have been unable to conduct the thousands of acts of international terrorism on the scale and with the lethality they perpetrated, including the Terrorist Attacks, which caused the deaths, maiming, or otherwise injuring of Plaintiffs and Plaintiffs' family members.

## VIII.   THE ACTS OF IRAN CAUSED PLAINTIFFS' INJURIES AND DEATHS

571.   As discussed herein, Iran has a long history of materially supporting the Special Groups and other terrorists, including the FTOs, SDGTs, SDTs, SDNs and/or other Iranian sponsored terrorist responsible for the Terrorist Attacks which killed or injured Plaintiffs. Simply put, Iran is no stranger to supporting terrorist attacks perpetrated by FTOs and other terrorist organizations against U.S. nationals with the intent to terrorize, kill or cause severe bodily and emotional harm.

572.   Here, Iran provided material support and resources to the Special Groups and other terrorist organizations, including the FTOs, SDGTs, SDTs, SDNs and other terrorists who perpetrated the Terrorist Attacks which killed or injured Plaintiffs.

573.   Without Iran's support, the Special Groups and other terrorist organizations, including the FTOs, SDGTs, SDTs, and/or SDNs responsible for the Terrorist Attacks which resulted in Plaintiffs being killed or injured would not have been able to carry out such Terrorist Attacks with the scale and lethality in which they were perpetrated.

## IX.   CLAIMS

574.   Plaintiffs bring the following claim against Defendant.

### A.   CLAIM 1: PROVISION OF MATERIAL SUPPORT FOR ACTS OF EXTRAJUDICIAL KILLING, TORTURE, AND HOSTAGE TAKING UNDER 28 U.S.C. § 1605A

575.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

576.    Plaintiffs were grievously injured by Iran's provision of material support (within the meaning of § 1605A(h)(3)) to terror operatives in Iraq who engaged in extrajudicial killing, torture and hostage taking, and who injured the Plaintiffs.

577.    Iran is and was at all times relevant a state sponsor of terrorism within the meaning of § 1605A(h)(6).

578.    The anticipated Estates of Plaintiffs listed in the foregoing paragraphs assert claims on behalf of the decedents who were grievously injured by Iran's provision of material support (within the meaning of § 1605A(b)(3)), to terror operatives in Iraq who engaged in the acts of extrajudicial killing, torture and/or hostage taking that caused the decedents' conscious pain and suffering and ultimately deaths.

579.    As a direct and proximate result of the willful, wrongful, and intentional acts of Iran and its agents, Plaintiffs identified in the foregoing paragraphs were injured and/or killed and endured severe physical injuries, extreme mental anguish, pain and suffering, loss of solatium, and economic losses, including medical expenses and lost income.

580.    As a direct and proximate result of the willful, wrongful, and intentional acts of Iran and its agents, the decedents listed in the foregoing paragraphs endured physical injury, extreme mental anguish, and pain and suffering that ultimately lead to their deaths.

581.    Plaintiffs' compensatory damages, including, but not limited to, their severe physical injuries, extreme mental anguish, pain and suffering, loss of solatium, prejudgment interest and any economic losses determined by the trier of fact.

582.    Iran is liable for the full amount of Plaintiffs' compensatory damages, including physical injuries, extreme mental anguish, pain and suffering and any pecuniary loss (or loss of income to the anticipated estates).

583.    Iran's acts in providing material support for acts of extrajudicial killing, torture, and hostage-taking were intended to inflict severe emotional distress on the Plaintiffs.

584.    As a result of Iran's acts, the families of individuals identified in the foregoing paragraphs as injured or killed as a result of Defendant's acts in providing material support for acts of extrajudicial killing, torture, and hostage-taking have suffered severe emotional distress, extreme mental anguish, loss of sleep, loss of appetite, and other severe physical manifestations, as well as loss of solatium and other harms to be set forth to the trier of fact.

585.    Because Iran (a State Sponsor of Terror), and its agents routinely relied upon and controlled IRISL, Mahan Air, and the Iranian National Oil Company to provide material support to FTOs and Special Groups and/or other terrorist organizations, including those FTOs, Special Groups, and other terrorist organizations responsible for the Terrorist Attacks that resulted in the death, maiming, or injury to Plaintiffs and/or Plaintiffs' family members, to advance the terrorist activities of Iran, and the FTOs, Special Groups, and other terrorists, Iran is vicariously liable for the personal injuries caused by IRISL, Mahan Air, and the Iranian National Oil Company.

586.    Because Iran (a State Sponsor of Terror) and its agents routinely provided material support to FTOs, Special Groups, and other terrorist organizations, including those FTOs, Special Groups and other terrorist organization responsible for the Terrorist Attacks that resulted in the death, maiming, or injury to Plaintiffs and/or Plaintiffs' family members, to advance the terrorist activities of those FTOs, Special Groups and other terrorist organizations, Iran is vicariously liable for the personal injuries caused by those FTOs, Special Groups, and other terrorist organizations.

587.    The conduct of the Iran and its agents was criminal, outrageous, extreme, wanton, willful, malicious, a threat to international peace and security, and a threat to the public

warranting an award of punitive damages against Iran pursuant to 28 U.S.C. § 1605A(c).

## X.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand:

a)  Judgment for all Plaintiffs against Defendant for compensatory damages, including, but not limited to, physical injury, extreme mental anguish, pain and suffering, emotional injuries, economic losses, including medical expenses and lost income, and loss of solatium, in amounts to be determined at trial;

b)  Judgment for Plaintiff Estates against Defendant for compensatory damages for the extrajudicial killing of the decedents, including, but not limited to, physical injury, extreme mental anguish, pain and suffering, economic losses, including loss of support, financial and otherwise, and any pecuniary loss (or loss of income to the estates) in amounts to be determined at trial;

c)  Judgment for all Plaintiffs against Defendant for punitive damages in an amount to be determined at trial;

   i.  Punitive damages are warranted in this case because:

      1.  The conduct of Defendant and its agents demonstrates a policy of encouraging, supporting and directing a campaign of thousands or tens of thousands of deadly acts of terrorism directed at civilians and peacekeeping forces, and in particular against U.S. nationals, such that the monstrous character of the Terrorist Attacks is obvious. Specifically, Defendant focused its finances, infrastructure, agents and instrumentalities to support, encourage and increase the infliction of maximum pain and suffering on

innocent people and their families;

2. The conduct of Defendant and its agents demonstrates that it harbors a deep-seeded and malicious hatred of the United States, and that Defendant intentionally committed terroristic murder and extrajudicial killings, torture and hostage taking of American civilians and peacekeeping servicemen and servicewomen;

3. The conduct of Defendant and its agents is extreme and outrageous such that it demonstrates an undeniable intent to do harm, and inflict severe physical and emotional distress, even on those not present at the site of the acts;

4. The Terrorist Attacks described herein and that which the Plaintiffs experienced are among the most heinous acts of deliberate violence;

5. The Defendant, its agents, and all others, should be unquestionably deterred from committing similar acts in the future;

6. Defendant still publicly denies its role in the Terrorist Attacks, and disclaims even its mere presence in Iraq during the Relevant Period;

7. Defendant took purposeful and concerted steps to deny, conceal, and mask its role in the Terrorist Attacks;

8. Defendant knowingly violated U.S. and international sanctions, laws, and treaties to effectuate its purposeful campaign of terror;

9. Defendant has built its system of terrorism such that it acts through

agents and instrumentalities of the state to perpetrate and

perpetuate terrorism;

10. Defendant has commodified and privatized terrorism such that the

core function of its agents, proxies and instrumentalities are

sufficiently distinct and commercial, and not merely governmental.

d) Plaintiffs' costs and expenses;

e) Plaintiffs' attorney's fees; and

f) Such other and further relief as the Court finds just and equitable.

Respectfully Submitted,                   Dated: May 15, 2017

| THE NATIONS LAW FIRM | MM~LAW LLC |
|---|---|
| By: /s/ Rachel V. Rose<br>Rachel V. Rose<br>DC Bar No. TX0132<br>Howard L. Nations (DC Bar Application Pending)<br>Texas Bar No. 14823000<br>3131 Briarpark Drive, Suite 208<br>Houston, Texas 77042<br>Telephone: 713.807.8400<br>Facsimile: 713.807.8423<br>Email: rachel.rose@howardnations.com<br>       howard@howardnations.com | Gavriel Mairone (*Pro Hac Vice* to be filed)<br>Illinois Bar No. 618698<br>980 North Michigan Avenue, Suite 1400<br>Chicago IL 60611<br>Telephone: 312.253.7444<br>Facsimile: 312.275.8590<br>Email: ctlaw@mm-law.com |
| LEVIN, PAPANTONIO, THOMAS, MITCHELL, RAFFERTY AND PROCTOR | NIX, PATTERSON AND ROACH, LLP |
| Troy A. Rafferty (*Pro Hac Vice* to be filed)<br>Florida Bar No. 24120<br>Christopher G. Paulos (*Pro Hac Vice* to be filed)<br>Florida Bar No. 0091579<br>Jeffrey Gaddy (*Pro Hac Vice* to be filed)<br>Florida Bar No. 53046<br>Troy Bouk (*Pro Hac Vice* to be filed)<br>Florida Bar No. 43384<br>316 South Baylen Street, Suite 600<br>Pensacola, Florida 32502 | Michael B. Angelovich (*Pro Hac Vice* to be filed)<br>Texas Bar No. 00785666<br>Chad E. Ihrig (*Pro Hac Vice* to be filed)<br>Texas Bar No. 24084373<br>Christian Hurt (*Pro Hac Vice* to be filed)<br>Texas Bar No. 24059987<br>3600 N. Capital of Texas Highway<br>Building B, Suite 350<br>Telephone: 512.328.5333<br>Facsimile: 512.328.5335 |

| | |
|---|---|
| Telephone: 850.435.7000<br>Facsimile: 850.436.6123<br>Email:  trafferty@levinlaw.com<br>        cpaulos@levinlaw.com<br>        jgaddy@levinlaw.com<br>        tbouk@levinlaw.com | Email:  mangelovich@nixlaw.com<br>        cihrig@nixlaw.com<br>        christianhurt@nixlaw.com |
| **LUCAS MAGAZINE**<br><br>James L. Magazine (*Pro Hac Vice* to be filed)<br>Florida Bar No. 0847232<br>8606 Government Drive<br>New Port Richey, Florida 34654<br>Telephone: 727.849.5353<br>Facsimile: 727.845.7949<br>Email:  jim@lucasmagazine.com | **BURG, SIMPSON, ELDREDGE, HERSH AND JARDINE, P.C.**<br><br>David K. TeSelle (*Pro Hac Vice* to be filed)<br>Colorado Bar No. 29648<br>40 Inverness Drive East<br>Englewood, Colorado 80112<br>Telephone: 303.792.5595<br>Facsimile: 303.708.0527<br>Email:  dteselle@burgsimpson.com |
| **SPANGENBERG, SHIBLEY, AND LIBER LLP**<br><br>William Hawal (*Pro Hac Vice* to be filed)<br>Ohio Bar No. 0006730<br>1001 Lakeside Avenue E, No. 1700<br>Cleveland, Ohio 44114<br>Telephone: 216.600.0114<br>Facsimile: 216.696.3924<br>Email:  whawal@spanglaw.com | |