**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JOSHUA L. HOLLADAY, SHIRLEY ATKINSON, CRYSTAL HASTINGS, DOMENICK J. ALAGNA, BRIAN CLARK ALLDRIDGE, JOANN ALLDRIDGE, ANDREW CHARLES MAJOR, ASHLEY MEIKEL MAJOR, A.M.M, a minor, RONALD ALLDRIDGE, DIANNA ALLDRIDGE, TODD ALLDRIDGE, TRAVIS R. BASS, HAROLD BASS, MARY L. BASS, ALLEN MILTON, AARON BASS, ADAM C. BASS, LISA LAMBERT, DANIEL BIVENS, GRANT R. BLACKWELL, TERAY A. BUNDY, EVAN W. BYLER, THOMAS M. COE II, HEATHER N. COE, V.T.C., a minor, QUENTIN D. COLLINS, MELIDA COLLINS, SIERA N. COLLINS, SHAWN COLLINS, MICHAEL A. COLLINS, I.C.C., a minor, JAY M. FONDREN, ANNE H. FONDREN, M.J.F, a minor, ANTONIO M. FREDERICK, ERNESTO P. HERNANDEZ III, LAURA F. HERNANDEZ, E.H., a minor, N.H., a minor, ERNESTO I HERNANDEZ II, TINA L. HOUCHINS INDIVIDUALLY, AND FOR THE ESTATE OF AARON D. GAUTIER, GREGORY E. HOGANCAMP, TARA K. HUTCHINSON, JERRALD J. JENSEN, WYMAN H. JONES, IOAN A. KELEMEN, RANDALL L. KLINGENSMITH, JONATHAN F. KUNIHOLM, MICHELE TERESE QUINN, S.K., a minor, BRUCE KUNIHOLM, ELIZABETH KUNIHOLM, ERIN KUNIHOLM, JOHN MAINE, AYAD M. MAJEED, SANA ALI, M.A.M, a minor, M.A.M, a minor, S.M, a minor, HARDY P. MILLS IV, JOSEPH C. MIXSON, VIRGINIA B. MIXSON, JOSEPH JOHNSON MIXSON, KARON MIXSON, ALICIA MIXSON, BALTAZAR MORIN JR., MIRANDA A. HARELSTON, JAMES R. NICHOLS, QUEEN NICHOLS, JAMES | §§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§ | **PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>**Case No.: 1:17-cv-00915-RDM**<br><br>**Hon. Randolph D. Moss** |

| | | |
|---|---|---|
| NICHOLS, THOMAS NICHOLS, SHARON NICHOLS, SEAN M. NIQUETTE, LAUREN NIQUETTE, MELINA ROSE NOLTE INDIVIDUALLY, AND FOR THE ESTATE OF NICHOLAS S. NOLTE, A.N., a minor, ANITA NOLTE, JESSICA NOLTE, TIMOTHY J. O'SULLIVAN, MICHAEL L. OWEN, LAURIE MILLER, R.O., a minor, COLIN L. PEARCY, LAIRD PEARCY, ANNE PEARCY, JODY STRIKER, KARYN MCDONALD, ANDREW PEARCY, PATRICK PEARCY, JAMES J. POOLE III, ALLISON P. ROOSIEN, PEGGY J. PORTWINE INDIVIDUALLY, AND FOR THE ESTATE OF BRIAN L. PORTWINE, MARK J. PRATT, SONJA RUHREN INDIVIDUALLY, AND FOR THE ESTATE OF DAVID ALAN RUHREN, BRIAN R. SCHAR, BRAD LEE SCHWARZ, DANIEL W. SEGERS, LARRY SEGERS, SHARON W. PARKER, DAVID L. SEGERS, DAVID A. SIMMONS II, ARTHUR B. STOKENBURY, TRAVIS M. STRONG, TAYLER HESTON, ANTHONY J. DURKACS, KOMA K. TEXEIRA, BRIMA TURAY, RUTH TURAY, ALLEN R. VAUGHT, GRANT BLANEY VON LETKEMANN II, KELLY LYNN VON LETKEMANN, SEAN LEE WILLIAMS, SUE ANN WILLIAMS, JOSHUA B. WOLFE, JEFF M. WRIGHT, ROGER L. YOUNG,<br><br>(Addresses filed under Seal)<br><br>Plaintiffs,<br><br>v.<br><br>THE ISLAMIC REPUBLIC OF IRAN<br>The Ministry of Foreign Affairs<br>Imam Khomeini Avenue<br>Tehran, Iran | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | |

| | | |
|---|---|---|
| THE ISLAMIC REVOLUTIONARY GUARD CORP ("IRGC")<br>Armed Forces Headquarters Iran<br>Tehran – Zone 7 – Shariati<br>Ghoddoosi Square (Ghaar)<br>Tehran, Iran<br><br>IRANIAN MINISTRY OF INTELLIGENCE & SECURITY<br>(a/k/a Vezarat-e Ettela'at Va Amniat-e Keshvar a/k/a VEVAK a/k/a VAJA)<br>Second Negarestan Street, Pasdarsan Avenue<br>Tehran, Iran<br><br>BANK MARKAZI JOMHOURI ISLAMI IRAN<br>(a/k/a the Central Bank of the Islamic Republic of Iran)<br>Mirdamad Bouelvard<br>No. 198<br>Tehran, Iran<br><br>BANK MELLI IRAN<br>Ferdowsi Avenue<br>Tehran, Iran<br><br>MELLI BANK PLC<br>98a Kensington High Street<br>London 48 4SG<br>United Kingdom<br><br>NATIONAL IRANIAN OIL COMPANY<br>Hafez Crossing<br>Taleghani Avenue<br>Tehran, Iran<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |

# TABLE OF CONTENTS


I. NATURE OF THE CASE ........ 1

II. JURISDICTION AND VENUE ........ 4

A. This Court Has Jurisdiction Over All Claims and All Parties. ........ 4

1. This Court May Exercise Jurisdiction over the Subject Matter of All Claims Asserted Herein. ........ 4

i. Foreign Sovereign Immunities Act ........ 5

2. This Court May Exercise Personal Jurisdiction over All Parties to this Action. ........ 5

B. Venue is Proper in this Court. ........ 6

III. LEGISLATIVE BACKGROUND ........ 6

IV. THE DEFENDANTS ........ 8

A. The Islamic Republic of Iran ........ 8

B. Iranian Revolutionary Guard Corps ........ 12

C. The Iranian Ministry of Intelligence & Security (MOIS) ........ 14

D. Bank Markazi Jomhouri Islami Iran ........ 18

E. Bank Melli & Melli Bank Plc ........ 19

F. National Iranian Oil Company ........ 23

V. FACTUAL ALLEGATIONS ........ 26

A. Iran's Long History of Materially Supporting And Encouraging Acts of International Terrorism ........ 27

B. Iran's Sponsorship and Material Support of Terrorism in Iraq ........ 31

C. Islamic Revolutionary Guard Corps—Qods Force (IRGC-QF) ........ 35

D. Hezbollah ........ 38

E. Iran's Ministry of Defense and Armed Forces Logistics (MODAFL) ........ 44

F. Ansar al Islam ........ 46

G. Al Qaida Network ........ 52

1. Abu Musab Zarqawi and the Rise of Al Qa'ida in Iraq ("AQI") ........................ 60

H. The Special Groups ........................................................................................ 64

1. The Badr Corps/Badr Organization.................................................................. 69

2. Kata'ib Hizballah ............................................................................................ 70

3. Jaysch al Mahdi & The Promised Day Brigades............................................... 76

4. Asa'ib Ahl Al Haq............................................................................................ 77

I. Iranian Signature Weapons Used in the Terrorist Attacks.................................... 79

1. Explosively Formed Penetrators ...................................................................... 79

2. Improvised Rocket Assisted Munitions ............................................................ 86

J. Iran Evades Sanctions & Commits Acts of Terrorism Through Its Agents/Proxies ............................................................................................................ 87

1. Islamic Republic of Iran Shipping Lines........................................................... 88

2. Mahan Air ........................................................................................................ 92

3. National Iranian Oil Company (NIOC)............................................................. 95

4. Khatam al-Anbiya Construction Company & The Headquarters for the Restoration of Holy Shrines.................................................................................... 96

VI. THE PLAINTIFFS & THE TERRORIST ATTACKS ...................................... 104

A. The November 20, 2009 Attack – Supply Route of Kalzoo ................................ 106

1. Plaintiffs The Holladay Family ......................................................................... 106

B. The October 12, 2011 Attack – COS Gary Owen ............................................... 107

1. Plaintiffs The Alldridge Family ........................................................................ 107

C. The July 10, 2011 Attack – Forward Operating Base Garry Owen...................... 110

1. Plaintiffs The Niquette Family.......................................................................... 110

D. The August 21, 2009 Attack – Route Irish, baghdad........................................... 112

1. Plaintiff Randall Lavis Klingensmith................................................................ 112

E. The November 22, 2008 Attack –En Route to FOB Kalsu.................................. 113

1. Plaintiffs The Owen Family ..... 113

2. Plaintiffs The Williams Family ..... 115

F. The August 8, 2008 Attack – Baghdad ..... 117

1. Plaintiff Baltazar Morin, Jr. ..... 117

G. The April 28, 2008 Attack – FOB Loyalty ..... 119

1. Plaintiffs The Coe Family ..... 119

H. The April 8, 2008 Attack – MSR Tampa ..... 120

1. Plaintiffs The Collins Family ..... 120

I. The April 4, 2008 Attack – Victory Base Complex, Baghdad ..... 123

1. Plaintiffs The Von Letkemann Family ..... 123

J. The March 26, 2008 Attack – FOB Phoenix ..... 125

1. Plaintiffs The Hernandez Family ..... 125

K. The March 2, 2008 Attack – Basra ..... 127

1. Plaintiff Timothy Joseph O'Sullivan ..... 127

L. The November 2, 2007 Attack – Route Senators Highway, Baghdad ..... 129

1. Plaintiffs The Poole Family ..... 129

M. The October 31, 2007 Attack – Sadr City, Baghdad ..... 130

1. Plaintiff Koma Kekoa Texeira ..... 130

N. The September 19, 2007 Attack – Kadhimiya ..... 131

1. Plaintiff Brian Robert Schar ..... 131

O. The September 4, 2007 Attack – Sadar City, Baghdad ..... 132

1. Plaintiffs The Mixson Family ..... 132

P. The August 22, 2007 Attack – Baghdad/Sadr City Border ..... 134

1. Plaintiff Jerrald J. Jensen ..... 134

Q. The June 17, 2007 Attack – Basra ..... 136

1. Plaintiff Grant Ransom Blackwell .................... 136

R. The July 17, 2007 Attack – Sadr City .................... 137

1. Plaintiffs The Pearcy Family .................... 137

S. The July 10, 2007 Attack – Observation Point Cavalier, Taji .................... 139

1. Plaintiffs The Segers Family .................... 139

T. The May 31, 2007 Attack - Baghdad .................... 141

1. Plaintiff John Maine .................... 141

U. The May 28, 2007 Attack – Sadr City .................... 142

1. Plaintiff Gregory Edward Hogancamp .................... 142

V. The May 17, 2007 Attack – Baghdad .................... 144

1. Plaintiffs The Gautier/Houchins Family .................... 144

W. The February 25, 2007 Attack – CSC Scania .................... 145

1. Plaintiff Joshua Bradley Wolfe .................... 145

X. The February 3, 2007 Attack – Route Dover, South of Camp Taji .................... 146

1. Plaintiffs The Bass Family .................... 146

Y. The January 27, 2007 Attack – Route Michigan, Baghdad .................... 148

1. Plaintiffs The Nichols Family .................... 148

Z. The December 4, 2006 Attack – Baghdad .................... 149

1. Plaintiffs The Portwine Family .................... 149

AA. The November 27, 2006 Attack – Shula .................... 151

1. Plaintiffs The Strong Family .................... 151

BB. The February 14, 2006 Attack – Baghdad .................... 153

1. Plaintiff Tara Kathleen Hutchinson .................... 153

CC. The January 18, 2006 Attack – Southwest of FOB Shatt .................... 154

1. Plaintiffs The Majeed Family .................... 154

DD. The September 2, 2005 Attack - Mosul ..... 156

1. Plaintiff Ioan Adrian Kelemen ..... 156

EE. The August 13, 2005 Attack – Sadr City, Iraq ..... 157

1. Plaintiff Brad Lee Schwarz ..... 157

FF. The April 19, 2005 Attack – Route Midland ..... 159

1. Plaintiff Antonio Martinez Frederick ..... 159

GG. The April 18th 2005 Attack – Karbala ..... 160

1. Plaintiff Wyman Harrell Jones ..... 160

HH. The January 1, 2005 Attack – Haditha ..... 162

1. Plaintiffs The Kuniholm Family ..... 162

II. The December 21, 2004 Attack – FOB Marez, Mosul ..... 164

1. Plaintiffs The Ruhren Family ..... 165

2. Plaintiff Mark Joseph Pratt ..... 166

3. Plaintiff Evan Wayne Byler ..... 167

4. Plaintiff Teray Anton Bundy ..... 168

5. Plaintiff Jeff McKinley Wright ..... 169

6. Plaintiffs The Turay Family ..... 170

7. Plaintiff Daniel Bivens ..... 171

8. Plaintiffs The Collins Family ..... 172

JJ. The November 24, 2004 Attack - Baghdad ..... 174

1. Plaintiffs The Fondren Family ..... 174

KK. The November 9, 2004 Attack – Iskandariya ..... 176

1. Plaintiffs The Nolte Family ..... 176

LL. The August 16, 2004 Attack – Sadr City, Baghdad ..... 178

1. Plaintiff David Allen Simmons II ..... 178

MM. The June 29, 2004 Attack – Camp Fallujah ..... 179

1. Plaintiffs The Mills Family ..... 179

NN. The June 21, 2004 Attack – Combat Outpost Apache ..... 181

1. Plaintiff Arthur B. Stokenbury ..... 181

OO. The April 9, 2004 Attack – Market area of Baiji ..... 183

1. Plaintiff Domenick Jared Alagna ..... 183

PP. The December 23, 2003 Attack – Sadr City, Baghdad ..... 184

1. Plaintiff Roger Lee Young ..... 184

QQ. The December 17, 2003 Attack – Sadr City ..... 186

1. Plaintiff Allen Ryan Vaught ..... 186

VII. ALL OF THE TERRORIST ATTACKS WERE ACTS OF INTERNATIONAL TERRORISM ..... 187

VIII. THE ACTS OF IRAN CAUSED PLAINTIFFS' INJURIES AND DEATHS ..... 190

IX. CLAIMS FOR RELIEF ..... 190

PRAYER FOR RELIEF ..... 195

## INDEX OF ACRONYMS

**AAH** – Asa'ib Ahl Al Haq or the "League of the Righteous"

**AAI** – Ansar al Islam

**AEDPA** – Antiterrorism and Effective Death Penalty Act of 1996

**AIO** – Aerospace Industries Organization

**AQ** - Al Qaida (a/k/a/ Al-Qaeda or Al-Qa'ida)

**AQI** – Al Qaida In Iraq (a/k/a Al-Qaeda In Iraq or Al-Qa'ida In Iraq ) in Iraq

**ASV** – Armored Security Vehicle

**ATA** – Anti-terrorism Act, 18 U.S.C. § 2333, *et seq*.

**BAS –** Battalion Aid Station

**BBC** – British Broadcasting Company

**BFV** – Bradley Fighting Vehicle

**CBI –** Central Bank of Iran

**CISADA** – Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010

**COP –** Combat Outpost

**DFAC** – Dining Facility

**DIO** – Defense Industries Organization

**EFP** – Explosively formed penetrators

**FinCEN** – Financial Crimes Enforcement Network

**FOB** – Forward Operating Base

**FSIA** – Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq*.

**FTO** – Foreign Terrorist Organization

**HAMAS** – Ḥarakat al-Muqāwamah al-ʾIslāmiyyah Islamic Resistance Movement

**HMMWV** – High Mobility Multipurpose Wheeled Vehicle

**HRHS** – The Headquarters for the Restoration of Holy Shrines

**IAIO** – Iran Aviation Industries Organization

**IAV** – Interim Armored Vehicle

**ICEI** – Imensazen Consultant Engineers Institute

**IED** – Improvised explosive device

**IFV** – Infantry Fighting Vehicle

**IRAM** – Improvised Rocket Assisted Munitions

**IRGC** – Islamic Revolutionary Guard Corps

**IRGC-QF** – Islamic Revolutionary Guard Corps-Qods Force

**IRISL** – Islamic Republic of Iran Shipping Lines

**ISIL** – Islamic State of Iraq and the Levant aka "ISIS" or "Daesh"

**ITRSHRA** – Iran Threat Reduction and Syria Human Rights Act of 2012

**JAM** – Jaysch al Mahdi or the "Mahdi Army"

**JASTA** – Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, Sept. 28, 2016, 130 Stat. 852

**KAA** - Khatam al-Anbiya Construction Company

**KH** – Kata'ib Hizballah

**KRG** – Kurdistan Regional Government

**LMTV** – Light Medium Tactical Vehicle

**LSA –** Logistical Support Area

**MNF-I** – Multi National Forces in Iraq

**MOD** – Ministry of Defense

**MODAFL** – Iran's Ministry of Defense and Armed Forces Logistics

**MOIS** – The Iranian Ministry of Intelligence and Security a/k/a "Vezarat-e Ettela'at Va Amniat-e Keshvar" a/k/a "VEVAK" a/k/a "VAJA"

**MRAP** – Mine-Resistant Ambush Protected

**MSR** – Main Supply Route

**MTC** – Medium Transport Company

**NIOC** – National Iranian Oil Company

**OFAC** – Office of Foreign Assets Control

**OP** – Observation Point

**PDB** – Promised Day Brigades

**PTSD** – Post Traumatic Stress Disorder

**QRF** – Quick Response Force

**RJF** – Reformation and Jihad Front

**RPG** – Rocket Propelled Grenade

**SDGT** – Specially Designated Global Terrorist

**SDN** – Specially Designated National

**SDT** – Specially Designated Terrorist

**TBI** – Traumatic Brain Injury

**TTP –** Tactics, Techniques, and Procedures

**UBL** – Usama bin Laden

**WMD** – Weapons of Mass Destruction

## I. NATURE OF THE CASE

1. There can be no question the Islamic Republic of Iran ("Iran") is, and at all relevant times has been, actively engaged in materially supporting and promoting terrorist attacks against U.S. nationals[1] in Iraq, that its efforts began even before the U.S. invasion in 2003, that such support includes the provision of money, weapons, training, and advisors, and that it has solidified an organizational/operational relationship between Lebanese Hizbollah (or "Hezbollah"), Al Qaida, Ansar al Sunna/Ansar al Islam ("Ansar al Islam"), and various "Special Groups."

2. To effectuate its campaign of terror against the citizens of Iraq and the coalition forces serving there, Iran worked hand in glove with its agents and instrumentalities, including its state-owned or state-controlled financial institutions, and government agencies.

3. In order to fund this terror campaign in Iraq, Iran directed its state owned and/or operated banks, including Defendants Bank Markazi Jomhouri Islami Iran ("Bank Markazi," "Central Bank of Iran" or "CBI"), Bank Melli Iran, Melli Bank PLC, and the state- owned and operated National Iranian Oil Company ("NIOC") to conspire with an assortment of Western financial institutions willing to substantially assist Iran to evade U.S. and international economic sanctions, conduct illicit trade-finance transactions, and illegally disguise financial payments to and from U.S. dollar-denominated accounts.

4. Defendant Iran's aforementioned agents included the U.S.-designated Foreign Terrorist Organization ("FTO") (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism

---

[1] As used herein, the terms "United States' nationals," "nationals of the United States," and "U.S. nationals" shall have the same meaning as set forth in the Immigration and Nationality Act, codified at 8 U.S.C. § 1101(a)(22), which defines the term "national of the United States" as ". . . (A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States."

and Effective Death Penalty Act of 1996 ("AEDPA")) Hezbollah;[2] Defendant the Islamic Revolutionary Guard Corps ("IRGC"), whose subdivision known as the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF") is a U.S.-designated Specially Designated Global Terrorist ("SDGT"); Iran's Ministry of Intelligence and Security ("MOIS") (an SDGT and Specially Designated National, "SDN"), and other terrorist agents that included a litany of Iraqi Shi'a terror groups referred to herein collectively as "Special Groups."[3]

5. Iran also conspired with and materially supported Sunni FTOs Ansar al Islam ("AAI") and Al Qaida ("AQ") to terrorize the people of Iraq and Coalition Forces, seeking to disrupt the peacekeeping process and prevent the establishment of free and democratic Iraq.[4]

6. The acts of international terrorism[5] at issue in this Action (the "Terrorist Attacks") were perpetrated by agents of Iran- the Special Groups, AAI, AQ, and other terrorists ("Terrorist Groups"), all of whom were materially (and substantially) supported, directly and/or indirectly,

---

[2] The pronunciation and spelling of "Hezbollah" (also known as "Hizbollah" and "Hizbu'llah), is based on region and dialect, but all translate to the "Party of Allah." As used herein, Hezbollah and Hizbollah refer to a Shiite Muslim political party and militant group the United States and European Union consider a foreign terrorist organization.

[3] Discussed in more detail below, Special Groups are terrorist organizations established and funded by Iran.

[4] The U.S. Dept. of State designated Al Qa'ida, Ansar al Islam, and Al-Qa'ida in Iraq ("AQI") as Foreign Terrorist Organizations on October 8, 1999, March 22, 2004, and December 17, 2004, respectively.

[5] As used herein, the term "international terrorism" shall have the same meaning as set forth at 18 U.S.C. § 2331(1), which defines international terrorism as "activities that (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; (B) appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination or kidnapping; and (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the person they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum."

by Defendants.

7. The Terrorist Attacks resulted in the deaths, maiming, and/or otherwise injury to Plaintiffs and/or Plaintiffs' family members.

8. This is a civil action pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611 (hereinafter "FSIA") for wrongful death, personal injury and related torts, by the estates and families of United States' nationals and/or members of the U.S. armed forces (as defined in 10 U.S.C. § 101) who were killed or injured by Defendants and/or their agents in Iraq from 2003 to 2011 (the "Relevant Period").

9. None of the Terrorist Attacks were acts occurring in the course of (A) declared war; (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin.

10. Iran serves as a command, financial and/or logistical conduit for various terrorist groups, including the Terrorist Groups and FTOs named herein, and their terrorist activities, specifically including the Terrorist Attacks which killed or injured Plaintiffs or Plaintiffs' family members. Defendants knew they were supporting terrorists and FTOs.

11. As detailed below, the Defendants herein directed millions of U.S. dollars in arms, equipment and material to Hezbollah, the IRGC, and the IRGC-QF, which, in turn, trained, armed, supplied and funded Iran's terrorist agents in Iraq in carrying out their attacks against Plaintiffs and their family members.

12. At all relevant times, Defendants intentionally, knowingly and/or recklessly provided material support, directly or indirectly, to the Special Groups, Ansar al Islam, Al Qaida and other terrorists, that, at all relevant times, engaged in acts of international terrorism against the United States and nationals of the United States, including Plaintiffs.

13. At all relevant times, Defendants intentionally, knowingly and/or recklessly contributed substantial and material support and/or resources, directly and/or indirectly, to persons and/or organizations that posed a significant risk of committing acts of terrorism that threatened the security of nationals of the United States.

14. Plaintiffs' claims arise from forty-three (43) separate acts of international terrorism that occurred throughout Iraq between approximately December 17, 2003 and November 20, 2009.

## II. JURISDICTION AND VENUE

15. Jurisdiction and venue are proper in this Court.

### A. THIS COURT HAS JURISDICTION OVER ALL CLAIMS AND ALL PARTIES.

16. This Court has jurisdiction over the subject matter of this Action and Defendants pursuant to 28 U.S.C. § 1330(a)–(b), 1331, 1332(a)(2), and the FSIA, 28 U.S.C. § 1605(a)(2).

17. This Court may exercise personal jurisdiction over all parties to this Action.

#### 1. This Court May Exercise Jurisdiction over the Subject Matter of All Claims Asserted Herein.

18. This Court may exercise its original jurisdiction over claims against the Islamic Republic of Iran pursuant to 28 U.S.C. § 1330(a). This is a nonjury civil action for relief *in personam* in the form of money damages against a foreign state as defined in 28 U.S.C. § 1603(a)[6] for personal injury or death that was caused by an act, extrajudicial killing, or the

[6] 28 U.S.C. § 1603(a) defines "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." The statute defines an "agency or instrumentality of a foreign state as any entity - (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of the foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by the foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e), nor created under the laws of any third country." 28 U.S.C. § 1603(a)–(b).

provision of material support or resources for such an act.

***i. Foreign Sovereign Immunities Act***

19. 28 U.S.C. § 1605A excepts the Islamic Republic of Iran from foreign sovereign immunity because it is a designated State Sponsor of Terrorism. Further, 28 U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that is or was a State Sponsor of Terrorism, and also against any official, employee or agent of that foreign state while acting within the scope of his or her office, employment or agency, for wrongful death, personal injury, and related torts.

20. The United States officially designated Iran a State Sponsor of Terrorism on January 19, 1984, pursuant to § 6(j) of the Export Administration Act, § 40 of the Arms Export Control Act, and § 620A of the Foreign Assistance Act, and has renewed said designation annually.

21. Iran was designated as a State Sponsor of Terror at all times during the Relevant Period.

22. At all relevant times, Plaintiffs were nationals of the United States under 28 U.S.C. § 1605A(c).

23. None of the attacks alleged herein occurred within the territory of the Islamic Republic of Iran. This fact renders inapplicable the FSIA's requirement that Plaintiffs afford Defendants an opportunity to arbitrate.

**2. This Court May Exercise Personal Jurisdiction over All Parties to this Action.**

24. Plaintiffs consent to this Court's exercise of personal jurisdiction over them.

25. This Court has jurisdiction over this matter and over the Defendants pursuant to 28 U.S.C. §§ 1330(a)–(b), 1331, 1332(a)(2), and 1605A(a)(1), which create subject-matter and

personal jurisdiction for civil actions for wrongful death and personal injury against State Sponsors of Terrorism and their officials, employees and agents.

26. This Court may exercise personal jurisdiction over the Islamic Republic of Iran pursuant to 28 U.S.C. § 1330(b) and the applicable exception to immunity in 28 U.S.C. § 1605A(a)(1)). Together, these provide for personal jurisdiction over Iran and agents and instrumentalities for claims arising under 28 U.S.C. § 1330(a) upon valid service of process under 28 U.S.C. § 1608.

27. Further, that exercise of personal jurisdiction is reasonable; foreign sovereigns and their extensively controlled instrumentalities are not "persons" under Fifth Amendment's Due Process Clause. That exercise of personal jurisdiction is consistent with the forum's manifest interest in providing effective means of redress for its residents.

### B. VENUE IS PROPER IN THIS COURT.

28. Venue is proper in this district pursuant to 28 U.S.C. § 1391(f).

29. Venue is proper in this district as to the Islamic Republic of Iran pursuant to 28 U.S.C. § 1391(f)(4), which provides that civil actions against a foreign state may be brought in the United States District Court for the District of Columbia.

## III. LEGISLATIVE BACKGROUND

30. This case is brought by and/or on behalf of U.S. nationals and/or family members of such U.S. nationals who were injured and/or killed in certain acts of international terrorism caused by Defendants.

31. Defendants materially and substantially supported the IRGC, IRGC-QF, MOIS, Hezbollah, Special Groups, Ansar al Islam, Al Qaida, and other terrorists for the purpose of killing, maiming, and/or otherwise injuring U.S. nationals, including Plaintiffs.

32. In 1996, as part of the AEDPA, Congress amended the FSIA to allow U.S.

victims of terrorism to sue designated State Sponsors of Terrorism, such as Iran, for their terrorist acts.[7] Pursuant to the National Defense Authorization Act for Fiscal Year 2008, Public L. No. 110-181, members of the United States armed forces, employees of the U.S. government and individuals performing a contract awarded by the United States Government, acting within the scope of the employee's employment may also bring private claims against State Sponsors of Terrorism.[8]

33. Congress's purpose in lifting the sovereign immunity under the AEDPA was to "affect the conduct of terrorist states outside the U.S. [by promoting] safety of U.S. citizens who travel overseas."[9]

34. As a result of the AEDPA, foreign states, such as Iran, cannot assert sovereign immunity where a victim claims money damages for personal injuries or death caused by, among other things, the provision of material support or resources.

35. Pursuant to 28 U.S.C. § 1605A(a)(1), "[a] foreign state shall not be immune from the jurisdiction of courts of the United States … in any case … in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."

36. If a foreign State satisfies one of these, or the several other exceptions to immunity, it "shall be liable in the same manner and to the same extent as a private individual

---

[7] 28 U.S.C. § 1605A(a)(1).

[8] 28 U.S.C. §1605A(c)

[9] 44B AM. JUR. 2D *International Law* § 140 (2013).

under like circumstances."[10]

37. The FSIA provides an exception to sovereign immunity of foreign states where, *inter alia*, a foreign state is a designated state sponsor of terrorism (such as Iran) that has engaged in acts of international terrorism, and was so designated at the time of the alleged wrongful conduct and is still so designated when the claim is filed.

38. Specifically, the FSIA permits U.S. courts to maintain jurisdiction over a foreign State where that State engages in an act of terrorism or provides "material support or resources" to a terrorist organization.[11]

39. The FSIA provides that Plaintiffs may bring an action against non-immune foreign states, such as Iran, in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.[12]

40. During the Relevant Period, including when the Terrorist Attacks occurred and when this Action was filed, Iran was designated a State Sponsor of Terror by the United States.

## IV. THE DEFENDANTS

### A. THE ISLAMIC REPUBLIC OF IRAN

41. Plaintiffs assert causes of action against Iran. Iran directed, planned and authorized acts of torture, extrajudicial killing, hostage taking, and provided material support or resources to Hezbollah, Special Groups, Ansar al Islam, Al Qaida, and other terrorists that perpetrated the Terrorist Attacks specifically for the purpose of carrying out those Attacks. Iran's actions proximately and directly caused the murders and injuries to Plaintiffs and Plaintiffs' family members in those Terrorist Attacks.

---

[10] 28 U.S.C. § 1606.

[11] *See* 18 U.S.C. § 2339A(b).

[12] 28 U.S.C. § 1391(f).

42. Plaintiffs' deaths and injuries were a natural and probable consequence of Iran's actions as set forth herein. Moreover, such deaths and injuries should have been, and in fact, were foreseeable.

43. At all times relevant to this Complaint, Iran is and was a foreign state within the meaning of 28 U.S.C. § 1603 and designated a State Sponsor of Terrorism pursuant to § 6(j) of the Export Administration Act of 1979, 50 U.S.C. app. § 2405.

44. Iran provided material support and resources for the commission of acts of extrajudicial killing, torture and/or hostage taking within the meaning of 28 U.S.C. § 1605A, including the Terrorist Attacks in which Plaintiffs were killed, injured, or maimed, and performed actions that caused the Terrorist Attacks and the harm to Plaintiffs herein.

45. The Government of Iran is politically and ideologically hostile to the United States and its allies, and has consistently provided material support for acts of international terrorism, including extrajudicial killings, torture, and hostage takings, particularly through MOIS, IRGC, IRGC-QF and its Lebanese-based FTO, Hezbollah, which historically have served as Iran's proxies and agents, enabling Iran to project extremist violence and terror throughout the Middle East and around the globe.

46. Both before and during the U.S. liberation and occupation of Iraq and its subsequent peacekeeping mission, Iran supported a massive international terror campaign against Iraqi citizens and U.S. nationals, including Plaintiffs.

47. As detailed herein, Iran provided funds, arms, equipment, and material support to Hezbollah, IRGC, IRGC-QF, and MOIS which, in turn, trained, armed, supplied and funded Iran's terrorist agents in Iraq in carrying out their attacks against Plaintiffs and their family members.

48. Iran's efforts to kill and maim U.S. nationals in Iraq, and to thwart U.S. policy objectives in Iraq, were readily apparent and widely reported.

49. In fact, Iran's role in funding militant groups that target and kill Coalition[13] and Iraqi forces and innocent American, British, Iraqi and other civilians was a matter of public record.

50. For example, on October 5, 2005, at a press briefing at the Foreign Office in London, William Patey, the British ambassador to Baghdad, blamed the Iranian Revolutionary Guard for helping supply the technology and weapons which has been used in bomb attacks against British troops in the south which claimed the lives of eight British soldiers and two British civilians.

51. On October 10, 2005, the British Broadcasting Company ("BBC") reported that:

> An armour-piercing version of the bomb—blamed for the deaths of eight British soldiers this year—marks the latest advance in the insurgents' arsenal. *The UK has accused Iran of supplying the new weapon to militants in southern Iraq, via the Lebanese Hezbollah militia group,* although Tehran has denied this.

(Emphasis added).

52. The BBC followed up with multiple reports in 2006 describing the details from military briefings about Iran's material support to Shi'a militia groups that were targeting and killing British and U.S. forces in Iraq, including Plaintiffs.

53. For example, on June 23, 2006, the BBC reported:

> BBC world affairs correspondent, Paul Reynolds, says both the American and

[13] "Coalition Forces" refers to the "[…]multinational force under unified command to take all necessary measures to contribute to the maintenance of security and stability in Iraq, including for the purpose of ensuring necessary conditions for the implementation of the timetable and programme as well as to contribute to the security of the United Nations Assistance Mission for Iraq, the Governing Council of Iraq and other institutions of the Iraqi interim administration, and key humanitarian and economic infrastructure[.]" *See* S.C. Res. 1511, ¶ 13, U.N. SCOR, U.N. Doc. S/RES/1511, at 3 (Oct. 16, 2003).

> British military in Iraq have claimed for some time that Iran, or factions within the Iranian government, have been supporting Shias politically and militarily…
>
> …"Since January we have seen an upsurge in their support, particularly to the Shia extremist groups," Gen Casey said.
>
> "They are using surrogates to conduct terrorist operations both against us and against the Iraqi people."
>
> "We are quite confident that the Iranians, through the special operations forces, are providing weapons, IED [improvised explosive device] technology and training to Shia extremist groups in Iraq," he said.

54. In another example, on September 26, 2008, CNN reported that U.S. officials claimed Iran had provided Shi'a militias in Iraq with "millions of dollars" in funding and that:

> The official said that high-grade military explosives and specialized timers are among the "boutique military equipment" moving from Iran into Iraq. Some of the equipment is of the same type that Hezbollah, an Iranian-backed Shiite militia, used against Israeli forces in Lebanon during the summer, the official said. The origin of the weapons was easy to discern because of *Iranian markings* on it, he said. Because Iran maintains tight control over armaments, he said, shipment of the weapons into Iraq had to involve "*elements associated with the Iranian government*."
>
> (Emphasis added).

55. Iran, through its agents and instrumentalities, including Defendants herein, provided Explosively Formed Penetrators ("EFPs") (discussed in more detail at Section V(I)1, below), along with other munitions and training in tactics, that were used to injure and kill Plaintiffs. Such bombs are sometimes inaccurately called "improvised explosive devices" ("IEDs"); in reality, the EFPs were not "improvised" but professionally manufactured and specifically designed by Iran and its agents to target and penetrate Plaintiffs and Coalition Forces' armor, and sow terror within the borders and amongst the citizens of Iraq.

56. Because Iran (a State Sponsor of Terror) routinely provided material support to FTOs and Special Groups, AAI, AQ and other terrorists, including those Terrorist Groups and

FTOs responsible for the Terrorist Attacks that resulted in the death, maiming, or injury to Plaintiffs and/or Plaintiffs' family members, to advance the terrorist activities of those FTOs and Special Groups and other terrorists, Iran is directly and/or vicariously liable for the personal injuries caused by those FTOs and Terrorist Groups.

57. Further, Iran's objectives were not secret. Its pursuit and development of weapons of mass destruction—including IEDs, EFPs, mines and similar explosive munitions — were the subject of hundreds of news reports, U.S. government reports, and Congressional testimony, as well as U.N. Security Council resolutions and European Union regulations.

**B. IRANIAN REVOLUTIONARY GUARD CORPS**

58. The IRGC was founded in the wake of the 1979 revolution as a branch of the Iranian Armed Forces tasked with protecting the country's Islamic system. Since its origin as an ideologically driven militia, the IRGC has taken an ever more assertive role in virtually every aspect of Iranian society. The IRGC is a special entity unto itself, part military force, part paramilitary force, and part business conglomerate. Its expanded social, political, military, and economic role has led many analysts to argue that its political power has surpassed even that of the Shi'a clerical system.

59. The IRGC is nominally comprised of five branches (Ground Forces, Air Force, Navy, Basij militia, and Qods Force special operations IRGC-QF) in addition to a counterintelligence directorate and representatives of the Supreme Leader.

60. Several of the IRGC's leaders have been sanctioned under U.N. Security Council Resolution 1747.

61. The IRGC is now a vast conglomerate. It controls Iran's missile batteries, its nuclear program, and a business empire.

62. The IRGC is the spine of the current political structure and a major player in the

Iranian economy.[14] It has expanded well beyond its mandate into a socio-military-political-economic force that deeply penetrates Iran's power structure.[15] The IRGC is a central participant in Iran's concerted efforts to sow terror in Iraq.

63. Even before the U.S. invasion of Iraq in 2003, the IRGC had long cultivated ties to Shi'a opposition groups opposed to Saddam Hussein's brutal regime, including the Badr Corps (discussed in more detail below) that was headquartered in Iran in the 1980s and the 1990s.

64. The IRGC's subversion of Iraq has not been limited to terrorism.

65. The IRGC has also infiltrated Iraqi society, providing "political and ideological support" via charitable associations such as the Khomeini Social Help Committee – in Karbala, Najaf, Kut, and Sadr City – and the Imam Mohammad Bagher Institute in Najaf.

66. The IRGC also purchased or developed seven television stations in Iraq, and at least three radio stations.

67. According to the U.S. State Department's 2005 Country Reports on Terrorism: "[t]he IRGC was increasingly involved in supplying lethal assistance to Iraqi militant groups, which destabilizes Iraq ... Senior Iraqi officials have publicly expressed concern over Iranian interference in Iraq, and there were reports that Iran provided funding, safe passage, and arms to insurgent elements." (Emphasis added)

68. The IRGC-QF's "Department 2000" manages Iran's relationship with Hezbollah, which includes the flow of some of Iran's most sophisticated weapon systems, including military grade EFPs, anti-tank guided missiles, and various rockets, such as the Fajr-5.

---

[14] Central Bank of the Islamic Republic of Iran, *General Information*, http://www.cbi.ir/page/GeneralInformation.aspx (last visited Sept. 12, 2017).

[15] Bruno Greg and Jayshree Bajoria, Iran's Revolutionary Guards, Council on Foreign Relations, Oct. 12, 2011.

69. The IRGC is an "agency or instrumentality" of the government of Iran as defined by 28 U.S.C. § 1603(b), and is owned and controlled by the government of Iran.

70. Defendant Iran authorized, ratified and approved the acts of Defendant IRGC.

71. Accordingly, Defendant Iran is vicariously liable for the acts of Defendant IRGC.

### C. THE IRANIAN MINISTRY OF INTELLIGENCE & SECURITY (MOIS)

72. The Iranian Ministry of Intelligence and Security (a/k/a "Vezarat-e Ettela'at Va Amniat-e Keshvar" a/k/a "VEVAK" a/k/a "VAJA," hereinafter "MOIS") is located at Second Negarestan Street, Pasdarsan Avenue, Tehran, Iran.

73. MOIS headquarters is a facility located in Tehran on the block bounded by Sanati Street on the West, 30th Street on the South, and Iraqi Street on the East.

74. MOIS is the most powerful and well-supported ministry among all Iranian ministries in terms of logistics, finances, and political support. It is a non-military governmental organization that operates both inside and outside of Iran.

72. MOIS functions as the Iranian Intelligence Service and, in this capacity, it is the secret police and primary intelligence agency of the Islamic Republic of Iran. It is the part of the Iranian government's security apparatus responsible for the assassination of Iranian political dissidents inside and outside the country.

73. MOIS uses all means at its disposal to protect the Islamic Revolution of Iran, utilizing such methods as infiltrating internal opposition groups, monitoring domestic threats and expatriate dissent, arresting alleged spies and dissidents, exposing conspiracies deemed threatening, and maintaining liaison with other foreign intelligence agencies as well as with organizations that protect the Islamic Republic's interests around the world.

74. MOIS operates under the direct supervision of Iran's Supreme Leader, Ayatollah Khamenei, who claims to be the leader of the Muslim world. As noted above, MOIS agents are

known as "Unknown Soldiers of Imam Zaman," who is the Twelfth Imam in the succession of Islamic leaders of Shi'a Muslims. However, the organization is not bound by Shi'a beliefs. To advance its goals, MOIS recruits individuals regardless of their beliefs.

75. According to Iran's constitution, all organizations must share information with the Ministry of Intelligence and Security. The ministry oversees all covert operations. The IRGC and IRGC-QF Qods Force share all the information they collect with MOIS.

76. MOIS and the IRGC-QF coordinate through foreign embassies, "charities," and cultural centers in targeted countries.

77. Hezbollah is organizationally linked to MOIS, and is used by MOIS as a proxy in Iran's intelligence operations.

78. In the Middle East, Iran, through MOIS and the IRGC-QF, uses Hezbollah to threaten the United States in Iraq and Afghanistan by backing insurgent groups, including Terrorist Groups who committed the Terrorist Attacks involving Plaintiffs.

79. Specifically, MOIS acted as a conduit for Iran's provision of funds, training and direction to Terrorist Group for their terrorist activities beyond the borders of Iran including the actions relating to the Terrorist Attacks and Plaintiffs injuries.

80. MOIS and it agents have routinely been, and are presently designated by the U.S. Treasury as an SDN and SDGT, pursuant to Iranian Financial Sanctions Regulations ("IFSR"), including:

a. Executive Order 13399 of April 25, 2006, *Blocking Property of Additional Persons in Connection With the National Emergency With Respect to Syria*, sanctioning entities and individuals that:

> [H]ave been, involved in the planning, sponsoring, organizing, or perpetrating of: (A) the terrorist act in Beirut, Lebanon, that resulted in the assassination of former Lebanese Prime Minister Rafiq Hariri and the deaths of 22 others; or (B) any other bombing, assassination,

> or assassination attempt in Lebanon since October 1, 2004, that is related to Hariri's assassination or that implicates the Government of Syria or its officers or agents; (ii) to have obstructed or otherwise impeded the work of the Commission established pursuant to UNSCR 1595; (iii) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, any such terrorist act, bombing, or assassination attempt, or any person designated pursuant to this order; or (iv) to be owned or controlled by, or acting or purporting to act for or on behalf of, directly or indirectly, any person designated pursuant to this order.

b. Executive Order 13460 of February 13, 2008, *Blocking Property of Additional Persons in Connection With the National Emergency With Respect to Syria*, sanctioning entities and individuals:

> [R]esponsible for or otherwise significantly contributing to actions taken or decisions made by the Government of Syria *that have the purpose or effect of undermining efforts to stabilize Iraq* or of allowing the use of Syrian territory or facilities to undermine efforts to stabilize Iraq.
>
> (Emphasis added).

c. Executive Order 13553 of September 28, 2010, designating MOIS and its agents as an "IRAN-HR" entity, responsible for "serious human rights abuses by the government of Iran. In doing so the United States sought to sanction entities and individuals that:

> "[Were] acting on behalf of the Government of Iran (including members of paramilitary organizations) who is responsible for or complicit in, or responsible for ordering, controlling, or otherwise directing, the commission of serious human rights abuses against persons in Iran or Iranian citizens or residents, or the family members of the foregoing, on or after June 12, 2009, regardless of whether such abuses occurred in Iran… materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, [such] activities described… or any person whose property and interests in property are blocked pursuant to this order; or.. owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order.

d. Executive Order 13606 of April 22, 2012, designating MOIS and its agents as an "HRIT-IR" entity, responsible for "grave human rights abuses by the governments

of Iran and Syria via information technology." In doing so, the United States sanctioned entities and individuals that:

> [P]rovided, directly or indirectly, goods, services, or technology to Iran or Syria likely to be used to facilitate computer or network disruption, monitoring, or tracking that could assist in or enable serious human rights abuses by or on behalf of the Government of Iran or Syria… [or] provided, directly or indirectly, goods, services, or technology to Iran or Syria likely to be used to facilitate computer or network disruption, monitoring, or tracking that could assist in or enable serious human rights abuses by or on behalf of the Government of Iran…[or] materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of [these] activities… [or] owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order."

81. MOIS has been involved in kidnappings, assassinations, and terrorism since its inception in 1985.

82. Many of the U.S. State Department reports on global terrorism over the last twenty-five years refer to MOIS as Iran's key facilitator and director of terrorist attacks.

83. In 1995 and again in 1996, Usama Bin Laden approached MOIS and asked to join forces against the United States. Bin Laden's phone records, obtained by U.S. investigators working on the U.S. embassy bombings in Kenya and Tanzania, show that 10 percent of phone calls made by Bin Laden and his lieutenants were to Iran.

84. Seif al-Adl, one of AQ's top-ranking leaders at the time, was the liaison between Iranians and AQ; he coordinated meetings with the IRGC's leaders and MOIS officials.

85. At all times relevant to this action, MOIS acted as an agent of Iran and performed certain acts within the scope of its agency within the meaning of 28 U.S.C. § 1603(b).

86. U.S. federal courts have consistently held that the IRGC and the MOIS are parts

of the Iranian state itself.[16]

87. Defendant Iran authorized, ratified, and approved the acts of Defendant MOIS.

88. Accordingly, Defendant Iran is vicariously liable for the acts of Defendant MOIS.

### D. BANK MARKAZI JOMHOURI ISLAMI IRAN

89. Bank Markazi Jomhouri Islami Iran is the Central Bank of Iran. The Central Bank of Iran ("CBI") was established in 1960, and, according to its website, CBI is responsible for the design and implementation of Iran's monetary and credit policies.[17]

90. CBI is headquartered in Tehran, Iran at Mirdamad Boulevard, No. 198.

91. CBI has provided millions of dollars to terrorist organizations via other Iranian-owned and controlled banks. For example, in a press release issued by the U.S. Treasury Department in 2007 regarding the designation of the Iranian-owned Bank Saderat as an SDGT, the U.S. Government noted that:

> Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat *transferred $50 million from the* ***Central Bank of Iran*** *through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence*. (Emphasis added.)

92. According to the United States' Financial Crimes Enforcement Network ("FinCEN"):

> The Central Bank of Iran, which regulates Iranian banks, has assisted designated Iranian banks by transferring billions of dollars to these banks in

---

[16] *See e.g.*, *Rimkus v. Islamic Republic of Iran*, 575 F.Supp.2d 181, 198–200 (D.D.C. 2008) (Lamberth, C.J.); *Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 60–61 (D.D.C. 2006) (Lamberth, J.) (both MOIS and IRGC must be treated as the state of Iran itself for purposes of liability); and *Salazar v. Islamic Republic of Iran*, 370 F.Supp.2d 11, 105, 115–16 (D.D.C. 2005) (Bates, J.) (same).

[17] *Supra* note 14.

> 2011. In mid-2011, the CBI transferred several billion dollars to designated banks, including Saderat, Mellat, EDBI and Melli, through a variety of payment schemes. In making these transfers, the CBI attempted to evade sanctions by minimizing the direct involvement of large international banks with both CBI and designated Iranian banks.

93. CBI is an alter-ego and “agent and instrumentality” of the Iranian government and its Supreme Leader as defined by 28 U.S.C. § 1603, and it has routinely used Iranian banks like the other Defendant Iranian banks as conduits for terror financing and weapons proliferation on behalf of the Iranian regime.

94. Defendant Iran authorized, ratified and approved the acts of Defendant CBI.

95. Accordingly, Defendant Iran is vicariously liable for the acts of Defendant CBI.

**E. BANK MELLI & MELLI BANK PLC**

96. Bank Melli Iran was established in 1927 by order of the Iranian Parliament. It is one of the largest banks in Iran.

97. Following the Iranian Revolution in 1979, all banks in Iran were nationalized, and, as discussed below, even now most are effectively controlled by the Iranian regime.

98. Bank Melli Iran is headquartered at Ferdowsi Avenue, Tehran, Iran.

99. Bank Melli Iran maintains a branch office in Germany, located at Holzbrücke 2, 20459 Hamburg, Germany.

100. Bank Melli Iran is an “agency or instrumentality” of the government of Iran as defined by 28 U.S.C. § 1603(b).

101. As discussed in detail below, Bank Melli Iran is dominated and controlled by Iran to such an extent that it rightfully can be considered an organ of the state as defined by 28 U.S.C. § 1603(b)(2).

102. Melli Bank Plc in London was established in January 2002 as a wholly-owned subsidiary of Bank Melli.

103. Melli Bank Plc is chartered in the United Kingdom, and until recently was headquartered at 98a Kensington High Street, London, W8 4SG, United Kingdom and in 2016 moved their head office to Dubai. Melli Bank Plc maintains an Agent for service of process in London.

104. The Chairman of Bank Melli Iran serves as the Chairman of the Board of Directors of Melli Bank Plc.

105. Bank Melli Iran appoints all members of the Board of Directors of Melli Bank Plc.

106. Melli Bank Plc. is dominated and controlled by Iran to such an extent that it rightfully can be considered an organ of the state as defined by 28 U.S.C. § 1603(b)(2).

107. According to the U.S. government, from 2004-2011, Bank Melli Iran and Melli Bank Plc in London transferred approximately $100 million USD to the IRGC-QF, which trained, armed, and funded terrorist groups that targeted and killed and maimed American and Iraqi forces and civilians.

108. Specifically, according to the U.S. government:

> Islamic Revolutionary Guards Corps (IRGC) and IRGC-Qods Force, who channel funds to militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians, have used Bank Melli and other Iranian banks to move funds internationally. Bank Melli used deceptive banking practices to obscure its involvement from the international banking system by requesting that its name be removed from financial transactions when handling financial transactions on behalf of the IRGC.

109. In October 2007 and throughout the remainder of the relevant period, Bank Melli Iran and Melli Bank Plc were each designated as a SDN pursuant to Executive Order ("E.O.")

13382, and included on the Office of Foreign Assets Control's SDN list.[18] The U.S. Treasury Department press release announcing the designation stated:

> Bank Melli also provides banking services to the [Iranian Revolutionary Guard Corps] and the Qods Force. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

110. A State Department diplomatic cable from March 2008 noted that:

> Bank Melli and the Central Bank of Iran also provide crucial banking services to the Qods Force, the IRGC's terrorist supporting arm that was headed by UNSCR 1747 designee Commander Ghassem Soleimani. Soleimani's Qods Force leads Iranian support for the Taliban, Hezbollah [sic], Hamas [sic] and the Palestinian Islamic Jihad. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. Bank Melli use of Deceptive Banking Practices .... When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from payment instructions for US dollar denominated transactions.

111. According to the U.S. government, Bank Melli provided banking services to the IRGC-QF which trained, armed, and funded terrorist groups that targeted, killed and maimed American and Iraqi forces and civilians.

---

[18] "The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury administers and enforces economic and trade sanctions based on U.S. foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy or economy of the United States." *See* U.S. Department of the Treasury, *Terrorism and Financial Intelligence*, https://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx (last visited Sept. 12, 2017).

112. Specifically, according to the U.S. government in a November 10, 2009 diplomatic cable:

> [The] Islamic Revolutionary Guards Corps (IRGC) and IRGC-Qods Force, who channel funds to militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians, have used Bank Melli and other Iranian banks to move funds internationally. Bank Melli used deceptive banking practices to obscure its involvement from the international banking system by requesting that its name be removed from financial transactions when handling financial transactions on behalf of the IRGC.

113. During the Relevant Time Period, Bank Melli Iran financed evasions transactions that purposefully evaded U.S. sanctions on behalf of Mahan Air (an SDGT) and Iran's Ministry of Defense and Armed Forces Logistics.

114. For example, Bank Melli issued a Letter of Credit to Mahan Airlines (an Iranian airline) in August 2004 to help Mahan Airlines illegally acquire aircraft engines subject to the U.S. embargo.

115. Bank Melli's financial support and assistance to Mahan Airlines is particularly significant because on October 12, 2011, the United States designated Mahan Air as an SDGT for "providing financial, material and technological support to the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF). Based in Tehran, Mahan Airlines provides transportation, funds transfers and personnel travel services to the IRGC-QF."

116. The U.S. Treasury Department explained Mahan Airline's direct involvement with terrorist operations, personnel movements and logistics on the IRGC-QF's behalf:

> Mahan Air [has] facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq by bypassing normal security procedures and not including information on flight manifests to eliminate records of the IRGC-QF travel.

> Mahan Air crews have facilitated IRGC-QF arms shipments. Funds were also transferred via Mahan Air for the procurement of controlled goods by the IRGC-QF.
>
> In addition to the reasons for which Mahan Air is being designated today, Mahan Air also provides transportation services to Hezbollah, a Lebanon-based designated Foreign Terrorist Organization. Mahan Air has transported personnel, weapons and goods on behalf of Hezbollah and omitted from Mahan Air cargo manifests secret weapons shipments bound for Hezbollah.

117. Mahan Airlines was also later identified as the conduit to Iran of thousands of radio frequency modules that were ultimately recovered by Coalition Forces in Iraq from IEDs and EFPs that were used to target Iraqi civilians, U.S. soldiers, and Coalition Forces, including some Plaintiffs herein.

118. In mid-2007, Bank Melli Iran's branch in Hamburg, Germany ("Bank Melli-Hamburg") transferred funds on behalf of Iran's Defense Industries Organization ("DIO").

119. As is further discussed below, DIO is an Iranian government-owned defense manufacturer whose name, logo, and/or product tracking information was stamped on munitions found in weapons caches that were seized from terrorist organizations in Iraq, including large quantities of weapons produced by DIO in 2006 and 2007 (e.g. 107 millimeter artillery rockets, as well as rounds fuses for 60 millimeter and 81 millimeter mortars).

120. Defendant Iran authorized, ratified, and approved the acts of Defendants Bank Melli and Melli Bank Plc.

121. Accordingly, Defendant Iran is vicariously liable for the acts of Defendants Bank Melli and Melli Bank Plc.

### F. NATIONAL IRANIAN OIL COMPANY

122. The National Iranian Oil Company ("NIOC"), owned and overseen by the Government of Iran through its Ministry of Petroleum, is responsible for the exploration,

production, refining, and export of oil and petroleum products in Iran.

123. NIOC is headquartered at Hafez Crossing, Taleghani Avenue, Tehran, Iran.

124. NIOC is an "agency or instrumentality" of the Government of Iran as defined by 28 U.S.C. § 1603(b).

125. In 2008, the Treasury Department identified NIOC (and other Iranian agencies) as "centrally involved in the sale of Iranian oil, as entities that are owned or controlled by the [Government of Iran]."

126. Pursuant to E.O. 13382, the U.S. Government designated NIOC as an SDN.

127. The U.S. Government has identified NIOC as an agent or affiliate of the IRGC.

128. In September 2012, the U.S. Treasury Department handed its report to Congress regarding its determination that NIOC is an agent or affiliate of the IRGC. The report provided that:

> Recently, the IRGC has been coordinating a campaign to sell Iranian oil in an effort to evade international sanctions, specifically those imposed by the European Union that prohibit the import, shipping, and purchase of Iranian oil, which went into full effect on July 1, 2012. NIOC, which is owned by the Government of Iran through the Ministry of Petroleum, is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran.
>
> Under the current Iranian regime, the IRGC's influence has grown within National Iranian Oil Co. For example, on August 3, 2011, Iran's parliament approved the appointment of Rostam Qasemi, a Brigadier General in the IRGC, as Minister of Petroleum. Prior to his appointment, Qasemi was the commander of Khatam Al-Anbia, a construction and development wing of the IRGC that generates income and funds operations for the IRGC. Even in his new role as Minister of Petroleum, Qasemi has publicly stated his allegiance to the IRGC.

129. As the IRGC has become increasingly influential in Iran's energy sector, Khatam Al-Anbiya has obtained billions of dollars' worth of contracts with Iranian energy companies, including NIOC, often without participating in a competitive bidding process.

130. Under the Iran Threat Reduction and Syria Human Rights Act of 2012 ("ITRSHRA"), the U.S. government determined that that NIOC is an agent or affiliate of the IRGC under section 104(c)(2)(E)(i) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 ("CISADA") and section 302 of ITRSHRA. As part of that 2012 certification, NIOC was formally determined to be part of the Government of Iran.

131. In addition, the ITRSHRA provided that:

> It is the sense of Congress that the National Iranian Oil Company and the National Iranian Tanker Company are not only owned and controlled by the Government of Iran but that those companies provide significant support to Iran's Revolutionary Guard Corps and its affiliates.[19]

132. After the events giving rise to the claims herein, the U.S. government withdrew this determination as of 2016.

133. NIOC used its oil and natural gas business to launder money for the IRGC, often using Defendant CBI for this purpose.

134. In 2009, West Point's Combating Terrorism Center published a report on the role of NIOC, particularly in the Maysan province in Iraq (Southeast border between Iran and Iraq), and its role in studying U.S. troops movements:

> The establishment of a new U.S. and Iraqi [Forward Operating Base] on the Iranian border has resulted in three waves of attacks in an area that was formerly devoid of incidents .... The incident occurred in the same district as the February 2007 EFP attack on a British aircraft at a Buzurgan dirt airstrip, itself a reaction by Special Groups to UK long-range patrolling of the Iranian border. This part of the border is increasingly the scene of U.S.

[19] U.S. Department of the Treasury, *Sanctions*, *See*, https://www.treasury.gov/resource-center/sanctions/Documents/hr_1905_pl_112_158.pdf (last visited Sept. 12, 2017).

> and Iranian countermoves to support their proxies and patrol the frontier; Iranian intelligence gathering takes place using National Iranian Oil Company helicopters and border guards, while U.S.-Iraqi helicopter-borne joint patrols provide moral and material support to isolated Iraqi border posts and local communities.

135. Thus, NIOC served a critical function in funding and supporting the IRGC's activities.

136. NIOC also obtained letters of credit from western banks to provide financing and credit to the IRGC.[20]

137. Defendant Iran authorized, ratified, and approved the acts of Defendant NIOC.

138. Accordingly, Defendant Iran is vicariously liable for the acts of Defendant NIOC.

## V. FACTUAL ALLEGATIONS

139. International terrorism is a serious and deadly problem that threatens the vital interests of the United States.[21] It affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States' citizens, as well as foreign visitors to the United States.[22]

140. The United States has a clear interest in combating terrorism, both within its borders and abroad, and in protecting its nationals at home and abroad.

141. Iran committed and continues to commit violent attacks against U.S. nationals. Iran commits these attacks via proxy terrorist organizations..

142. According to the CIA, Iranian leaders view terrorism as an important instrument of foreign policy they use both to advance national goals and to export the regime's Islamic

---

[20] The Superseding Indictment filed in *U.S. v. Zarrab* (filed in the S.D.N.Y (1:15-cr-00867)) demonstrates that, as late as 2013, NIOC continued to illegally launder U.S. dollars through U.S. financial institutions.

[21] Justice Against Sponsors of Terrorism Act, § 2(a)(1), Pub. L. 114-222 (2016).

[22] *Id*. at § 2(a)(2).

revolutionary ideals.[23]

143. Further, Iran supports and directs terrorist operations by Hezbollah a desires to keep the United States and U.S. nationals as primary terrorist targets.[24]

144. In June 2007, U.S. Department of State spokesman, Sean McCormack, delivered a press briefing on Iran and its ties to international terrorism. When asked what changes he was looking for concerning Iran and its ties to terrorism, he responded, "Well, for starters, stop supplying *money, technology, and training* for people who are trying to kill [U.S. nationals]..."[25] (Emphasis added).

### A. IRAN'S LONG HISTORY OF MATERIALLY SUPPORTING AND ENCOURAGING ACTS OF INTERNATIONAL TERRORISM

145. For decades Iran has made the funding of terrorist organizations (including the Special Groups and other terrorists that perpetrated the Terrorist Attacks) and the commodification of international acts of terrorism its business.

146. Iran has a history of financing, supporting and training terrorists and their affiliates in the perpetration of terrorist attacks against the United States, its citizens and its allies. For example, Hon. Judge John D. Bates found in a lawsuit brought by U.S. victims of the bombing of the U.S. embassies in Nairobi and Dar es Salaam that, "[s]upport from Iran and Hezbollah was critical to al Qaeda's execution of the 1998 embassy bombings…Prior to its meetings with Iranian officials and agents, al Qaeda did not possess the technical expertise

---

[23] Central Intelligence Agency, Directorate of Intelligence, *Iran: The Uses of Terror*, (Oct. 22, 1987 (approved for release June 1999)), https://www.cia.gov/library/readingroom/docs/DOC_0000259360.pdf.

[24] *Id.*

[25] U.S. Department of State, *Sean Womack Daily Press Briefing* (June 27, 2007), http://site-894736.bcvp0rtal.com/detail/videos/archive/video/1807599216/daily-briefing---june-27-2007.

required to carry out the embassy bombings."[26]

147. Similarly, Iran has been lavish with its support to all groups (including Sunni groups with ties to al Qaida) engaged in acts of international terrorism against Iraqi citizens, Coalition Forces and U.S. nationals, including Plaintiffs.

148. Since the Iranian Revolution in 1979, Iran has been a principal source of extremism and terrorism throughout the Middle East and the rest of the world, responsible for bombings, kidnappings, hostage-taking torture, extrajudicial killings, and assassinations across the globe.

149. On January 19, 1984, the United States designated Iran a State Sponsor of Terrorism. That designation has remained in force throughout the Relevant Period to this Action.

150. Iran prefers not to be directly implicated in acts of international terrorism against U.S. nationals, but instead acts through co-conspirators and/or agents and offers bounties for killing U.S. nationals, shooting down U.S. helicopters, and destroying American tanks.

151. Reports suggest that in Fall 2003 "a senior Iranian cleric in Tehran set up a special 100-member army, known as al Saqar, which means eagle in Arabic, to . . . carry out [acts of international terrorism]."[27]

152. Countries determined by the Secretary of State to have repeatedly provided support for acts of international terrorism receive such a designation pursuant to three laws: (1) section 6(j) of the Export Administration Act; (2) section 40 of the Arms Export Control Act; and (3) section 620A of the Foreign Assistance Act.

153. Taken together, the main categories of sanctions resulting from designation under

---

[26] *Wamai v. Republic of Sudan et. al.*, No. 1:08-cv-01349-JDB-JMF (D. D.C. Nov. 30, 2011), Memorandum Opinion at 13–14, ECF No. 55.

[27] Edward T. Pound, *Special Report: The Iran Connection*, U.S. News and World Report, Nov. 14, 2004.

these authorities include: (1) restrictions on U.S. foreign assistance; (2) a ban on defense exports and sales; (3) certain controls over exports of dual use items; and (4) miscellaneous financial and other restrictions.

154. Designation under the above-referenced authorities also implicates other sanction laws that penalize persons and countries engaging in certain trade with state sponsors. Currently there are three recidivist countries designated under these authorities: Iran, Sudan, and Syria.[28]

155. In Iraq, the policies of Iran have been largely successful, "giving Iran an unprecedented degree of influence there at the expense of the United States…" An Iran-friendly Iraq "serves as an opportunity for Iran to evade the increasingly harsh international sanctions regime and to continue financing [FTOs]."[29]

156. Iranian diplomatic, political, and economic networks within Iraq are highly developed and closely linked both to Hezbollah and to the IRGC-QF.

157. Unclassified Iraqi government Harmony records, collated by the Combating Terrorism Center at West Point, as well as information provided to the Coalition Forces through interrogation of detainees of the Shite militias, illustrate how Iran sponsored terrorist groups, directly and through Hezbollah (Iran's proxy for more than 30 years), operated in Iraq, including supporting and directing the terrorist groups responsible for the Terrorist Attacks which killed or injured Plaintiffs or their family members.

158. Planning and preparation by Iran and its agents, including Hezbollah, for their active involvement in supporting terrorist groups and encouraging sectarian violence in Iraq has

---

[28] U.S. Department of State, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm (last visited Mar. 24, 2017).

[29] Frederick W. Kagan et. al., *Iranian Influence in the Levant, Egypt, Iraq, and Afghanistan*, at 6 (May 2012), http://www.aei.org/wp-content/uploads/2012/05/-iranian-influence-in-the-levant-egypt-iraq-and-afghanistan_171235465754.pdf.

been underway since at least 2002.

159. At least as early as the 2003 U.S. overthrow of Saddam Hussein's regime in Iraq, Iran has assiduously worked to expand its influence in Iraq and throughout the region in a variety of ways, including by fomenting violence and terrorism when such activities have served its diplomatic, political, and economic ambitions.

160. When Coalition Forces liberated Iraq in 2003, Iran's IRGC formed the counter-Coalition Ramazan Corps and ordered it to attack U.S. and Iraqi forces. Saddam Hussein's 24-year rule ended on April 9, 2003. The U.S. Department of State reported that, shortly thereafter, individuals with ties to the IRGC may have attempted to infiltrate southern Iraq and elements of the Iranian regime helped members of AAI transit and find safe haven in Iran.

161. In a Friday prayers sermon in Tehran in May 2003, Secretary General of Iran's powerful Guardian Council Ayatollah Ahmad Jannati publicly encouraged Iraqis to stage and participate in suicide operations against U.S. nationals, including Plaintiffs and Coalition Forces.[30] He went on to encourage the so-called "holy fighters" to "maintain good relations with the coalition forces" but at the same time create "a secret group that would conduct attacks against American troops."[31]

162. In 2005, the Department of State reported that Iran was a safe haven in that known terrorists, extremists, and sympathizers are able to transit its territory and cross the long and porous border into Iraq. Iran also equips terrorists with technology and provides training in

[30] U.S. *Department* of State, Office of the Coordinator for Counterterrorism, *Patterns of Global Terrorism* (Apr. 29, 2004) http://www.state.gov/j/ct/rls/crt/2003/31644.htm.

[31] Edward T. Pound, *Special Report: The Iran Connection*, U.S. News and World Report (Nov. 22, 2004), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iran-connection&catid=33&Itemid=115.

extremist ideology and militant techniques.[32]

163. In 2008, William Burns, U.S. Undersecretary of State for Political Affairs, testified before Congress that it is "Iran's… support for terrorist groups…its efforts to sow violence and undermine stability in Iraq and Afghanistan, including lethal support for groups that are directly responsible for hundreds of U.S. casualties."[33]

164. As recently as 2015, the State Department stated that "Iran's state sponsorship of terrorism worldwide remained undiminished through the … IRGC-QF, its Ministry of Intelligence and Security, and Tehran's ally Hezbollah, which remained a significant threat to the stability of Lebanon and the broader region."[34]

### B. IRAN'S SPONSORSHIP AND MATERIAL SUPPORT OF TERRORISM IN IRAQ

165. Iran is the world's foremost exporter of global terrorism, and uses various FTOs, Special Groups, and other agents or proxies to distribute and deliver this deadly product around the globe.

166. Iran utilizes Special Groups and other terrorists that coordinated with Hezbollah and the IRGC as front groups to perpetrate terrorist acts, including those that killed or injured Plaintiffs or members of Plaintiffs' families.

167. Iran's command and control over IRGC, FTOs and Special Groups that routinely perpetrate terrorist attacks, including the Terrorist Attacks at issue in this Action, is best

---

[32] U.S. Department of State, Office of the Coordinator for Counterterrorism, *Country Reports on Terrorism 200*, at 21 (2006), https://www.state.gov/documents/organization/65462.pdf.

[33] *U.S. Policy Towards Iran: Hearing Before S. Comm. on Foreign Relations and H. Comm. on* Foreign *Affairs*, 110th Cong. (July 9, 2008) (testimony of William J. Burns, Undersecretary for Political Affairs, U.S. Department of State), https://2001-2009.state.gov/p/us/rm/2008/106817.htm.

[34] U.S. Department of State, Office of the Coordinator for Counterterrorism, *Country* Reports *on Terrorism 2015*, at 166 (June 2016), https://www.state.gov/documents/organization/258249.pdf.

illustrated by diagramming the command and control Iran exercises over those entities:




168. Iran's support of terrorist groups in Iraq was described in the U.S. State Department's 2005 Country Reports on Terrorism, which observed:

> Iran has provided political and ideological support for several terrorist and militant groups active in Iraq. Attractive to terrorists in part because of the limited presence of the United States and other Western governments there, Iran is also a safe haven in that known terrorists, extremists, and sympathizers are able to transit its territory and cross the long and porous border into Iraq. Iran also equips terrorists with technology and provides training in extremist ideology and militant techniques.

169. Iran furthers its terrorism-based foreign policy through a number of key Iranian Proxies including Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL"), the IRGC, the IRGC-QF, Hezbollah/Hizbollah, NIOC, KAA, Mahan Air, and Special Groups.

170. In 2008, Pentagon Press Secretary Geoff Morrell reported on the "smuggling system in which the Iranians are providing their allies within Iraq, these special groups, with the munitions that are then used to take on us, whether it be EFPs or rockets or conventional arms. These are being used by these special groups and being provided by the Iranians."

171. On January 9, 2008, the U.S. Treasury Department designated four individuals and one entity under E.O. 13438 for threatening the peace and stability of Iraq and the government of Iraq. Three of the individuals, Ahmed Foruzandeh (a Brigadier General in the IRGC-QF), Abu Mustafa Al-Sheibani, and Isma'il Hafiz Al Lami (a/k/a "Abu Dura") were all based in Iran and/or received funding from Iran.

172. Regarding the designation of Abu Mustafa Al-Sheibani, the Treasury Department press release stated:

> Iran-based Abu Mustafa Al-Sheibani leads a network of Shia extremists that commit and provide logistical and material support for acts of violence that threaten the peace and stability of Iraq and the Government of Iraq. Al-Sheibani's Iran-sponsored network was created to affect the Iraqi political process in Iran's favor. The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers. Its second objective is to eliminate Iraqi politicians opposed to Iran's influence. *Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network.*
>
> Al-Sheibani's network – consisting of several hundred members – conducted IED attacks against Americans in the Baghdad region. As of March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran. *As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for*

> *eventual arrival in Baghdad.* In early May 2007, Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.
>
> Additionally, Al-Sheibani commands several pro-Iranian insurgent groups in southern Iraq that work to destabilize Iraq and sabotage Coalition efforts. These groups use a variety of weapons, to include mortars, Katyusha rockets, and anti-tank landmines. *Ordered by IRGC headquarters to create disorder, the task of these groups is to attack bases of Coalition Forces in southern Iraq, particularly British forces.*
>
> (Emphasis added).

173. To that end, Iran (with Hezbollah's aid) has armed, trained, and funded a variety of FTOs and Special Groups, and infiltrated and co-opted Iraqi security forces in an effort to kill or maim U.S. nationals, including Plaintiffs, and to coerce the United States into withdrawing those forces and to terrorize Iraq's civilian population in order to increase Iran's own influence.

174. According to a 2010 report by the Combatting Terrorism Center at West Point, Iran paid Iraqi "insurgent" groups "between $4,000 and $13,000 per rocket or roadside bomb, depending on the circumstances."

175. Iran did not just act on its own. As part of its strategy of sophisticated and clandestine use of terrorism, Iran preferred not to act directly against the Coalition Forces in Iraq. Rather, Iran relied on various other entities, including Defendants named herein. to act on Iran's behalf and at Iran's discretion and guidance. Moreover, without the funding provided to these organizations by Iran, they would not be able to carry out the volume, consistency, frequency, scale, and lethality of the acts of international terrorism they currently, and in the past, routinely perpetrated, including the Terrorist Attacks that killed, maimed, or otherwise injured Plaintiffs or Plaintiffs' family members.

## C. ISLAMIC REVOLUTIONARY GUARD CORPS—QODS FORCE (IRGC-QF)

176. The highest echelons of the Iranian government and the highest echelons of Hezbollah have worked together to organize a violent, resistance movement in Iraq. The IRGC-QF, with direct assistance from Iran, has established and funded this movement.

177. Ayatollah Khomeini established the IRGC-QF in 1979 to protect Iran's Islamic Revolution and export it beyond Iran's borders. The commander of the IRGC-QF reports directly to Iran's Supreme Leader, Ayatollah Ali Khomeini.

178. The Qods Force is the IRGC unit tasked with extraterritorial operations. It trains and equips Islamic revolutionary groups around the Middle East. The IRGC-QF typically provides this paramilitary instruction in Iran and Sudan. At times, the IRGC-QF plays a more direct role in the military operations of the forces it trains, including pre-attack planning and other operation-specific military advice.

179. The Qods Force operates worldwide covertly, as part of a strategy which intends to conceal Iran's participation in terrorist activities.

180. Iran, through the Qods Force, gains access to countries and conceals its involvement in international terrorism therein by cloaking its operations with the appearance of legitimacy, mainly through civilian, charity, or religious oriented institutions or entities.[35]

181. Since 2003, Iran has been materially supporting acts of international terrorism by advising, organizing, training, funding, and equipping FTOs and Special Groups, and other terrorists to kill, maim, or otherwise injure U.S. nationals, among others. To do this, Iran enlisted (and continues to enlist) the IRGC-QF to provide such support to these FTOs and Special

[35]As an example, the Qods Force used the Iranian Red Crescent to operate in the Balkans during the 1990s to provide assistance to the Bosnian Muslims against the Serb, and to Hizbollah during the 2006 Lebanon War. *See, e.g.*, *U.S. Embassy Cables: Iran Abuses Iranian Red Crescent to Send Agents and Weapons Overseas*, THE GUARDIAN (Oct. 23, 2008), https://www.theguardian.com/world/us-embassy-cables-documents/174875.

Groups.

182. This material support has made these FTOs, Special Groups and other terrorists more effective and lethal than they ever could have been without such assistance.

183. In October 2007, the United States designated the IRGC-QF a SDGT pursuant to E.O. 13324, explaining that:

> The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.
>
> *In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.*

(Emphasis added).

184. In 2004, the Qods Force began flooding Iraq with EFPs – lethal roadside bombs that fire a molten copper slug capable of piercing armor. These EFPs wreaked havoc on American troops, accounting for nearly twenty percent of U.S. service personnel deaths. EFPs require skilled assembly and rely on sophisticated sensors. According to General Stanley McChrystal, then head of Joint Special Operations Command, "[t]here was zero question where [the EFPs] were coming from. We knew where all the factories were in Iran. The EFPs killed hundreds of Americans."[36]

185. On October 25, 2007, when the U.S. Department of Treasury designated IRGC-

---

[36] Dexter Filkins, *The Shadow Commander*, THE NEW YORKER (Sept. 30, 2013), http://www.newyorker.com/magazine/2013/09/30/the-shadow-commander.

QF as SDGT under E.O. 13224, the Department cited the IRGC-QF's material support to the Taliban, Lebanese Hezbollah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command as evidence of Iran seeking to inflict casualties on U.S. and NATO forces.[37]

186. IRGC-QF controls and commands Hezbollah, the Lebanese terrorist organization (described below). Pursuant to instructions from IRGC-QF to form Unit 3800. Unit 3800 was tasked by the IRGC-QF with recruiting, radicalizing and training Iraqi militants and organizing several Iraqi terrorist/insurgency militias, called Special Groups.

187. According to Brigadier Gen. Kevin J. Bergner, a U.S. military spokesman who previously served as the Deputy Commanding General for MNF-I in Mosul, Iraq, "the Qods Force has provided armor-piercing weapons to extremist groups in Iraq, funneling them up to $3 million a month and training Iraqi militiamen at three camps near Tehran." General Bergner added, "[t]he Iranian Qods Force is using Lebanese Hezbollah essentially as a proxy, as a surrogate in Iraq ... Our intelligence reveals that senior leadership in Iran is aware of this activity."

188. The Qods Force has a track record of disguising operatives, and some who may appear to be retired officers, in civilian functions to facilitate operations.

189. The Qods Force provides financial aid to terrorist groups in Iraq by using the civilian or religious cover, specifically, entities known as The Headquarters for the Restoration of Holy Shrines (Setad-e Bazsazi-ye Atabat-e Ali-yat, hereinafter "HRHS"), and Khatam al-Ambiya AA (discussed in detail below).

[37] U.S. Department of The Treasury, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007) https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx.

## D. HEZBOLLAH

190. Iran has had a long, deep, strategic partnership with the Lebanese-based Foreign Terrorist Organization Hezbollah, which historically has served as Iran's proxy and agent, enabling Iran to project extremist violence and terror throughout the Middle East and around the globe.

191. Hezbollah is probably the most prominent and "successful" group developed with the assistance of the IRGC-QF.

192. From its inception, Hezbollah has enjoyed significant financial and material aid from Iran. The IRGC-QF, in particular, played a critical role in Hezbollah's foundation and its funding and training.

193. On June 25, 2016, the Secretary General of Hezbollah, Sheikh Hassan Nasrallah, claimed that "We are open about the fact that Hezbollah's budget, its income, its expenses, everything it eats and drinks, its weapons and rockets, come from the Islamic Republic of Iran." Nasrallah stated that, "[a]s long as Iran has money, we have money… Just as we receive the rockets that we use to threaten Israel, we are receiving our money. No law will prevent us from receiving it…"[38]

194. Through its proxy, agent, and strategic partner Hezbollah, Iran orchestrated a series of kidnappings of Westerners in Lebanon, including several Americans, in the 1980s; killed more than two hundred U.S. Marines at their barracks in Beirut, Lebanon, in 1983; hijacked TWA flight 847 in 1985; and launched two major attacks in the 1990s on Jewish targets in Buenos Aires, Argentina, namely the 1992 bombing of the Israeli Embassy (killing

---

[38] Majid Rafizadeh, *In first, Hezbollah confirms all financial support comes from Iran*, Al Arabiya English (June 25, 2016), https://english.alarabiya.net/en/2016/06/25/In-first-Hezbollah-s-Nasrallah-confirms-all-financial-support-comes-from-Iran.html.

twenty-nine people), and the 1994 bombing of a Jewish community center (killing eighty five people). Hezbollah assisted al Qaeda affiliated terrorists in the Khobar bombings in Saudi Arabia on June 25, 1996 (which killed 19 U.S. service members) and in the bombing of the U.S. embassies in Nairobi and Dar es Salaam on August 7, 1998 (which killed 224 and injured approximately 5000 people).

195. Hezbollah is a Shi'a Islamist militant group based in Lebanon, funded by Iran, and formed in 1982. Its leaders are followers of Ayatollah Khomeini and Ayatollah Khamenei, and its forces are trained and organized by a contingent of 1,500 Revolutionary Guards. Hezbollah's military strength has grown so significantly that its paramilitary wing, the Jihad Council, is considered more powerful than the Lebanese Army. Hezbollah relied almost exclusively on Iranian largesse, which funds at least $100 to $200 million a year or more.[39] The U.S. Department of State estimates that Hezbollah has tens of thousands of supporters and members worldwide. While Hezbollah is based in the southern suburbs of Beirut, the Bekaa Valley, and southern Lebanon, its activities make evident the group is capable of operating around the globe, particularly in Iraq.

196. Despite Shi'a ideologies, Iran and Hezbollah have supported and worked with Sunni and other terrorist organizations to effectuate their broader goal of exporting terror around the globe and destabilizing western involvement and influence in the Middle East. According to the New York Times:

> In an interview, Sheikh Naim Qassem, Hezbollah's deputy secretary general, proudly acknowledged his organization's efforts to pass its rich militant experience to other Iranian aligned forces. "Every group anywhere in the world that works as we work, with our ideas, is a win for the party," he said. "It is natural: All who are in accordance

[39] U.S. Department of Defense, *CDA—Military Power of Iran, Unclassified Report on Military Power of Iran* (Apr. 2010), http://www.fas.org/man/eprint/dod_iran_2010.pdf.

> with us in any place in the world, that is a win for us because they are part of our axis and a win for everyone in our axis."[40]

197. Hezbollah received "massive material and technical support from the Iranian government"[41] in the planning and perpetrating the terrorist attack which killed 241 Marines in Beirut in 1983.

198. The Iranian regime provides "extensive financial support for terrorists generally and in support for al Qaeda and Hezbollah in particular"[42]

199. Iran "created Hizballah…[and] has been the sponsor of Hizballah since its inception, providing funding, training, leadership and advice via Hizballah's leadership councils…Hizballah has received from Iran $100 million to $500 million in direct financial support annually…Hizballah served as a terrorist proxy for Iran, created specifically for the purpose of serving as a front for Iranian terrorism, in effect, a cover name for terrorist operations run by Iran's IRGC around the world."[43]

200. As a result of its mission, conduct, and terrorist activities, on January 25, 1995, Hezbollah was designated a SDT by the United States. It has maintained that designation since that time.

201. Hezbollah was designated an FTO by the United States on October 8, 1997, and it has retained that designation since that time.

202. On October 31, 2001, pursuant to E.O. 13224, Hezbollah was designated SDGT by the United States. It has maintained that designation since that time.

---

[40] Ben Hubbard, *Hezbollah: Iran's Middle East Agent, Emissary and Hammer,* N.Y. TIMES (Aug. 27, 2017).

[41] *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d. 46, 58 (D. D.C. 2003).

[42] *Havlish v. Bin Laden (In re Terrorist Attacks on September 11, 2001),* 2011 U.S. Dist. LEXIS 155899, at 97-98 (S.D.N.Y. Dec. 22, 2011).

[43] *Id*.

203. According to a December 20, 2004 *Washington Post* article, "Western diplomats and political analysts in Beirut estimated that Hezbollah received *$200 million a year from Iran*." (Emphasis added).

204. Sometime after the 2003 U.S. invasion of Iraq, Hezbollah created "Unit 3800," an entity dedicated to supporting Iraqi Shi'a terrorist groups targeting Iraqi citizens, and Multi National Forces in Iraq ("MNF-I").

205. At Iran's request, Hezbollah leader Hassan Nasrallah established Unit 3800.

206. Unit 3800 has trained and advised various Shi'a militias in Iraq, later termed the Special Groups.

207. By early 2005, the presence of Hezbollah operatives in Iraq became an open secret when Iraqi Interior Minister Falah al-Naquib announced the arrest of eighteen Lebanese Hezbollah members on terrorism charges.

208. According to U.S. intelligence estimates—and following the 2007 arrest and interrogation of Hezbollah's senior operative in Iraq—in 2007 the IRGC-QF provided Hezbollah and one of its local trainers, Ali Musa Daqduq (who is discussed in greater detail below), up to $3,000,000.00 in U.S. currency *every month*.

209. Hezbollah's terrorist attacks include the suicide truck bombings of the U.S. Embassy and U.S. Marine barracks in Beirut in 1983; the U.S. Embassy annex in Beirut in 1984; and the 1985 hijacking of TWA flight 847, during which U.S. Navy diver Robert Stethem was murdered. Elements of the group were responsible for the kidnapping, detention, and murder of Americans and other Westerners in Lebanon in the 1980s. Hezbollah was implicated, along with Iran, in the 1992 attacks on the Israeli Embassy in Argentina and in the 1994 bombing of the Argentine-Israeli Mutual Association in Buenos Aires. In 2000, Hezbollah

operatives captured three Israeli soldiers in the Shebaa Farms area and, separately, kidnapped an Israeli non-combatant in Dubai. Although the non-combatant survived, on November 1, 2001, Israeli Army Rabbi Israel Weiss pronounced the soldiers dead. The surviving non-combatant and the bodies of the Israeli soldiers were returned to Israel in a prisoner exchange with Hezbollah in 2004.[44]

210. Hezbollah carried out two attacks against UN Interim Force Peacekeepers in Lebanon; an attack in late July 2011 that wounded six French citizens, and a second attack, days later, which injured three French soldiers. Also in 2011, four Hezbollah members were indicted by the UN-based Special Tribunal for Lebanon, an international tribunal investigating the 2005 assassination of Lebanese Prime Minister Rafik Hariri. A fifth Hezbollah member, Hassan Habib Merhi, was indicted in October 2013.

211. In January 2012, Thai police detained Hezbollah operative Hussein Atris on immigration charges as he was attempting to depart Thailand. Atris, a SDGT, was convicted of possessing bomb-making materials by a Thai court in September 2013 and sentenced to two years and eight months in prison. He was released in September 2014 and is believed to reside in Lebanon. In July 2012, a suspected Hezbollah operative was detained by Cypriot authorities for allegedly helping plan an attack against Israeli tourists on the island. On March 21, 2013, a Cyprus court found the operative guilty of charges based on his surveillance activities of Israeli tourists.

212. Hezbollah was also responsible for the July 2012 attack on a passenger bus carrying 42 Israeli tourists at the Sarafovo Airport in Bulgaria, near the city of Burgas. The explosion killed five Israelis and one Bulgarian, and injured 32 others.

---

[44] U.S. Department of State, Office of the Coordinator for Counterterrorism, *Country Reports on Terrorism 2015*, at 369 (June 2016), https://www.state.gov/documents/organization/258249.pdf.

213. In May 2013, Hezbollah publicly admitted to playing a significant role in the ongoing conflict in Syria, rallying support for Syrian President Bashar al-Assad. Hezbollah's support for the Assad regime continues in 2017.

214. In 2015, the group also continued its operations against Israel. In January, Hezbollah fired rockets on an Israeli convoy, killing two Israeli soldiers. In a speech in Tehran in August, Hezbollah Deputy Secretary General Shaykh Na'im Qasim declared Israel, the United States, and Takfiri groups as enemies of Islam and urged Muslims to fight against these enemies. In December, Hezbollah leader Nasrallah threatened attacks in revenge for the death of senior Hezbollah militant Samir Kuntar. Nasrallah claimed orders had already been given and fighters on the ground were preparing attacks.

215. In May 2015, Cypriot authorities arrested dual Lebanese-Canadian national Hussein Bassam Abdallah after finding 8.2 tons of liquid ammonium nitrate in the basement of a residence in Larnaca. Abdallah admitted to Cypriot authorities he was a member of Hezbollah. He was charged on five offenses, including participation in a terrorist organization and providing support to a terrorist organization, by the Republic of Cyprus and sentenced to six years in prison on June 29, 2015.

216. Iran continues to provide Hezbollah with funding, training, weapons, and explosives, as well as political, diplomatic, monetary, and organizational aid. Such support and material is crucial to Hezbollah's continued terrorist operations. Moreover, the support is substantial.

217. United States District Courts have found, in numerous lawsuits related to international acts of terrorism sponsored or directed by Iran, that Hezbollah is, in fact, an arm of the IRGC and a key component to Iran's *modus operandi* of sponsoring and/or directing

international terrorism aimed primarily against the United States and its allies.[45]

218. Hezbollah training camps in southern Lebanon and Iran, and Hezbollah's expertise in the use of EFPs, kidnapping, communications and small-unit operations, were critical to the IRGC's operations in Iraq during the Relevant Period.

### E. IRAN'S MINISTRY OF DEFENSE AND ARMED FORCES LOGISTICS (MODAFL)

219. In October 2007, the United States designated Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL") as a FTO stating it controls the Defense Industries Organization, an Iranian entity identified in the Annex to UN Security Council Resolution 1737 and designated by the United States under E.O. 13382 on March 30, 2007.

220. MODAFL is the principal procurement arm of Iran's military and terror apparatus.

221. MODAFL operates the [Iran] Aviation Industries Organization ("IAIO"), the Aerospace Industries Organization ("AIO"), and the Defense Industries Organization ("DIO"). MODAFL was designated by the United States on October 25, 2007.

222. The AIO was designated on June 28, 2005 for weapons proliferation.

223. The MAPNA group is also a key component of MODAFL and the IRGC's procurement chain.

224. Abbas Aliaabadi, Chairman of MAPNA International FZE and President of the MAPNA Group, is a former member of the Iranian Ministry of Construction Jihad and of the Iranian Air Force. Aliaabadi was also a key member of the Ministry of Culture & Islamic Guidance instrumental in the creation of Hezbollah and has close links to the IRGC.

225. Pursuant to the Arms Export Control Act and the Export Administration Act,

[45] *See, e.g.*, *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 135–36 (D. D.C. 2011); *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 55 F. Supp. 3d 189, 197 (D. D.C. 2014).

MODAFL was sanctioned in November 2000 for its involvement in missile technology proliferation activities.

226. The U.S. government explained the basis for the designation as follows:

> The Ministry of Defense and Armed Forces Logistics (MODAFL) controls the Defense Industries Organization, an Iranian entity identified in the Annex to UN Security Council Resolution 1737 and designated by the United States under E.O. 13382 on March 30, 2007. MODAFL also was sanctioned, pursuant to the Arms Export Control Act and the Export Administration Act, in November 2000 for its involvement in missile technology proliferation activities.
>
> MODAFL has ultimate authority over Iran's Aerospace Industries Organization (AIO), which was designated under E.O. 13382 on June 28, 2005. The AIO is the Iranian organization responsible for ballistic missile research, development and production activities and organizations, including the Shahid Hemmat Industries Group and the Shahid Bakeri Industries Group, which were both listed under UN Security Council Resolution 1737 and designated under E.O. 13382. The head of MODAFL has publicly indicated Iran's willingness to continue to work on ballistic missiles. Defense Minister Brigadier General Mostafa Mohammad Najjar said that one of MODAFL's major projects is the manufacturing of Shahab-3 missiles and that it will not be halted. MODAFL representatives have acted as facilitators for Iranian assistance to an E.O. 13382-designated entity and, over the past two years, have brokered a number of transactions involving materials and technologies with ballistic missile applications.

227. Formally, the IRGC is a subordinate directorate of MODAFL.

228. The IRGC uses MODAFL to both procure and develop weapons and equipment for its use.

229. The DIO, the AIO, and Defense Technology and Science Research Centre are all subordinate to MODAFL, giving it operational control over Iran's ballistic missile development program.[46]

230. MODAFL entities' illicit procurement activities have resulted in a series of

[46] Steven R. Ward, *Immortal: A Military History of Iran and Its Armed Forces* 320 (2009).

ongoing U.S. sanctions.[47]

231. Moreover, Iran continues to provide material support, including resources and guidance, to multiple terrorist organizations and Special Groups, including all of the terrorist groups that perpetrated the acts of international terrorism complained herein, that undermine the stability of the Middle East and Central Asia.[48]

232. The Special Groups and FTOs that Iran provides material resources and support to include multiple Shi'a, and some Sunni, terror groups in Iraq, including but not limited to, Kata'ib Hizballah ("KH"); Asa'ib Ahl Al Haq ("AAH"); Jaysch al Mahdi ("JAM"); Badr Organization ("Badr") (all discussed below); and Ansar al Islam and Al Qaida in Iraq.

233. Tellingly, Hamas, Lebanese Hezbollah, and the Palestinian Islamic Jihad maintain representative offices in Tehran, in part to help coordinate Iranian financing and training.[49]

### F. ANSAR AL ISLAM

234. From its beginning, Iran did not confine its support of anti-U.S. national fighters to Shi'a groups. Iran also supported Ansar al Islam (a/k/a Ansar al Sunna, "AAI"), a radical terrorist group with close ties to Al Qaida.

235. In the 1990s, Al Qaida developed a close relationship with Iran and the IRGC. Usama bin Laden and Ayman al Zawahiri held clandestine meetings with Imad Mughniyah and Ahmad Vahidi (then commander of IRGC Qods Force) which "lead to an informal agreement to cooperate in providing support for actions carried out primarily against Israel and the United States…Thereafter, senior al Qaeda operatives and trainers traveled to Iran to receive training in

---

[47] The United States has sanctioned MODAFL pursuant to the Arms Export Control Act, the Export Administration Act (in November 2000), and Executive Order 13382 (in October 2007).

[48] U. S. Department of State, *2016 International Narcotics Control Strategy Report*, https://www.state.gov/j/inl/rls/nrcrpt/2016/vol2/253407.htm (last visited Sept. 12, 2017).

[49] *Id.*

explosives. Usama bin Laden also sent senior aides to Iran for training with the IRGC and to Lebanon for training with Hizballah.[50]

236. AAI is a Kurdish Sunni Muslim insurgent group and separatist movement in Iraq with well-established ties to Al Qaida and Iran. Although the group's initial membership was primarily Kurdish, it grew to comprise a large number of Sunni Arabs, including Iraqis, Saudis, and Yeminis.

237. Mullah Krekar, aka Faraj Ahmad Najmuddin, reportedly founded Ansar al Islam in December 2001 (at that time, with funding and logistical support from Al Qaida and Usama bin Laden). However, the group has significant, life-sustaining ties to Iran.

238. AAI seeks to transform Iraq into an Islamic state. AAI operates primarily in northern Iraq, but maintains a presence in western and central Iraq. AAI expanded its operations into Syria in 2011.

239. AAI has a number of aliases, including Ansar al-Sunna; Ansar al-Sunna Army; Devotees of Islam; Followers of Islam in Kurdistan; Helpers of Islam; Jaish Ansar al-Sunna; Jund al-Islam; Kurdish Taliban; Kurdistan Supporters of Islam; Partisans of Islam; Soldiers of God; Soldiers of Islam; Supporters of Islam in Kurdistan.

240. AAI was established in 2001 in Iraqi Kurdistan with the merger of two violent Kurdish extremist factions that traced their roots to the Islamic Movement of Kurdistan. AAI seeks to expel western interests from Iraq and establish an independent Iraqi state based on its interpretation of Sharia law. AAI has been mostly active in the northern party of Iraq, western Iraq-Anbar province, and in the areas surrounding and including Mosul and Kirkuk since 2003.

241. In 2001, AAI seized control of several villages near the town of Halabja and

[50] *Havlish v. Bin Laden (In re Terrorist Attacks on September 11, 2001)*, 2011 U.S. Dist. LEXIS 155899, at 110-111 (S.D.N.Y. Dec. 22, 2011).

established an administration ruled by Shari'a Law. As part of Operation Iraqi Freedom, Coalition and Kurdish forces routed AAI from northern Iraq.

242. Coalition airstrikes destroyed AAI's base in northern Iraq (Iraqi Kurdistan) in late March 2003, and the majority of AAI members fled across the border and regrouped in Iran with the assistance of the IRGC and the Iranian regime. Counterterrorist operations suggest many of those fighters reentered Iraq and took active part in anti-Coalition activities. From Iran, the group continued to operate under leader Abu Abdullah Shafi's leadership and was temporarily renamed Ansar al-Sunna (although it officially re-adopted the name Ansar al-Islam in 2007).

243. During the summer of 2004, the jihadists began migrating back into Iraq. A large number of the returning jihadists chose to settle in Mosul. In October 2004, coalition forces in Mosul captured a senior Ansar leader, Aso Hawleri. A week later, Lt. Gen. Norton Schwartz, who at the time was Director, the Joint Staff, Pentagon (and from 2008-2012 was Chief of Staff of the Air Force), warned that Ansar al Islam had reemerged as the coalition's "principal organized terrorist adversary in Iraq."

244. From 2003-2007, AAI continued to target Coalition Forces and U.S. Nationals, including Plaintiffs. Its deadliest attack during this period occurred on February 1, 2004, when it launched multiple simultaneous suicide car bombings at PUK offices in Erbil, killing over 100 civilians and injuring over 130 more. By February 2007, AAI had claimed responsibility for over 1,600 attacks in Iraq, including against American nationals. AAI openly cooperated with AQ; however, it adamantly refused to formally join the Islamic State of Iraq, which was an umbrella organization established by AQ. Instead, in May 2007, AAI joined with the Mujahideen Army, the Islamic Army in Iraq, and Ansar al-Sunna Shariah (a splinter group that had broken from AAI in early 2007 because its members wished to take a harder line against AQ) to form an anti-

Coalition umbrella organization called the Reformation and Jihad Front ("RJF"). The RJF was a pan-Islamist organization that challenged AQ for leadership of the Iraqi Sunni Islamist movement.

245. AAI claimed responsibility for the beheading of 12 Nepalese hostages and the kidnapping and beheading of an Iraqi who was employed as a mechanic for the American forces at the Mosul airport. AAI targeted Iraqi Kurds for alleged collaboration with the U.S. In September 2003, members of the Jaysch Ansar al-Sunna beheaded three Iraqi Kurdish militiamen in retaliation for the cooperation by Kurdish political parties with the U.S. in Iraq.

246. U.S. and British intelligence reports in 2004 "concluded that [AAI] was working closely with Iran, and also al Qaeda, in its terrorist attacks against coalition forces." One British defense report noted "Intelligence indicates that elements of Iran's [IRGC-QF] 'are providing safe haven and basic training to Iran-based [AAI] cadres.'" (brackets in original).[51]

247. On December 21, 2004, AAI subgroup Jamaat Ansar al-Sunna launched a suicide bomb attack on Forward Operating Base Marez in Mosul, Iraq. AAI insurgent Abu Museli, disguised as an Iraqi Security Services officer, entered the base mess tent and detonated the explosive vest he was wearing. The blast killed fourteen U.S. soldiers, four U.S. citizen Halliburton employees, and four Iraqi soldiers allied with the U.S. military. An additional fifty-one U.S. soldiers and twenty-one others sustained non-fatal injuries. AAI, through Jamaat Ansar al-Sunna, claimed credit for the attack. This Terrorist Attack resulted in the death, maiming or injury of certain Plaintiffs, who are referred to below.

248. Another British intelligence source "said that Iranian government agencies were also secretly helping [AAI] members cross into Iraq from Iran, as part of a plan to mount sniper

---

[51] Pound, *supra* note 27.

attacks against coalition forces."[52] American sources confirmed this information, adding that "an Iranian was aiding [AAI] 'on how to build and set up' IED's.[53]

249. In February 2004, Kurdish intelligence officials uncovered a cache of Syrian, Yemeni, and Saudi passports—all bearing Iranian entry stamps—in an Ansar al Islam safe-house on the Iranian side of the border. The fact the passports found had Iranian stamps on them indicated the terrorists did not secretly infiltrate into Iran, but that they entered with the cognizance and full knowledge of the Iranian authorities. According to Iraqi intelligence officers, captured Ansar al-Sunna militants have admitted to receiving assistance from Iranian officials.

250. Iran played a significant role in supporting AAI. Iran openly allowed the group to operate along its borders despite the group's alleged affiliation with the AQ network. AAI was tasked with conducting checks on cars leaving their stronghold to going into Iran, indicating coordination with the Islamic Republic.

251. According to a document from Iraqi intelligence dated June 13, 2002 and seized by U.S. forces in Iraq, it was reported from a trust-worthy source that Mullah Kraykar (Krekar), the head of the AAI organization arrived in Iran for negotiations with several Iranian officials. The information indicated that the purpose of the visit was to confirm a unified strategy and to guarantee continuous Iranian support to that group.

252. According to other sources Mullah Krekar spent many years in Iran and was arrested in Amsterdam after a flight from Tehran.

253. AAI operations decreased substantially by 2006, but the group continued to maintain an extensive support and financial infrastructure in Europe that it used to recruit and send jihadis to Iraq.

---

[52] *Id.*

[53] *Id.*

254. Over the course of 2007-2008, AAI moved increasingly away from the RJF and strengthened its ties to AQ. It coordinated with AQ on several attacks against U.S. and PUK troops and began to adopt AQ's hardline attitude against Sunni Iraqis who worked for the U.S. or Iraqi governments.

255. On May 4, 2010, AAI's leader Abu Abdullah al-Shafi was captured by U.S. forces in Baghdad and remains in prison. On December 15, 2011, AAI announced a new leader: Abu Hashim Muhammad bin Abdul Rahman al Ibrahim. In March 2012, a Norwegian court convicted Iraqi citizen and AAI founder Mullah Krekar (aka Najmuddin Faraj Ahmad) of issuing threats and inciting terrorism, and sentenced him to six years in prison. Living in Norway on a long-term resident permit, Krekar appealed, and in December 2012, an appeals court affirmed his convictions for issuing threats and intimidating witnesses, but reversed his conviction for inciting terrorism. The appeals court reduced his prison sentence to two years and 10 months. He was released from prison in late January 2015, but was arrested again shortly after for praising the January 2015 Charlie Hebdo attacks in Paris in a TV interview.

256. AAI has conducted attacks against a wide range of targets including Iraqi government and security forces, as well as U.S. and Coalition Forces and U.S. nationals, including Plaintiffs. AAI has conducted numerous kidnappings, executions, and assassinations of Iraqi citizens and politicians. The group has either claimed responsibility or is believed to be responsible for attacks in 2011 that resulted in 24 deaths and wounded 147. In 2012, the group claimed responsibility for the bombing of the Sons of Martyrs School in Damascus, which was occupied by Syrian security forces and pro-government militias; seven people were wounded in the attack. In 2014, AAI claimed responsibility for attacks near Kirkuk, Tikrit, and Mosul, Iraq; primarily directed against Iraqi police and security forces and, in one instance, an oil field.

257. The U.S. Department of Treasury designated AAI a Specially Designated Terrorist Group under E.O 13224 on February 20, 2003.

258. The U.S. Department of State designated AAI a FTO on March 22, 2004.

259. Australia, New Zealand, Canada, and the European Union have designated AAI as terrorist organization. The U.S. Treasury Department designated Mullah Krekar an individual providing assistance to terrorism and thus subject to having all international assets frozen in December 2006.

### G. AL QAIDA NETWORK

260. Al Qaida (a/k/a al-Qaeda, a/k/a al-Qa'ida, "AQ") is a designated international terrorist organization, widely recognized as such by all civilized nations and the United Nations, and is neither a legitimate "military force" nor a recognized sovereign state.

261. The United States has designated AQ, including its branches, subsidiaries and "franchisees" (Including al-Qa'ida in Iraq ("AQI")) as a foreign terrorist organization and a specially designated global terrorist.

262. Commencing in the early 1990s and continuing until at least 2011, the Islamic Republic of Iran provided significant, indispensable, funding, weapons, safe haven, training, intelligence, centers for command and control, undocumented transport between Afghanistan, Iraq and Pakistan across its borders and other significant material support.

263. Iran was an indispensable accomplice and provided significant financial and material support in AQ's terrorist attacks against American, European and Iraqi civilians and soldiers from at least 1991 until 2011.

264. On June 30 1989, General Omar Hassan al-Bashir led a coup d'état toppling the exiting regime in Sudan. The radical Salafi cleric, Hassan Abd Allah al Turabi served as the

"intellectual architect" or "the power behind the throne", sometimes officially as leader of the National Islamic Front and sometimes as speaker of the parliamentary assembly.

265. In 1990-1991, Turabi founded the Popular Arab and Islamic Congress, which included representatives from the Palestine Liberation Organization, Hamas, Egyptian Islamic Jihad, Al Qaeda, Algerian Islamic Jihad, Hezbollah, Abu Nidal Group, and the Islamic Revolutionary Guard Corp.

266. In 1991, the Kingdom of Saudi Arabia expelled AQ leader Usama bin Laden (“UBL”) and UBL moved his base of operations to Sudan.

267. The Sudanese army protected Bin Laden’s home in Khartoum and his terrorist training bases within the country as well as providing AQ with access to the international and United States financial networks. In addition, Sudan provided AQ with 200 Sudanese passports, allowing AQ operatives to travel under fictitious identities.

268. Turabi brought together UBL and leaders of the IRGC Qods Force and leaders of Hezbollah. Commencing in April 1991, Turabi hosted meetings bringing together leaders from AQ, Hezbollah, and Iranian and Sudanese officials. According to AQ shura council member Abu Hajer al-Iraqi, the purpose of these meetings was to focus on common enemies, the West and the United States.

269. In 1991, Hezbollah opened a base of operations in Khartoum, Sudan.

270. On December 13, 1991, Iranian President Ali Akbar Hashemi Rafsanjani arrived in Khartoum, Sudan for a six-day visit, by a delegation of 157 members, including Mohsen Rezai then Commander of the IRGC, Iranian Intelligence Minister Ali Fallahian and Iranian Defense Minister Ali Akbar Torkan. Various agreements were signed between Iran and Sudan, pursuant

to which, inter alia, Iran delivered $300 million of Chinese weapons and 2000 IRGC operatives were sent to train Sudan's Popular Defense Forces.

271. According to the 9-11 Commission Report, in late 1991 or 1992, discussions in Sudan between AQ and Iranian operatives led to an agreement to cooperate in providing support - specifically, training - for actions carried out primarily against Israel and the United States. Not long afterward, senior AQ operatives and trainers traveled to Iran to receive training in explosives.

272. The 9-11 Commission reported that "“[t]he relationship between al Qaeda and Iran demonstrated that Sunni-Shia divisions did not necessarily pose an insurmountable barrier to cooperation in terrorist operations."[54]

273. Iran was a valuable connection for UBL and AQ, and AQ was highly beneficial to Iran, given AQ's extreme and violent position against America and its animosity against the Kingdom of Saudi Arabia. Iran and Hezbollah played significant roles in the buildup of AQ's terrorist capabilities.

274. As a result of the creation of this terrorist alliance, AQ leader Ayman al Zawahiri repeatedly visited Tehran during the 1990s and met with Minister Ali Fallahian, other officers of Iran Ministry of Intelligence and Security ("MOIS"), and Qods Force Commander Ahmad Vahidi.

275. Throughout the 1990s, the Al Qaeda-Iran-Hezbollah terrorist training arrangement continued. Hezbollah leader Imad Mughniyah coordinated these training activities, including training of AQ personnel, with Iranian government officials in Iran and with IRGC officers working undercover at the Iranian embassy in Beirut, Lebanon.

[54] The 9/11 Comm. Rpt. (2004) at p. 61.

276. AQ operative Ali Mohammed provided security for one prominent meeting between Hezbollah's chief external operations officer, Imad Mughniyah, and Bin Laden in Sudan. Mohammed testified at this plea hearing that "Hezbollah provided explosives training for AQ and a1 Jihad. Iran supplied Egyptian Jihad with weapons. Iran also used Hezbollah to supply explosives that were disguised to look like rocks."

277. Iran trained Saif al-Adel, head of AQ security, and other AQ members, including shura council members, at Hezbollah training camps in the mid-1990s. AQ leader Mustafa Hamid was one of AQ's primary points of contact with IRGC. He negotiated the agreement between AQ and Iran, which secured safe transit between Iran and Afghanistan and to Iraq for AQ members.

278. This facility was used by AQ in planning and perpetrating the terrorist attacks conducted against U.S. civilians, diplomats and servicemen and women, such as: the suicide bombing of U.S. Air force personnel and their families in Khobar, Saudi Arabia; the U.S. embassies in Nairobi and Dar es Salaam; and the World Trade Center on September 11, 2001.

279. On June 25, 1996, Iranian-backed Hezbollah terrorists, with the support of AQ, bombed the Khobar Towers housing complex in Dhahran, Saudi Arabia, killing 19 U.S. servicemen and wounding approximately 500 others. FBI investigators concluded: the operation was undertaken on direct orders from senior Iranian government leaders; the bombers had been trained and funded by the IRGC in Lebanon's Bekaa Valley; and senior members of the Iranian government, including Ministry of Defense, Ministry of Intelligence and Security and the Supreme Leader's office, had selected Khobar as the target and commissioned Hezbollah to carry out the operation.

280. AQ was involved in the planning and preparations for the Khobar Towers bombing. UBL tried to facilitate a shipment of explosives to Saudi Arabia, and, on the day of the operation, bin Laden was, according to NSA intercepts, congratulated on the telephone.[55]

281. The 9/11 Commission examined classified CIA documents establishing that IRGC-Qods Force commander Ahmad Vahidi planned the Khobar Towers attack with Ahmad al Mugassil, a Saudi-born AQ operative.

282. Two months later, in August 1996, UBL would cite the Khobar Towers bombing in his first *fatwa*, a "Declaration of War Against the Americans Occupying the Land of the Two Holy Places": "The crusader army became dust *when we detonated* al Khobar…" (Emphasis added).

283. Iran aided, abetted and conspired with Hezbollah, UBL, and AQ to launch the large-scale bombing attacks against the United States embassies in Nairobi and Dar es Salaam on August 7, 1998. Prior to their meetings with Iranian officials and agents, Bin Laden and AQ did not possess the technical expertise required to carry out the embassy bombings. Iran, through Hezbollah, provided explosives training to Bin Laden and AQ and rendered direct assistance to AQ operatives.[56]

284. As stated in the 9/11 Report, "Iran made a concerted effort to strengthen relations with al Qaeda after the October 2000 attack on the *USS Cole*…" For example, Iranian officials facilitated the travel of AQ members – including at least 8 of the 9/11 hijackers – through Iran on their way to and from Afghanistan, where the hijackers trained at AQ's terrorist training camps.[57]

---

[55] The 9/11 Comm. Rpt. (2004) at p. 60.

[56] *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 139 (D.D.C. Nov. 28, 2011).

[57] The 9/11 Comm. Rpt. (2004) at pp. 240-241.

285. U.S., Saudi, and Egyptian political pressure on the Sudanese eventually forced them to expel Usama bin Laden in May 1996. Radical Afghan Sunni warlord Gulbuddin Hekmatyar, a strong Iranian ally, invited bin Laden to join him in Afghanistan. UBL then relocated to Afghanistan with the assistance of the Iranian intelligence services.[58]

286. Iran provided material support to AQ after the 9/11 attacks in several ways, most significantly by providing safe haven to AQ leaders and operatives, keeping them safe from retaliation by U.S. forces, which invaded Afghanistan. According to the U.S. Treasury Department press release, January 16, 2009, in late 2001, while in Tehran, AQ senior operative Mustafa Hamid negotiated with the Iranians to relocate al Qaeda families to Iran after the 9/11 attacks.

287. In the fall of 2001, Iran facilitated the exit from Afghanistan, into Iran, of numerous AQ leaders, operatives, and their families. The Iran-Afghanistan safe passageway, established earlier to get AQ recruits into and out of the training camps in Afghanistan, was utilized to evacuate hundreds of AQ fighters and their families from Afghanistan into Iran for safe haven there. The IRGC knew of, and facilitated, the border crossings of these AQ fighters and their families entering Iran.

288. Among the high-level AQ officials who arrived in Iran from Afghanistan at this time were Sa'ad bin Laden and the man who would soon lead "al Qaeda in Iraq," Abu Musab al Zarqawi.

289. In late 2001, Sa'ad bin Laden facilitated the travel of UBL's family members from Afghanistan to Iran. Thereafter, Sa'ad bin Laden made key decisions for AQ and was part of a small group of AQ members involved in managing AQ from Iran.

---

[58] *Id*. at 65.

290. By 2002, AQ had established in Iran its 'management council,' a body that Usama bin Laden reportedly tasked with providing strategic support to the organization's leaders in Pakistan. Key members of the council included Saif al-Adel, Sulayman Abu Ghayth, Abu al-Khayr al-Masri, Abu Muhammad al-Masri, and Mahfouz Ould al-Walid (a.k.a Abu Hafs al-Mauritani). All five senior operators remained influential over the next several years and retained close ties to bin Laden. Adel organized groups of fighters to overthrow Hamid Karzai's regime in Afghanistan and provided support for the May 12, 2003 terrorist attacks in Riyadh.

291. The Iranian regime offered AQ this safe haven in order to advance its own interests. Having AQ operatives in the country gave Iran a bargaining chip and important leverage with the U.S. and Saudi Arabia. In addition, it enabled Iran to protect itself from a possible attack against targets in Iran. The deal enabled Iran to cause chaos in Iraq and thus preventing it from becoming a Muslim democratic regime, which would endanger the security of the Iranian regime by the example and influence it would pose to the tens of thousands of Iranian pilgrims who visit the Shiite shrines in Iraq each year.

292. The agreement between IRGC Qods Force commander Qassem Soleimani and AQ senior commander Abu Hafs al-Mauritani at Iran's Zahedan (near the Pakistani and Afghanistan border) during December 2001.

293. In testimony before the U.S. Senate in February 2003, CIA Director George Tenet said, "we see disturbing signs that Al Qaeda has established a presence in both Iran and Iraq."[59]

294. Senior AQ members continued to conduct terrorist operations from inside Iran. For example, the U.S. intercepted communications from Saif al Adel, then in Mashad, Iran, to

[59] David Johnston, *Threats and Responses: Washington; Top U.S. Officials Press Case Linking Iraq to Al Qaeda*, N.Y. TIMES (Feb. 12, 2003, http://www.nytimes.com/2003/02/12/world/threats-responses-washington-top-us-officials-press-case-linking-iraq-al-qaeda.html).

AQ assassination teams in Saudi Arabia just before their May 12, 2003 assault on three housing compounds in Riyadh. AQ leaders in Iran planned and ordered the Riyadh bombing.

295. CIA Director General Michael Hayden noted that Usama Bin Laden understood that Iran was providing safe harbor to AQ.

296. For example – he quoted communications between senior AQ commanders and bin Laden, found on bin Laden's computer: "everybody is threatened – as long as he moves – by a missile…There is an idea preferred by some of the brothers to avoid attrition [loss of staff, leaders, and the organization's old elites] the idea is that some brothers will travel to '*safe*' areas with their families, just for protection." The author offers some ideas for safe havens: Sind, Baluchistan, Iran. Two months later bin Laden agrees they should be taking refuge in safer areas."[60]

297. After the September 19, 2008 attack on the American embassy in Sana'a, Yemen, which killed 19 people, Ayman al Zawahiri sent a letter to IRGC (which was intercepted) which stated: "Al-Qaeda's leadership pays tribute to Iran's generosity, stating that *without its 'monetary and infrastructure assistance' it would have not been possible for the group to carry out the terror attacks*.[61] (Emphasis added).

298. Testifying before the Senate Foreign Relations Committee on March 16, 2010, then commander of U.S. Central Command General David Petraeus stated that: AQ "[c]ontinues

---

[60] Michael W. Hayden, AMERICAN INTELLIGENCE IN THE AGE OF TERROR – PLAYING TO THE EDGE 339-340 (2016).

[61] Con Coughlin, *Iran receives al Qaeda praise for role in terrorist attacks*, THE TELEGRAPH (Nov. 23, 2008, http://www.telegraph.co.uk/news/worldnews/middleeast/iran/3506544/Iran-receives-al-Qaeda-praise-for-role-in-terrorist-attacks.html).

to use Iran as a key facilitation hub, where facilitators connect AQ's senior leadership to regional affiliates..."[62]

### 1. Abu Musab Zarqawi and the Rise of Al Qa'ida in Iraq ("AQI")

299. In 1999, Abu Musab Zarqawi founded and was the operational leader of Al Tawhid al Jihad (a/k/a Jund al-Islam), an organization with close personal and organizational links to the AQ network. UBL provided Zarqawi $200,000 to set up a training camp in Afghanistan near the border with Iran. In 2000, a Jordanian court sentenced him in absentia to fifteen years of hard labor for his role in the AQ millennial terror plot targeting Western interests in Jordan.

300. On September 23, 2001, Tawhid (together with Iranian-sponsored AAI) took hostage, tortured and murdered (the majority of whom were beheaded) 42 Peshmerga security officers in the Iraqi Kurd border town (on the border with Iran).

301. In early 2002, Zarqawi escaped from U.S. forces in Afghanistan to Iran with other AQ leaders and operatives. While staying in Iran, Zarqawi operated under the control of the IRGC and the Qods Force. Intelligence officials claimed that the time Zarqawi spent in Iran was crucial for rebuilding his network before relocating to Iraq to establish AQI.

302. Several months later, Zarqawi returned to the AAI camp in northern Iraq, run by his Jund al-Islam/Tawhid lieutenants.

303. On September 24, 2003, the U.S. Treasury designated Zarqawi and several of his associates as *Specially Designated Global Terrorists*, stating that Zarqawi not only has "ties" to

[62] U.S. Military Academy, *Combating Terrorism at West Point* (Apr. 2017), https://ctc.usma.edu/v2/wp-content/uploads/2017/04/CTC-Sentinel_Vol10Iss4.pdf.

Hezbollah, but that plans were in place for his deputies to meet with both Hezbollah and Asbat al Ansar (a Lebanese Sunni terrorist group tied to AQ). [63]

304. In 2004, Zarqawi changed the name of his group from Al Tawhid to AQI.

305. US Department of Treasury designed Tawhid al Jihad as an FTO and SDGT on October 15, 2004.[64] The OFAC SDN designation was updated on December 1, 2004 to the other known names of AQI.[65]

306. MOIS and IRGC-QF are under the general command of Section 101, also called the Leader's Intelligence and Security office. They cooperate and share intelligence in "exporting the revolution" (which is a euphemism for fomenting violence and destabilizing other regimes, primarily via acts of international terrorism).[66]

307. Department 15 of MOIS handles liaison responsibilities with foreign terror groups while the IRGC relies on its Qods Force for many of the same functions.[67]

308. On June 10, 2003, American intelligence officials asserted that MOIS and the IRGC Qods Force are deeply involved in supporting AQ.[68]

---

[63] *Supra* note 37.

[64] U.S. Department of the Treasury, *Recent OFAC Actions* (Oct. 15, 2004), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20041015.aspx.

[65] U.S. Department of the Treasury, *Recent OFAC Actions* (Dec. 1, 2004), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/pages/20041201.aspx.

[66] Stratfor, Iranian Intelligence and Regime Preservation (June 22, 2010), https://worldview.stratfor.com/article/special-series-iranian-intelligence-and-regime-preservation.

[67] William Tucker, *A Reported Shift in Iran's IRGC*, IN HOMELAND SECURITY (Sept. 29, 2015),http://inhomelandsecurity.com/a-reported-shift-in-irans-irgc/; Stratfor Report, *Iranian Intelligence and Regime Preservation* (June 22, 2010), https://worldview.stratfor.com/article/special-series-iranian-intelligence-and-regime-preservation.

309. In December 2006, two Qods force agents were arrested in Baghdad, possessing "weapons lists, documents pertaining to shipments of weapons into Iraq, organizational charts, telephone records and maps, among other sensitive intelligence information… [and] information about importing modern specially shaped explosive charges into Iraq. Officials were particularly concerned by the fact that the Iranians had information about importing modern, specially shaped explosive charges into Iraq, weapons that have been used in roadside bombs to target U.S. military armored vehicles."[69] An American intelligence official said these documents "show how the Qods Force… is working with individuals affiliated with Al Qaeda in Iraq and Ansar Al Sunna." [70] One of the IRGC Qods Force detainees was, according to General Stanley McChrystal, Mohsen Chizari, commander of Qods Force's Operations and Training staff.[71]

310. Iranian involvement in Iraq with the Sunni terrorists was known in military and intelligence circles since the Fallujah uprising in March of 2004.

311. Iranian mines and weapons were funneled to Zarqawi's terrorists in Fallujah and elsewhere throughout Sunni dominated Anbar province.

312. On February 16, 2012, the U.S. Department of Treasury designated MOIS, indicating that it has facilitated AQ operatives in Iran and provided them with documents, identification cards, and passports. The Treasury also stated that MOIS provided money and

---

[68] *U.S. says Iran harbors al Qaeda 'associate'*, WASHINGTON TIMES (June 10, 2003, http://www.washingtontimes.com/news/2003/jun/10/20030610-125659-6237r/).

[69] *Iraq Expels 2 Iranians Detained by U.S.*, WASHINGTON POST (Dec. 30 2006, http://www.washingtonpost.com/wp-dyn/content/article/2006/12/29/AR2006122901510.html).

[70] *Iran's Secret Plan For Mayhem* , NEW YORK SUN, (Jan. 3 2007, http://www.nysun.com/foreign/irans-secret-plan-for-mayhem/46032/).

[71] Michael Weiss and Hassan Hassan, ISIS: INSIDE THE ARMY OF TERROR 53 (2015).

weapons to AQI (a terrorist group designated under E.O. 13224), and negotiated prisoner releases of AQ operatives. [72]

313. Under Secretary for Terrorism and Financial Intelligence, David S. Cohen, stated on July 28, 2011 "that Iran is the leading state sponsor of terrorism in the world today. By exposing Iran's secret deal with al-Qa'ida, allowing it to funnel funds and operatives through its territory, we are illuminating yet another aspect of Iran's unmatched support for terrorism. Today's action [designating the following AQ terrorists and others] also seeks to disrupt this key network and deny al-Qa'ida's senior leadership much-needed support…Iran is a critical transit point for funding to support al-Qa'ida's activities in Afghanistan and Pakistan." Among terrorists designated were the following:[73]

a. Ezedin Abdel Aziz Khalil, a prominent AQ facilitator, who has been operating under a secret agreement between AQ and the Iranian government. The Iranian regime has permitted Khalil to operate within its borders since 2005 and maintain a relationship with him. Khalil moved money and recruits from across the Middle East into Iran, then on to Pakistan for the benefit of AQ senior leaders. He was responsible for moving significant amounts of money via Iran for onward passage to AQ leadership in Iraq and Afghanistan.

b. Muhsin al-Fadhli, who was considered then "an AQ leader in the Gulf countries." Al-Fadhli is so trusted within AQ that he was one of the few terrorists with foreknowledge of the 9/11 attacks. When he was first designated in 2005, al-Fadhli was "considered an al Qaeda leader in the Gulf" who "provided support to Iraq-based fighters for attacks against" the U.S.-led Coalition. Al-Fadhli was also a "major facilitator" for deceased AQI leader Abu Musab al Zarqawi…Al-Fadhli began working with AQ's Iran-based facilitation network in 2009 and was later arrested by the Iranians. He was subsequently released by the Iranians in 2011 and went on to assume the leadership of the facilitation network from AQ leader Yasin al-Suri later that year.

[72] U.S. Department of the Treasury, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (Feb. 16 2012), https://www.treasury.gov/press-center/press-releases/Pages/tg1424.aspx.

[73] U.S. Department of the Treasury, *Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point* (Jul. 28, 2011), https://www.treasury.gov/press-center/press-releases/Pages/tg1261.aspx.

c. AQ leader Yasin al Suri along with five other terrorist operatives who use Iranian soil to move funds and recruits from Iran's neighboring Gulf countries to South Asia and elsewhere. Al Suri's network assists senior AQ operatives in Iraq and Pakistan.

314. On February 5, 2014, the U.S. Treasury Department designated senior AQ member Jafar al-Uzbeki, part of an AQ network which operates in Iran "with the knowledge of Iranian authorities." The U.S. Treasury added that this network "uses Iran as a transit point for moving funding and foreign fighters through Turkey to support al Qaeda-affiliated elements inside Syria."

### H. The Special Groups

315. Iran opposes U.S. peacekeeping efforts and initiated acts of international terrorism against U.S. nationals, Coalition Forces, and Iraqi citizens with the goals of destabilizing Iraq and increasing Iranian influence in that country.

316. Iran, through its proxies and/or agents acting within the scope of their employment, agency, and direction from Iran, provided substantial material support and/or resources that facilitated acts of torture, extrajudicial killing and hostage taking that caused personal injury or death to more than one thousand Americans in Iraq.

317. Iran's support for the Special Groups is now well established. The IRGC-QF attempted to develop the Special Groups into a network similar to Hezbollah – a highly-lethal network that relied upon the Iranian regime to survive. The purpose of the IRGC-QF in developing these Special Groups was to create highly lethal networks that relied upon the Iranian regime to survive, and thus, were controlled, either directly or indirectly, by Iran.

318. Iran leveraged (and continues to do so) its control and dominion over the IRGC, the IRGC-QF, and Hezbollah, and through those entities, provided the Special Groups with training (in Iran), weapons, safe harbor, U.S. currency, and intelligence, including those Special

Groups responsible for the Terrorist Attacks which killed, maimed, or otherwise injured Plaintiffs.[74] The training provided to the Special Groups while they were in Iran included tactics and technology to conduct kidnappings, small unit tactical operations, and employ sophisticated IEDs.[75]

319. These Special Groups returned to Iraq after receiving their Iran-supported training, maintaining their group's organization. Thus, each Special Group consisted of Iraqi civilians who trained together in Iran on how to use IEDs, EFPs, mortars, rockets, as well as intelligence, sniper, and kidnapping operations.

320. The Special Groups operate throughout Iraq and, at all relevant times, remained under the control of Iran, through its proxies and/or agents, MOIS, IRGC, IRGC-QF, and Hezbollah.

321. During the Relevant Period, the IRGC-QF supplied the Special Groups with an estimated funding stream of *at least* between $750,000 to $3 million (U.S. Dollars) a month.

322. Utilizing the training, weapons and funding provided by Defendants, either directly or indirectly, the Special Groups planned and executed a string of bombings, kidnappings, sectarian murders, and more against Iraqi civilians, Coalition Forces and U.S. nationals, including Plaintiffs.

323. Although U.S. policy (supported by U.N. Security Council resolutions) was to establish peace and stability in Iraq in the hopes of establishing a democratic government, Iran viewed the U.S. and international peacekeeping efforts in Iraq as a potential threat to its regime.

---

[74] U.S. Department of Defense, *CDA—Military Power of Iran, Unclassified Report on Military Power of Iran*, at 3 (Apr. 2010), http://www.fas.org/man/eprint/dod_iran_2010.pdf.

[75] U.S. Department of Defense, *Iranian Government Behind Shipping Weapons to Iraq*, http://archive.defense.gov/news/newsarticle.aspx?id=1289 (last visited Sept. 13, 2017).

324. Rather than cooperate with the United States and Coalition Forces authorized by the U.N. to bring peace, democracy and stability to Iran, or alternatively to openly and directly engage in armed conflict with the U.S. or other Coalition Forces, Iran chose to undermine U.S. and U.N. peacekeeping efforts by unleashing massive waves of terrorism and sectarian violence in Iraq, in part, by targeting U.S. Nationals, including Plaintiffs, through the Special Groups that Iran controlled.

325. President Bush declared on May 1, 2003, that "major combat operations in Iraq have ended."

326. On May 23, 2003, the Coalition Provisional Authority established as the interim government for Iraq disbanded the Iraqi military forces.

327. The U.N. Security Council authorized the post-conflict occupation of Iraq by Coalition Forces in October 2003 to maintain "security and stability."[76]

328. After 2003, the IRGC inserted hundreds of its Iranian-trained operatives into Iraq's state security organs (notably the Ministry of Interior intelligence structure) in part through its influence within the Badr Organization (discussed further below).

329. In addition to its coordination with the Badr Organization, Iran, through its agent the IRGC-QF, formed the Ramezan Corps intended to operate specifically in Iraq. The Ramezan Corps cultivated, armed, trained and supported several Shi'a terror groups in Iraq that the U.S. military later termed "Special Groups."

330. Although a June 7, 2004 U.N. Security Council Resolution expressly assigned Coalition Forces in Iraq the task of helping Iraq "*by preventing and deterring terrorism*," Iran set out to target Coalition Forces and U.S. nationals, including Plaintiffs, and force them out of Iraq.

---

[76] S.C. Res. 1511, ¶ 13, U.N. Doc. S/RES/1511 (Oct. 16, 2003).

(Emphasis added).[77]

331. After Coalition Forces invaded, Iranian intelligence services penetrated Iraq rapidly and thoroughly. The thrust of their collection efforts was finding out what weapons U.S. troops were carrying and what kind of body armor they were wearing. Iranian agents also sought information on the location of U.S. Army and intelligence bases; on the routes traveled by U.S. convoys; on the operations of the Special Forces' elite Delta Force; and on the plans of the U.S. military and intelligence inside Iraq. The Iranians preferred not to be directly implicated in attacks on U.S. forces, but instead offered bounties to Iraqis for killing Americans, shooting down U.S. helicopters, and destroying American tanks.[78]

332. The number and sophistication of Special Groups increased in 2005, as the Iranian regime deployed Hezbollah to train Iraqi civilians in Iran.

333. In 2007, the Special Groups further escalated the number of mortar and rocket attacks against U.S. national targets, including Plaintiffs, in the Baghdad International Zone. The accuracy of this indirect fire improved because of the training and weapons these Special Groups received from Iran.

334. In sum, from October 16, 2003 onward, even though U.S. military personnel in Iraq were present at the request of the sovereign government of Iraq and participants in an internationally sanctioned peace keeping mission pursuant to the U.N. Security Council Resolution acting under Chapter VII of the U.N Charter, Iran embarked on a policy of terrorism, extrajudicial killings and murder, kidnapping and torture to thwart those efforts.

335. During the Relevant Period, the conduct of MOIS IRGC, IRGC-QF, Hezbollah, AAI, AQ, the Special Groups, and other Iranian supported terrorists in the extrajudicial killing,

[77] S.C. Res. 1546, U.N. Doc. S/RES/1546.

[78] Pound, *supra* note 27.

injuring, and kidnapping and hostage taking of U.S. nationals, Coalition Forces, and civilians were conducted by operatives who did not carry fixed distinctive signs recognizable at a distance, carry arms openly, conduct their operations in accordance with the laws and customs of war, or enjoy any form of combatant immunity for their acts. In fact, Hezbollah, the IRGC, IRGC-QF, AAI, AQ, the Special Groups and other Iranian supported terrorists acted in flagrant violation of, *inter alia*, the Geneva Convention Articles 48, 51(2)[79] and 52(2) of Additional Protocol I; Article 4(2)(d) of Additional Protocol II[80] and Article 147 of the Geneva Convention on the Protection of Civilian Persons in Time of War (Fourth Geneva Convention 1949) as well as United Nations Security Council Resolution 1373.[81]

336. Because of the perceived unreliability and value of the post-Hussein regime Iraqi currency, Special Groups and other terrorists in Iraq used U.S. currency almost exclusively.

337. Iran facilitated and enabled the terrorist attacks launched against U.S. Nationals, including the Plaintiffs, and others on a massive scale which would not have been possible without Iran's provision of hundreds of thousands of munitions, advanced technologies, training, funding, intelligence, safe harbor and other material support detailed herein.

338. Without the massive Iranian funding and material support, Special Groups and

---

[79] Article 51(2) of Additional Protocol I prohibits acts or threats of violence where the primary purpose is to spread terror among the civilian population.

[80] The prohibition of acts or threats of violence aimed at terrorizing the civilian population is further supported by the wider prohibition of acts of terrorism in Article 4(2)(d) of Additional Protocol II. The UN Secretary-General noted that violations of Article 4 of Additional Protocol II have long been considered violations of customary international law. UN Secretary-General, *Report on the establishment of a Special Court for Sierra Leone*; ICTR Statute, Article 4(d) (cited in Vol. II, Ch. 1, § 545).

[81] United Nations Security Council, *Prevention and Suppression of Financing Terrorist Acts*, (Sept. 28, 2001), http://www.un.org/en/sc/ctc/specialmeetings/2012/docs/United%20Nations%20Security%20Council%20Resolution%201373%20(2001).pdf (passing unanimously to reaffirm various UN resolutions).

other Iranian proxies would not have been able to conduct the thousands of acts of international terrorism on the scale and with the lethality they achieved, including the Terrorist Attacks which resulted in the deaths, maiming, or otherwise injuring of Plaintiffs and Plaintiffs' family members.

**1. The Badr Corps/Badr Organization**

339. The Badr Corps was established in 1982 in Iran as the military wing of the Supreme Council for Islamic Revolution in Iraq.

340. From its headquarters in Iran, the Badr Corps operated extensive networks throughout Iraq in the 1990s. The group smuggled men and weapons into Iraq to conduct attacks against the Iraqi regime of Saddam Hussein.

341. Like Hezbollah, the Badr Corps established clandestine offices in businesses and social organizations in Iraq.

342. The Badr Corps also used Iraqi front companies to recruit operatives, collect intelligence, and circulate propaganda materials in Shi'a populated areas.

343. Before 2003, the Badr Corps served as Iran and Hezbollah's most important surrogate inside Iraq, acting as a *de facto* arm of the IRGC-QF.

344. The Badr Corps received training and weapons from Iraq through the IRGC and Hezbollah.

345. After Saddam Hussein's overthrow in 2003, the Badr Corps renamed itself the Badr Organization, and many of its operatives joined the newly formed Iraqi security forces.

346. Published reports indicate that thousands of members of the Badr Organization remained on the IRGC-QF payroll after 2004.

347. Several senior Badr Corps operatives later emerged as key conduits for funneling weapons to Iranian Proxies in Iraq from 2004 through at least 2011, including Abu Mustafa al-

Sheibani, a key smuggler of deadly Iranian IEDs, and Jamal Ja'far Muhammad, a/k/a Abu Mahdi al-Muhandis (a/k/a "The Engineer"), who later led Kata'ib Hizballah (discussed below).

348. "Department 1000" of the IRGC-QF, known as the Ramezan Corps, is in charge of Iraqi operations and remains the largest Qods Force command outside of Iran. It coordinated, armed, and influenced the Badr Organization.

349. Although the Badr Organization evolved into a major political organization with seats in the new Iraqi parliament, it also played a significant role in facilitating Special Groups' operations in Iraq. A number of Special Groups commanders such as Al-Muhandis are, or were, Badr Corp agents and operatives.

350. It was through the Badr Corp that the IRGC inserted hundreds of its Iranian-trained operatives into Iraq's state security organs (e.g. the Iraqi Ministry of Interior Intelligence structure) during the Relevant Period.

**2. Kata'ib Hizballah**

351. Kata'ib Hizballah ("KH") has functioned as Iran's go-to terror group in Iraq and received support from Lebanese Hezbollah, including training in weapons use; IED construction and operation; and sniper, rocket, and mortar attacks. KH is a radical Shi'a Islamist group, an Iraqi terrorist organization, and an anti-Western establishment responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since at least 2007. KH has ideological ties to Lebanese Hezbollah and may have received support from that group.

352. KH has a number of aliases, including Hezbollah Brigades; Hezbollah Brigades in Iraq; Hezbollah Brigades-Iraq; KH; Kata 'ib Hezbollah; Kheta'ib Hezbollah; Khattab Hezballah; Hezbollah Brigades-Iraq of the Islamic Resistance in Iraq; Islamic Resistance in Iraq; Kata'ib Hizbollah Fi al-Iraq; Katibat Abu Fathel al-A'abas; Katibat Zayd Ebin Ali; Katibut Karbalah.

353. KH was formed in 2006 and came to prominence in 2007 for attacks against

Coalition Forces and U.S. nationals, including Plaintiffs, and its online propagandizing of those attacks. The IRGC-QF established it as a vehicle to deploy its most experienced operators and its most sensitive equipment. Historically, KH operated mainly in Shi'a areas of Baghdad, such as Sadr City and throughout the south.

354. The IRGC-QF positioned one of its own, Abu Mahdi al-Muhandis (aka Jamal al-Ibrahimi), as the leader of KH. Under al-Muhandis, KH developed as a compact movement of less than 400 personnel that was firmly under IRGC Qods Force control and maintains relatively good operational security.

355. In June 2011, five U.S. soldiers were killed in a rocket attack in Baghdad when KH assailants fired between three and five rockets at U.S. military base Camp Victory.

356. In 2015, Iran continued to be deeply involved in the conflict in Syria, working closely with the Assad regime to counter the Syrian opposition, and also in Iraq where Iran continued to provide support to militia groups, including the FTO KH. Iranian-backed groups, including KH, continued to operate in Iraq during 2015, which exacerbated sectarian tensions in Iraq and contributed to human rights abuses against primarily Sunni civilians. KH and other Iraqi Shi'a militias associated with the IRGC have been brought into the Iraqi government's Popular Mobilization Forces. The inclusion of KH, a designated FTO, in the Popular Mobilization Forces enlisted by the Iraqi Government in the effort against the Islamic State of Iraq and the Levant ("ISIL," aka "ISIS" or "Daesh"), threatens to undermine counterterrorism objectives.

357. On June 24, 2009, the United States designated KH an FTO.

358. The State Department's notice of KH's FTO designation stated that:

> The organization has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks, and sniper operations. Kata'ib Hizbollah [sic] also targeted the International Zone in Baghdad in a

> November 29, 2008 rocket attack that killed two UN workers. In addition, KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.

359. KH was simultaneously designated an SDGT under E.O. 13224, because it was "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since 2007."

360. The U.S. Treasury Department also designated KH pursuant to E.O. 13438.

361. The U.S. Treasury Department's 2009 press release announcing KH's designation explained that KH had "committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces..."

362. The press release also quoted then-Under Secretary for Terrorism and Financial Intelligence, Stuart Levey, as stating "[t]hese designations play a critical role in our efforts to protect Coalition troops, Iraqi security forces, and civilians from those who use violence against innocents to intimidate and to undermine a free and prosperous Iraq."

363. The U.S Treasury press release also stated: "[f]urther, the IRGC-Qods Force provides lethal support to KH and other Iraqi Shia militia groups who target and kill Coalition and Iraqi Security Forces."

364. The 2009 press release further reported that between March 2007 and June 2008, KH led a number of attacks against U.S. forces in Iraq, advising:

> As of 2008, Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training--to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks--to Kata'ib Hizballah members in Iran.

365. Furthermore, the 2009 U.S. Treasury Department press release noted:

> Recordings made by Kata'ib Hizballah for release to the public as

> propaganda videos further demonstrate that Kata'ib Hizballah conducted attacks against Coalition Forces. In mid-August 2008, Coalition Forces seized four hard drives from a storage facility associated with a Kata'ib Hizballah media facilitator. The four hard drives included approximately 1,200 videos showing Kata'ib Hizballah's sophisticated planning and attack tactics, techniques, and procedures, and Kata'ib Hizballah's use of the most lethal weapons--including RPG-29s, IRAMs, and EFPs--against Coalition Forces in Iraq.

366. One of the hard drives contained 35 attack videos edited with the KH logo in the top right corner. Additionally, between February and September 2008, Al-Manar in Beirut, Lebanon broadcast several videos showing KH conducting multiple attacks against U.S. nationals and Coalition Forces in Iraq.

367. Immediately preceding the government of Iraq's approval of the United States-Iraq security agreement in late November 2008, KH posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks against the government of Iraq if it signed the security agreement with the United States.

368. In 2008, the U.S. Department of Defense described the linkages it found between KH, Iran, and multiple terrorist attacks against U.S. nationals in Iraq—including KH's use of EFPs:

> [A]lso known as Hezbollah Brigades, is a terrorist group believed to receive funding, training, logistics and material support from Iran to attack Iraqi and coalition forces using what the military calls 'explosively formed penetrators' – roadside bombs designed to pierce armor-hulled vehicles – and other weapons such as rocket-assisted mortars.

369. As noted above—and as stated by the U.S. Treasury Department in its July 2009 press release—throughout 2008, Al-Manar, Lebanon Hezbollah's official television outlet in Lebanon (and itself a designated SDGT since May 2006), played numerous videos of KH launching rocket and IED attacks against U.S. troops in Iraq. In this manner, Hezbollah helped

publicize KH's activities and increase its profile among leading Shi'a terrorist groups.

370. Although KH's leadership remains in flux, one individual reportedly associated with the group is Abu Mahdi al-Muhandis. According to an inquiry published by Kuwaiti daily al-Rai on June 4, 2016, during the 1980's, Abu Mahdi al-Muhandis received an Iranian citizenship from the Iranian regime as part of his prominent role in the Badr Corps.[82]

371. KH's leader, Abu Mahdi al-Muhandis, is wanted in Kuwait for his alleged role in the 1983 bombings of the American and French embassies in Kuwait City, as well as for his alleged involvement in the assassination attempt on the Kuwaiti Emir in 1985. In an interview with Hezbollah-affiliated media on January 3 2017, Abu Mahdi al-Muhandi admitted that he cooperated with Hezbollah top commanders Imad Moughniyeh and Mustafa Badreddine from the early 80's. According to him, this cooperation included training opposition Iraqi Shiite groups to fight Saddam Hussein regime and the U.S. troops in Iraq from 2003 onward.[83]

372. The U.S. Treasury Department designated al-Muhandis an SDGT in July 2009 and announced the designation in the same press release announcing KH's designation. That press release stated:

> As of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The groups received training in guerilla warfare, handling bombs and explosives, and employing weapons--to include missiles, mortars, and sniper rifles. In another instance as of September 2007, al-Muhandis led networks that moved ammunition and weapons--to include explosively formed penetrators (EFPs)--from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces. As of mid-February 2007, al-Muhandis also ran a

[82] *See* http://www.alraimedia.com/ar/article/special-reports/2016/06/04/684698/nr/nc (last visited Sept. 13, 2017) (Arabic translation available).

[83] Middle East Media Research Institute TV Monitor Project, *Clip #5829*, https://www.memri.org/tv/abu-mahdi-al-muhandis-deputy-commander-popular-mobilization-units-optimism-over-liberation-mosul (last visited Sept. 12, 2017).

> weapons smuggling network that moved sniper rifles through the Iran-Iraq border to Shia militias that targeted Coalition Forces. Al-Muhandis also provided logistical support for attacks against Iraqi Security Forces and Coalition Forces conducted by JAM Special Groups and certain Shia militias. In one instance, in April 2008, al-Muhandis facilitated the entry of trucks--containing mortars, Katyusha rockets, EFPs, and other explosive devices--from Iran to Iraq that were then delivered to JAM Special Groups in Sadr City, Baghdad. Additionally, al-Muhandis organized numerous weapons shipments to supply JAM Special Groups who were fighting Iraqi Security Forces in the Basrah and Maysan provinces during late March-early April 2008.
>
> In addition to facilitating weapons shipments to JAM Special Groups and certain Shia militias, al-Muhandis facilitated the movement and training of Iraq-based Shia militia members to prepare them to attack Coalition Forces. In one instance in November 2007, al-Muhandis sent JAM Special Groups members to Iran to undergo a training course in using sniper rifles. Upon completion of the training course, the JAM Special Groups members had planned to return to Iraq and carry out special operations against Coalition Forces. Additionally, in early March 2007, al-Muhandis sent certain Shia militia members to Iran for training in guerilla warfare, light arms, marksmanship, improvised explosive devices (IED) and anti-aircraft missiles to increase the combat ability of the militias to fight Coalition Forces.
>
> In addition to the reasons for which he is being designated today, al-Muhandis participated in the bombing of Western embassies in Kuwait and the attempted assassination of the Emir of Kuwait in the early 1980s. Al-Muhandis was subsequently convicted in absentia by the Kuwaiti government for his role in the bombing and attempted assassination.

373. In a July 2010 press briefing, U.S. General Ray Odierno identified KH as the group behind increased threats to U.S. bases in Iraq. General Odierno confirmed that KH operatives had gone to Iran for special training and then returned to Iraq. General Odierno stated, "[T]hey are clearly connected to Iranian IRGC."

374. In June 2011, it was estimated that KH membership exceeded 1,000 people in Iraq.

375. Senior Iraqi Intelligence officials have stated that KH receives unlimited funding

from Iran, allowing KH operatives to be paid $300-$500 per month.

### 3. Jaysch al Mahdi & The Promised Day Brigades

376. Jaysh al Mahdi ("JAM" or the "Mahdi Army") was established by radical Shi'a cleric Muqtada al-Sadr in June 2003. On April 18, 2004, it led the first major armed confrontation by Shi'a militia against U.S.-led forces in Iraq.

377. JAM was co-founded by Imad Mughniyah, once the terrorism chief of Hezbollah and "an agent of Iran and a direct role in Iran's sponsorship of terrorist activities."[84] Prior to September 11, 2001, Mughniyah was ranked number one on the FBI's Most Wanted list for leading the attacks which killed 183 Marines in the bombing of the Holiday Inn in Beirut, the hijacking of a TWA plane and murder of a U.S. Navy diver, and the bombing of the U.S. Embassy in Beirut (replaced as number one most wanted by Usama bin Laden).

378. JAM expanded its territorial control of mixed or predominantly Shi'a neighborhoods and displaced or killed the local Sunni population.

379. JAM was able to gain initial control in many of the neighborhoods in and around Baghdad (such as Sadr City) by offering the Shi'a population protection and social services.

380. In a Department of Defense news briefing on August 24, 2007, General Rick Lynch confirmed that on August 7, 2006, the 3rd Brigade Combat Team "conducted a raid on a militant house . . . about 20 miles east of Baghdad . . . They arrested one of our division's most valued targets, . . . [who] acted as a link between Iran and the [JAM]. He was the main Shia

[84] "Imad Fayez Mughniyah (a/k/a Hajj Radwan) was, for decades prior to his death in February 2008, the terrorist operations chief of Hizballah. Mughniyah played a critical role in a series of imaginative high-profile terrorist attacks across the globe, and his abilities as a terrorist coordinator, director, and operative was an order of magnitude beyond anything comparable on the scene between 1980-2008. Mughniyah was, since the early 1980s, an agent of the Islamic Republic of Iran, where he lived for many years. Imad Mughniyah had a direct reporting relationship to Iranian intelligence and a direct role in Iran's sponsorship of terrorist activities." *Havlish v. Bin Laden (In re Terrorist Attacks on September 11, 2001)*, 2011 U.S. Dist. LEXIS 155899, at 106-107 (S.D.N.Y. Dec. 22, 2011).

conduit in that region for getting Iranian EFPs and rockets into Baghdad, . . ."[85]

381. Al-Sadr dissolved part of his militia after 2007, but maintained a small group of Iranian-supported militants called the Promised Day Brigades ("PDB") to carry out terrorist attacks against Coalition Forces and U.S. nationals, including certain Plaintiffs.

382. The PDB has received funding, training, and weapons from the IRGC and is one of the Special Groups.

383. It is estimated that the PDB had approximately 5,000 active members in June 2011.

384. The PDB actively targeted U.S. nationals, including Plaintiffs and U.S. forces, in an attempt to disrupt security operations and further destabilize Iraq.

385. For example, in June 2011, the PBD claimed responsibility for 52 attacks on U.S. Forces.

386. On June 28, 2011, the PDB issued a statement claiming responsibility for ten (10) mortar and Katyusha rocket attacks against U.S. Military convoys in which U.S. officials confirmed that three U.S. troops were killed.

387. PDB's headquarters is located in Sadr City, Baghdad, and the groups' main areas of operation include southern Iraq, and Baghdad.

**4. Asa'ib Ahl Al Haq**

388. Asa'ib Ahl Al Haq ("AAH" or the "League of the Righteous") terrorist organization is a Shi'a Special Group supported by Hezbollah and the IRGC-QF that conducted assassinations and operations in Iraq against Coalition Forces and various individuals and U.S. nationals.

---

[85] Kimberly Kagan, THE SURGE: A MILITARY HISTORY (ENCOUNTER BROADSIDES) 50 (2010).

389. AAH was originally established by Senior Sadrist and MDF-I detainee Qais al-Khazali. His brother, Laith Khazali, also helped lead the organization.

390. AAH split from al-Sadr's JAM in 2006. Since that time, AAH has conducted: thousands of IED attacks against U.S. and Iraqi forces; targeted kidnappings of Westerners and Iraqis; rocket and mortar attacks on the U.S. Embassy; murders of American and British soldiers; and assassinations of Iraqi officials.

391. AAH fought alongside Hezbollah in the 2006 Lebanon-Israeli War.

392. During the Relevant Period, AAH received significant funding from Iran, and had links to Iran's IRGC-QF and Hezbollah.

393. Senior Lebanese Hezbollah operative Ali Musa Daqduq provided training to AAH terrorists.

394. Daqduq reported to Youssef Hashim, the head of Lebanese Hezbollah Special Operations, and the latter reported to Abdul Reza Shahlai, the director of the IRGC-QF External Operations.

395. In October 2006, AAH used mortars to attack Coalition Forces at Forward Operating Base Falcon.

396. In May of 2007, AAH operatives attacked the Iraqi Finance Ministry, kidnapping British contractor, Peter Moore, and his four bodyguards. AAH released Moore in December 2009 in exchange for the Iraqi government's release of its leader Qais al-Khazali, but not before murdering Moore's four bodyguards.

397. In October 2009, AAH used mortars to attack the U.S. Consulate in Al Hillah, Babil, Iraq.

398. In October 2011, AAH claimed responsibility for a roadside bomb that killed the

last American to die before the U.S. withdrawal in Iraq in November 2011.

399. Hezbollah and the IRGC-QF provided JAM, PDB, KH, AAH, and other Shi'a groups with a variety of weapons and training used to target U.S. nationals, including Plaintiffs, and Coalition Forces engaged in their post-2003 peacekeeping mission.

400. These weapons included signature Iranian munitions such as EFPs and Improvised Rocket Assisted Munitions ("IRAMs"), as well as 107 mm rockets (often used as part of IRAMs), 120 mm and 60 mm mortars, RPG launchers and other small arms.

401. The training and weapons provided by Iran and its agents resulted in an increased lethality and effectiveness of the Terrorist Attacks, and included sophisticated tell-tale tactics that had not previously been seen in Iraq prior to infusion of Iranian agents, Hezbollah and the IRGC-QF in 2003.

## I. IRANIAN SIGNATURE WEAPONS USED IN THE TERRORIST ATTACKS

402. A variety of Iranian weapons flowed into Iraq through direct purchases by Iran. The number of EFPs used against Coalition Forces and U.S. nationals rose at a rate of 150% between January 2006 and December 2006, and increased every month between November 2006 and January 2007.

### 1. Explosively Formed Penetrators

403. One of Iran's primary forms of material support and/or resources that facilitated extrajudicial killings of U.S. citizens in Iraq was the financing, manufacturing and deployment of EFPs and IEDs.

404. IED is a term commonly used by the U.S. military as shorthand for a roadside bomb. The Terrorist Groups consistently sought to attempt to improve IED effectiveness and

sophistication.[86]

405. EFPs, IEDs, and other WMDs were typically smuggled from Iran to Iraq, and the IRGC-QF played a vital role in that process.

406. Additionally, in Iraq, the IRGC and Hezbollah supplied and trained various Special Groups to deploy EFPs.

407. EFPs are a particularly effective form of manufactured IED and are sometimes known as a "shaped charge," usually made with a manufactured concave copper disk and a high explosive packed behind the liner.

408. The EFPs deployed by the IRGC and Hezbollah in Iraq were not truly "improvised" explosive devices but professionally manufactured and specifically designed to target U.S. nationals, including Plaintiffs, and Coalition Forces' armor. These EFPs cannot be made without specific machinery, access to which Iran controls, and without which Special Groups and other terrorist organizations could not obtain or use these munitions.

409. EFPs constitute "weapons of mass destruction" as that term is defined in 18 U.S.C. § 2332a(2)(A).

410. In Iraq, EFPs were often triggered by various technologies, including passive infra-red sensors (tripped by the engine heat of passing vehicles) and radio frequency modules (triggering the weapon when high-powered radio waves were generated by Coalition Forces' jamming devices), ultimately setting off an explosion within the steel casing of the EFP, forcing the copper disk forward, and turning it into a high-velocity molten slug, traveling at over a mile per second, that could pierce the military-grade armor of most U.S. vehicles deployed in Iraq even up to 300 feet away.

---

[86] Pound, *supra* note 27.

411. Metallurgic analysis by U.S. technicians helped confirm the high-purity copper EFP liners were not generally produced in Iraq.

412. Differences in the liners indicated the kind of press that was required to fabricate them—a heavy (hydraulic) press not commonly seen in Iraq.

413. To produce these weapons, copper sheets are often loaded onto a punch press to yield copper discs. These discs are annealed in a furnace to soften the copper. The discs are then loaded into a large hydraulic press and formed into the disk-like final shape.

414. The hydraulic press machinery was transported to Iran by Iran's national maritime carrier, Islamic Republic of Iran Shipping Line ("IRISL").

415. This munitions manufacturing process is critical to the design and concomitant lethality of the weapon and is controlled by Iran.

416. EFPs are far more sophisticated than homemade explosive devices such as traditional improvised explosive devices, and they are designed specifically to target vehicles such as armored patrols and supply convoys, though Hezbollah and the Special Groups have deployed them against U.S. and Iraqi civilians as well.

417. One of the ways in which the IRGC provided "militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed penetrators (EFPs) that were specially designed to defeat armored vehicles" included providing them with manufacturing supplies such as copper and steel, as well as machinery—including hydraulic presses used to form copper into the shape of disks used in EFPs.

418. Iran propagated its specialized weapons knowledge up and down its network of terror proxies in Iraq, as the U.S. State Department documented in its 2006 *Country Reports on Terrorism* regarding Iran's specific efforts to provide terrorists with lethal EFPs to ambush and

murder U.S. nationals, including Plaintiffs, and other Coalition Forces:

> Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks. Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hezbollah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. *These individuals then passed on this training to additional militants in Iraq.*
>
> (Emphasis added)

419. As reported by the New York Time on March 26, 2007, U.S. Army officials believe that terrorists first began using EFPs in Iraq in August 2003.

420. In December 2003, Coalition Forces recovered radio equipment that was most likely intended for use with EFPs in Iraq.

421. In December 2004, Coalition Forces recovered passive infrared sensors modified for use with EFPs.

422. Although Iran's use of EFPs was publicly disclosed by U.S. and British officials in 2005 when the two counties issued diplomatic protests, the official identification of specific attacks as EFP attacks was not first publicly disclosed until 2010.

423. In 2006, the U.S. State Department's Country Reports on Terrorism further documented Iran's specific efforts to provide terrorists with lethal EFPs to ambush and murder U.S. nationals, including Plaintiffs, and other Coalition Forces:

> Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese

> Hezbollah [sic]. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hezbollah [sic], implemented training programs for Iraqi militants in the construction and use of sophisticated lED technology. *These individuals then passed on this training to additional militants in Iraq.*
>
> (Emphasis added).

424. Also in 2006, Brigadier Gen. Michael Barbero, Deputy Chief of Staff for Strategic Operations of the Multi-National Force-Iraq stated, "Iran is definitely a destabilizing force in Iraq. I think it's irrefutable that Iran is responsible for training, funding and equipping some of these Shi'a extremist groups and also providing advanced IED technology to them, and there's clear evidence of that."

425. Brigadier Gen. Kevin Bergner commented on Iran funding of Hezbollah operatives in Iraq:

> Actions against these Iraqi groups have allowed coalition intelligence officials to piece together the Iranian connection to terrorism in Iraq [...] Iran's Qods Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups. [...] It shows how Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities. And it paints a picture of the level of effort in funding and arming extremist groups in Iraq.... The groups operate throughout Iraq. They planned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel. They receive arms – including explosively formed penetrators, the most deadly form of improvised explosive device – and funding from Iran. They also have received planning help and orders from Iran.

426. In May 2007, the Commander of the Multinational Division-Center, U.S. Army Major General Richard Lynch, confirmed that "[m]ost of our casualties have come from improvised explosive devices. That's still the primary threat to our soldiers—IEDs. And we have an aggressive campaign to counter those IEDs, but they still are taking a toll on our soldiers: 13 killed, 39 soldiers wounded. *What we're finding is that the technology and the financing and the*

*training of the explosively formed penetrators are coming from Iran*. The EFPs are killing our soldiers, and we can trace that back to Iran." (Emphasis added.)

427. That same year, the Deputy Chief of Staff for Intelligence with the MNF-I, U.S. Army Major General Richard Zahner, declared that:

> Labels on weapons stocks seized inside and outside Iraq point to Iranian government complicity in arming Shiite militias in Iraq […] Iran is funneling millions of dollars for military goods into Iraq […] You'll find a red label on the C-4 [explosive] printed in English and will tell you the lot number and name of the manufacturer.

Major General Zahner further added:

> [T]he control of military-grade explosives in Iran is controlled through the state apparatus and is not committed through rogue elements right there. It is a deliberate decision on the part of elements associated with the Iranian government to affect this type of activities.

428. According to the U.S. State Department's 2007 Country Reports on Terrorism:

> Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups that target Coalition and Iraqi security forces and Iraqi civilians. In this way, Iranian government forces have been responsible for attacks on Coalition forces. The Islamic Revolutionary Guard Corps (IRGC) -Qods Force, continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs), and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to additional militants inside Iraq, a "train-the-trainer" program. In addition, the Qods Force and Hezbollah have also provided training inside Iraq. In fact, Coalition Forces captured a Lebanese Hezbollah operative in Iraq in 2007.

429. Other U.S. Government reports, such as the Department of Defense's December 2007 "Measuring Stability and Security in Iraq" quarterly report to Congress, similarly

concluded that:

> Iranian Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) efforts to train, equip, and fund Shi'a extremists also continue despite reported assurances to Prime Minister Maliki that Iran will cease lethal aid.

430. These observations continued in 2008. According to the U.S. State Department's 2008 Country Reports on Terrorism:

> The Qods Force, an elite branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and supporting terrorists abroad. The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hezbollah, Iraq-based militants, and Taliban fighters in Afghanistan ...
>
> Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian- produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was responsible for some of the lethality of anti-Coalition attacks by providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force, in concert with Lebanese Hezbollah, provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

431. Similarly, in 2011, the U.S. Ambassador to Iraq, James F. Jeffrey, was quoted as saying "[F]resh forensic testing on weapons used in the latest deadly attacks in the country bolsters assertions by U.S. officials that Iran is supporting Iraqi insurgents with new weapons and training. […] We're not talking about a smoking pistol. There is no doubt this is Iranian."

432. Further, the State Department's 2011 *Country Reports on Terrorism* reported:

> Despite its pledge to support the stabilization of Iraq, Iran continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi Shia militant groups targeting U.S. and Iraqi forces, as

> well as civilians. Iran was responsible for the increase of lethal attacks on U.S. forces and provided militants with the capability to assemble explosives designed to defeat armored vehicles. The IRGC-QF [Islamic Revolutionary Guard Corps-Qods Force], in concert with Lebanese Hezbollah, provided training outside of Iraq as well as advisors inside Iraq for Shia militants in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry.

433. Iran also introduced other weapons into Iraq for the purpose of supporting terrorist attacks on U.S. nationals and coalition personnel, including Plaintiffs. These included 81 mm mortars (the remainder of the region uses 82 mm mortars), repainted 107 mm rockets imported into Iran from China and marked for sale in the open markets, 60 mm canisters filled with Iranian-manufactured mortar rounds; 240 mm rockets, IRAMs, RPG-7s, RPG-29s, and RKG-3 armor penetrating anti-tank grenades deployed by the Terroristl Groups in various acts of international terrorism, including the Terrorist Attacks wherein Plaintiffs and/or Plaintiffs' family members were killed, maimed, or otherwise injured.

434. The presence of these weapons shows a high level of sophistication of the Iranian arms flow into Iraq as the purchases are made by the Iranian regime.

**2. Improvised Rocket Assisted Munitions**

435. In addition to EFPs, Iran also provided material support to the Terrorist Groups by providing them with IRAMs.

436. Along with EFPs, Improvised Rocket Assisted Munitions were a signature weapon of terrorists in Iraq that were supplied by the IRGC.

437. An IRAM is a rocket-fired improvised explosive device made from a large metal canister—such as a propane gas tank—filled with explosives, scrap metal, ball bearings, and propelled by rockets, most commonly 107 mm rockets launched from fixed or mobile sites by remote control. They are designed to cause catastrophic damage and inflict mass casualties.

438. According to The Joint Improvised Explosive Device Defeat Organization of the

U.S. Department of Defense, IRAMs were first introduced by Iran in November 2007 against U.S. personnel in Iraq.

439. Although Iran's use of IRAMs was publicly disclosed by U.S. officials after their introduction in 2007, systematic identification of specific attacks as IRAM attacks was not publicly disclosed until 2010.

440. IRAM attacks occurred primarily in Baghdad and in the Shi'a dominated areas in southern Iraq, where Iranian-backed militias primarily operate.

441. All of the foregoing material support provided to Terrorist Groups, including those Special Groups that perpetrated the Terrorist Attacks that resulted in the death, maiming, or otherwise injuring of Plaintiffs and Plaintiffs' family members, was provided by Iran for attacks on Coalition Forces and U.S. nationals, including Plaintiffs, was financed and facilitated in substantial part by Iran.

442. Because Iran is under numerous sanctions issued by other countries, it continues to evade those sanctions by operating clandestinely through agents of Iran, including the Islamic Republic of Iran Shipping Lines, Mahan Air, and the National Iranian Oil Company.

### J. IRAN EVADES SANCTIONS & COMMITS ACTS OF TERRORISM THROUGH ITS AGENTS/PROXIES

443. Iran obtains and provides weapons and other material support to Terrorist Groups and other terrorist organizations through agents and proxies that are nothing more than extensions of the Iranian regime.

444. Congress and successive Administrations have enacted several laws and executive orders that imposed sanctions on countries and firms that sell WMD technology and military equipment to Iran. Despite these efforts, Iran continued to evade sanctions.

445. In order to thwart U.S. sanctions efforts, Iran cultivated close relationships with

foreign arms suppliers, including Russia, China, and North Korea.

446. In addition, Iran sought to clandestinely acquire dual-use technologies from European manufacturers, and certain export-controlled defense products, aircraft parts, dual-use technologies and materials from the United States.

447. Iran used proxies and agents as tools to circumvent sanctions, including IRISL, NIOC, KAA, and Mahan Air.

448. IRISL, NIOC, KAA, Mahan Air, and other Iranian government and IRGC fronts serve as financial, physical, and logistical conduits for Iran and its terroristic goals. At all relevant times, these agents and proxies of Iran acted in concert with Defendants.

**1. Islamic Republic of Iran Shipping Lines**

449. As Iran's national maritime carrier, IRISL[87] is an agent and instrumentality of Iran.

450. IRISL has a long history of facilitating arms shipments on behalf of the IRGC and the Iranian military, including copper discs that are a key component in EFPs (discussed below) used to kill and maim many of the Plaintiffs herein.

451. For example, a November 2007 State Department cable noted:

> Washington remains concerned about on-going conventional arms transfers from China to Iran, particularly given Iran's clear policy of providing arms and other support to Iraqi insurgents and terrorist groups like the Taliban and Hezbollah….
>
> We have specific information that Chinese weapons and components for weapons transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern.

452. The diplomatic cable went on to note that an IRISL-flagged vessel was loaded at a

[87] IRISL is Iran's national maritime carrier: a global operator of merchant vessels with a worldwide network of subsidiaries, branch offices and agent relationships. It provides a variety of maritime transport services, including bulk, break-bulk, cargo and containerized shipping.

Chinese port with multiple containers of cargo bound for delivery at the port of Bandar Abbas, Iran.

453. The cargo included DIO[88] manufactured ammunition cartridges (7.62 x 39 rounds for AK-47 assault rifles).

454. DIO is an Iranian government-owned weapons manufacturer controlled by MODAFL.

455. An April 2008 State Department cable warned of an IRISL shipment of chemical weapons precursors from China aboard the IRISL-leased, Iranian flagged merchant vessel ("M/V") *Iran Teyfouri*.

456. In September 2008, the U.S. Treasury Department designated IRISL a SDN, stating: "Not only does IRISL facilitate the transport of cargo for U.N. designated proliferators, it also falsifies documents and uses deceptive schemes to shroud its involvement in illicit commerce."

457. The Treasury Department further noted that:

> [i]n order to ensure the successful delivery of military-related goods, IRISL has deliberately misled maritime authorities through the use of deception techniques. These techniques were adopted to conceal the true nature of shipments ultimately destined for MODAFL [Iran's Ministry of Defense and Armed Forces Logistics].

458. In January 2009, a former Russian merchant ship chartered by IRISL—named the M/V *Monchegorsk* and flying a Cypriot flag—was spotted leaving the Iranian port of Bandar Abbas and heading for the Suez Canal.

459. Egyptian authorities were alerted by the U.S. Navy and the M/V *Monchegorsk*

---

[88] DIO was designated an SDN by the U.S. on March 30, 2007. IRGC Brigadier-General Seyyed Mahdi Farahi was the Managing Director of DIO and has been sanctioned by the European Union since 2008. He was later sanctioned by the U.S. on January 17, 2016. *See*, http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex%3A32010D0644 (last visited Sept. 13, 2017).

was forced into an Egyptian port to be searched. Iran's DIO was later determined to be the shipper of the military-related cargo.

460. Munitions, believed to be headed for Gaza, were found hidden in the cargo, including components for mortars and thousands of cases of powder, propellant, and shell casings for 125mm and 130mm guns.

461. In October 2009, U.S. troops boarded a German-owned freighter, the M/V *Hansa India*, in the Gulf of Suez and found eight containers full of ammunition that were headed to Syria from Iran.

462. The vessel carried seven containers of small arms ammunition (including 12 million bullet casings), as well as one container containing copper discs of the type used in EFPs to kill and maim Coalition Forces and U.S. nationals, including Plaintiffs.

463. The acronym "IRISL" was painted in large block letters on the exterior side walls of each shipping container, and the barrels of munition parts discovered inside the containers were marked with the inscription "SAEZMANE SANAYE DEFA," a common transliteration from Farsi to English of the name for Iran's Defense Industries Organization.

464. The M/V *Hansa India* was registered to the Hamburg-based shipping company Leonhardt & Blumberg, but had been under charter to IRISL for several years.

465. In November 2009, the Government of Israel intercepted an IRISL-flagged ship, the M/V *Francop*, headed for Beirut, Lebanon and then Latakia, Syria. The vessel was loaded with munitions crates that were either stamped "IRISL" or included documentation marked with the IRGC-QF logo.

466. The munitions found onboard included over two thousand 107mm "Katyusha" rockets, more than six hundred 122mm "Grad 20" rockets, and also various rocket fuses, mortar

shells, rifle cartridges, fragment grenades and 7.62mm bullets.

467. The M/V *Francop*, owned by the Cypriot shipping company UFS, was carrying shipping containers clearly marked IRISL.

468. Because the DIO, as discussed *infra*, was one of MODAFL's three main weapons systems manufacturers, it was required to use IRISL for most of its illicit shipments of military-related raw-materials, parts and finished products for, and from, foreign suppliers, Iranian arms dealers and terrorist organizations.

469. Iran's DIO was listed as an entity of concern for military procurement activities in an early warning document distributed by the German government to industry in July 2005.

470. The DIO was also designated by the United Nations in 2006 for its involvement in Iran's WMD program.

471. During 2006 and 2007, weapons caches seized by Coalition Forces from the Special Groups in Iraq contained large quantities of weapons produced by Iran; including many 107 millimeter artillery rockets with closely clustered DIO lot numbers and production dates between 2005 and 2007, as well as rounds and fuses for 60 millimeter and 81 millimeter mortars with DIO lot markings and 2006 production dates.

472. There can be no question that IRISL facilitated shipments of military cargo to FTOs and Special Groups, including those responsible for carrying out the Terrorist Attacks that killed, maimed, and/or injured Plaintiffs or Plaintiffs' family members.

473. IRISL *did*, in fact, facilitate shipments of military cargo to Hezbollah, one of the organizations controlled and/or otherwise substantially and materially supported by Iran and responsible for acts of international terrorism that killed and injured American citizens in Iraq, including the Plaintiffs. However, IRISL was not Iran's only means of passing weapons on to the

Terrorist Groups, weapons used to commit acts of international terrorism, including the Terrorist Attacks carried out against Plaintiffs and/or Plaintiffs' family members.

**2. Mahan Air**

474. Mahan Airlines was founded in 1991 and began passenger air travel services in June 1992 as the first Iranian "private" airline. Since 1997, Mahan Airlines has also provided air cargo operations.

475. Mahan Airlines operates under the name "Mahan Air" and uses the Tehran Imam Khomeini International Airport and Mehrabad International Airport as its main business hubs.

476. As of November 2016, Mahan Air owned at least 60 passenger and cargo aircraft, and, in additional to domestic flights, flew to 52 destinations in Europe, Asia and the Middle East.

477. Mahan Air publically acknowledges that it is wholly-owned by Mol-Al-Movahedin Charity.

478. The Mol-A-Movahedin Charity is managed and controlled by the IRGC.

479. Mahan Air is an "agency or instrumentality" of the government of Iran as defined by 28 U.S.C. § 1603(b).

480. October 12, 2011, the United States designated Mahan Air as an SDGT for "providing financial, material and technological support to the Islamic Revolutionary Guard Corps-Qods Force."

481. According to the U.S. government, Mahan Air (1) "facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq;" (2) "facilitated IRGC-QF arms shipments"; and (3) "transported personnel, weapons and goods on behalf of Hezbollah [sic]." (Brackets in original).

482. The Treasury Department explained Mahan Air's direct involvement with

terrorist operations, personnel movements and logistics on behalf of the IRGC-QF:

> Mahan Air also facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq by bypassing normal security procedures and not including information on flight manifests to eliminate records of the IRGC-QF travel.
>
> Mahan Air crews have facilitated IRGC-QF arms shipments. Funds were also transferred via Mahan Air for the procurement of controlled goods by the IRGCQF.
>
> In addition to the reasons for which Mahan Air is being designated today, Mahan Air also provides transportation services to Hezbollah [sic], a Lebanon-based designated Foreign Terrorist Organization. Mahan Air has transported personnel, weapons and goods on behalf of Hezbollah [sic] and omitted from Mahan Air cargo manifests secret weapons shipments bound for Hezbollah [sic].

483. Under-Secretary of Commerce Eric L. Hirschhorn described this supply chain as "egregious conduct by… foreign companies and individuals who have endangered the lives of U.S. and coalition forces in Iraq."

484. During a press conference, Under-Secretary for Terrorism and Financial Intelligence David S. Cohen said that "Mahan Air's close coordination with the Qods Force – secretly ferrying operatives, weapons and funds on its flights – reveals yet another facet of the IRGC's extensive infiltration of Iran's commercial sector to facilitate its support for terrorism."

485. The U.S. Department of Treasury further highlighted that Mahan Air provided travel services to Qods Force personnel to fly to and from Iran and for military training.

486. The airline facilitated arms shipments and "covert travels" to Iraq of suspected Qods Force members who were responsible for targeting Coalition Forces.

487. Mahan Air was also later identified as the conduit to Iran of thousands of radio frequency modules recovered by Coalition Forces in Iraq from IEDs that were used to target U.S.

nationals, including Plaintiffs, and Coalition Forces.[89]

488. Coalition Forces recovered these modules from IED devices in Iraq that were used to target U.S. nationals, including Plaintiffs, and Coalition Forces.

489. The modules had encryption capabilities and a particularly long range that allowed Special Groups operatives to operate them across significant distances.

490. In 2008, Mahan Air transported the IED components from Singapore and Thailand to Tehran, Iran.

491. In short, at the direction of Iran, Mahan Air transported weapons, personnel, and technology into Iraq on behalf of the IRGC-QF and Hezbollah, and did, in fact, transport modules used to control and activate IEDs and EFPs deployed against Coalition Forces in Iraq.

492. Mahan Air, in its supporting, albeit crucial, role of exporting terrorism, and the materials and instruments thereof for Iran, is an agent and instrumentality of Iran.

493. Due to the role played by Mahan Air, Iran was able to effectuate global jihad and commit acts of terrorism much more effectively and conveniently during the Relevant Period, including the time in which the Terrorist Attacks at issue were committed.

494. Since 2012, Mahan Air has multiple daily flights from Tehran, Mashhad, Isfahan, Shiraz and Abadan to Damascus. These flights use Iraqi air space and carry weapons, equipment and Revolutionary Guard personnel to be used on the ground in Syria in support of Iranian-backed operations.

495. Since fighting began in Syria, the Iraqi Special Groups linked to the Qods Force have been sent by bus through Basra to Abadan and from there are transferred to Damascus with Mahan aircraft. According to reports obtained from the IRGC, these groups include the

[89] *See* Superseding Indictment in *United States v. Larijani, available at:* https://www.justice.gov/opa/file/837996/download (last visited Sept. 13, 2017).

Special Groups: Badr Corps., KH, AAH, as well as the FTO Hezbollah. As they were in Iraq, these terrorist groups, now operating in Syria, are commanded by the IRGC and have been directly linked to the massacres of Aleppo and killings of Syrian civilians.

### 3. National Iranian Oil Company (NIOC)

496. Defendant NIOC is not a state agency, operation, or program of the Iranian Government. Rather, it is a front-company for the IRGC, and therefore an agent and instrumentality of Iran.

497. At all relevant times, the NIOC was controlled by Iran through the IRGC.

498. NIOC is an "agency or instrumentality" of the government of Iran as defined by 28 U.S.C. § 1603(b).

499. In 2008, the Treasury Department identified NIOC (and other Iranian agencies) as "centrally involved in the sale of Iranian oil, as entities that are owned or controlled by the [government of Iran]."

500. Pursuant to E.O. 13382, the United States designated NIOC as an SDN.

501. The United States has identified NIOC as an agent or affiliate of the IRGC.

502. Under the ITRSHRA, the U.S. government determined that that NIOC is an agent or affiliate of the IRGC under section 104(c)(2)(E)(i) of the CISADA and section 302 of the ITRSHRA. As part of that 2012 certification, NIOC was formally determined to be part of the Government of Iran.

503. During the Relevant Period, the NIOC not only was under IRGC control, but it also served a critical function in supporting the IRGC's activities.

504. The Iranian Helicopter Aviation Company, Ahwaz Pipe Mill Co., and Kala Naft[90]

[90] Kala Naft was designated as a Specially Designated Nations (DN) by the United States Treasury on June 16, 2010. U.S. Department of the Treasury, *Recent OFAC Actions* (June 16,

are all subsidiaries of the NIOC.

505. As early as February 1998, Kala Naft was identified by the UK government "as having procured goods and/or technology for weapons of mass destruction programs."

506. Kala Naft was also publicly identified as a NIOC subsidiary in a 2003 Commerce Department action that further stated that Kala Naft was a recipient of illegally exported U.S. origin oil field equipment from the U.S.

### 4. Khatam al-Anbiya Construction Company & The Headquarters for the Restoration of Holy Shrines

507. Iran also logistically and financially supports terrorist groups through proxies of Iran, including, but not limited to Khatam al-Anbiya Construction Company (a/k/a Khatam al-Anbiya Construction Headquarters, Qaragah-e Sazandegi-ye Khatam al-Anbiya, or "Seal of the Prophets," hereinafter referred to as "KAA"), and The Headquarters for the Restoration of the Holy Shrines ("HRHS"), both Qods Force front entities, as well as their agents and subsidiaries.

508. KAA serves to help the IRGC disguise its funding and operations, including IRGC-Qods Force terror activities.

509. KAA is a large Iranian corporation, controlled by the IRGC, and serves to help the IRGC funnel money, material, and personnel to its operations.

510. KAA was originally founded by the IRGC as an engineering wing to assist in the building of fortifications during the Iran-Iraq War (1980-1989) and to rebuild after the conflict. Since then it has diversified into mechanical engineering, energy, mining, and defense.

511. KAA is an "agency or instrumentality" of the government of Iran as defined by 28 U.S.C. § 1603(b), and, as a designated IRGC entity, is owned and controlled by the government

---

2010), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20100616.aspx.

of Iran.

512. IRGC Commander-in-Chief, Major General Mohammad Ali Jafari, serves as KAA's council chairman.

513. KAA functions as the IRGC's engineering and logistical arm, conducting a range of civil engineering activities, such as road and dam construction, the manufacturing of pipelines to transport water, oil, gas (within and outside Iran's borders), mining operations, agriculture, and telecommunications.

514. On October 25, 2007, KAA was designated by the U.S. Treasury Department under E.O. 13382 for extensively assisting IRGC to gain financial support for IRGC activities.

515. The U.S. Treasury designated nine IRGC-affiliated entities, including KAA, and five IRGC-affiliated individuals as derivative designations of the IRGC.

516. On June 23, 2008, the European Union also designated IRGC-affiliated companies, including KAA, for their support to Iranian ballistic missile and nuclear programs.

517. On June 9, 2010, the U.N. Security Council designated KAA in the 1929 Resolution for its involvement with Iranian military and nuclear activities.[91]

518. On February 10, 2010, The U.S. Department of the Treasury took further action to implement then-existing U.S. sanctions against the IRGC by designating an individual and four companies affiliated with the IRGC pursuant to Executive Order (E.O.) 13382, which freezes the assets of designated proliferators of weapons of mass destruction (WMD) and their supporters. This action focused in particular on KAA, considered an arm of the IRGC designated pursuant to E.O. 13382 in 2007. At the time, Treasury stated:

---

[91] United Nations, *Security Council Imposes Additional Sanctions on Iran, Voting 12 in Favour to 2 Against, with 1 Abstention*, (June 9 2010), https://www.un.org/press/en/2010/sc9948.doc.htm.

> Today's designations include IRGC General Rostam Qasemi, who is also the commander of Khatam al-Anbiya Construction Headquarters, the engineering arm of the IRGC that serves to help the IRGC generate income and fund its operations. Khatam al-Anbiya is owned or controlled by the IRGC and is involved in the construction of streets, highways, tunnels, water conveyance projects, agricultural restoration projects, and pipelines. Treasury also today designated four companies that are owned or controlled by, or that act on behalf of, Khatam al-Anbiya.
>
> As the IRGC consolidates control over broad swaths of the Iranian economy, displacing ordinary Iranian businessmen in favor of a select group of insiders, it is hiding behind companies like Khatam al-Anbiya and its affiliates to maintain vital ties to the outside world," said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. "Today's action exposing Khatam al-Anbiya subsidiaries will help firms worldwide avoid business that ultimately benefits the IRGC and its dangerous activities.

519. In 2011, the British and Japanese governments both listed KAA as an entity of concern due to its involvement in the proliferation of WMDs, missiles, and biological, chemical, and nuclear weapons.

520. KAA also owns and controls Ghorb Karbala (a/k/a Gharargah Karbala, Gharargah Sazandegi Karbala-Moasseseh Taha, or Ghorb-e Karbala), an entity also listed in an annex to U.N. Security Council Resolution 1929 of June 9, 2010, as an entity of Iran's IRGC, with a role "in Iran's proliferation-sensitive nuclear activities and the development of nuclear weapon delivery systems."

521. Companies that are owned or controlled by KAA, or that act on its behalf, and directly support its efforts include: Fater Engineering Institute, Imensazen Consultant Engineers Institute (ICEI), Makin Institute, and Rahab Institute.

522. By 2010, KAA had become a massive holding firm with control of more than 812 registered companies inside and outside of Iran and the recipient of over 1,700 Iranian-government contracts, many awarded on a no-bid basis.

523. KAA has undertaken infrastructure development projects in Iraq, Syria, and Lebanon, extending its services as a tool of the IRGC and Iran.

524. KAA was operating on the ground in Iraq during the entire Relevant Time period.

525. No later than October 2006, western media outlets were reporting that KAA was involved in hidden and unlawful economic activities beyond the borders of Iran.

526. On May 7, 2008, Mohammad Reza Pourzeyai, then KAA deputy head, announced that KAA had built a railway line connecting Iraq's Basra and Iran's Khorramshar.

527. KAA also performed due diligence and planned a project for building a water pipeline from the Iraqi border to the middle of Syria, a distance of approximately 256 kilometers, and also designed a project for building an oil pipeline from Iran's Abadan refinery to Basra, Iraq.

528. KAA also undertook efforts to renovate the Mosul Dam in Iraq. KAA's work on Dam projects around the globe is a known conduit through which the IRGC moves its operatives into foreign countries.

529. On December 13, 2011, then commander of KAA, Abu al-Qassem Mozaffari, confirmed that KAA operates in Iraq, Syria and Lebanon.

530. From 2002 through 2007, Defendant Banks sent and received payments totaling nearly USD $100 million for KAA, and supplied financial services and other material support to many KAA subsidiaries.

531. KAA, under the guise of various construction development projects in Iraq, in concert with other agents of Iran, provided the means by which Iran and other Defendants were able to supply raw materials, currency, weapons, and munitions used by the Special Groups and other terrorist organizations to effectuate Iran's campaign of terror in Iraq.

532. A critical IRGC agent, subsidiary and Iranian-proxy is the HRHS.

533. HRHS was established in 2003, purportedly to renovate the Shiite shrines in Iran and in Iraq. In order to do so, HRHS enlisted the assistance of KAA.

534. According to its charter, as listed on its website, HRHS was authorized by the Islamic regime to, among other things, renovate Shiite shrines in Iraq and to coordinate between the Iranian regime and Iraqi government organizations and NGOs.

535. HRHS does not hide its links to the Qods Force; a provincial official in the HRHS told Iranian media that the organization is affiliated with the Qods Force.

536. The commander of the Qods Force, Qassem Soleimani, and the Supreme Leader's representative to the Qods Force both sit on HRHS's Board of Trustees. The four other board members include HRHS head Hassan Pelarak, and three senior clerics who are members of the Supreme Leader's office. Thus, the Supreme Leader and his top general responsible for external operations control HRHS.

537. Hassan Pelarak is a former mining executive and former IRGC commander, and, according to Iranian media, has served in the Qods Force.

538. All HRHS heads have served as Qods Force officers. Pelarak's predecessors, Hassan Danaeifar, who is now Iran's ambassador to Iraq, and Mansour Haghighatpour, who is now a former parliamentarian, have been Qods Force officers. In 2008, Soleimani touted Danaeifar's Qods Force credentials in a famous message passed along to General David Patraeus, commander of U.S. forces in Iraq.

539. It is no coincidence that Qassem Soleimani sits on HRHS's Board of Trustees and that the organization's Directors have been Qods Force officers; the unit uses the infrastructure of the HRHS to funnel weapons, manpower, money, equipment,

and supplies into Iraq.

540. HRHS publishes on its website that it renovates Shiite shrines in Najaf, Karbala, Kadhimiya, Samarra, and other places.

541. HRHS claims to have spent millions of dollars on more than 200 projects in Iraq and further plans to develop projects valued at approximately $1.6 billion.

542. HRHS also claims that its finances are charitable donations from citizens, as well as government, private, and quasi-government entities.

543. HRHS embraces and supports the Special Groups. The direct link between HRHS and the Special Groups is concretely reflected on its official website of the HRHS Samarra office.[92]

544. HRHS considers the Special Groups to be "Defenders of the Shiite Holy Shrines in Iraq," as stated on websites controlled by the IRGC-QF.[93]

545. HRHS is nothing more than a front for the IRGC-QF, whose mission is to support the Iranian-backed terror groups in Iraq, disrupt the stability of free and democratic Iraq, and expand Iranian influence in the country.

546. HRHS and KAA worked closely together in Iraq.

547. HRHS worked in cooperation with the IRGC-QF-affiliated KAA to perform construction work on the Zahra Shrine in Najaf, Iraq. This project involved the HRHS subsidiary, Kowsar Engineering.

---

[92] *See* http://setadsamarra.ir/ (last visited Sept. 13, 2017) (translation available).

[93] *Introduction with the Brigades of the Defenders of the Shiite Holy Shrines Operating in Iraq*, OWEIS, Iran (January 12, 2015), http://oweis.ir/ (Farsi web address and translation available). *Marking the Fourth Anniversary of the [Assassination of] Martyr Hassan Shateri*, Tasnim News, Tehran (February 16, 2007), https://www.tasnimnews.com/fa/news/ (Farsi web address and translation available).

548. Under the guise of serving the faithful, KAA and HRHS act as a pipeline for the Qods Force, whose mission is to support the Iranian-backed Iraqi network and expand Iranian influence in the country.

549. KAA and HRHS, much like its IRGC affiliates, works closely with the well-known FTO, Hezbollah. This relationship was highlighted following the assassination of IRGC-QF senior commander Hassan Shateri (a/k/a Hesam Khoshnevis) in February 2013.

550. Shateri was deployed to Lebanon by KAA to lead its Lebanese branch, while at the same time serving as senior IRGC-QF commander.

551. Shateri's role in the Lebanese branch of KAA extended far beyond construction projects into extensive terror activities. On August 3, 2010, the U.S. Department of Treasury designated Hassan Shateri "for providing technical support to Hizballah's reconstruction efforts in Lebanon and to the expansion of the terrorist group's private communications network. Khoshnevis [Shateri] also operates as President Ahmadinejad's personal representative in Lebanon."

552. Shateri arrived in Lebanon after the Lebanon War of 2006 in order to: (1) rehabilitate Hezbollah's operational infrastructure damaged during the conflict; (2) to replace Hezbollah's lost arsenal; and (3) to rebuild its missile sites close to the demarcation line with Israel. Shateri served as a Special Representative of the IRGC, sitting on Hezbollah's Central Command where he helped shape Hezbollah's policies with advice from Secretary-General Hassan Nasrallah.

553. Prior to working in Lebanon, Shateri operated in Afghanistan, where his mission was to renovate regions that were damaged during fighting with Coalition Forces in Afghanistan.[94]

554. Between his services in Afghanistan and Lebanon, Shateri was operating in Iraq.[95]

555. Though his detailed activities in Iraq were concealed, the Supreme Leader's Representative to the Qods Force, Ali Shirazi, mentioned Shateri's time there, saying he was dispatched to Iraq as part of his extensive service for the Islamic Revolution.[96]

556. In or around February 2013, after Shateri's assassination, Hezbollah published details that showed that KAA functioned as a cover for Qods Force insurgent activities.

557. As of July 2007, both Defendant Bank Melli and Bank Mellat were headed by UNSCR 1737 designee and former IRGC Commander Rahim Safavi.

558. Defendant Bank Melli and Bank Mellat also provided material support to KAA and its subsidiaries by handling their letters of credit. These letters of credit are primarily used to finance KAA's purchase of equipment and services from overseas suppliers.

559. KAA subsidiaries serviced by Defendant Bank Melli and Bank Mellat include the designated entities Ghorb Nooh, Sepasad, Sahel Consultant Engineers and Gharargah Sazandegi Ghaem.

---

[94] *Where and How Volunteers for Fighting ISIS are Trained*, Masregh News, Tehran (June 23, 2014), https://www.mashreghnews.ir/news/ (Farsi web address and translation available).

[95] Dexter Filkins, *The Shadow Commander,* THE NEW YORKER (Sept. 30, 2013), http://www.newyorker.com/magazine/2013/09/30/the-shadow-commander.

[96] Will Fulton, *The Assassination of Iran Quds Force General Hassan Shateri in Syria* (Feb. 28, 2013), https://www.criticalthreats.org/analysis/the-assassination-of-iranian-quds-force-general-hassan-shateri-in-syria#_edn77efea9b2d5a1d9d20e5cb794c934c9632

560. KAA and HRHS' activities in Iraq, from 2003 until the present, provided the perfect vehicle through which Iran smuggled and disguised raw materials, currency, weapons, and munitions used by the Terrorist Groups to effectuate Iran's campaign of terror in Iraq.

## VI. THE PLAINTIFFS & THE TERRORIST ATTACKS

561. At issue in this case are forty-three (43) separate attacks perpetrated by Special Groups and other terrorist organizations, including the FTOs, SDGTs, SDTs, SDNs and other terrorists with known links to Iran which killed or injured Plaintiffs (the "Terrorist Attacks").

562. During the Relevant Period, the injuries and deaths caused by Defendants to Plaintiffs were the result of acts of international terrorism committed, planned, or authorized by organizations designated as foreign terrorist organizations pursuant to Section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), as of the date on which such acts of international terrorism were committed, planned, and/or authorized. Further, Iran funded, aided and abetted such foreign terrorist organizations by, at least, knowingly providing funding and other substantial and material support to the Terrorist Groups who committed such acts of international terrorism.

563. Further, none of the Terrorist Attacks occurred in the course of (1) a declared war; (2) an armed conflict, whether or not war had been declared between two or more nations; or (3) an armed conflict between military forces of any origin.

564. All Plaintiffs physically injured or killed in Iraq were, at the time of their injury or extrajudicial killing, participating in a peacekeeping mission intended to contribute to the security of the United Nations Assistance Mission for Iraq, the Governing Council of Iraq and other institutions of the Iraqi interim administration, and key humanitarian and economic infrastructure.

565. Without Iran's conduct, support, control and authority described herein, the Terrorist Groups, including the FTOs, SDGTs, SDTs, and/or SDNs responsible for the Terrorist Attacks would not have had the funding or material support necessary to carry out these Terrorist Attacks.

566. Forty-six (46) plaintiffs are individuals who were injured in forty-three different Terrorist Attacks that occurred in Iraq between December 17, 2003 and November 20, 2009 and who, as a result, experienced physical and mental pain and suffering and emotional distress. Four (4) plaintiffs are decedents, whose Estates bring claims for individuals who were killed in those attacks, as well as all heirs thereof. The remaining seventy (71) plaintiffs are family members of the victims of those attacks and have experienced injuries including anxiety, severe mental anguish, extreme emotional distress, and loss of companionship as a result of their relatives' injuries or death.

567. Iran goes to great lengths to hide the fact that it funds terrorism, including funding the Special Groups and terrorists that perpetrated the terrorist attacks that resulted in the death or injury of Plaintiffs.

568. Additionally, even utilizing the utmost diligence, it can take months, or even years, before the terrorist group who perpetrated an act of international terrorism, or the type of weapon/explosive used by a terrorist group in a terrorist attack, can be identified.

569. Here, Plaintiffs did not know and did not have reason to know of their potential claims against Defendants until very recently, certainly not more than five years from the date of filing this Action.

570. As it concerns Plaintiffs' claims, and as outlined above, Iran has fraudulently concealed its involvement with any of the Terrorist Groups and terrorists responsible for

perpetrating the Terrorist Attacks. Iran has further denied the fact it provided material support and resources to the Terrorist Groups responsible for perpetrating the Terrorist Attacks. As such, the doctrine of equitable tolling applies to this Action and all Plaintiffs.

571. The following Plaintiffs are United States' nationals or government contractors injured or killed in the acts of international terrorism complained of herein, and estates and/or family members of such U.S. nationals or contractors:

## A. THE NOVEMBER 20, 2009 ATTACK – SUPPLY ROUTE OF KALZOO

### 1. Plaintiffs The Holladay Family

572. Plaintiff Joshua Lionel Holladay is a citizen of the United States and is domiciled in the State of Alabama.

573. In the early morning of November 20, 2009, Joshua Lionel Holladay, age 26, was serving as a peacekeeping serviceman in the U.S. Army National Guard, 41st Brigade Combat Team, 1-186th Infantry Regiment. At the time, Mr. Holladay held the rank of Private First Class, E-3.

574. Mr. Holladay was performing his duties as an Infantryman in a M1117 Armored Security Vehicle ("ASV") while escorting a convoy of fuel tankers from Baghdad to Imam Ali Air Base (a/k/a. COB Adder) along "Supply Route Kalzoo." Half-way into the mission, as it traveled at 50 MPH, an explosion ripped through the armored vehicle, knocking Mr. Holladay unconscious.

575. The weapon used to attack and injure Mr. Holladay was an Iranian-manufactured EFP provided by Iran and/or one of its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

576. As a result of the November 20, 2009 Terrorist Attack, Mr. Holladay sustained significant injuries due to the concussive blast of the explosion and shrapnel impacting his right

arm, right lower extremities, and hands. Mr. Holladay also suffered a left tibial plateau fracture and nerve damage.

577. Mr. Holladay was treated at five different hospitals in the days following the attack and was eventually transferred to the Charlie Norwood VA Hospital in Augusta, Georgia where he continued to be hospitalized and received intensive treatment for 18 months due to the severity of his injuries. He will require further treatment and care.

578. As a result of the November 20, 2009 Terrorist Attack and the injuries he suffered, Joshua Lionel Holladay has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

579. Mr. Holladay has received a disability rating of 100% by the Veteran's Administration.

580. Plaintiff Shirley Atkinson, is a citizen of the United States and is domiciled in the State of Alabama. She is the mother of Joshua Lionel Holladay.

581. Plaintiff Crystal Hastings, is a citizen of the United States and is domiciled in the State of Alabama. She is the sister of Joshua Lionel Holladay.

582. As a result of the November 20, 2009 Terrorist Attack and the injuries suffered by Joshua Lionel Holladay, Plaintiffs Shirley Atkinson and Crystal Hastings have incurred past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services.

### B. THE OCTOBER 12, 2011 ATTACK – COS GARY OWEN

#### 1. Plaintiffs The Alldridge Family

583. Plaintiff Brian Clark Alldridge is a citizen of the United States and is domiciled in

the State of Texas.

584. On the night of October 12, 2011, Brian Clark Alldridge, age 35, was serving as a peacekeeping serviceman in the U.S. Army as a Fire Arms Specialist with the HCC, 3rd Brigade 8th Cavalry Regiment, 1st Cavalry Division. At the time, Mr. Alldridge held the rank of Private First Class, E-3.

585. As Mr. Alldridge was getting out of bed to begin preparing for work that night, he heard a rocket come in, followed by an explosion, and the sound of an alarm. Mr. Alldridge opened the door and was hit by the blast of a rocket which exploded 5 to 8 meters from him. Still dazed from the first rocket, Mr. Alldridge was hit by a second rocket 10-12 seconds later which exploded approximately 10 meters from him knocking him up against the wall. His tents along with 15-20 tents in his living area were destroyed. Mr. Alldridge later awoke in the Battalion Aid Station (BAS) with blood on his face and shrapnel wounds to his body.

586. The weapons used to attack and injure Mr. Alldridge on October 12, 2011 were Iranian-manufactured rockets provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

587. Mr. Alldridge was initially treated in the BAS. From there, Mr. Alldridge was medevac'd to Camp Adder in Tallil, Iraq.

588. As a result of the October 12, 2011 Terrorist Attack, Mr. Alldridge sustained significant injuries to include: the loss of his left testicle, hearing loss, TBI, cognitive disorder, memory issues, PTSD, and the inability to conceive additional children due to a cyst forming in his groin area where he incurred shrapnel wounds.

589. Mr. Alldridge still receives treatment for the permanent injuries he sustained during the attack. Due to the hearing loss he sustained, Mr. Alldridge will wear a hearing aid for

the remainder of his life.

590. As a result of the October 12, 2011 Terrorist Attack and the injuries he suffered, Brian Clark Alldridge has incurred past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

591. Mr. Alldridge has received a disability rating of 100% by the Veteran's Administration.

592. Plaintiff Joann Alldridge is a citizen of the United States and is domiciled in the State of Texas. She is the wife of Brian Clark Alldridge.

593. Plaintiff Andrew Charles Major is a citizen of the United States and is domiciled in the State of Texas. He is the son of Joann Alldridge and the stepson of Brian Clark Alldridge.

594. Plaintiff Ashley Meikel Major is a citizen of the United States and is domiciled in the State of Texas. She is the daughter of Joann Alldridge and the stepdaughter of Brian Clark Alldridge.

595. Plaintiff A.M.M., a minor, represented by her legal guardian Joann Alldridge, is a citizen of the United States and is domiciled in the State of Texas. She is the daughter of Joann Alldridge and the stepdaughter of Brian Clark Alldridge.

596. Plaintiff Ronald Alldridge, is a citizen of the United States and is domiciled in the State of Washington. He is the father of Brian Clark Alldridge.

597. Plaintiff DiAnna Alldridge, is a citizen of the United States and is domiciled in the State of Washington. She is the mother of Brian Clark Alldridge.

598. Plaintiff Todd Alldridge, is a citizen of the United States and is domiciled in the State of Indiana. He is the brother of Brian Clark Alldridge.

599. As a result of the October 12, 2011 Terrorist Attack and the injuries suffered by Brian Clark Alldridge, Plaintiffs Joann Alldridge, Andrew Charles Major, Ashley Meikel Major, A.M.M., a Minor, Ronald Alldridge, DiAnna Alldridge, and Todd Alldridge, have incurred past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services.

## C. THE JULY 10, 2011 ATTACK – FORWARD OPERATING BASE GARRY OWEN

### 1. Plaintiffs The Niquette Family

600. Plaintiff Sean M. Niquette is a citizen of the United States and is domiciled in the State of New York.

601. On the morning of July 10, 2011, Sean M. Niquette, age 25, was serving as a peacekeeping serviceman in the U.S. Army, 3rd Battalion, 8th Calvary Regiment, 3rd Advise and Assist Brigade, 1st Calvary Division. At the time, Mr. Niquette held the rank of First Lieutenant, O-2.

602. On July 10, 2011, Mr. Niquette was performing his duties as an Armor Officer in his living quarters when he was notified, via sirens and alarms, that they were being attacked by rocket fire. Mr. Niquette ran to a bunker when one of the rockets exploded approximately 15 yards from him, killing one of his fellow servicemen. Mr. Niquette was externally exposed to the blast forces of the explosion and sustained physical injuries and concussive forces of the explosion.

603. The weapons used to attack and injure Mr. Niquette on July 10, 2011 were Iranian-manufactured rockets provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

604. The Iranian-supported Special Group known as AAH was operating in the area

around FOB Garry Owen at the time of the July 10, 2011 Terrorist Attack and have claimed responsibility for attacks against U.S. Forces at the time of the attack that injured Mr. Niquette.

605. Iranian-supported Special Group(s) perpetrated the Terrorist Attack that resulted in Mr. Niquette's injuries.

606. As a result of the July 10, 2011 Terrorist Attack, Mr. Niquette sustained significant injuries from the blast forces of the explosion including being dazed and disoriented from the blast, migraine headaches, tinnitus or ringing in his ears, and cognitive deficiencies due to Traumatic Brain Injury ("TBI").

607. As a result of the July 10, 2011 Terrorist Attack, Mr. Niquette also sustained significant emotional and psychological injuries due to his proximity to the concussive blast forces of the explosion and participating in the collection of the deceased serviceman's body. These emotional and psychological injuries include, but are not limited to, PTSD, anxiety, depression, social anxiety disorder, and social and occupational impairment.

608. As a result of the July 10, 2011 Terrorist Attack, Mr. Niquette underwent significant medical treatment, including care for these ongoing injuries at Ft. Hood TBI Clinic, Walter Reed National Military Medical Center, National Intrepid Center of Excellence, Ft. Hood Warrior Transition Unit, Carl Darnell Army Medical Center, Middle Tennessee VA Hospital, Binghamton VA Outpatient Clinic, and Buffalo VA Medical Center.

609. As a result of the July 10, 2011 Terrorist Attack and the injuries he suffered, Sean M. Niquette has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

610. Mr. Niquette has received a disability rating of 80% by the Veteran's

Administration.

611. Plaintiff Lauren Niquette is a citizen of the United States and is domiciled in the state of New York. She is the spouse of Sean M. Niquette.

612. As a result of the July 10, 2011 Terrorist Attack and the injuries suffered by Sean M. Niquette, Plaintiff Lauren Niquette has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services.

### D. THE AUGUST 21, 2009 ATTACK – ROUTE IRISH, BAGHDAD

#### 1. Plaintiff Randall Lavis Klingensmith

613. Plaintiff Randall Lavis Klingensmith is a citizen of the United States and is domiciled in the State of Georgia.

614. On the morning of August 21, 2009, Randall Lavis Klingensmith, age 38, was serving as a peacekeeping serviceman in the U.S. Army, 601st Central Consolidation (CCT). At the time, Mr. Klingensmith held the rank of Major, O-4.

615. Mr. Klingensmith was serving as a Contingency Contracting Officer (CCO) and was being transported along with ten others in a Mine-Resistant Ambush Protected (“MRAP”) vehicle, as part of a convoy along Route Irish, in route from Bagdad International Airport to the International Zone. The vehicle in which Mr. Klingensmith was travelling was hit by an EFP, causing the vehicle to be blown open. Mr. Klingensmith attempted to provide aide to his fellow soldiers, but as he stood up, he collapsed due to his injuries. While under fire, Mr. Klingensmith was evacuated with other wounded soldiers, transferred to an operational vehicle, and driven to the nearest station for air evacuation.

616. The weapon used to attack and injure Mr. Klingensmith on August 21, 2009 was an Iranian-manufactured EFP provided by Iran and/or its agents to Iranian-funded and Iranian-

trained terror operatives in Iraq.

617. As a result of the August 21, 2009 Terrorist Attack, Mr. Klingensmith fractured his lower back and his right leg was pierced with shrapnel. Mr. Klingensmith's left leg was partially severed below his knee. In addition, Mr. Klingensmith sustained severe injuries due to the concussive blast of the explosion including TBI, nerve damage in his left leg, shrapnel injuries to his right knee, right shoulder injury, broken teeth, and a ruptured left ear requiring him to now wear a hearing aid. Mr. Klingensmith also suffers from PTSD.

618. Upon arriving at the nearest station for air evacuation Mr. Klingensmith heart-beat flatlined and he was resuscitated. Due to Mr. Klingensmith's extensive injuries, doctors placed Mr. Klingensmith in a medically induced coma before transporting him to Germany. Mr. Klingensmith underwent significant and multiple reconstructive surgeries related to his injuries, receiving multiple surgeries at Walter Reed Hospital and Liberty Regional Hospital, to remove shrapnel, install a pin in his leg, application of an external fixator frame, and repair both knees. In addition, doctors had to remove muscle tissue from his right shoulder and thigh to repair his left leg. Mr. Klingensmith is still receiving treatment for his injuries.

619. As a result of the August 21, 2009 Terrorist Attack and the injuries he suffered, Randall Lavis Klingensmith has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

620. Mr. Klingensmith has received a disability rating of 100% by the Veteran's Administration.

## E. THE NOVEMBER 22, 2008 ATTACK –EN ROUTE TO FOB KALSU

### 1. Plaintiffs The Owen Family

621. Plaintiff Michael L. Owen is a citizen of the United States and is domiciled in the State of Arizona.

622. On the afternoon of November 22, 2008, Michael L. Owen, age 24, was serving as a peacekeeping serviceman in the U.S. Army, U.S. 555 Brigade, 5th Engineers Battalion ("The Fightin' Fifth"), 515th Sapper Company, 1st Platoon. At the time, Mr. Owen held the rank of Specialist, E-4.

623. Mr. Owen was performing his duties as the Truck Commander in the front passenger seat of his Buffalo vehicle. He was traveling in a convoy, in which he was in the lead vehicle, approximately 35 miles south of Baghdad when his vehicle was struck by a 6-array EFP.

624. The weapon used to attack and injure Mr. Owen on November 22, 2008 was an Iranian-manufactured 6-array EFP provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

625. The Iranian-supported Terrorist Groups known as Kata'ib Hizballah and JAM were operating in the area around FOB Kalsu at the time of the November 22, 2008 Terrorist Attack, and have claimed responsibility for attacks against U.S. Forces at the time of the attack that injured Mr. Owen.

626. As a result of the November 22, 2008 Terrorist Attack, Mr. Owen sustained significant injuries, including, but not limited to, multiple shrapnel wounds to his left thigh, a femoral artery injury, two shattered fingers and one fractured finger on his right hand, one fractured finger on his left hand, as well as significant injuries from the blast forces of the explosion including being dazed and disoriented from the blast, migraine headaches, and TBI. His emotional and psychological injuries include, but are not limited to, PTSD, anxiety, depression, social anxiety disorder, and social and occupational impairment.

627. As a result of the November 22, 2008 Terrorist Attack, Mr. Owen underwent significant medical treatment, including treatment in Baghdad, Landstuhl Regional Medical Center in Germany, Walter Reed National Military Medical Center, Brooke Army Medical Center, and Kansas City VA Medical Center. He is continuing care at the Phoenix VA Medical Center and various medical care providers in Arizona.

628. As a result of the November 22, 2008 Terrorist Attack and the injuries he suffered, Michael L. Owen has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

629. Mr. Owen has received a disability rating of 90% by the Veteran's Administration.

630. Plaintiff Laurie Miller is a citizen of the United States and is domiciled in the state of Kansas. She is the mother of Michael L. Owen.

631. Plaintiff R.O., a minor, is a citizen of the United States and is domiciled in the state of Kansas. She is the daughter of Michael L. Owen.

632. As a result of the November 22, 2008 Terrorist Attack and the injuries suffered by Michael Owen, Plaintiff Laurie Miller and R.O., a minor, have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services.

**2. Plaintiffs The Williams Family**

633. Plaintiff Sean Lee Williams is a citizen of the United States and is domiciled in the State of Missouri.

634. On November 22, 2008, Sean Lee Williams, age 36, was serving as a peacekeeping serviceman and Combat Engineer in the U.S. Army 555 Brigade, 5th Engineers

Battalion ("The Fightin' Fifth"), 515th Sapper Company, 1st Platoon. At the time, Mr. Williams held the rank of Sergeant, E-5.

635. On the evening of November 22, 2008, Mr. Williams was the gunner in a "Cougar," a MRAP vehicle as part of the convoy en route to Forward Operating Base ("FOB") Kalsu. The convoy was hit by a "6 array" EFP. The explosion struck and caused extensive damage to the vehicles in the convoy, including that in which Mr. Williams was a passenger. Mr. Williams, as the gunner, was externally exposed to the blast forces of the explosion. Mr. Williams sustained physical injuries from the blast and concussive forces of the explosion. In the aftermath of the attack, despite his own injuries, Mr. Williams attended to and witnessed the injuries to the men under his command.

636. The weapons used to attack and injure Mr. Williams during the November 22, 2008 Terrorist Attack were Iranian-manufactured EFPs provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

637. The Iranian-supported Terrorist Groups known as Kata'ib Hizballah and JAM were operating in the area around FOB Kalsu at the time of the November 22, 2008 Terrorist Attack, and have claimed responsibility for attacks against U.S. Forces at the time of the attack that injured Mr. Williams.

638. Mr. Williams sustained physical injuries as a result of the November 22, 2008 Terrorist Attack that were caused by the concussive blast forces of the explosion; these injuries include being dazed and disoriented from the blast, migraine headaches, tinnitus or ringing in his ears, and TBI.

639. As a result of the November 22, 2008 Terrorist Attack, Mr. Williams also sustained significant emotional and psychological injuries due to his proximity to the concussive

blast forces of the explosion, including, but not limited to PTSD, anxiety, depression, social anxiety disorder, and social and occupational impairment.

640. As a result of the November 22, 2008 Terrorist Attack, Mr. Williams underwent significant medical treatment, including care for these ongoing injuries at Ft. Leonard Wood Hospital, Harry S. Truman Veteran's Memorial Hospital in Missouri, as well as healthcare facilities in Salt Lake City, Utah.

641. As a result of the November 22, 2008 Terrorist Attack, Mr. Williams will require further medical treatment and care.

642. As a result of the November 22, 2008 Terrorist Attack and the injuries he suffered, Sean Lee Williams has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

643. Mr. Williams has received a disability rating of 90% by the Veteran's Administration.

644. Plaintiff Sue Ann Williams is a citizen of the United States and is domiciled in the State of Missouri. She is the wife of Sean Lee Williams.

645. As a result of November 22, 2008 Terrorist Attack and the injuries suffered by Sean Lee Williams, Plaintiff Sue Ann Williams has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services.

### F. THE AUGUST 8, 2008 ATTACK – BAGHDAD

#### 1. Plaintiff Baltazar Morin, Jr.

646. Plaintiff Baltazar Morin, Jr. is a citizen of the United States and is domiciled in the State of Texas.

647. On August 8, 2008, Baltazar Morin, Jr., age 19, was serving in the U.S. Army, 4th Infantry Regiment, 2nd Battalion, 10th Mountain Division, Bravo Company. At the time, Mr. Morin held the rank of Specialist, E-4.

648. Mr. Morin was performing his duties as the Turret Gunner in his Humvee while leading a convoy on "Route Jackson" in the Al Daura Market, south of Baghdad, Iraq, when an explosion ripped through the vehicle.

649. The weapon used to attack and injure Mr. Morin was an Iranian-manufactured EFP provided to Iranian-funded and Iranian-trained terror operatives in Iraq.

650. The Iranian-supported Special Group known as KH has claimed responsibility for the attack that resulted in injury to Mr. Morin.

651. As a result of the attack, he sustained significant injuries due to the ground blast fragments impacting the left side of his face and jaw. He also sustained neck and back injuries and a concussion.

652. Mr. Morin underwent significant medical treatment for his injuries and will require further medical treatment and care.

653. As a result of the Attack and the injuries he suffered, Baltazar Morin, Jr. has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

654. Mr. Morin has received a disability rating of 80% by the Veteran's Administration.

655. Plaintiff Miranda Arispe Harelston, is a citizen of the United States and is domiciled in the State of Texas. She is the sister of Baltazar Morin, Jr.

656. As a result of the August 8, 2008 Terrorist Attack and the injuries suffered by Baltazar Morin, Jr., Plaintiff Miranda Arispe Harelston has incurred past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services.

## G. THE APRIL 28, 2008 ATTACK – FOB LOYALTY

### 1. Plaintiffs The Coe Family

657. Plaintiff Thomas Milton Coe II is a citizen of the United States and is domiciled in the State of Texas.

658. On the morning of April 28, 2008, Thomas Milton Coe II, age 26, was serving as a peacekeeping serviceman and Signal Support Systems Specialist in the U.S. Army, 230th Infantry 4th Brigade 10th Mountain. At the time, Mr. Coe held the rank of Private First Class, E-3.

659. On the morning of April 28, 2008, Mr. Coe was walking back from the chow hall inside FOB Loyalty, carrying food for some of the other men when several rockets struck inside the FOB, causing severe damage to supply trucks and buildings and injuring and killing numerous people. The first rocket hit the ground but did not detonate; a second rocket landed, exploded, and detonated the first rocket with it. The third rocket hit a building in the center of FOB Loyalty. When the rockets hit, Mr. Coe took cover, then tried to proceed to his Tactical Operations Command, at which time he was struck in the head by falling and blasted debris from the third rocket explosion. He was then struck and run over by a pick-up truck during the chaos of the rocket explosions and the aftermath. The truck hit Mr. Coe's left foot, ran up his entire body, and pinned his shoulder, with the driver's side front wheel against his face.

660. The weapons used in the FOB Loyalty attack that resulted in severe injury to Mr.

Coe were Iranian-manufactured rockets provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

661. As a result of the April 28, 2008 Terrorist Attack, Mr. Coe sustained significant and permanent injuries to his body, including to his shoulder, foot and ankle, requiring several surgeries. Mr. Coe also has suffered from and continues to suffer from severe PTSD, severe anxiety, and depression. Mr. Coe also developed carpal tunnel syndrome, requiring surgery.

662. Mr. Coe's medical treatment includes surgery for his shoulder, surgeries on his foot and ankle, psychiatric and psychological care, carpal tunnel surgery, and stomach surgery.

663. As a result of the April 28, 2008 Terrorist Attack and the injuries he suffered, Thomas Milton Coe II has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

664. Mr. Coe has received a disability rating of 100% by the Veteran's Administration.

665. Plaintiff Heather Nicole Coe is a citizen of the United States and is domiciled in the State of Texas. She is the wife of Thomas Milton Coe II.

666. Plaintiff V.T.C., a minor, is a citizen of the United States and is domiciled in the State of Texas. He is the son of Thomas Milton Coe II.

667. As a result of the April 28, 2008 Terrorist Attack and the injuries suffered by Thomas Milton Coe II, Plaintiffs Heather Nicole Coe and V.T.C., a minor, have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services.

### H. THE APRIL 8, 2008 ATTACK – MSR TAMPA

#### 1. Plaintiffs The Collins Family

668. Plaintiff Quentin D. Collins is a citizen of the United States and is domiciled in the State of New Mexico.

669. On April 8, 2008, Mr. Collins, age 49, was serving as a peacekeeping serviceman in the U.S. Army, as a Chaplain in the 1203rd Engineer Battalion, 20th Engineer Brigade. At the time, Mr. Collins held the rank of Major, O-4.

670. On April 8, 2008, Quentin D. Collins was driving a Humvee 1151 - Up armored vehicle, which was the third vehicle in a convoy of five vehicles returning to Logistical Support Area (LSA) Anaconda by way of Main Supply Route (MSR) Tampa. They were approximately fifteen kilometers from LSA Anaconda when their vehicle struck an IED buried under the roadway. The explosion blew the left tire off of the Humvee and collapsed the frame of the vehicle, causing the steering wheel shaft and wall to trap his left leg within the Humvee. Mr. Collins' leg was trapped and pinned in the Humvee for over an hour. During that time, he lost sensation in his leg and was unable to move it. He became disoriented and time seemed to slow down. The explosion resulted in Mr. Collins being diagnosed with continued lower back pain, left leg pain, left knee pain, PTSD including fear of leaving family alone, hypervigilance, hypersensitivity to sound, hallucinations such as seeing debris on side of road causing apprehension and fear.

671. The weapon(s) used to attack and injure Mr. Collins on April 8, 2008 were IEDs provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

672. As a result of the April 8, 2008 Terrorist Attack, Mr. Collins sustained significant injuries due to the concussive blast forces and being trapped in the Humvee, including low back injuries, bilateral knee injuries, TBI, and PTSD.

673. Mr. Collins was initially treated at the scene of the attack and later underwent x-

rays at Air Force Theatre at LAS Anaconda of his left foot. He underwent arthroscopic left knee surgery in February 2009 at Dewitt Military Hospital, Ft. Belvoir, Maryland. He has continued to experience TBI, PTSD, including experiencing dreams, flashbacks, haunted by carnage and smells, consideration of suicide, depression, etc. Mr. Collins continues to receive treatment for the permanent injuries he sustained during the attack.

674. As a result of the April 8, 2008 Terrorist Attack and the injuries he suffered, Quentin D. Collins has experienced, and continues to experience, severe physical and mental anguish and extreme emotional pain and suffering.

675. Mr. Collins has received a disability rating of 100% by the Veteran's Administration.

676. Plaintiff Melida Collins is a citizen of the United States and is domiciled in the State of New Mexico. She is the wife of Quentin D. Collins.

677. Plaintiff Siera Nicole Collins is a citizen of the United States and is domiciled in the State of California. She is the daughter of Quentin D. Collins.

678. Plaintiff Shawn Christopher Alan Collins is a citizen of the United States and is domiciled in the State of New Mexico. He is the son of Quentin D. Collins.

679. Plaintiff Michael Anthony Collins is a citizen of the United States and is domiciled in the State of New Mexico. He is the son of Quentin D. Collins.

680. Plaintiff I.C.C., a minor, is a citizen of the United States and is domiciled in the State of New Mexico. He is the minor son of Quentin D. Collins.

681. As a result of the April 8, 2008 Terrorist Attack and the injuries suffered by Quentin D. Collins, Plaintiffs Melida Collins, Siera Nicole Collins, Shawn Christopher Alan Collins, Michael Anthony Collins, and I.C.C., a minor, have past and future noneconomic

damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services.

## I. THE APRIL 4, 2008 ATTACK – VICTORY BASE COMPLEX, BAGHDAD

### 1. Plaintiffs The Von Letkemann Family

682. Plaintiff Grant Blaney Von Letkemann II is a citizen of the United States and is domiciled in the State of Colorado.

683. On April 4, 2008, Grant Blaney Von Letkemann II, age 35, was serving as a peacekeeping serviceman and Military Police Officer, in the MNF-1 Commanding General/Multinational Force Iraq, as part of the Personal Security Detail for U.S. General David Petraeus. At the time, Mr. Von Letkemann held the rank of Sergeant First Class, E-7.

684. At approximately 20:15 on April 4, 2008, Mr. Von Letkemann was standing on a porch of Building 82 in Camp Victory, Baghdad, Iraq. The Incoming Alarm began to sound, indicating the base was in imminent danger of being hit by incoming fire. The C-RAM rocket mortar defense system began firing rounds and tracers towards the incoming munitions. Mr. Von Letkemann could tell by the direction of the tracer fire that the incoming projectiles were headed toward him. He immediately sought cover in the stairwell of the building. After entering the building, it was rocked by a loud explosion, shaking the walls, and causing metal, debris, dust, and smoke to envelope the area and Mr. Von Letkemann. The area where he had been standing was blasted and covered in debris. Mr. Von Letkemann was hit with such concussive blast forces that his watch face, camera display, and water bottle were shattered or cracked. As a result of the blast, he was disoriented, nauseous, and was unable to hear. After confirming that his men were safe, Mr. Von Letkemann received medical treatment on the base related to concussive injuries and TBI.

685. An investigation into the attack determined that Mr. Von Letkemann and his unit

had been attacked with a 107mm rocket. The remains of the rocket bore markings and stamps indicating the rocket had been manufactured in Iran just months before being used in Iraq.

686. Further investigation revealed the April 4, 2008 Terrorist Attack was committed by individuals associated with the Special Group JAM, which was trained and armed by Iran's IRGC-QF with the assistance of Hezbollah.

687. The weapon used to attack and injure Mr. Von Letkemann during the April 4, 2008 Terrorist Attack was Iranian-manufactured Rocket provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

688. Mr. Von Letkemann sustained physical injuries as a result of the April 4, 2008 Terrorist Attack that were caused by the concussive blast forces of the explosion including being dazed and disoriented from the blast, migraine headaches, tinnitus or ringing in his ears, and TBI.

689. As a result of the April 4, 2008, Terrorist Attack, Mr. Von Letkemann also sustained significant emotional and psychological injuries due to his proximity to the concussive blast forces of the explosion, including, but not limited to, PTSD, anxiety, depression, social anxiety disorder, nightmares, and insomnia.

690. As a result of the April 4, 2008 Terrorist Attack, Mr. Von Letkemann underwent significant medical treatment and he will require further treatment and care. Mr. Von Letkemann sought medical treatment at Evans Army Hospital, Ft. Carson, Colorado; Veterans Administration Hospital, Denver, Colorado; and Kaiser Permanente Medical Offices at Rock Creek, Lafayette, Colorado.

691. As a result of the April 4, 2008 Terrorist Attack and the injuries he suffered, Grant Blaney Von Letkemann II, has past and future noneconomic damages, including severe

physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

692. Mr. Von Letkemann has received a disability rating of 70% by the Veteran's Administration.

693. Plaintiff Kelly Lynn Von Letkemann is a citizen of the United States and is domiciled in the State of Colorado. She is the wife of Grant Blaney Von Letkemann II.

694. As a result of April 4, 2008 Terrorist Attack and the injuries suffered by Grant Blaney Von Letkemann II, Plaintiff Kelly Lynn Von Letkemann has past and future noneconomic damages, including severe mental anguish, extreme emotionally pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services**.**

### J. THE MARCH 26, 2008 ATTACK – FOB PHOENIX

#### 1. Plaintiffs The Hernandez Family

695. Plaintiff Ernesto P. Hernandez III is a citizen of the United States and is domiciled in the State of Virginia.

696. On the morning of March 26, 2008, Ernesto P. Hernandez, age 39, was serving as a peacekeeping serviceman in the U.S. Air Force, Multi-National Strategic Transitioning Command - Iraq. At the time, Mr. Hernandez held the rank of Major, O-4.

697. Ernesto P. Hernandez III was performing his duties as a Chief Security Assistance Officer to the Ministry of Defense ("MOD") when he heard the alarm warning sound at approximately 5:15 a.m., followed by a long series of explosions. Multiple rockets and mortars began hitting FOB Phoenix near his living quarters. Immediately Mr. Hernandez grabbed his body armor and helmet and ran down the stairs from his living quarters towards a tent that was housing female personnel. Mr. Hernandez worked with others to help relocate the women to

safety in a nearby bunker. During the attack, while assisting others, Mr. Hernandez was hit with shrapnel in his arm and back. The force of one of the explosions threw him into the wall, causing him to hit his head and arm. Upon reaching the bunker, Mr. Hernandez threw himself in front of others to protect those in the bunker from the blasts.

698. The weapon used to attack and injure Mr. Hernandez on March 26, 2008 was an Iranian-manufactured/supplied rocket, provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

699. As a result of the March 26, 2008 Terrorist Attack, Mr. Hernandez sustained significant injuries. During the attack, Mr. Hernandez was hit in the body with shrapnel and he sustained a head injury when he was thrown against the wall by the force of one of the explosions. Also, during the attack, Mr. Hernandez injured his lower back when he threw himself in front of others to protect those in the bunker which also caused damage to the sciatic nerve in his left leg. Since that time, Mr. Hernandez has suffered from PTSD.

700. Mr. Hernandez was seen by a Navy Corpsman at the Combat Support Hospital for his injuries; treatment included dressing, injections, and medication for pain and infection. He was treated at Ft. Belvoir and various military facilities in the Washington, DC and Virginia area when he returned home.

701. As a result of the March 26, 2008 Terrorist Attack and the injuries he suffered, Ernesto P. Hernandez III has incurred past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

702. Mr. Hernandez has received a disability rating of 100% by the Veteran's Administration.

703. Plaintiff, Laura Fay Hernandez, is a citizen of the United States and is domiciled in the State of Virginia. She is the wife of Ernesto P. Hernandez III.

704. Plaintiff, E.H., a Minor, is a citizen of the United States and is domiciled in the State of Virginia. He is the son of Ernesto P. Hernandez III.

705. Plaintiff, N.H., a Minor, is a citizen of the United States and is domiciled in the State of Virginia. He is the son of Ernesto P. Hernandez III.

706. Plaintiff, Ernesto I. Hernandez, II, is a citizen of the United States and is domiciled in the State of Texas. He is the father of Ernesto P. Hernandez III.

707. As a result of the March 26, 2008 Terrorist Attack and the injuries suffered by Ernesto P. Hernandez III, Plaintiffs, Laura Fay Hernandez, E.H., a Minor, N.H., a Minor, and Ernesto I. Hernandez II have incurred past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services.

## K. THE MARCH 2, 2008 ATTACK – BASRA

### 1. Plaintiff Timothy Joseph O'Sullivan

708. Plaintiff Timothy Joseph O'Sullivan is a citizen of the United States and is domiciled in the State of Ohio.

709. On March 2, 2008, Timothy Joseph O'Sullivan, age 36, was serving in the U.S. Air Force as a peacekeeping serviceman and Senior Advisor to British Forces stationed in Basra, Iraq. At the time in this area, Iranian-sponsored Terrorist Groups were awarding bounties for the killing, kidnapping, or maiming of Coalition service members. At the time, Mr. O'Sullivan held the rank of Captain, O-3.

710. At the time of the March 2, 2008 Terrorist Attack, Mr. O'Sullivan was performing his duties as the Senior Advisor to British forces while traveling in an armored Warrior Infantry

Fighting Vehicle ("IFV") as part of a five vehicle convoy.

711. Due to the high bounties being paid by and to Iranian-supported terrorists for American casualties, Mr. O'Sullivan was traveling in a British vehicle when it was hit and destroyed by a massive EFP explosion.

712. During Mr. O'Sullivan's time in Basra, from approximately 2007 through 2008, his unit was attacked approximately 800 – 1,100 times with Iranian IRAM rockets that were manufactured in or provided by Iran.

713. As result of these rocket attacks, Mr. O'Sullivan suffers from PTSD.

714. The weapons used to attack and injure Mr. O'Sullivan were an Iranian-manufactured EFP, and Iranian-manufactured and supplied rockets, provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

715. The Iranian-funded Special Group JAM has claimed responsibility for the EFP attack that resulted in injury to Mr. O'Sullivan.

716. As a result of the March 2, 2008 attack, Mr. O'Sullivan sustained significant physical and psychological injuries due to the concussive blast of the EFP explosion including TBI, internal bleeding, and injuries to his upper extremities.

717. Mr. O'Sullivan underwent extensive healthcare treatment for his injuries, including orthopedic surgical procedures to his right wrist and hand. He received treatment at various hospitals in Basra, Iraq; Kuwait City, Kuwait; Landstuhl, Germany; Tampa, Florida; and Dayton, Ohio. Mr. Sullivan is currently being treated for TBI.

718. As a result of the March 2, 2008 attack and multiple rocket attacks, Timothy Joseph O'Sullivan has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages,

including medical expenses, lost income, and loss of earning capacity.

719. Mr. O'Sullivan has received a disability rating of 80% by the Veteran's Administration.

### L. THE NOVEMBER 2, 2007 ATTACK – ROUTE SENATORS HIGHWAY, BAGHDAD

#### 1. Plaintiffs The Poole Family

720. Plaintiff James Joseph Poole III is a citizen of the United States and is domiciled in the State of Texas.

721. In the evening of November 2, 2007, Mr. Poole, age 24, was serving as a peacekeeping serviceman in the U.S. Army, as an Artilleryman in Iron Company 3/2 SCR (Stryker Cavalry Regiment). At the time, Mr. Poole held the rank of Sergeant, E-5.

722. On November 2, 2007, at approximately 21:09 hours, Mr. Poole was in a three-vehicle convoy returning from patrol in the Dora neighborhood in Baghdad, Iraq. Mr. Poole was seated in the right rear air guard hatch in the lead vehicle, a Stryker, an armored combat vehicle. His vehicle was struck by a 4 array EFP which pierced the driver's side of the vehicle's armor.. The force of the explosion slammed Mr. Poole's body into the air guard hatch and the explosion perforated his left ear drum. The Stryker caught on fire, but Mr. Poole was pulled from the vehicle prior to the fire engulfing the entire vehicle.

723. The weapon used to attack and injure Mr. Poole on November 2, 2007 was an Iranian-manufactured EFP provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

724. As a result of the November 2, 2007 Terrorist Attack, Mr. Poole sustained significant injuries including a perforated left ear drum and TBI.

725. Mr. Poole received treatment for his perforated ear drum and TBI at the 28th Combat Support Hospital in Baghdad, Iraq after the attack on November 2, 2007.

726. As a result of the November 2, 2007 Terrorist Attack and the injuries he suffered, James Joseph Poole III has incurred past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

727. Plaintiff, Allison Poole Roosien, is a citizen of the United States and is domiciled in the State of Michigan. She is the sister of James Joseph Poole III.

728. As a result of the November 2, 2007 Terrorist Attack and the injuries suffered by James Joseph Poole III, Plaintiff Allison Poole Roosien has past and future noneconomic damages, including severe mental anguish, extreme emotionally pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services.

## M. THE OCTOBER 31, 2007 ATTACK – SADR CITY, BAGHDAD

### 1. Plaintiff Koma Kekoa Texeira

729. Plaintiff Koma Kekoa Texeira is a citizen of the United States and is domiciled in the State of Hawaii.

730. On the morning of October 31, 2007, Koma Kekoa Texeira, age 30, was serving as a peacekeeping serviceman and Infantryman in the U.S. Army, 1-2 Stryker Calvary Regiment, Charlie Company. At the time, Mr. Texeira held the rank of Specialist, E-4.

731. On October 31, 2007, Mr. Texeira's unit was on patrol in Sadr City, Baghdad. He was a passenger in a Stryker, second in the convoy, when he was knocked unconscious. When he regained consciousness, he could smell chemicals and heard screaming. His fellow soldier noticed blood coming from Mr. Texeira's leg and he was rendered aid.

732. The weapon used to attack and injure Mr. Texeira was an Iranian-manufactured EFP provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

733. As a result of the October 31, 2007 Terrorist Attack, Mr. Texeira sustained significant physical and psychological injuries after the EFP blast and he sustained injury from shrapnel to his left leg.

734. Mr. Texeira's unit set up a makeshift hospital for treatment of the wounded before they headed back to the unit. He now seeks treatment through the VA.

735. As a result of the October 31, 2007 Terrorist Attack and the injuries he suffered, Koma Kekoa Texeira has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

736. Mr. Texeira has received a disability rating of 80% by the Veteran's Administration.

## N. THE SEPTEMBER 19, 2007 ATTACK – KADHIMIYA

### 1. Plaintiff Brian Robert Schar

737. Plaintiff Brian Robert Schar is a citizen of the United States and is domiciled in the State of Colorado.

738. On September 19, 2007, Brian Robert Schar, age 25, was serving as a peacekeeping serviceman in the U.S. Army as a Combat Engineer in the 1st. Infantry Division, 2nd Brigade Combat Team, 9th Engineer Battalion, 1st Alfred Company Platoon. At the time, Mr. Schar held the rank of Sergeant, E-5.

739. On that evening, Mr. Schar was riding in the front passenger seat in the lead vehicle of an Army convoy. As the convoy headed north on "Route Senator" along 14th of July Street it approached an Iraqi checkpoint located near a bridge. As Mr. Schar's vehicle traversed the bridge, an EFP (hidden behind a light post and disguised as a rock) exploded, devastating the vehicle and knocking Mr. Schar unconscious. Upon awakening, Mr. Schar realized he had no use

of his hands. While awaiting rescue, he continued to lose and regain consciousness, and during the lucid moments realized that both his right and left legs had been severed from his body. Mr. Schar was evacuated from the scene of the attack.

740. The weapon used to attack and injure Mr. Schar on September 19, 2007 was an Iranian-manufactured EFP provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

741. As a result of the September 19, 2007 Terrorist Attack, Mr. Schar sustained significant injuries, including the loss of both legs and a portion of his right pinky finger. Shrapnel and debris form the blast embedded in wounds to his colon, stomach, and upper extremities. Mr. Schar also suffered burns and permanent scarring from the blast and from acid because of the battery mounted below his seat.

742. Mr. Schar underwent significant medical treatment for the injuries he sustained during the September 19, 2007 Terrorist Attack, and will require further treatment and care for those injuries.

743. As a result of the September 19, 2007 Terrorist Attack and the injuries he suffered, Brian Robert Schar has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

744. Mr. Schar has received a disability rating of 100% by the Veteran's Administration.

## O. THE SEPTEMBER 4, 2007 ATTACK – SADAR CITY, BAGHDAD

### 1. Plaintiffs The Mixson Family

745. Plaintiff Joseph Catlin Mixson is a citizen of the United States and is domiciled in the State of Florida.

746. On the morning of September 4, 2007, Joseph Catlin Mixson, age 21, was serving as a peacekeeping serviceman as an Infantryman in the U.S. Army, Second Battalion, 16th Infantry. At the time, Mr. Mixson held the rank of Private First Class, E-3.

747. Mr. Mixson was performing his duties as an Infantryman in his Humvee while on patrol in Sadr City, Baghdad. An EFP detonated near his vehicle, instantly killing three passengers and destroying the vehicle. Mr. Mixson was ejected from the vehicle and is the only survivor.

748. The weapon used to attack and injure Mr. Mixson on September 4, 2007 was an Iranian-manufactured EFP provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

749. As a result of the September 4, 2017 Terrorist Attack, Mr. Mixson sustained significant injuries including, but not limited to, severe damage to distal portions of the legs; severe damage to left elbow; multiple shrapnel/bullet wounds; physical head injuries, TBI, and PTSD. He was stabilized at the scene and then taken by truck to FOB Loyalty where he was further stabilized and transported by medevac to an air base in the area before being flown to Germany.

750. Mr. Mixson's medical treatment included emergent tourniquets to his arms and legs, subsequent double amputations above the knee, significant orthopedic repair of the left elbow, treatment for skull fractures, TBI, anxiety, and PTSD. Subsequent care and rehabilitation was rendered at Brook Army Medical Center (Texas).

751. As a result of the September 4, 2007 Terrorist Attack and the injuries he suffered, Joseph Catlin Mixson has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages,

including medical expenses, lost income, and loss of earning capacity.

752. Mr. Mixson has received a disability rating of 100% by the Veteran's Administration.

753. Plaintiff Virginia BreAnn Mixson is a citizen of the United States and is domiciled in the state of Florida. She is the spouse of Joseph Catlin Mixson.

754. Plaintiff Joseph Johnson Mixson is a citizen of the United States and is domiciled in the state of Florida. He is the father of Joseph Catlin Mixson.

755. Plaintiff Karon Mixson is a citizen of the United States and is domiciled in the state of Florida. She is the mother of Joseph Catlin Mixson.

756. Plaintiff Alicia Mixson is a citizen of the United States and is domiciled in the state of Florida. She is the sister of Joseph Catlin Mixson.

757. As a result of the September 4, 2007 Terrorist Attack and the injuries suffered by Joseph Catlin Mixson, Plaintiff's Virginia BreAnn Mixson, Joseph Johnson Mixson, Karon Mixson, and Alicia Mixson have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services.

## P. THE AUGUST 22, 2007 ATTACK – BAGHDAD/SADR CITY BORDER

### 1. Plaintiff Jerrald J. Jensen

758. Plaintiff Jerrald J. Jensen is a citizen of the United States and is domiciled in the State of Colorado.

759. On August 22, 2007, Jerrald J. Jensen, age 37, was serving as a peacekeeping serviceman in the U.S. Army 3rd Squadron, 61st Cavalry Regiment, as the personal driver for Major Keith Brace. At the time, Mr. Jensen held the rank of Specialist, E-4.

760. On this date, Mr. Jensen was performing his duties as the driver for Major Brace,

driving an M1165 Up-Armored High Mobility Multipurpose Wheeled Vehicle ("HMMWV") combat vehicle in a six-vehicle convoy. As the convoy slowed to pass through a gate, three EFPs fastened to a concrete barrier simultaneously exploded.

761. As a result of the August 22, 2007 Terrorist Attack, Mr. Jensen was pierced with metal and shrapnel in his knee, head, and face. He also suffered chemical burns from an exploding battery. Despite these injuries, Mr. Jensen was able to drive the vehicle away from the blast site, through a fence, and behind a wall. Upon exiting the vehicle, Mr. Jensen was then shot by his attackers in the right arm, shattering his elbow and lodging in his back.

762. The weapons used to attack and injure Mr. Jensen were Iranian-manufactured EFPs provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

763. As a result of the August 22, 2007 Terrorist Attack, Mr. Jensen sustained significant injuries, due to the concussive blast of the explosion, including TBI, and shrapnel wounds that tore his lower jaw from his face, resulting in loss of his lower mandible, and severing his tongue.

764. Mr. Jensen underwent significant and multiple reconstructive surgeries and other medical treatment related to his injuries. He will require further medical treatment and care.

765. As a result of the August 22, 2007 Terrorist Attack and the injuries he suffered during that attack, Jerrald J. Jensen has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

766. Mr. Jensen has received a disability rating of 80% by the Veteran's Administration.

## Q. THE JUNE 17, 2007 ATTACK – BASRA

### 1. Plaintiff Grant Ransom Blackwell

767. Plaintiff Grant Ransom Blackwell is a citizen of the United States and is domiciled in the State of South Carolina.

768. On the late afternoon of June 17, 2007, Grant Ransom Blackwell, age 25, was serving as a peacekeeping serviceman and Infantryman in the U.S. Army, Bravo Company, 1st Battalion of the 121 Field Artillery. At the time, Mr. Blackwell held the rank of Sergeant, E-5.

769. On June 17, 2007, Mr. Blackwell's unit was in a convoy moving south bound on Route Aspen. They were a couple hundred meters turning off of Route Tampa when they noticed what appeared to be a small pile of asphalt, not uncommon at the time. As the convoy passed it, it detonated, immediately setting Mr. Blackwell's Humvee on fire, and ripping off the back half of the Humvee.

770. The weapon used to attack and injure Mr. Blackwell was an Iranian-manufactured EFP provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

771. As a result of the June 17, 2007 Terrorist Attack, Mr. Blackwell sustained significant physical and psychological injuries that include shrapnel to his head and neck after his helmet was blown off from the force of the blast. Due to the fact that his Humvee was on fire Mr. Blackwell also sustained burns to his back and buttocks.

772. Mr. Blackwell was bandaged until the medevac arrived, at which time he was transferred to Tallil Air Force Base for further treatment.

773. As a result of the June 17, 2007 Terrorist Attack and the injuries he suffered, Grant Ransom Blackwell has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic

damages, including medical expenses, lost income, and loss of earning capacity.

774. Mr. Blackwell has received a disability rating of 50% by the Veteran's Administration.

### R. THE JULY 17, 2007 ATTACK – SADR CITY

#### 1. Plaintiffs The Pearcy Family

775. Plaintiff Colin Laird Pearcy is a citizen of the United States and is domiciled in the State of Illinois.

776. In the early morning hours of July 17, 2007, Colin Laird Pearcy, age 24, was serving as a peacekeeping serviceman in the U.S. Army as an Infantryman with the 3rd Platoon B Company, 2nd Battalion 325th Airborne Infantry Regiment, 2nd Brigade, 82nd Airborne Division. At the time, Mr. Pearcy held the rank of Specialist, E-4.

777. As Mr. Pearcy's unit was patrolling in Baghdad's Sadr City during curfew hours, he was driving a Humvee on Route Maryland. They stopped to decide their next move when the Humvee was hit by an EFP which went through the front right of the Humvee in the hood/engine area and came through the windshield of the driver's side of the Humvee. Mr. Pearcy was knocked out initially from the blast and sustained significant injuries to his left hand and arm as well as shrapnel to his arms and legs. The Humvee was completely disabled. Mr. Pearcy was unable to extricate himself from the Humvee and was pulled from the Humvee by other members of his unit.

778. The weapon used to attack and injure Mr. Pearcy on July 17, 2007 was an Iranian-manufactured EFP provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

779. Mr. Pearcy sustained significant injuries to his left hand and arm, shrapnel in both arms and legs, burns and cuts on the left side of his neck, and significant blood loss at the attack

scene, requiring packing and a tourniquet. He was placed in another Humvee to return to COP Callahan. Mr. Pearcy underwent surgery on his ulnar artery at the Baghdad Emergency Room later that day, transferred to Balad Air Base, after which he was taken to Landstuhl Medical Center in Landstuhl, Germany where he underwent additional surgery and removal of some shrapnel. Mr. Pearcy was then transferred to Walter Reed VA Hospital and underwent additional surgery including debridement, skin graft surgery, physical therapy and other treatment.

780. As a result of the July 17, 2007 Terrorist Attack, Mr. Pearcy sustained significant injuries including damage to his left hand and arm, damage to ulnar artery, limited strength & mobility to his left hand and arm, loss of feeling at site of skin graft to left forearm, shrapnel to his arms and legs, TBI, memory loss, tinnitus, sleep apnea, seizures, PTSD, flashbacks, nightmares, depression.

781. As a result of the July 17, 2007 Terrorist Attack and the injuries he suffered, Colin Laird Pearcy has incurred past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

782. Mr. Pearcy has received a disability rating of 90% by the Veteran's Administration.

783. Plaintiff Laird Pearcy is a citizen of the United States and is domiciled in the State of Illinois. He is the father of Colin Laird Pearcy.

784. Plaintiff Anne Pearcy is a citizen of the United States and is domiciled in the State of Illinois. She is the mother of Colin Laird Pearcy.

785. Plaintiff Jody Striker is a citizen of the United States and is domiciled in the State of Illinois. She is the sister of Colin Laird Pearcy.

786. Plaintiff Karyn McDonald is a citizen of the United States and is domiciled in the State of Illinois. She is the sister of Colin Laird Pearcy.

787. Plaintiff Andrew Pearcy is a citizen of the United States and is domiciled in the State of Wisconsin. He is the brother of Colin Laird Pearcy.

788. Plaintiff Patrick Pearcy is a citizen of the United States and is domiciled in the State of Ohio. He is the brother of Colin Laird Pearcy.

789. As a result of the July 17, 2007 Terrorist Attack and the injuries suffered by Colin Laird Pearcy, Plaintiffs, Laird Pearcy, Anne Pearcy, Jody Striker, Karyn McDonald, Andrew Pearcy, and Patrick Pearcy have incurred past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services.

## S. THE JULY 10, 2007 ATTACK – OBSERVATION POINT CAVALIER, TAJI

### 1. Plaintiffs The Segers Family

790. Plaintiff Daniel Wayne Segers is a citizen of the United States and is domiciled in the State of Alabama.

791. On the afternoon of July 10, 2007, Daniel Wayne Segers, age 20, was serving as a peacekeeping serviceman in the U.S. Army, Alpha Company 2-8, First Cavalry. At the time, Daniel Wayne Segers held the rank of Specialist, E-4.

792. Mr. Segers was serving as an Infantryman at the time of the attack and was located in the gunner position in a Humvee located outside the west gate of Observation Point (OP) Cavalier near FOB Taji, Iraq. Mr. Segers was on overwatch / force protection along with several other Humvees and Bradley vehicles when an Iranian two-stage RPG-7 round penetrated the back passenger side door of the Humvee in which Mr. Segers was located. The initial stage

of the RPG-7 penetrated the Humvee, but the second stage did not explode and was found in the back floorboard of the Humvee after the attack.

793. The blast from the RPG-7 penetrator caused Mr. Segers to strike his head and body inside the Humvee, sustaining serious physical injuries, including damage to his liver, stomach, rectum, penis, right side, right knee, right hand, corneal lacerations to his right eye, bladder, a concussion, TBI, as well as taking more than 100 pieces of shrapnel all over his body. Additionally, he suffers from PTSD, depression, anxiety, violent attacks in his sleep, insomnia, suicidal ideation and attempts.

794. The weapon used to attack the occupants of the Humvee on January 20, 2006 was an Iranian-manufactured/supplied dual-stage RPG-7 provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

795. Mr. Segers was transported to a Combat Support Hospital in Balad, Iraq, where he underwent exploratory surgery, liver surgery, surgery on his diaphragm and stomach, and other treatment to stabilize him and treat his injuries. The next day, he was flown to Landstuhl Medical Center in Landstuhl, Germany for additional medical treatment and surgery. He was transported back to the United States in mid-July 2007, and began treatment at Darnall Army Medical Center in Fort Hood, Texas. Mr. Segers continues to receive ongoing medical treatment for the injuries sustained in this attack as well as for his symptoms of PTSD.

796. As a result of the July 10, 2007 Terrorist Attack and the injuries he suffered, Daniel Wayne Segers has incurred past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

797. Mr. Segers has received a disability rating of 80% by the Veteran's

Administration.

798. Plaintiff, Larry Segers, is a citizen of the United States and is domiciled in the State of Alabama. He is the father of Daniel Wayne Segers.

799. Plaintiff, Sharon Wynona Parker, is a citizen of the United States and is domiciled in the State of Alabama. She is the mother of Daniel Wayne Segers.

800. Plaintiff, David Larry Segers, is a citizen of the United States and is domiciled in the State of Alabama. He is the brother of Daniel Wayne Segers.

801. As a result of the July 10, 2007 Terrorist Attack and the injuries suffered by Daniel Wayne Segers, Plaintiffs Larry Segers, Sharon Wynona Parker, and David Larry Segers, have incurred past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services.

## T. THE MAY 31, 2007 ATTACK - BAGHDAD

### 1. Plaintiff John Maine

802. Plaintiff John Maine is a citizen of the United States and is domiciled in the State of Oregon.

803. On the afternoon of May 31, 2007, John Maine, age 20, was serving as a peacekeeping serviceman and Cavalry Scout in the U.S. Army, 1st Infantry Division, 4th Infantry Battle Combat Team, 41 Calvary Alpha Troop. At the time, Mr. Maine held the rank of Specialist, E-4.

804. At approximately 1300 hours on May 31, 2007, Mr. Maine’s unit was returning to their FOB from an investigative patrol. His Humvee was in the third position in a vehicle convoy. The convoy was hit by an EFP.

805. The weapon used to attack and injure Mr. Maine was an Iranian-manufactured

EFP provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

806. As a result of the May 31, 2007 Terrorist Attack, Mr. Maine sustained significant injuries. Mr. Maine sustained severe physical and psychological issues due to the blast from the EFP. He experienced immediate pain in his head from hitting the roof of the Humvee, knee pain from crashing into the front seat when they were blown forward, and ringing in his ears.

807. Mr. Maine has been diagnosed with TBI, short-term memory loss as well as long-term memory loss, and a back injury. He has auditory hearing loss and a high level of light sensitivity which requires special lenses.

808. As a result of the May 31, 2007 Terrorist Attack and the injuries he suffered, John Maine has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

809. Mr. Maine has received a disability rating of 90% by the Veteran's Administration.

## U. THE MAY 28, 2007 ATTACK – SADR CITY

### 1. Plaintiff Gregory Edward Hogancamp

810. Plaintiff Gregory Edward Hogancamp is a citizen of the United States and is domiciled in the State of Florida.

811. On May 28, 2007, Gregory Edward Hogancamp, age 24, was serving as a peacekeeping serviceman in the U.S. Army, 1st Battalion, 8th Cavalry Regiment, 2nd Brigade Combat Team, 1st Cavalry Division. At the time, Mr. Hogancamp held the rank of Corporal, E-4.

812. At approximately 14:00 on May 28, 2007, Mr. Hogancamp was performing his

duties as a member of a tank crew in a M1A2 Battle Tank traveling in a convoy through Sadr City, Iraq when an explosion tore apart the tank. The inside of the tank was engulfed in smoke and flames, causing the halon fire suppression system to activate. Mr. Hogancamp remained conscious and attempted to exit the tank but was unable to reach the hatch due to the severity of his wounds. He then lost consciousness. He was rescued by other members of his unit and evacuated to safety.

813. The weapon used to attack and injure Mr. Hogancamp during the May 28, 2007 Terrorist Attack was an Iranian-manufactured EFP provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

814. Several days after the May 28, 2007 Terrorist Attack, Mr. Hogancamp's unit captured an individual known to have perpetrated the EFP attack on the convoy. This person was taken into custody by U.S. Special Forces and it was determined that he was Iranian and/or affiliated with Iran's Qods Force.

815. As a result of the May 28, 2007 Terrorist Attack, Mr. Hogancamp sustained significant injuries due to the explosion and resulting fire, including third degree burns and a shattered right leg. Shrapnel from the explosion embedded in Mr. Hogancamp's right leg, chest, and stomach. His left index finger was partially amputated. He suffered a concussion resulting in TBI, and to this day, has hearing loss and permanent scarring.

816. Mr. Hogancamp underwent significant medical treatment and will require further treatment and care as a result of the May 28, 2007 Terrorist Attack.

817. As a result of the May 28, 2007 Terrorist Attack and the injuries he suffered, Gregory Edward Hogancamp has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future

economic damages, including medical expenses, lost income, and loss of earning capacity.

818. Mr. Hogancamp has received a disability rating of 80% by the Veteran's Administration.

## V. THE MAY 17, 2007 ATTACK – BAGHDAD

### 1. Plaintiffs The Gautier/Houchins Family

819. Plaintiff Aaron Daniel Gautier was a citizen of the United States and was domiciled in the State of Virginia at the time of his death.

820. On May 17, 2007, Aaron Daniel Gautier, age 19, was serving as a peacekeeping serviceman in the U.S. Army as an Infantryman in the 4th Brigade Combat Team, 23rd Infantry 2nd Battalion, Bravo Company. At the time, Mr. Gautier held the rank of Private First Class, E-3. He was promoted to Corporal after his death.

821. On this date, Mr. Gautier was the gunner in a Stryker Interim Armored Vehicle ("IAV") that was traveling through a marketplace in Baghdad, Iraq. An IED detonated near the IAV, killing Mr. Gautier.

822. The weapon used to attack and injure Mr. Gautier was an IED provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

823. The Iranian-supported Special Group known as KH has claimed responsibility for the attack that resulted in the death of Mr. Gautier.

824. Plaintiff Tina Louise Houchins is a citizen of the United States and is domiciled in the state of Virginia. She is the mother of Aaron Daniel Gautier.

825. Plaintiff Tina Louise Houchins brings an action individually, and on behalf of the Estate of Daniel Gautier, and all heirs thereof, as its legal representative.

826. As a result of the May 17, 2007 Terrorist Attack and the injuries and death suffered by Aaron Daniel Gautier, Plaintiff Tina Louise Houchins has experienced severe mental

anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of Aaron Daniel Gautier's society, services, companionship, comfort, protection, instruction, advice and counsel, loss of earnings, income, and net accumulation to the estate of Aaron Daniel Gautier.

### W. THE FEBRUARY 25, 2007 ATTACK – CSC SCANIA

#### 1. Plaintiff Joshua Bradley Wolfe

827. Plaintiff Joshua Bradley Wolfe is a citizen of the United States and is domiciled in the State of Washington.

828. On the night of February 25, 2007, Joshua Bradley Wolfe, age 27, was serving as a peacekeeping serviceman in the U.S. Army National Guard, 593 Medium Transportation Company ("MTC"). At the time, Mr. Wolfe held the rank of Specialist, E-4.

829. At the time of the February 25, 2007 Terrorist Attack, Mr. Wolfe was performing his duties as a Motor Transport Operator. The 593rd MTC was conducting convoy security along with members of the 260th Quartermaster Battalion, 3rd Sustainment Troop Brigade, 3rd Infantry Division, stationed in Fort Stewart, Georgia. The convoy was heading south on Main Supply Route ("MSR") Tampa to Tallil Air Base in Southern Iraq. After passing "SCANIA," a small U.S. Military installation, Mr. Wolfe's convoy was hit by an EFP.

830. The weapon used to attack the convoy on February 25, 2007, and resulting in injury to Mr. Wolfe, was an Iranian-manufactured EFP provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

831. As a result of the February 25, 2007 Terrorist Attack, Mr. Wolfe sustained significant injuries to his back and shoulder and a concussion.

832. As a result of the February 25, 2007 Terrorist Attack, Mr. Wolfe underwent multiple orthopedic surgeries and significant medical treatment. He will require further medical

treatment and care.

833. As a result of the February 25, 2007 Terrorist Attack and the injuries he suffered, Joshua Bradley Wolfe has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

834. Mr. Wolfe has received a disability rating of 90% by the Veteran's Administration.

### X. THE FEBRUARY 3, 2007 ATTACK – ROUTE DOVER, SOUTH OF CAMP TAJI

#### 1. Plaintiffs The Bass Family

835. Plaintiff Travis Ryan Bass is a citizen of the United States and is domiciled in the State of Indiana.

836. On the morning of February 3, 2007, Mr. Bass, age 24, was serving as a peacekeeping serviceman in the U.S. Army, HHB Field Artillery, 2nd Battalion, 319th Regiment, 82nd Airborne. At the time, Mr. Bass held the rank of Specialist, E-4.

837. Mr. Bass was performing his duties as a Unit Supply Specialist and while travelling in a Light Medium Tactical Vehicle (LMTV), as part of a larger convoy along Route Dover, south of Camp Taji, his LMTV was struck by a multiple array EFP. The blast penetrated the LMTV through the passenger door and exited the opposite side of the vehicle. The blast from the EFP initially caused Mr. Bass to blackout. Upon regaining consciousness, Mr. Bass rendered aid to his sergeant and pulled him out of the vehicle. Despite these efforts, the sergeant did not survive.

838. The weapon used to attack and injure Mr. Bass on February 3, 2007 was an Iranian-manufactured multiple array EFP provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

839. The Special Group KH has claimed responsibility for the attack that resulted in injury to Mr. Bass.

840. As a result of the February 3, 2007 Terrorist Attack, Mr. Bass sustained significant injuries including TBI, PTSD, and injuries to his back. As a result of the February 3, 2007 Terrorist Attack and the injuries he suffered, Travis Ryan Bass has incurred past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

841. Mr. Bass receives both therapy and medication for the injuries he sustained.

842. Mr. Bass has received a disability rating of 50% by the Veteran's Administration.

843. Plaintiff, Harold Bass, is a citizen of the United States and is domiciled in the State of Indiana. He is the father of Travis Ryan Bass.

844. Plaintiff, Mary Louise Milton, is a citizen of the United States and is domiciled in the State of Indiana. She is the mother of Travis Ryan Bass.

845. Plaintiff, Allen Milton, is a citizen of the United States and is domiciled in the State of Indiana. He is the stepfather of Travis Ryan Bass.

846. Plaintiff, Aaron Bass, is a citizen of the United States and is domiciled in the State of Indiana. He is the brother of Travis Ryan Bass.

847. Plaintiff, Adam Christopher Bass, is a citizen of the United States and is domiciled in the State of Indiana. He is the brother of Travis Ryan Bass.

848. Plaintiff, Lisa Lambert, is a citizen of the United States and is domiciled in the State of Indiana. She is the sister of Travis Ryan Bass.

849. As a result of the February 3, 2007 Terrorist Attack and the injuries suffered by

Travis Ryan Bass, Plaintiffs Harold Carl Bass, Mary Louis Milton, Allen Milton, Aaron Bass, Adam Christopher Bass, and Lisa Lambert, have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services.

### Y. THE JANUARY 27, 2007 ATTACK – ROUTE MICHIGAN, BAGHDAD

#### 1. Plaintiffs The Nichols Family

850. Plaintiff James R. Nichols is a citizen of the United States and is domiciled in the State of Virginia.

851. On the evening of January 27, 2007, James R. Nichols, age 30, was serving as a peacekeeping serviceman in the U.S. Army, 1-7 Field Artillery, Alpha Company. At the time, Mr. Nichols held the rank of Sergeant, E-5.

852. Mr. Nichols was performing his duties as the convoy leader/dismount in his Humvee and was returning to base after detaining and escorting insurgents for confinement when his convoy was part of a complex ambush. Mr. Nichols was in the third of four vehicles. The convoy was assaulted with rockets, RPGs, and small firearms from multiple directions. The attack was coordinated from a Shi'a mosque and a nearby apartment complex. After being hit, his vehicle was flipped 360 degrees.

853. The weapons used to attack and injure Mr. Nichols on January 27, 2007 were an Iranian-manufactured and/or supplied IED and RPGs provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

854. As a result of the January 27, 2007 Terrorist Attack, Mr. Nichols sustained significant injuries from the blast forces of the explosion including, but not limited to, being dazed and disoriented from the blast, migraine headaches, tinnitus or ringing in his ears, and

cognitive deficiencies due to TBI. His emotional and psychological injuries include, but are not limited to, PTSD, anxiety, depression, social anxiety disorder, and social and occupational impairment.

855. As a result of the January 27, 2007 Terrorist Attack and the injuries he suffered, James R. Nichols has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

856. Mr. Nichols has received a disability rating of 100% by the Veteran's Administration.

857. Plaintiff Queen Nichols is a citizen of the United States and is domiciled in the state of Illinois. She is the mother of James R. Nichols.

858. Plaintiff James Nichols is a citizen of the United States and is domiciled in the state of Illinois. He is the father of James R. Nichols.

859. Plaintiff Thomas Nichols is a citizen of the United States and is domiciled in the state of Illinois. He is the brother of James R. Nichols.

860. Plaintiff Sharon Nichols is a citizen of the United States and is domiciled in the state of Illinois. She is the sister of James R. Nichols.

861. As a result of the January 27, 2007 Terrorist Attack and the injuries suffered by James R. Nichols, Plaintiff's mother and father, Queen Nichols and James Nichols, and his brother and sister, Thomas Nichols and Sharon Nichols, have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services.

## Z. THE DECEMBER 4, 2006 ATTACK – BAGHDAD

### 1. Plaintiffs The Portwine Family

862. Plaintiff Brian Lee Portwine was a citizen of the United States and was domiciled in the State of Florida at the time of his death.

863. On December 4, 2006, Brian Lee Portwine, age 18, was serving as a peacekeeping serviceman in the U.S. Army, 2nd Brigade, One Eight Bravo Company, 1st Platoon, 8th Mechanized Infantry Division. At the time, Mr. Portwine held the rank of Private First Class, E-3.

864. At the time of the December 4, 2006 Terrorist Attack, Mr. Portwine was riding in the rear of an M2 Bradley Infantry Fighting Vehicle as part of a mounted patrol in Baghdad, Iraq when his vehicle was struck by an EFP. The explosion caused fuel to spray into the troop compartment, in turn igniting the interior on fire. The explosion also caused such damage to the vehicle that the occupants were unable to open the doors and escape the burning vehicle. Mr. Portwine remained trapped in the vehicle as it burned and filled with smoke. Eventually, although injured, Mr. Portwine and the other occupants were able to escape the burning vehicle.

865. The weapon used to attack and injure Mr. Portwine was an Iranian-manufactured EFP provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

866. As a result of the attack, Mr. Portwine sustained significant injuries due to concussive blast forces, including shrapnel wounds and lacerations to his head and face and a concussion. Mr. Portwine also had shrapnel and fragments of human bone imbedded in his body when the unit's interpreter's legs were eviscerated by the explosion resulting from the December 4, 2006 Terrorist Attack.

867. As a result of the December 4, 2006 Terrorist Attack, Mr. Portwine underwent medical treatment for his wounds in Baghdad, Iraq, and continued receiving treatment for his

injuries in the United States.

868. As a result of the December 4, 2006 Terrorist Attack and the injuries he suffered, Mr. Portwine experienced severe physical and mental anguish and extreme emotional pain and suffering.

869. On May 27, 2011, after being diagnosed with PTSD and TBI resulting from the December 4, 2006 Terrorist Attack, Mr. Portwine committed suicide.

870. The December 4, 2006, Terrorist Attack, during which Mr. Portwine was injured, was the direct and proximate cause and/or a substantial contributing factor to his PTSD diagnosis and his TBI, as well as his mental anguish and extreme emotional pain and suffering that resulted in his suicide.

871. Plaintiff Peggy Jean Portwine is a citizen if the United States and is domiciled in the state of Georgia. She is the mother of Brian Lee Portwine.

872. Plaintiff Peggy Jean Portwine brings an action individually, and on behalf of the Estate of Brian Lee Portwine, and all heirs thereof, as its legal representative.

873. As a result of the December 4, 2006, Terrorist Attack and the injuries suffered by, and death of, Brian Lee Portwine, Plaintiff Peggy Jean Portwine has severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of Brian Lee Portwine's society, services, companionship, comfort, protection, instruction, advice and counsel, loss of earnings, income, and net accumulation to the estate of Brian Lee Portwine.

## AA. THE NOVEMBER 27, 2006 ATTACK – SHULA

### 1. Plaintiffs The Strong Family

874. Plaintiff Travis MacCody Strong is a citizen of the United States and is domiciled in the State of Colorado.

875. On the night of November 27, 2006, Travis MacCody Strong, age 29, was serving

as a peacekeeping serviceman in the U.S. Army, 123rd Infantry Regiment, Fort Lewis, Washington. At the time, Mr. Strong held the rank of Staff Sergeant, E-6.

876. Mr. Strong was performing his duties as the Vehicle Commander and Controlled Gunner in his Stryker IAV while leading a mission along Creek Road in the Shula neighborhood of Baghdad, Iraq. Mr. Strong was seated inside the vehicle, in the center seat, when an explosion struck the convoy. The explosion completely severed his right leg and nearly severed his left leg. Mr. Strong suffered enormous blood loss and was found to be asystole ("flat-lined") multiple times as medics worked to stabilize him.

877. The weapon used to attack and injure Mr. Strong on November 27, 2006 was an Iranian-manufactured EFP provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

878. As a result of the November 27, 2006 Terrorist Attack, Mr. Strong sustained significant injuries due to the explosion including massive blast damage to his legs and extensive shrapnel wounds.

879. Mr. Strong underwent surgery to treat his leg wounds, which resulted in bi-lateral above-the-knee amputations. He received medical and hospital care and treatment at Walter Reed Medical Hospital, Bethesda, Maryland; Balboa Naval Hospital in San Diego, California; Denver Veteran's Center, Colorado; University of Colorado Hospital, Denver, Colorado; and Denver Health, Denver, Colorado.

880. As a result of the November 27, 2006 Terrorist Attack and the injuries he suffered, Travis MacCody Strong has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

881. Mr. Strong has received a disability rating of 100% by the Veteran's Administration.

882. Plaintiff Tayler Heston is a citizen of the United States and is domiciled in the state of Arizona. She is the mother of Travis MacCody Strong.

883. Plaintiff Anthony Joseph Durkacs is a citizen of the United States and is domiciled in the State of Nevada. He is the brother of Travis MacCody Strong.

884. As a result of the November 27, 2006 Terrorist Attack and the injuries suffered by Travis MacCody Strong, Plaintiffs Tayler Heston and Anthony Joseph Durkacs have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services.

### BB. The February 14, 2006 Attack – Baghdad

#### 1. Plaintiff Tara Kathleen Hutchinson

885. Plaintiff Tara Kathleen Hutchinson is a citizen of the United States and is domiciled in the State of Texas.

886. On the morning of February 14, 2006, Tara Kathleen Hutchinson, age 29, was serving as a peacekeeping servicewoman and member of the Military Police in the U.S. Army, 463rd Military Police, Bravo Company. At the time, Ms. Hutchinson held the rank of Staff Sergeant, E-6.

887. On February 14, 2006, Ms. Hutchinson's unit was providing military support to three Iraqi police stations near Race Track Road in Baghdad. The unit was dispatched to pick up an interpreter. After leaving the FOB, Ms. Hutchinson, serving as the squad leader, was sitting in the right front passenger seat of an M1165 Up-Armored HMMWV combat vehicle. As the vehicle reached the end of an overpass, an EFP detonated, destroying the vehicle.

888. The weapon used to attack and injure Ms. Hutchinson was an Iranian-manufactured EFP provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

889. As a result of the February 14, 2006 Terrorist Attack, Ms. Hutchinson sustained significant injuries. Ms. Hutchinson's right leg was severed three inches above the knee and she experienced third degree burns and shrapnel wounds to her left leg. Due to blood loss, Ms. Hutchinson flat-lined and was without a heartbeat for several minutes, resulting in anoxic brain injury.

890. Ms. Hutchinson underwent significant medical treatment for her injuries and will require further treatment and care.

891. As a result of the February 14, 2006 Terrorist Attack and the injuries she suffered, Tara Kathleen Hutchinson, has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

892. Ms. Hutchinson has received a disability rating of 100% by the Veteran's Administration.

## CC. THE JANUARY 18, 2006 ATTACK – SOUTHWEST OF FOB SHATT

### 1. Plaintiffs The Majeed Family

893. Plaintiff Ayad Mohammad Majeed is a citizen of the United States and is domiciled in the State of Georgia.

894. Mr. Majeed, age 30, was an Iraqi national employed by DynCorp International ("Dyncorp") working for the U.S. Department of State and serving as an interpreter/translator. He was traveling as an interpreter with International Police Liaison Officers provided by his employer, DynCorp, at the time of his injuries.

895. Mr. Majeed has standing under the FSIA pursuant to 28 U.S.C § 1605A(a)(2)(A)(ii)(III), because he was "an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment."

896. On January 18, 2006, at approximately 1:35 p.m., a convoy of two vehicles was traveling from the U.S. Embassy in Basra approximately two kilometers southwest of FOB Shatt. Mr. Majeed was a passenger in the lead vehicle of the convoy, an Alpha Armored Suburban A-94. He was seated behind the navigator. After the lead vehicle made a turn, the vehicle was struck by an EFP from the right side. All passengers were gravely wounded.

897. Mr. Majeed suffered severe injuries, including massive lacerations to his right and left arms that required a tourniquet which kept him from bleeding out at the attack site. He was transferred by helicopter to a British base hospital in Basra.

898. Mr. Majeed's injuries required amputation of his right arm below the elbow as well as extensive repair of his left hand.

899. The weapon used to attack and injure Mr. Majeed was an Iranian-manufactured EFP provided to Iranian-funded and Iranian-trained terror operatives in Iraq.

900. The Special Group known as JAM has claimed responsibility for the attack that resulted in injury to Mr. Majeed.

901. As a result of the attack, Mr. Majeed sustained significant injuries including serious injuries to his right hand and arm requiring amputation of his right hand and arm below the elbow. He also sustained serious injuries to his left hand and arm. He was prescribed a prosthesis for his right hand, undergone injections for his left hand, undergone tendon transfer surgery, and will continue to require medical care and treatment in the future.

902. As a result of the Attack and the injuries he suffered, Ayad M. Majeed has

experienced severe mental anguish and extreme emotional pain and suffering. He continues to receive medical and psychological treatment and will receive medical and psychological treatment in the future.

903. Plaintiff, Sana Ali, is a citizen of the United States and is domiciled in the State of Georgia. She is the wife of Ayad M. Majeed.

904. Plaintiff, M.A.M., a Minor, is a citizen of the United States and is domiciled in the State of Georgia. He is the minor son of Ayad M. Majeed.

905. Plaintiff, M.A.M., a Minor, is a citizen of the United States and is domiciled in the State of Georgia. She is the minor daughter of Ayad M. Majeed.

906. Plaintiff, S. M., a Minor, is a citizen of the United States and is domiciled in the State of Georgia. He is the minor son of Ayad M. Majeed.

907. As a result of the January 18, 2006 Terrorist Attack and the injuries suffered by Ayad M. Majeed, Plaintiffs Sana Ali, M.A.M., a Minor, M.A.M., a Minor, and S.M., a Minor, have incurred past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services.

## DD. THE SEPTEMBER 2, 2005 ATTACK - MOSUL

### 1. Plaintiff Ioan Adrian Kelemen

908. Plaintiff Ioan Adrian Kelemen is a citizen of the United States and is domiciled in the State of Arizona.

909. On the night of September 2, 2005, Ioan Adrian Kelemen, age 33, was serving as a peacekeeping serviceman and Field Artillery Gunner in the U.S. Army, C. BTRY 2/180th Field Artillery attached to Force Protection. At the time, Mr. Kelemen held the rank of Sergeant First Class, E-7.

910. On September 2, 2005 Mr. Kelemen's unit was on a patrol with Albanian Coalition Forces and an Iraqi interpreter. Mr. Kelemen was the turret gunner in a HMMWV. The vehicle was struck by an IED. Mr. Keleman was knocked unconscious due to the blast and once he regained consciousness, immediately got on the radio to call for help until back-up arrived at their location.

911. The weapon used to attack and injure Mr. Kelemen was an Iranian-manufactured IED provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

912. The Iranian-funded and trained Foreign Terrorist Organization AAI was operating in the area at the time of the September 2, 2005 Terrorist Attack that injured Mr. Keleman, and claimed responsibility for the attack.

913. As a result of the September 2, 2005 Terrorist Attack, Mr. Kelemen sustained significant physical and psychological injuries. Mr. Kelemen's injuries include TBI, lower back injury, and left arm injury.

914. Mr. Kelemen immediately went to the casualty support hospital where he received treatment for his injuries and continues to require additional treatment for his injuries.

915. As a result of the September 2, 2005 Terrorist Attack and the injuries he suffered, Ioan Adrian Kelemen has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

916. Mr. Kelemen has received a disability rating of 90% by the Veteran's Administration.

## EE. THE AUGUST 13, 2005 ATTACK – SADR CITY, IRAQ

### 1. Plaintiff Brad Lee Schwarz

917. Plaintiff Brad Lee Schwarz is a citizen of the United States and is domiciled in the State of Illinois.

918. On August 13, 2005, Brad Lee Schwarz, age 20, was serving as a peacekeeping serviceman as a M1 Armor Crewman in the U.S. Army 3rd Infantry Division 315 Infantry. At the time, Mr. Schwarz held the rank of Private, E-1.

919. On August 13, 2005, Mr. Schwarz was third in a convoy of four Bradley Fighting Vehicles ("BFV"), serving as the troop carrier seated behind the gunner. The convoy was on the way to relieve a company from a security detail, crossing over a major four lane highway. After three BFVs crossed the highway, a dual stacked EFP was detonated. The impact of the explosion caused significant damage to the fourth BFV and the impact of the explosion and concussive forces blasted Mr. Schwarz and other personnel in the third BFV. Reports over the radio that “the Bradley was on fire” resulted in Mr. Schwarz and the crew rapidly exiting the Bradley. Mr. Schwarz sustained physical injuries from the pressures of the blast and concussive forces of the explosion.

920. The weapons used to attack and injure Mr. Schwarz in the August 13, 2005 Terrorist Attack were Iranian-manufactured EFPs provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

921. As a result of the August 13, 2005 Terrorist Attack, Mr. Schwarz underwent medical treatment at Camp Buehring in Kuwait; Winn Army Community Hospital, Ft. Stewart, Georgia; North Chicago VA, Chicago, Illinois; and Northern Illinois Medical Center, McHenry, Illinois. He will require further treatment and care.

922. As a result of the August 13, 2005 Terrorist Attack, Mr. Schwarz sustained physical injuries from the forces of the explosion including being dazed or disoriented from the

blast, headaches, tinnitus or ringing in his ears, and TBI. He also sustained significant emotional and psychological injuries due to his proximity to the concussive blast forces of the explosion, including, but not limited to, PTSD, anxiety, depression, social anxiety disorder, nightmares, and insomnia.

923. As a result of the August 13, 2005 Terrorist Attack and the injuries he suffered, Brad Lee Schwarz has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

924. Mr. Schwarz has received a disability rating of 100% by the Veteran's Administration.

### FF. THE APRIL 19, 2005 ATTACK – ROUTE MIDLAND

#### 1. Plaintiff Antonio Martinez Frederick

925. Plaintiff Antonio Martinez Frederick is a citizen of the United States and is domiciled in the State of Mississippi.

926. On the morning of April 19, 2005, Antonio Martinez Frederick, age 33, was serving as a peacekeeping serviceman and Infantryman in the U.S. Army, 155 Brigade. At the time, Mr. Frederick held the rank of Sergeant, E-5.

927. On April 19, 2005, Mr. Frederick's unit, stationed at FOB Lima, was in a convoy proceeding to FOB Dogwood on Route Midland. The unit was hit by two explosions, with one explosion hitting the Humvee vehicle in front of Mr. Frederick's vehicle. Mr. Frederick saw one of the men from the exploded Humvee on fire and without an arm. They had to put the fire out with dirt. Mr. Frederick's unit had to set up a perimeter for defense because they were getting fired upon. During the attack, Mr. Frederick pulled out an injured member of the unit trapped inside the exploded Humvee. Mr. Frederick injured his back during the attack and was severely

traumatized by seeing his fellow servicemember on fire. The other injured servicemember that Mr. Frederick pulled out of the Humvee later died of his injuries.

928. The weapon used in the April 19, 2005 Terrorist Attack that resulted in injury to Mr. Frederick was an IEDs provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

929. As a result of the April 19, 2005 Terrorist Attack, Mr. Frederick sustained significant and permanent injuries, including back injury, depression, isolation, anxiety, PTSD, and TBI.

930. As a result of the April 19, 2005 Terrorist Attack and the injuries he suffered, Antonio Martinez Frederick has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

931. Mr. Frederick has received a disability rating of 100% by the Veteran's Administration.

## GG. THE APRIL 18TH 2005 ATTACK – KARBALA

### 1. Plaintiff Wyman Harrell Jones

932. Plaintiff Wyman Harrell Jones is a citizen of the United States and is domiciled in the State of Florida.

933. On the morning of April 18, 2005, Wyman Harrell Jones, age 42, was serving as a peacekeeping serviceman as a Cannon Crewmember in the U.S. Army, 2nd Platoon, A Battery, 114th Field Artillery Regiment, for the 2nd Battalion in the 155th Armor Brigade Combat Team at FOB Lima in Karbala. At the time, Mr. Jones held the rank of Sergeant, E-5.

934. On April 18th, 2005, Mr. Jones' unit was traveling down the road toward Iskandariyah in an armor-plated Humvee when they turned down a road into the desert. Mr.

Jones was in the third vehicle of a five-vehicle convoy. As they were traveling, an IED exploded next to the vehicle. The blast blew Mr. Jones, who had been sitting on the right side of the back seat, out of the vehicle. His legs, back, arms, face, thighs and hands were on fire. When he regained consciousness, he realized he was throwing sand on himself to extinguish the fire. Other service members assisted in extinguishing his body.

935. The weapon used to attack and injure Mr. Jones was an IED provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

936. As a result of the April 18, 2005 Terrorist Attack, Mr. Jones sustained significant injuries. He received third degree burns over 31% of his body, first degree burns over 8% of his face, a broken humerus, torn rotator cuff, nerve damage in his left leg and left arm, TBI, fractured back, smoke damage to his lungs, and optic nerve damage in both eyes. The percussive nature of the blast also damaged his hearing.

937. Mr. Jones was given morphine at the scene of the attack for his immense pain. Within five days, around the 23rd of April, he arrived at Brook Army Medical Center for the first of many surgeries, including skin grafts, rods placed in his arm, and bone removed from his shoulder to repair the rotator cuff. Mr. Jones still requires extensive medical care. He now relies on hearing aids, is required to have a CAT scan done yearly to check on the smoke damage in his lungs, and once every three months he has to travel to Virginia to see a primary care doctor for his PTSD.

938. As a result of the April 18, 2005 Terrorist Attack and the injuries he suffered, Wyman Harrell Jones has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

939. Mr. Jones has received a 100% disability rating by the Veterans Administration.

## HH. THE JANUARY 1, 2005 ATTACK – HADITHA

### 1. Plaintiffs The Kuniholm Family

940. Plaintiff Jonathan F. Kuniholm is a citizen of the United States and is domiciled in the State of Oregon.

941. On the morning of January 1, 2005, Jonathan F. Kuniholm, age 33, was serving as a peacekeeping serviceman in the U.S. Marine Corps as the Engineer Officer in charge of 2nd Platoon, Charlie Company, 4th Combat Engineer Battalion attached to 1st Battalion 23rd Marines. At the time, Mr. Kuniholm held the rank of Captain, O-3.

942. On January 1, 2005, Mr. Kuniholm and his fellow Marines were stationed in Haditha, Iraq and tasked with providing convoy security to maintain supply lines between Baghdad and Camp Anaconda and with conducting engineering operations for security, mobility and counter-mobility of the infantry battalion.

943. On this date, Mr. Kuniholm was with the small craft platoon, headed south on the Euphrates River. The unit was responding to a report of small arms fire against a patrol in the area. The unit dismounted their boats and continued by foot on the western shore of the Euphrates. The platoon arrived at the site on the bank from which the previous patrol had been attacked with small arms. At this point, Mr. Kuniholm noticed an olive oil can sitting on top of a wall in the middle of the clearing. As he pointed at the can and informed the Lieutenant, the can was remotely detonated, causing a massive explosion. The shrapnel from the blast nearly severed his right arm, blew apart his rifle, and penetrated his body armor, wounding his right side. Following the explosion, the unit was attacked in a sophisticated L-shaped ambush, with shooters lined up along the south and west side of the clearing. Taking multi-directional fire from small arms and rocket propelled grenades, the Marines returned fire.

944. The weapon used to attack and injure Mr. Kuniholm during the January 1, 2005 Terrorist Attack was an IED provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

945. The Iranian-supported Foreign Terrorist Organization known as AAI was operating in the area around Haditha, and has claimed responsibility for attacks against U.S. Forces at and near the time of the attack that injured Mr. Kuniholm.

946. The tactics, techniques, and procedures ("TTP") employed in the attack against Mr. Kuniholm were taught to Ansar al Islam terrorists by the Iranian Qods Force and Hezbollah in training camps in Iran.

947. AAI was responsible for the January 1, 2005 Terrorist Attack that injured Mr. Kuniholm.

948. Mr. Kuniholm was evacuated by helicopter and taken to Al Asad Hospital where his right arm was amputated. The next day, Mr. Kuniholm was sent to the field hospital at Balad Air Force Base, Landstuhl, Germany, then Bethesda, Maryland, and finally Durham, North Carolina, for further medical treatment related to this Terrorist Attack.

949. Mr. Kuniholm will require further medical treatment and care as a result of the January 1, 2005 Terrorist Attack.

950. As a result of the January 1, 2005 Terrorist Attack and the injuries he suffered, Jonathan F. Kuniholm has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

951. Mr. Kuniholm has received a disability rating of 100% by the Veteran's Administration.

952. Plaintiff Michele Terese Quinn is a citizen of the United States and is domiciled in the State of Oregon. She is the wife of Jonathan F. Kuniholm.

953. Plaintiff S.K., a minor, represented by his legal guardians Jonathan F. Kuniholm and Michele Terese Quinn, is a citizen of the United States and is domiciled in the state of Oregon. He is the son of Jonathan F. Kuniholm and Michele Terese Quinn.

954. Plaintiff Bruce Kuniholm is a citizen of the United States and is domiciled in the State North Carolina. He is the father of Jonathan F. Kuniholm.

955. Plaintiff Elizabeth Kuniholm is a citizen of the United States and is domiciled in the State of North Carolina. She is the mother of Jonathan F. Kuniholm.

956. Plaintiff Erin Kuniholm is a citizen of the United States and is domiciled in the State of Oregon. She is the sister of Jonathan F. Kuniholm.

957. As a result of the January 1, 2005 Terrorist Attack and the injuries suffered by Jonathan F. Kuniholm, Plaintiffs Michele Terese Quinn, S. K., a minor, Bruce Kuniholm, Elizabeth Kuniholm, and Erin Kuniholm have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services.

## II. THE DECEMBER 21, 2004 ATTACK – FOB MAREZ, MOSUL

958. On December 21, 2004, a suicide bomber entered the mess hall and approached a large group of U.S. soldiers, detonating himself and killing twenty-two people. At the time, this was the single deadliest suicide attack on American soldiers in Iraq, with fourteen soldiers killed. Seventy-two other personnel were injured in the attack carried out by a suicide bomber wearing an explosive vest and the uniform of the Iraqi security services. All the victims were in or near the Dining Hall at the FOB located next to the main U.S. military airfield at Mosul.

959. The Iranian-supported Foreign Terrorist organization Ansar al-Islam immediately

claimed responsibility for the attack. In its claim of responsibility, Ansar al Islam said the suicide bomber was a 24-year-old man from Mosul who worked at the base for two months and had provided information about the base to the group.

960. Moreover, in subsequent sworn Detainee Statements, individuals with knowledge of the planning and preparation of the attack, as well as those considered responsible for its coordination, admitted that they were members of the Foreign Terrorist Organization Ansar al Islam (a/k/a Ansar al Sunna).

961. The bomber entered the mess hall and approached a large group of U.S. soldiers, detonating himself and killing twenty-two people. At the time, this was the single deadliest suicide attack on American soldiers, with fourteen soldiers killed.

962. Weeks before the attack, soldiers from the base intercepted a document that mentioned a proposal for a massive "Beirut"-type attack on U.S. forces. The reference was to the techniques, tactics, and procedures utilized in the 1983 Beirut barracks bombing funded by Iran and committed by Hezbollah and Iranian MOIS agents.

963. The weapon used in the December 21, 2004 Terrorist Attack to injure or kill the victims was provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

964. The training, tactics, and procedures employed in the December 21, 2004 Terrorist Attack were taught to Iranian-funded and Iranian-trained terror operatives in Iraq.

**1. Plaintiffs The Ruhren Family**

965. Plaintiff David Alan Ruhren was a citizen of the United States and was domiciled in the State of Virginia at the time of his death.

966. On the morning of December 21, 2004, David Alan Ruhren, age 20, was serving as a peacekeeping serviceman and Combat Engineer in the U.S. Army National Guard, 276th

Engineer Battalion, Charlie Company. At the time, Mr. Ruhren held the rank of Sergeant, E-5.

967. Mr. Ruhren was standing in line with others in his unit at the mess hall getting food to take with them on a mission. An individual disguised as an Iraqi officer walked in, sat down, and detonated a suicide bomb. Mr. Ruhren sustained mortal injuries as a result of the explosion.

968. Plaintiff Sonja Ruhren is a citizen of the United States and is domiciled in the state of Virginia. She is the mother of David Alan Ruhren.

969. Plaintiff Sonja Ruhren, brings an action individually, and on behalf of the Estate of David Alan Ruhren, and all heirs thereof, as its legal representative.

970. As a result of the December 21, 2004 Terrorist Attack and the injuries suffered by, and death of, David Alan Ruhren, Plaintiff Sonja Ruhren has experienced, and continues to experience, severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice, and counsel.

**2. Plaintiff Mark Joseph Pratt**

971. Plaintiff Mark Joseph Pratt is a citizen of the United States and is domiciled in the State of Virginia.

972. On the morning of December 21, 2004, Mark Joseph Pratt, age 39, was serving as a peacekeeping serviceman and Combat Engineer in the U.S. Army National Guard, 276th Engineer Battalion, Charlie Company. At the time, Mr. Pratt held the rank of Staff Sergeant, E-6. Mr. Pratt served in both the United States Army and Marine Corps. When honorably discharged from the U.S. Marine Corps, Mr. Pratt held the rank of Corporal, E-4.

973. Mr. Pratt reported to the mess hall for lunch. After sitting down with his food, the explosion tore through the dining area. The explosion killed two people next to Mr. Pratt, and knocked Mr. Pratt unconscious.

974. As a result of the December 21, 2004 Terrorist Attack, Mr. Pratt sustained significant injuries due to the concussive blast forces, including TBI, and injuries to his back and left hip. Mr. Pratt also suffers from PTSD.

975. Mr. Pratt underwent extensive medical treatment for both his physical and psychological injuries, including surgery on his back.

976. As a result of the December 21, 2004 Terrorist Attack and the injuries he suffered, Mark Joseph Pratt has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

977. Mr. Pratt has received a disability rating of 100% by the Veteran's Administration.

**3. Plaintiff Evan Wayne Byler**

978. Plaintiff Evan Wayne Byler is a citizen of the United States and is domiciled in the State of Idaho.

979. At the time of the December 21, 2004 Terrorist Attack, Evan Wayne Byler, age 27, was serving as a peacekeeping serviceman and Unit Supply Specialist in the U.S. Army National Guard, 276th Engineer Battalion. At the time, Mr. Byler held the rank of Sergeant, E-5.

980. Mr. Byler was present in the mess hall when the suicide bomber detonated the explosive device. The explosion knocked Mr. Byler unconscious.

981. As a result of the December 21, 2004 Terrorist Attack, Mr. Byler sustained significant injuries due to the concussive blast forces, including TBI with seizure disorder, speech aphasia, and short-term memory loss. Mr. Byler also suffers from migraine headaches, insomnia, anxiety, and various side-effects from seizure medication prescribed as a result of these injuries.

982. Mr. Byler has received medical treatment at St. Alphonsus Hospital, Nampa, Idaho; VA Medical Centers in Boise, Idaho; and in Martinsburg, Virginia, and continues to seek treatment at VA Medical Centers for his seizures and complications relating to his TBI and PTSD.

983. As a result of the December 21, 2004 Terrorist Attack and the injuries he suffered, Evan Wayne Byler has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

984. Mr. Byler has received a disability rating of 100% by the Veteran's Administration.

**4. Plaintiff Teray Anton Bundy**

985. Plaintiff Teray Anton Bundy is a citizen of the United States and is domiciled in the State of Virginia.

986. On December 21, 2004, Mr. Bundy, age 22, was serving as a peacekeeping serviceman as a Light Wheel Mechanic in the U.S. Army National Guard, 276th Engineer Battalion, Charlie Company. At the time, Mr. Bundy held the rank of Specialist, E-4.

987. On December 21, 2004, Mr. Bundy was present near the mess hall when the explosion tore through the dining area. Mr. Bundy was hit by the concussive forces of the explosions, and witnessed the devastating damage and the aftermath. Despite suffering from shock and confusion, Mr. Bundy provided first aid to the injured.

988. As a result of the December 21, 2004 Terrorist Attack, Mr. Bundy sustained significant emotional and psychological injuries due to his proximity to the explosion including PTSD, flashbacks, nightmares, and frequent intense migraine headaches.

989. Mr. Bundy underwent medical treatment for his injuries and will require further

treatment and care due the injuries caused by the December 21, 2004 Terrorist Attack.

990. As a result of the December 21, 2004 Terrorist Attack and the injuries he suffered, Teray Anton Bundy has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

991. Mr. Bundy has received a disability rating of 50% by the Veteran's Administration.

**5. Plaintiff Jeff McKinley Wright**

992. Plaintiff Jeff McKinley Wright is a citizen of the United States and is domiciled in the State of Virginia.

993. On December 21, 2004, Mr. Wright, age 20, was serving as a peacekeeping serviceman as a Combat Engineer in the U.S. Army National Guard, 276th Engineer Battalion, Charlie Company. At the time, Mr. Wright held the rank of Specialist, E-4.

994. On December 21, 2004, Mr. Wright was present in the mess hall when the suicide bomber detonated the explosive device. The explosion threw Mr. Wright approximately 20 feet and knocked him to the ground. As the smoked cleared, Mr. Wright took action and began assisting with the injured. After helping evacuate several of his fellow soldiers, Mr. Wright grew weak and faint. At this time, he realized that he had been hit by shrapnel in the stomach and legs. Upon realizing the extent of his wounds, Mr. Wright was ordered to evacuate with the other wounded.

995. As a result of the December 21, 2004 Terrorist Attack, Mr. Wright sustained significant injuries due to the concussive blast forces, including shrapnel wounds in his stomach, chest, and legs. He suffered a right ankle injury and now suffers from progressive hearing loss.

996. Mr. Wright underwent medical treatment to remove the shrapnel from his body. A

total of twenty-four pieces of shrapnel were found and removed from his stomach and legs.

997. As a result of the December 21, 2004 Terrorist Attack and the injuries he suffered, Jeff McKinley Wright has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

998. Mr. Wright has received a disability rating of 60% by the Veteran's Administration.

**6. Plaintiffs The Turay Family**

999. Plaintiff Brima Charles Turay is a citizen of the United States and is domiciled in the State of Virginia.

1000. Mr. Turay, age 21, was serving as a peacekeeping serviceman as a Combat Engineer in the U.S. Army National Guard, 276th Engineer Battalion, Alpha Company. At the time of the December 21, 2004 Terrorist Attack, Mr. Turay held the rank of Specialist, E-4.

1001. On December 21, 2004, Mr. Turay was walking to the mess hall and, as he was nearing the facility, the suicide bomber detonated the explosive device. After the explosion and in the chaos, Mr. Turay attempted to provide first aid to others injured, including the squadron leader.

1002. As a result of the December 21, 2004 Terrorist Attack, Mr. Turay sustained significant emotional and psychological injuries due to the concussive blast forces of the explosion, including, but not limited to, psychological injuries, PTSD, nightmares, reenactments, night sweats, headaches, insomnia, depression, anxiety, and other severe psychological and emotional complications.

1003. As a result of the injuries sustained by him during the December 21, 2004 Terrorist Attack, Mr. Turay has undergone counseling, therapy classes for treatment of PTSD,

and was prescribed medication at Washington D.C. Veterans Affairs Medical Center.

1004. As a result of the December 21, 2004 Terrorist Attack and the injuries he suffered, Brima Charles Turay has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1005. Mr. Turay has received a disability rating of 70% by the Veteran's Administration.

1006. Plaintiff Ruth Turay is a citizen of the United States and is domiciled in the State of Maryland. She is the mother of Brima Charles Turay.

1007. As a result of the December 21, 2004 Terrorist Attack and the injuries suffered by Brima Charles Turay, Plaintiff Ruth Turay has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of consortium, and past and future economic damages, including loss of services.

**7. Plaintiff Daniel Bivens**

1008. Plaintiff Daniel Bivens is a citizen of the United States and is domiciled in the State of Tennessee.

1009. On the afternoon of December 21, 2004, Daniel Bivens, age 21, was serving as a peacekeeping serviceman in the U.S. Army as a Unit Supply Specialist in Alpha Company, 1st Battalion 24th Infantry Regiment, 1st Brigade, 25th Infantry Division. At the time, Mr. Bivens held the rank of Private First Class, E-3.

1010. On December 21, 2004, Mr. Bivens was in the dining hall when an Iranian-affiliated suicide bomber detonated an explosive device and the explosion tore through the dining area. The explosion knocked Mr. Bivens unconscious and killed his Company Commander sitting at the table next to him.

1011. The weapon used to attack and injure Mr. Bivens was an Iranian-manufactured IED provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

1012. The terrorist group known as AAI has claimed responsibility for the December 21, 2004 Terrorist Attack that resulted in injury to Mr. Bivens.

1013. As a result of the December 21, 2004 Terrorist Attack, Mr. Bivens sustained significant injuries due to the concussive blast forces, including TBI, and injuries to his right knee. Mr. Bivens also suffers from PTSD, short and long-term memory loss, and sensitivity to light and loud noises.

1014. Mr. Bivens was treated at the VA for his injuries sustained in the December 21, 2004 attack.

1015. As a result of the December 21, 2004 Terrorist Attack and the injuries he suffered, Daniel Bivens has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1016. Mr. Bivens has received a disability rating of 70% by the Veteran's Administration.

**8. Plaintiffs The Collins Family**

1017. Plaintiff Quentin D. Collins is a citizen of the United States and is domiciled in the State of New Mexico.[97]

1018. On December 21, 2004, Quentin D. Collins, age 46, was serving as a peacekeeping serviceman in the U.S. Air Force as a Chaplain in the 822 Special Operations Forces, Joint Special Operations Command. At the time, Mr. Collins held the rank of Captain,

[97] Plaintiff Quentin D. Collins was also injured in the above-mentioned April 8, 2008 attack.

O-4.

1019. On December 21, 2014, Quentin D. Collins was waiting to enter the dining facility (DFAC) at FOB Marez, Mosul, Iraq when an Iranian-affiliated suicide bomber detonated an explosive device in the DFAC. After the explosion, he entered the DFAC to assist in rendering aid. Approximately 1 to 1 ½ hours later he was counseling the injured who had been transported to the hospital at FOB Diamondback which was located next to FOB Marez. While talking with injured soldiers, Mr. Collins heard several mortar strikes inside FOB Diamondback coming closer to his location. A mortar hit approximately five meters behind him. The explosion knocked him unconscious and shrapnel struck his lower back below his body armor. Between the time of the suicide bomber attacking the DFAC and the mortar attack, there was a small arms attack on the gate of FOB Diamondback. It was the conclusion of the command that all three attacks had been coordinated.

1020. The weapon(s) used to attack and injure Mr. Collins on December 21, 2004 were Iranian-manufactured Mortars provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

1021. The terrorist group known as Ansar al Islam has claimed responsibility for the December 21, 2004 Terrorist Attack that resulted in injury to Mr. Collins.

1022. As a result of the December 21, 2004 Terrorist Attack, Mr. Collins sustained significant injuries due to the concussive blast forces, including loss of consciousness, TBI, PTSD, including experiencing dreams, flashbacks, haunted by carnage and smells, consideration of suicide, depression, etc.

1023. Mr. Collins was initially treated at Air Force Theatre Hospital and underwent back surgery for a fractured back due to the attack. He was then transferred to Landstuhl,

Germany and began extensive medical treatment including surgery and physical therapy. Mr. Collins continues to receive treatment for the permanent injuries he sustained during the attack.

1024. As a result of the December 21, 2004 Terrorist Attack and the injuries he suffered, Quentin D. Collins has experienced, and continues to experience, severe physical and mental anguish and extreme emotional pain and suffering.

1025. Mr. Collins has received a disability rating of 100% by the Veteran's Administration.

1026. Plaintiff Melida Collins is a citizen of the United States and is domiciled in the State of New Mexico. She is the wife of Quentin D. Collins.

1027. Plaintiff Siera Nicole Collins is a citizen of the United States and is domiciled in the State of California. She is the daughter of Quentin D. Collins.

1028. Plaintiff Shawn Christopher Alan Collins is a citizen of the United States and is domiciled in the State of New Mexico. He is the son of Quentin D. Collins.

1029. Plaintiff Michael Anthony Collins is a citizen of the United States and is domiciled in the State of New Mexico. He is the son of Quentin D. Collins.

1030. Plaintiff I.C.C., a minor, is a citizen of the United States and is domiciled in the State of New Mexico. He is the minor son of Quentin D. Collins.

1031. As a result of the December 21, 2004 Terrorist Attack and the injuries suffered by Quentin D. Collins, Plaintiffs Melida Collins, Siera Nicole Collins, Shawn Christopher Alan Collins, Michael Anthony Collins, and I.C.C., a minor, have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of consortium, and past and future economic damages, including loss of services.

### JJ. THE NOVEMBER 24, 2004 ATTACK - BAGHDAD

#### 1. Plaintiffs The Fondren Family

1032. Plaintiff Jay Myrle Fondren is a citizen of the United States and is domiciled in the State of Texas.

1033. On the November 24, 2004, Jay Myrle Fondren, age 24, was serving as a peacekeeping serviceman and Fire Support Specialist in the U.S. Army, Charlie Troop 10th Calvary, 1st Brigade of the 1st Calvary Division. At the time, Mr. Fondren held the rank of Staff Sergeant, E-6.

1034. On November 24, 2004, Mr. Fondren's unit was doing route security on Route Pluto and Route Oilers on the outskirts of Sadr City, across from the UN building at the time. Mr. Fondren's Humvee was the second vehicle and they were returning from patrol when the Humvee hit a daisy chain of IEDs. The first IED contained ball-bearings and the second was plater charged. Following the blast, he called that he was hurt and was pulled from the Humvee. His fellow soldiers began to remove their belts to use as tourniquets and he looked down and saw both of his legs were missing below his cargo pockets.

1035. The weapon used to attack and injure Mr. Fondren was an IED provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

1036. As a result of the November 24, 2004 Terrorist Attack, Mr. Fondren sustained significant, physical, psychological, and life altering injuries. Mr. Fondren lost his right leg up to the hip and left leg above the knee. His right thumb had to be amputated, he sustained a right elbow fracture, and now has limited use of his right hand. Mr. Fondren has muscular, vascular and soft tissue damage on both arms. He was diagnosed with TBI, with blurred vision and auditory processing issues. Mr. Fondren also suffered a collapsed lung from the blast and now has chronic bronchitis.

1037. Following the attack, Mr. Fondren, was rushed back to the Green Zone where he

was taken by Medevac to Germany and then finally Walter Reed Hospital where he was sedated and unconscious for 21 days. He had to undergo extensive healthcare treatment for his injuries, including over 60 surgeries while he spent time as an inpatient at Walter Reed for nine months.

1038. As a result of the November 24, 2004 Terrorist Attack and the injuries he suffered, Jay Myrle Fondren has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1039. Mr. Fondren has received a disability rating of 100% by the Veteran's Administration.

1040. Plaintiff, Anne Hollingsworth Fondren, is a citizen of the United States and is domiciled in the state of Texas. She is the spouse of Jay Myrle Fondren.

1041. Plaintiff, M.J.F., a minor, is a citizen of the United States and is domiciled in the state of Texas. He is the child of Jay Myrle Fondren.

1042. As a result of the November 24, 2004 Terrorist Attack and the injuries suffered by Jay Myrle Fondren, Plaintiffs Anne Hollingsworth Fondren and M.J.F. have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of consortium, and past and future economic damages, including loss of services.

## KK. THE NOVEMBER 9, 2004 ATTACK – ISKANDARIYA

### 1. Plaintiffs The Nolte Family

1043. Plaintiff Nicholas S. Nolte was a citizen of the United States and is domiciled in the State of Nebraska at the time of his death.

1044. On the morning of November 9, 2004, Nicholas S. Nolte, age 25, was serving as a peacekeeping serviceman in the 2nd Low Altitude Air Defense Battalion, 2nd Marine Aircraft Wing, Marine Expeditionary Force, U.S. Marine Corps. At the time, Mr. Nolte held the rank of

Sergeant, E-5.

1045. Prior to his service in Iraq, Mr. Nolte served in the Presidential Helicopter Squadron HMX-1, guarding both President George W. Bush and President Bill Clinton.

1046. On November 9, 2004, Mr. Nolte was stationed at FOB Kalsu, in Iskandariya, Iraq. Mr. Nolte was traveling in a HMMWV that was hit by a “daisy chain” IED that was remote detonated by three individuals later determined to be responsible for the Terrorist Attack.

1047. Mr. Nolte was gravely injured. He was medically evacuated from the scene to a field hospital in Baghdad, Iraq. On November 11, 2004, Mr. Nolte was medevac’d to the U.S. Army Medical Center, in Lundstuhl, Germany. On November 19, 2004, Mr. Nolte was transported to the National Naval Medical Center in Bethesda, Maryland.

1048. On November 24, 2004, Mr. Nolte died as result of his wounds.

1049. The weapon used to attack and kill Mr. Nolte on November 9, 2004 was an IED provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

1050. The Special Group known as KH was operating in the area around FOB Kalsu and has claimed responsibility for attacks against U.S. Forces at the time of the attack that killed Mr. Nolte.

1051. KH perpetrated the Terrorist Attack that resulted in Plaintiff Nicholas S. Nolte’s injuries and resultant death.

1052. Plaintiff Melina Rose Nolte is a citizen of the United States and is domiciled in the state of Colorado. She is the widow of Nicholas S. Nolte.

1053. Plaintiff Melina Rose Nolte brings an action individually, and on behalf of the Estate of Nicholas S. Nolte, and all heirs thereof, as its legal representative.

1054. Plaintiff A.N., a minor, represented by her legal guardian Melina Rose Nolte, is a

citizen of the United States and is domiciled in the state of Colorado. She is the daughter of Melina Rose Nolte and Nicholas S. Nolte.

1055. Plaintiff Anita Nolte is a citizen of the United States and is domiciled in the state of Nebraska. She is the mother of Nicholas S. Nolte.

1056. Plaintiff Jessica Nolte is a citizen of the United States and is domiciled in the state of Nebraska. She is the sister of Nicholas S. Nolte.

1057. As a result of the November 9, 2004 Terrorist Attack and the injuries suffered by, and the resulting death of, Nicholas S. Nolte, Plaintiffs Melina Nolte, A.N., a minor, Anita Nolte, and Jessica Nolte have severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of Nicholas N. Nolte's society, services, companionship, comfort, protection, instruction, advice and counsel, loss of earnings, income, and net accumulation to the estate of Nicholas N. Nolte.

## LL. THE AUGUST 16, 2004 ATTACK – SADR CITY, BAGHDAD

### 1. Plaintiff David Allen Simmons II

1058. Plaintiff David Allen Simmons II is a citizen of the United States and is domiciled in the State of Alabama.

1059. On the evening of August 16, 2004, David Allen Simmons II, age 20, was serving as a peacekeeping serviceman and Tank Crew Member in the U.S. Army, Alpha Company 1st Battalion 12th Cavalry, 1st Calvary Division. At the time, Mr. Simmons held the rank of Private First Class, E-3.

1060. On August 16, 2004, Mr. Simmon's unit was stationed at FOB Eagle, in the northeast corner of Sadr City, Baghdad, Iraq. During a neighborhood patrol, Mr. Simmons was in the loader seat of an M-1 A-2 SEP Abrams tank. During the patrol, an RPG pierced the turret of the tank, went through the gunner display, and exploded inside the tank, hitting the gunner, the

tank commander, and Mr. Simmons with shrapnel and filling the tank with smoke.

1061. The weapon used to attack and injure Mr. Simmons was an Iranian-manufactured or supplied RPG provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

1062. The Iranian-supported Special Group JAM was operating in the area at the time of the August 16, 2004 Terrorist Attack, and committed the attack that injured Mr. Simmons.

1063. As a result of the August 16, 2004 Terrorist Attack, Mr. Simmons sustained significant and permanent injuries. As a result of the RPG explosion, Mr. Simmons was hit with shrapnel in the back of his head, hairline, and wrists. He suffered from smoke inhalation and depleted uranium exposure while repairing the damage done to his tank. He also suffers from chronic PTSD, adjustment disorder, and anxiety disorder as a result of the attack.

1064. Mr. Simmons was treated for smoke inhalation on-site of the attack, as well as medical treatment for the shrapnel in head and wrists.

1065. As a result of the August 16, 2004 Terrorist Attack and the injuries he suffered, David Allen Simmons II has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1066. Mr. Simmons has received a disability rating of 40% by the Veteran's Administration.

## MM. THE JUNE 29, 2004 ATTACK – CAMP FALLUJAH

### 1. Plaintiffs The Mills Family

1067. Plaintiff Hardy Pierce Mills IV is a citizen of the United States and is domiciled in the State of Texas.

1068. On the morning of June 29, 2004, Hardy Pierce Mills IV, age 19, was serving as a

peacekeeping serviceman in the U.S. Marine Corps as a Truck Driver with the 1st Marine Division, 1st Marine Expeditionary Force/Marine Headquarters Group. At the time, Mr. Mills held the rank of Lance Corporal, E-3.

1069. Mr. Mills was inside the motor pool doing maintenance on a gun truck in Camp Fallujah when an incoming mortar round landed in front of the truck. Mr. Mills sustained a direct strike to his body from the mortar fire. He sustained significant injuries as a result of the mortar fire.

1070. Mr. Mills was transported immediately to the hospital in Camp Fallujah. He suffered massive blast injuries and had shrapnel lodged in his left side, a collapsed lung, a lacerated spleen, severed arteries in his leg, and other serious injuries. He was medically evacuated to Baghdad Hospital and then transported to Landstuhl Medical Center in Germany for emergency surgery to stabilize and treat his injuries. He was then returned stateside to Bethesda Naval Medical Center and underwent additional surgeries, blood transfusions, skin grafts, surgical repair of severed arteries, application of a wound vac for infection, and other treatment.

1071. As a result of the June 29, 2004 Terrorist Attack, Mr. Mills sustained significant injuries including severed arteries in both legs which causes pain, nerve pain, and inability to stand and walk for long periods of time. He also has significant injuries to his left arm. He is totally disabled for both lower extremities and uses a wheelchair approximately 40% to 50% of the time. He also sustained psychological injuries including, PTSD, depression, anxiety attacks, etc.

1072. The weapon used to attack and injure Mr. Mills on June 29, 2004 was a mortar provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

1073. As a result of the June 29, 2004 Terrorist Attack, and the injuries he suffered, Hardy Pierce Mills IV, has incurred past and future noneconomic damages, including severe physical and mental pain and suffering, disability, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1074. Mr. Mills has received a disability rating of 100% by the Veteran's Administration.

1075. Plaintiff Cathy Jean Mills is a citizen of the United States and is domiciled in the State of Texas. She is the mother of Hardy Pierce Mills IV.

1076. Plaintiff Jacob Mills is a citizen of the United States and is domiciled in the State of Texas. He is the brother of Hardy Pierce Mills IV.

1077. Plaintiff Joshua Mills is a citizen of the United States and is domiciled in the State of Texas. He the brother of Hardy Pierce Mills IV.

1078. As a result of the June 29, 2004 Terrorist Attack and the injuries suffered by Hardy Pierce Mills IV, Plaintiffs Cathy Jean Mills, Jacob Mills, and Joshua Mills have incurred past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services.

## NN. THE JUNE 21, 2004 ATTACK – COMBAT OUTPOST APACHE

### 1. Plaintiff Arthur B. Stokenbury

1079. Plaintiff Arthur B. Stokenbury is a citizen of the United States and is domiciled in the State of Arkansas.

1080. On the morning of June 21, 2004, Arthur B. Stokenbury, age 28, was serving as a peacekeeping serviceman and an Infantryman in the U.S. Army National Guard, 4th Platoon,

Delta Company, 3rd Battalion, 153rd Infantry Regiment of the 1st Calvary Division, 39th Infantry. At the time, Mr. Stokenbury held the rank of Staff Sergeant, E-6.

1081. On June 21, 2004 Mr. Stokenbury's unit was on an escort mission for a civil affairs team. After concluding a meeting at Combat Outpost ("COP") Apache, and as he was walking back to report to his soldiers near his Humvee, a mortar exploded nearby. He was knocked to the ground but was able to then attempt to take cover when another mortar exploded nearby. Mr. Stokenbury was externally exposed to the blast forces of the explosions, the second of which caused him to lose consciousness, and he sustained physical injuries and concussive forces of the explosions.

1082. The weapons used to attack and injure Mr. Stokenbury were mortars provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

1083. As a result of the June 21, 2004 Terrorist Attack, Mr. Stokenbury sustained significant injuries including, but not limited to, shrapnel wounds to his neck, right shoulder, left leg, and cervical spine, loss of sense of smell, tinnitus or ringing in his ears, migraines and cognitive deficiencies due to TBI. His emotional and psychological injuries include, but are not limited to, PTSD, anxiety, depression, social anxiety disorder, and social and occupational impairment.

1084. As a result of the June 21, 2004 Terrorist Attack, Mr. Stokenbury underwent significant medical treatment in Baghdad and Germany, Walter Reed National Military Medical Center, Scott Air Force Base, Brooke Army Medical Center, Carl Darnell Army Medical Center, and continuing health care with various healthcare providers in Arkansas.

1085. As a result of the June 21, 2004 Terrorist Attack and the injuries he suffered, Arthur B. Stokenbury has past and future noneconomic damages, including severe physical and

mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1086. Mr. Stokenbury has received a disability rating of 90% by the Veteran's Administration.

### OO. THE APRIL 9, 2004 ATTACK – MARKET AREA OF BAIJI

#### 1. Plaintiff Domenick Jared Alagna

1087. Plaintiff Domenick Jared Alagna is a citizen of the United States and is domiciled in the State of Texas.

1088. On the afternoon of April 9, 2004, Domenick Jared Alagna, age 20, was serving as a peacekeeping serviceman in the U.S. Army, C-Battery 1st Battalion, 7th Field Artillery Regiment, 2nd Brigade, 1st Infantry Division as an Artilleryman. At the time, Mr. Alagna held the rank of Specialist, E-4.

1089. On April 9, 2004, Mr. Alagna and other soldiers in the Quick Response Force (QRF) Team went into Baiji and met with local police because they were told there would be riots. The local police advised that the riots would be on a road by the main market to the Mayor's house. They circled around behind where they were told the group of potential rioters would be. As Mr. Alagna's unit began to set up formation, they realized they had been set up to be ambushed. There were three RPG blasts and small arms fire from the street, windows, and rooftops toward the area where he and the other QRF members were located. One of the pieces of shrapnel pierced Mr. Alagna's body armor by his left kidney and destroyed that part of his body armor. Mr. Alagna was also hit with shrapnel on his left side from his helmet down to the bottom of his left leg. Several members of the QRF team were killed during the attack and others received significant injuries.

1090. The weapon used to attack and injure Mr. Alagna was an Iranian-

manufactured/supplied RPG provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

1091. The Iranian-supported Foreign Terrorist Organization known as AAI was operating in Biaji, and has claimed responsibility for attacks against U.S. Forces at and near the time of the attack that injured Mr. Alagna.

1092. The TTP employed in the attack against Mr. Alagna were taught to AAI terrorists by the Iranian Qods Force and Hezbollah in training camps in Iran.

1093. As a result of the April 9, 2004 Terrorist Attack, Mr. Alagna sustained significant injuries. Mr. Alagna sustained cuts on his left leg, and damage to his left knee, which left him unable to fully extend his knee, and in frequent pain. In addition, Mr. Alagna's back and hip are misaligned. Mr. Alagna also suffers from PTSD and anxiety as a result of the attack.

1094. In October 2004, Mr. Alagna received physical therapy on his left knee at Arifjan Hospital in Kuwait. In 2012 and 2014, Mr. Alagna received treatment for PTSD and anxiety at various VA facilities.

1095. As a result of the April 9, 2004 Terrorist Attack and the injuries he suffered, Domenick Jared Alagna has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1096. Mr. Alagna has received a disability rating of 40% by the Veteran's Administration.

## PP. THE DECEMBER 23, 2003 ATTACK – SADR CITY, BAGHDAD

### 1. Plaintiff Roger Lee Young

1097. Plaintiff Roger Lee Young is a citizen of the United States and is domiciled in the State of Kentucky.

1098. On the morning of December 23, 2003, Roger Lee Young, age 33, was serving as a peacekeeping serviceman and Calvary Scout/Sniper in the U.S. Army, Fox Troop 2nd Squadron 2nd Armored Calvary Regiment. At the time, Mr. Young held the rank of Specialist, E-3.

1099. On December 23, 2003, Mr. Young's unit was in Zone 71 South Baghdad, Sadr City in a three-truck convoy conducting route reconnaissance. Mr. Young was the gunner in the lead Humvee. During the reconnaissance, an IED explosion 20-25 feet away hit and disabled his Humvee and another Humvee. The explosion caused the 50-Cal gun to spin around and hit Mr. Young in the mouth, which loosened three teeth. The explosion also caused Mr. Young to sustain a concussion, black out, and injure his arm, shoulder, and neck. Mr. Young was spitting blood and required an immediate tooth extraction.

1100. The weapon used to attack and injure Mr. Young was an IED provided by Iran and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

1101. The Iranian-supported Special Group JAM was operating in Sadr City and has claimed responsibility for attacks against U.S. Forces at and near the time of the attack that injured Mr. Young.

1102. As a result of the December 23, 2003 Terrorist Attack, Mr. Young sustained significant and permanent injuries due to the explosion. Mr. Young suffered injuries to his left shoulder and arm, and neck. Mr. Young suffered a concussion and TBI. He further suffered from multiple tooth loss from being hit in the face and has a resulting speech impediment.

1103. Mr. Young's medical treatment included emergent treatment on the day of the explosion as well as additional and continuing treatment for physical therapy for his arm, shoulder, neck, and sleep apnea; physical therapy for neck/back pain; MRI; brain scans; neck

injections; carpal tunnel injections in hands and wrist; hand braces on both hands; back and left leg brace; chiropractic treatment for back, neck and spine; tooth extraction and dental treatment; as well as requiring four different types of ongoing medications.

1104. As a result of the December 23, 2003 Terrorist Attack and the injuries he suffered, Roger Lee Young has past and future noneconomic damages, including severe physical and mental pain and suffering, anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1105. Mr. Young has received a disability rating of 90% by the Veteran's Administration.

## QQ. THE DECEMBER 17, 2003 ATTACK – SADR CITY

### 1. Plaintiff Allen Ryan Vaught

1106. Plaintiff Allen Ryan Vaught is a citizen of the United States and is domiciled in the State of Texas.

1107. Around 8:00 a.m. on the morning of December 17, 2003, Allen Ryan Vaught, age 32, was serving as a peacekeeping serviceman in the U.S. Army Reserve as a Civil Affairs Specialist in the Civil Affairs Division – Psychological Operations for the 2nd Armored Cavalry Regiment, stationed at Forward Operating Base Marlboro. At the time, Mr. Vaught held the rank of Captain, O-3.

1108. Mr. Vaught's assignment included talking with local people and performing psychological operations against terrorism. On December 17, 2003, Mr. Vaught was second in a convoy of four military vehicles. The convoy was transporting two daughters of local tribal leaders to a medical facility. En route, the convoy was ambushed when two IEDs detonated, followed with sustained small arms fire.

1109. The weapon used to attack and injure Mr. Vaught was an IED provided by Iran

and/or its agents to Iranian-funded and Iranian-trained terror operatives in Iraq.

1110. Subsequent investigation into the attack revealed that the convoy's location and mission had been shared by the tribal leaders with JAM terrorists.

1111. The Iranian-supported Special Group JAM was operating in Sadr City and has claimed responsibility for attacks against U.S. Forces at and near the time of the attack that injured Mr. Vaught.

1112. As a result of the attack, Mr. Vaught suffered from several back injuries, a ruptured disc, hearing loss, and tinnitus. Along with these injuries, Mr. Vaught suffers from PTSD. He is still being treated for his injuries today.

1113. Mr. Vaught underwent two surgeries, first to fuse his back and the second to take out bone fragments. He still suffers years after the attack. Mr. Vaught no longer has full mobility, and simple actions such as driving, hearing, and social interactions have been severely impacted because of the attack.

1114. As a result of the December 17, 2003 Terrorist Attack and the injuries he suffered, Allen Ryan Vaught has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1115. Mr. Vaught has received a disability rating of 50% by the Veteran's Administration.

## VII. ALL OF THE TERRORIST ATTACKS WERE ACTS OF INTERNATIONAL TERRORISM

1116. At no time during the Relevant Period, nor due to actions of United States and Coalition Forces in Iraq, did the United States declare war or enact an Authorization for the use of military force against Iran, nor did the United States or Coalition Forces engage in an armed

conflict with the military forces of Iran, nor did Iran's military forces or their agents engage in lawful acts of war against Coalition Forces or U.S. nationals, including Plaintiffs.

1117. At no time relevant to this Action did the United States engage in an armed conflict with the military forces of Iran, nor did Iran's military forces or their agents engage in lawful acts of war against Coalition Forces and U.S. nationals, including Plaintiffs.

1118. At no time relevant to this Action did the operatives of Hezbollah, the IRGC, the IRGC-QF, the Special Groups, Ansar al Islam and/or other Iranian-sponsored terrorists who killed and injured Plaintiffs carry fixed distinctive signs recognizable at a distance, carry arms openly, conduct their operations in accordance with the laws and customs of war, or enjoy any form of combatant immunity for their acts.

1119. The specific attacks alleged herein were all carried out by terrorists and terrorist organizations, including designated FTOs, SDGTs, SDTs, and/or SDNs (all with the substantial and material support of Defendant), and not by armed forces of recognized governments or military forces.

1120. The conduct of Iran, IRGC, IRGC-QF, Hezbollah, Ansar al Islam, the Special Groups and/or other Iranian-supported terrorists, including the FTOs, SDGTs, SDTs, and/or SDNs, including those responsible for perpetrating the Terrorist Attacks which resulted in the injuries or deaths of Plaintiffs, violated the laws of armed conflict (including, e.g., AAH operatives masquerading as members of U.S. armed forces, targeting civilians and torturing and executing defenseless hostages), and the widespread and intentional attacks upon U.S. nationals (including Plaintiffs), British, Iraqi, and other civilians and United Nations personnel, constituted a substantial, rather than an incidental, part of their objectives and conduct.

1121. The deaths and injuries Plaintiffs sustained were not the result of, nor did they

occur in the course of, a declared war with Iran, or an armed conflict between the United States and Iran.

1122. The acts of the IRGC, IRGC-QF, Hezbollah, and/or the Special Groups (including the FTOs, SDGTs, SDTs, and/or SDNs responsible for perpetrating the Terrorist Attacks) that injured or killed Plaintiffs were acts of international terrorism within the meaning of 18 U.S.C. § 2331, involving violent acts intended to influence the United States and the United Nations by coercion (by coercing the withdrawal of Coalition Forces from Iraq) and to intimidate and coerce the Iraqi population, and were also acts constituting terrorist activities within the meaning of 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or engaging in terrorism within the meaning of 22 U.S.C. § 2656f.

1123. The acts of Iran, the IRGC, IRGC-QF, Hezbollah, Ansar al Islam, Special Groups and/or other Iranian-sponsored terrorists that injured the Plaintiffs were acts of torture, hostage taking and extrajudicial killing as defined by 28 U.S.C. §§ 1605A(h)(2) and 1605A(h)(7), and acts of international terrorism as defined by of 18 U.S.C. § 2331.

1124. The Terrorist Attacks at issue here were acts of international terrorism that were enabled by Defendant's provision of massive financial and material support and resources as defined by 28 U.S.C. § 1605A(h)(3) and 18 U.S.C. § 2339A, which caused the injuries to and/or deaths of Plaintiffs. Without Iran's provision of such material support, on the scale that such support was provided, the IRGC, IRGC-QF, Hezbollah, the Special Groups, Ansar al Islam and/or other Iranian proxies would not have been unable to conduct the thousands of acts of international terrorism on the scale and with the lethality they perpetrated, including the Terrorist Attacks, which caused the deaths, maiming, or otherwise injuring of Plaintiffs and Plaintiffs' family members.

## VIII. THE ACTS OF IRAN CAUSED PLAINTIFFS' INJURIES AND DEATHS

1125. As discussed herein, Iran has a long history of materially supporting the Special Groups and other terrorists, including the FTOs, SDGTs, SDTs, SDNs and/or other Iranian sponsored terrorist responsible for the Terrorist Attacks which killed or injured Plaintiffs. Simply put, Iran is no stranger to supporting terrorist attacks perpetrated by FTOs and other terrorist organizations against U.S. nationals with the intent to terrorize, kill or cause severe bodily and emotional harm.

1126. Here, Iran provided material support and resources to the Terrorist Groups and other individuals, including the FTOs, SDGTs, SDTs, SDNs and other terrorists who perpetrated the Terrorist Attacks which killed or injured Plaintiffs.

1127. Without Iran's support, the Terrorist Groups and other individuals and organizations, including the FTOs, SDGTs, SDTs, and/or SDNs responsible for the Terrorist Attacks which resulted in Plaintiffs being killed or injured would not have been able to carry out such Terrorist Attacks with the scale and lethality in which they were perpetrated.

## IX. CLAIMS FOR RELIEF

1128. Plaintiffs bring the following claims against Defendants.

### FIRST CLAIM FOR RELIEF

### AGAINST ALL DEFENDANTS ON BEHALF OF EACH PLAINTIFF IDENTIFIED HEREIN WHO SURVIVED AN ACT OF INTERNATIONAL TERRORISM FOR DEFENDANTS' MATERIAL SUPPORT TO ACTS OF EXTRAJUDICIAL KILLING, TORTURE AND HOSTAGE TAKING THAT RESULTED IN PERSONAL INJURY UNDER 28 U.S.C. § 1605A(c)

1129. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

1130. Iran is, and was at all times relevant, a State Sponsor of Terrorism within the meaning of § 1605A(h)(6).

1131. Plaintiffs identified in the foregoing paragraphs were grievously injured by Defendants' provision of material support (within the meaning of § 1605A(h)(3)) to Hezbollah, the IRGC, AQ, AAI and the Terrorist Groups who planned, conspired and provided substantial support to extrajudicial killings, attempted extrajudicial killings, torture and hostage takings that injured the Plaintiffs.

1132. As a direct and proximate result of the willful, wrongful, and intentional acts of the Defendants and their agents, Plaintiffs identified in the foregoing paragraphs were injured and endured severe physical injuries, extreme mental anguish, pain and suffering, loss of solatium, and economic losses including medical expenses and lost income.

1133. Plaintiffs' compensatory damages include, but are not limited to, their severe physical injuries, extreme mental anguish, pain and suffering, and any economic losses determined by the trier of fact.

1134. Defendants are jointly and severally liable for the full amount of Plaintiffs' compensatory damages, including physical injuries, extreme mental anguish, pain and suffering and any pecuniary loss.

1135. Defendants' acts in providing material support for acts of extrajudicial killing, torture, and hostage-taking were intended to inflict, and would reasonably result in, severe emotional distress on the Plaintiffs.

1136. Because Defendants and their Agents routinely relied upon and controlled MOIS, IRISL, Mahan Air, KAA, and/or the Iranian National Oil Company to provide material support to FTOs and Terrorist Groups or other terrorists, including those responsible for the Terrorist Attacks that resulted in maiming or injury to Plaintiffs, to advance the terrorist aims and objectives of each other, its agents and instrumentalities, and the FTOs, Special Groups, and

other terrorists, Defendants are equally and vicariously liable for the personal injuries caused by each other, and their agents, including MOIS, IRISL, Mahan Air, KAA, and the Iranian National Oil Company.

1137. The conduct of the Defendants and their Agents was criminal, outrageous, extreme, wanton, willful, malicious, a threat to international peace and security, and a threat to the public warranting an award of punitive damages against each Defendant pursuant to 28 U.S.C. § 1605A(c).

## SECOND CLAIM FOR RELIEF

### AGAINST ALL DEFENDANTS ON BEHALF OF THE ESTATES OF PLAINTIFFS IDENTIFIED HEREIN FOR DEFENDANTS' MATERIAL SUPPORT TO ACTS OF EXTRAJUDICIAL KILLING, TORTURE AND HOSTAGE TAKING THAT RESULTED IN WRONGFUL DEATH UNDER 28 U.S.C. § 1605A(c)

1138. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

1139. Iran is, and was at all times relevant, a State Sponsor of Terrorism within the meaning of § 1605A(h)(6).

1140. The Estates of Plaintiffs listed in the foregoing paragraphs assert claims on behalf of the decedents who were grievously injured by Defendants' provision of material support (within the meaning of § 1605A(h)(3)) to Hezbollah, the IRGC, MOIS, AQ, AAI and the Terrorist Groups who planned, conspired and provided substantial support to extrajudicial killings, attempted extrajudicial killings, torture and hostage takings that caused the Decedents' deaths.

1141. As a direct and proximate result of the willful, wrongful, and intentional acts of the Defendants and their agents, the Decedents listed in the foregoing paragraphs endured

physical injury, extreme mental anguish, and pain and suffering that ultimately lead to their deaths.

1142. Defendants are jointly and severally liable for the full amount of Plaintiffs' compensatory damages, including physical injuries, extreme mental anguish, pain and suffering and any pecuniary loss (or loss of income to the estates).

1143. Because Defendants and their Agents routinely relied upon and controlled MOIS, IRISL, Mahan Air, KAA, and the Iranian National Oil Company to provide material support to FTOs and Terrorist Groups or other terrorist organizations, including those FTOs, Special Groups, and other terrorist organizations responsible for the Terrorist Attacks that resulted in maiming or injury to Plaintiffs, to advance the terrorist aims and objectives of each other, its agents and instrumentalities, and the FTOs, Special Groups, and other terrorists, Defendants are equally and vicariously liable for the deaths caused by each other, and their agents, including MOIS, IRISL, Mahan Air, KAA, and the Iranian National Oil Company.

1144. The conduct of the Defendants and their Agents was criminal, outrageous, extreme, wanton, willful, malicious, a threat to international peace and security, and a threat to the public warranting an award of punitive damages against each Defendant pursuant to 28 U.S.C. § 1605A(c).

## THIRD CLAIM FOR RELIEF

### AGAINST ALL DEFENDANTS ON BEHALF OF THE FAMILIES OF PLAINTIFFS IDENTIFIED HEREIN AS INJURED OR KILLED AS A RESULT OF DEFENDANTS' MATERIAL SUPPORT TO ACTS OF EXTRAJUDICIAL KILLING, TORTURE AND HOSTAGE TAKING FOR LOSS OF SOLATIUM AND INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS UNDER 28 U.S.C. § 1605A(c)

1145. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

1146. Iran is, and was at all times relevant, a State Sponsor of Terrorism within the meaning of § 1605A(h)(6).

1147. Defendants' acts in providing material support for acts of extrajudicial killing, torture, and hostage-taking were intended to inflict severe emotional distress on the Plaintiffs.

1148. As a direct and proximate result of Defendants' acts, the families of individuals, identified in the foregoing paragraphs as injured or killed as a result of Defendants' acts in providing material support for acts of extrajudicial killing, torture, and hostage-taking, have suffered loss of solatium, severe emotional distress, extreme mental anguish, loss of sleep, loss of appetite, and other severe mental and physical manifestations, as well as other harms to be set forth to the trier of fact.

1149. Defendants are jointly and severally liable for the full amount of Plaintiffs' damages.

1150. Because Defendants and their Agents routinely relied upon and controlled MOIS, IRISL, Mahan Air, KAA. and the Iranian National Oil Company to provide material support to FTOs and Terrorist Groups or other terrorist organizations, including those FTOs, Special Groups, and other terrorist organizations responsible for the Terrorist Attacks that resulted in maiming or injury to Plaintiffs, to advance the terrorist aims and objectives of each other, its agents and instrumentalities, and the FTOs, Special Groups, and other terrorists, Defendants are equally and vicariously liable for the damages caused by each other, and their agents, including MOIS, IRISL, Mahan Air, KAA, and the Iranian National Oil Company.

1151. Defendants' conduct was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages against Defendant pursuant to 28 U.S.C. § 1605A(c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand:

a) Judgment for all Plaintiffs against Defendants, jointly and severally, for compensatory damages, including, but not limited to, physical injury, extreme mental anguish, pain and suffering, emotional injuries, economic losses, including medical expenses and lost income, and loss of solatium, in amounts to be determined at trial;

b) Judgment for Plaintiff Estates against Defendants, jointly and severally, for compensatory damages for the extrajudicial killing of the decedents, including, but not limited to, physical injury, extreme mental anguish, pain and suffering, economic losses, including loss of support, financial and otherwise, and any pecuniary loss (or loss of income to the estates) in amounts to be determined at trial;

c) Judgment for all Plaintiffs against Defendants, jointly and severally, for punitive damages in an amount to be determined at trial;

    i. Punitive damages are warranted in this case because:

        1. The conduct of Defendants and their agents demonstrates a policy of encouraging, supporting and directing a campaign of thousands or tens of thousands of deadly acts of terrorism directed at civilians and peacekeeping forces, and in particular against U.S. nationals, such that the monstrous character of the Terrorist Attacks is obvious. Specifically, Defendants focused its finances, infrastructure, agents and instrumentalities to support, encourage and increase the infliction of maximum pain and suffering on innocent people and their families;

        2. The conduct of Defendants and their agents demonstrates that it

harbors a deep-seated and malicious hatred of the United States and that Defendants intentionally committed terroristic murder and extrajudicial killings, torture and hostage taking of American civilians and peacekeeping servicemen and servicewomen;

3. The conduct of Defendants and their agents is extreme and outrageous such that it demonstrates an undeniable intent to do harm and inflict severe physical and emotional distress, even on those not present at the site of the acts;
4. The Terrorist Attacks described herein and that which the Plaintiffs experienced are among the most heinous acts of deliberate violence;
5. The Defendants, their agents, and all others, should be unquestionably deterred from committing similar acts in the future;
6. Defendants still publicly deny their role in the Terrorist Attacks and disclaim even their mere presence in Iraq during the Relevant Period;
7. Defendants took purposeful and concerted steps to deny, conceal, and mask their role in the Terrorist Attacks;
8. Defendants knowingly violated U.S. and international sanctions, laws, and treaties to effectuate their purposeful campaign of terror;
9. Defendants have built their system of terrorism such that they act through agents and instrumentalities of their state to perpetrate and perpetuate terrorism;

10. Defendants have commodified and privatized terrorism such that the core function of their agents, proxies and instrumentalities are sufficiently distinct and commercial, and not merely governmental.

d) Plaintiffs' costs and expenses;

e) Plaintiffs' attorney's fees; and

f) Such other and further relief as the Court finds just and equitable.

Respectfully Submitted, Dated: September 14, 2017

| | |
|---|---|
| **THE NATIONS LAW FIRM**<br><br>By: /s/ Rachel V. Rose<br>Rachel V. Rose<br>DC Bar No. TX0132<br>Howard L. Nations<br>DC Bar No. TX143<br>3131 Briarpark Drive, Suite 208<br>Houston, Texas 77042<br>Telephone: 713.807.8400<br>Facsimile: 713.807.8423<br>Email: rachel.rose@howardnations.com<br>howard@howardnations.com | **MM~LAW LLC**<br><br>Gavriel Mairone, *Pro Hac Vice*<br>Illinois Bar No. 618698<br>980 North Michigan Avenue, Suite 1400<br>Chicago, IL 60611<br>Telephone: 312.253.7444<br>Facsimile: 312.275.8590<br>Email: ctlaw@mm-law.com |
| **LEVIN, PAPANTONIO, THOMAS, MITCHELL, RAFFERTY AND PROCTOR**<br><br>Troy A. Rafferty, *Pro Hac Vice*<br>Florida Bar No. 24120<br>Christopher G. Paulos, *Pro Hac Vice*<br>Florida Bar No. 0091579<br>Jeffrey Gaddy, *Pro Hac Vice*<br>Florida Bar No. 53046<br>Troy Bouk, *Pro Hac Vice*<br>Florida Bar No. 43384<br>316 South Baylen Street, Suite 600<br>Pensacola, Florida 32502<br>Telephone: 850.435.7000<br>Facsimile: 850.436.6123<br>Email: trafferty@levinlaw.com<br>cpaulos@levinlaw.com<br>jgaddy@levinlaw.com | **NIX, PATTERSON AND ROACH, LLP**<br><br>Michael B. Angelovich, *Pro Hac Vice*<br>Texas Bar No. 00785666<br>Chad E. Ihrig, *Pro Hac Vice*<br>Texas Bar No. 24084373<br>Christian Hurt, *Pro Hac Vice*<br>Texas Bar No. 24059987<br>3600 N. Capital of Texas Highway<br>Building B, Suite 350<br>Austin, Texas 78746<br>Telephone: 512.328.5333<br>Facsimile: 512.328.5335<br>Email: mangelovich@nixlaw.com<br>cihrig@nixlaw.com<br>christianhurt@nixlaw.com |

<table>
<tr><td>tbouk@levinlaw.com</td><td></td></tr>
<tr><td>LUCAS MAGAZINE<br><br>James L. Magazine, Pro Hac Vice<br>Florida Bar No. 0847232<br>8606 Government Drive<br>New Port Richey, Florida 34654<br>Telephone: 727.849.5353<br>Facsimile: 727.845.7949<br>Email: jim@lucasmagazine.com</td><td>BURG, SIMPSON, ELDREDGE, HERSH AND JARDINE, P.C.<br><br>David K. TeSelle, Pro Hac Vice<br>Colorado Bar No. 29648<br>40 Inverness Drive East<br>Englewood, Colorado 80112<br>Telephone: 303.792.5595<br>Facsimile: 303.708.0527<br>Email: dteselle@burgsimpson.com</td></tr>
<tr><td>SPANGENBERG, SHIBLEY, AND LIBER LLP<br><br>William Hawal, Pro Hac Vice<br>Ohio Bar No. 0006730<br>1001 Lakeside Avenue E, No. 1700<br>Cleveland, Ohio 44114<br>Telephone: 216.600.0114<br>Facsimile: 216.696.3924<br>Email: whawal@spanglaw.com</td><td></td></tr>
</table>