UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOSHUA L. HOLLADAY, et al.,                    )
                                               )
                    Plaintiffs,                )
                                               )        Civil Action No. 1:17-cv-00915-RDM
          v.                                   )
                                               )
THE ISLAMIC REPUBLIC OF IRAN, et al.,          )
                                               )
                    Defendants                 )
_____)

**PLAINTIFFS' MEMORANDUM ADDRESSING 10-YEAR STATUTE OF
LIMITATIONS SET FORTH AT 28 U.S.C. § 1605A(b)**

**TABLE OF CONTENTS**

STATEMENT OF THE CASE ........................................................................................... 6

    A.    Statutory Background. .................................................................................. 6

    B.    Nature of this Action. .................................................................................. 9

ARGUMENT ............................................................................................................... 10

I.    *MAALOUF* IS NOT RELEVANT HERE BECAUSE PLAINTIFFS' CLAIMS
    ARE NOT TIME-BARRED. ................................................................................. 10

    A.    All Claims Are Timely Because The Limitations Period Did Not Begin
         Running Until Iran's Involvement Was Reasonably Known. ............................. 11

    C.    Claims Are Tolled Under The Servicemembers Civil Relief Act. ...................... 14

    B.    All Claims Are Timely As A Result Of Class Action Tolling. ............................ 14

    D.    Claims Are Tolled Based On Post-Traumatic Stress Disorder ("PTSD"). ............ 18

    E.    Claims Of Minors Are Subject To Tolling. ..................................................... 19

    F.    Even If The Court *Sua Sponte* Applied The Limitations Period, It Could
         Not Dismiss Any Of Plaintiffs' Claims Without Affording Them The
         Opportunity To Demonstrate That They Are Timely Under Various
         Tolling Doctrines. ..................................................................................... 19

II.    EVEN IF *MAALOUF* WERE CORRECTLY DECIDED, THE COURT
    SHOULD NOT CONSIDER THE LIMITATIONS ISSUE *SUA SPONTE* HERE. ........ 20

    A.    *Maalouf* Involved "Special Circumstances" Arising From Repeated
         Follow-On Beirut Bombing Cases. ............................................................... 20

    B.    This Case Is Very Different From *Maalouf* And Does Not Present The
         Same "Special Circumstances." .................................................................... 21

         1.    Plaintiffs Are Not "Piggybacking" On Stale Claims. .............................. 21

         2.    The Court's Duty Under The FSIA To Examine The Evidence
              Independently Militates In Favor Of Allowing Plaintiffs' Claims
              To Proceed. ....................................................................................... 22

         3.    Many Of Plaintiffs' Claims Are Indisputably Timely And The
              Remaining Claims Would Require Analysis And Factfinding
              Before They Could Be Dismissed As Untimely. ..................................... 23

i

4.      Plaintiffs Allege A Coordinated, Common Policy By Iran That Has Produced Interconnected Claims. ............................................................ 26

C.      Comity Does Not Require *Sua Sponte* Consideration of the Limitations Period In This Case. ............................................................................................. 29

      1.      Judge Bates' Comity Analysis Was Specific To The Facts Of *Maalouf* And Does Not Apply Here. ........................................................ 29

      2.      Judge Bates' Reasoning Was Carefully Limited And Should Not Be Expanded. ............................................................................................ 32

III.    THIS COURT SHOULD NOT FOLLOW *MAALOUF* BECAUSE IT WAS NOT CORRECTLY DECIDED. ............................................................................. 37

CONCLUSION .......................................................................................................................40

Pursuant to this Court's Minute Order of June 28, 2018, Plaintiffs respectfully submit this memorandum addressing the application of the 10-year statute of limitations set forth at 28 U.S.C. § 1605A(b).

Plaintiffs — who are members of the U.S. military, U.S. nationals, and their families — commenced this action on May 15, 2017, and filed a First Amended Complaint (Dkt. 16) ("FAC") on September 14, 2017. The case arises from 43 terrorist attacks in Iraq that occurred between December 17, 2003 and October 12, 2011, which Plaintiffs allege and are prepared to prove were sponsored by Iran and the Defendants in this case. Iran has chosen not to appear and defend this case and has therefore waived all non-jurisdictional affirmative defenses.

Under any interpretation of the 10-year statute of limitations, the claims in Part VI-A through Part VI-V (¶¶ 572-826) of the FAC are unquestionably timely because they were filed within 10 years of the terror attacks in question. The sole question presented is whether this Court should exercise its discretion to consider *sua sponte* the statute of limitations with respect to the remaining claims.

As the Court is aware, in *Maalouf v. Islamic Republic of Iran*, 306 F. Supp. 3d 203 (D.D.C. 2018), *appeal docketed*, No. 18-7052 (D.C. Cir.), Judge Bates invoked *sua sponte* the statute of limitations codified at § 1605A(b) to dismiss claims against Iran based on its role in the 1983 and 1984 U.S. embassy bombings in Beirut. The court acknowledged that, "[g]enerally, it is up to the defendant to raise a timeliness defense," *id.* at 205, and "[i]n the mine run of cases, courts should refrain from exercising this discretion, relying on the adversarial process to raise any non-jurisdictional issues in dispute." *Id.* at 208. The *Maalouf* court noted that, under *Owens v. Republic of Sudan*, 864 F.3d 751, 801 (D.C. Cir. 2017), the statute of limitations in § 1605A(b) is not jurisdictional. *Maalouf*, 306 F. Supp.3d at 208 & n.6.

1

But *Maalouf* opined that "*sua sponte* consideration 'might be appropriate in special circumstances,' particularly when an affirmative defense implicates the interests of the judiciary as well as the defendant." *Id.* at 208-09 (citation omitted). The court stressed that the *Maalouf* plaintiffs themselves conceded the untimeliness of their claims and noted "the facts supporting the statute of limitations defense are set forth in the papers plaintiff[s] [themselves] submitted." *Id.* at 212 (internal quotation marks and citation omitted; alterations in original). The court explained that, in such a situation, "respect for other sovereign nations, the Court's duty to independently assess claims of state-sponsored terrorism, and the practical effect of ignoring the statutory deadline weigh against granting default judgments against Iran on plainly untimely claims." *Id.* at 205. Another 1983 Beirut bombing case, *Bathiard v. Islamic Republic of Iran*, No. 16-1549, 2018 WL 3213294 (D.D.C. June 29, 2018) (Cooper, J.), also considered limitations *sua sponte.*

Other Beirut bombing cases have reached contrary conclusions and have held that courts should not exercise whatever discretionary authority they may have to consider limitations for defaulting defendants. In *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311 (D.D.C. 2014), Judge Lamberth declined to invoke the statute of limitations to dismiss a complaint filed on December 28, 2012:

> [T]he Court declines whatever discretionary authority it may have to raise the defense of limitations on Iran's behalf. It does so in light of the fundamental rule that statutes of limitations are generally treated as affirmative defenses that may be waived. Furthermore, before using its discretion to consider a defense not raised by a party, a court must "determine whether the interests of justice would be better served by addressing the merits or by dismissing the petition." In this case, defendants have chosen not to appear in this litigation and they must take the consequences that attend that decision, including waiver of potentially legitimate defenses. While the Court recognizes that considerations of international comity are compelling, it will heed Congress's determination that the statute of limitations is not a requirement for exercise of subject matter jurisdiction and proceed to consideration of the merits.

2

*Id.* at 331 (citations omitted); *see also Spaulding v. Islamic Republic of Iran*, No. 16-1748, 2018 WL 3235556, at *3 (N.D. Ohio July 2, 2018) (opining in 1983 Beirut bombing case filed on July 8, 2016: "[P]laintiffs assert that a statute of limitations defense is waived by a defaulting defendant, such as Iran in this case. Plaintiff is correct. Since Iran has failed to appear and defend on the basis of timeliness, this Court has 'no *obligation* to raise the time bar *sua sponte.*'") (citation omitted).

Plaintiffs in the instant case submit that *Maalouf* was not correctly decided and that *Worley* and *Spaulding* are more persuasive authority. But this Court need not decide that question (or wait for the D.C. Circuit to do so in *Maalouf*) in order to decline to invoke § 1605A(b) here.

**First**, *Maalouf* is irrelevant in this case because Plaintiffs' claims are not time-barred. A substantial portion of Plaintiffs' claims (specifically the claims in Part VI-A through Part VI-V of the FAC, ¶¶ 572-826) are indisputably timely under any reading of the 10-year statute of limitations. The remaining claims are timely by virtue of various statutory and non-statutory tolling rules (that were not applicable to the claims in *Maalouf*). Accordingly, as shown in Part I below, this case does not present any need even to consider whether and to what extent *Maalouf* should be followed.

**Second**, even applying the *Maalouf* framework, the instant case does not present the kind of "special circumstances" warranting *sua sponte* application of the statute of limitations. That is, the very reasons Judge Bates articulated in *Maalouf* for exercising judicial discretion to invoke the statute of limitations *sua sponte* do not apply here.

*Maalouf* identified two kinds of situations presenting "special circumstances" warranting *sua sponte* consideration of limitations. Neither situation exists in this case. The first situation

involves a defendant that inadvertently fails to assert limitations due to a calculation error or clerical mistake. *See* 306 F. Supp. 3d at 208 (citing *Day v. McDonough*, 547 U.S. 198, 202 (2006)). Defendants made no mistake here. All Defendants were properly served with process and have deliberately decided not to appear to contest this case, although Iran freely appears in commercial disputes and other litigation, suggesting a conscious, intentional choice on its part not to participate in these types of cases — namely, cases involving terrorism.

The second situation identified in *Maalouf* involves plaintiffs who acknowledge that their claims are "plainly untimely," so that the court need not consider evidence, hold a hearing, or undertake significant legal analysis in order to decide whether the statute of limitations bars the action. *Id.* at 210-11. That situation does not exist here, either. As noted, a substantial portion of Plaintiffs' claims are indisputably timely, and the remaining claims could not be dismissed as untimely without affording Plaintiffs the opportunity to present evidence demonstrating their timeliness under a number of tolling statutes and doctrines. Such an exercise would, at bottom, entail a fact-intensive, highly individualized inquiry affording the Plaintiffs a chance to develop an evidentiary record and a chance to be heard before the Court. The "interests of the judiciary" cited in *Maalouf*, 306 F. Supp. 3d at 209, do not justify such a burdensome exercise in the interests of at most a partial dismissal of Plaintiffs' claims, particularly to benefit a defaulting defendant that is a designated state sponsor of terrorism and has deliberately chosen not to appear or assert any defenses to the claims against it.

There are other dispositive differences between this case and *Maalouf*. Significantly, this action is not a follow-on Beirut barracks bombing case seeking to "piggyback" on stale judgments and asserting claims relating to a 35-year-old incident. The sheer age of the claims

distinguishes this case, which involves new claims, new evidence, and new Plaintiffs seeking to prove their claims to the Court's satisfaction.

Another distinguishing feature of this case is that it involves a unified policy of terrorism by Iran involving common methods, policies, strategies, and weapons, as opposed to discrete, decades-old incidents. There is no question that litigation on the merits of the patently ***timely*** claims presented in the FAC is appropriate, and insofar as the remaining claims arise from a similar factual nexus, there is no prejudice to Iran here (unlike in *Maalouf*) from litigation of the remaining claims. Unlike *Maalouf*, the limitations issue in this case is not all or nothing, but presents the question of mere ***incremental*** liability against Iran, arising from interconnected claims of which it had ample notice. Accordingly, any comity concerns are significantly diminished. Indeed, to the extent Iran is due comity in a case it has purposefully evaded and ignored, such concerns are fully accommodated by the Foreign Sovereign Immunity Act's ("FSIA") requirement that plaintiffs establish their "claim or right to relief by evidence satisfactory to the court," 28 U.S.C. § 1608(e). They do not justify *sua sponte* invoking an affirmative defense that Defendants deliberately waived to resolve only some of the claims presented.

In addition, this case involves members of the U.S. military, U.S. nationals, and their families, for whom Congress expressly created a cause of action against state sponsors of terrorism. The Supreme Court has instructed that comity must be applied with due regard for the rights of U.S. citizens and should not be used to sacrifice those rights. Moreover, many of the Plaintiffs in this case are in possession of classified information that may be relevant to the litigation — and have therefore proceeded cautiously to avoid "sanction from the Executive Branch for violation of security agreements that restrict disclosure of classified information," *De*

*Sousa v. Dep't of State*, 840 F. Supp. 2d 92, 104 n.4 (D.D.C. 2012), given the absence of "authority that directly controls a plaintiff's right to present classified information in a civil action." *Id*. at 104.

Hence, even if *Maalouf* were relevant, the Court still should not exercise its discretion to *sua sponte* apply the 10-year statute of limitations of 28 U.S.C. § 1605A(b).[1] If the Court disagrees that *Maalouf* can be so distinguished, it should choose not to follow that decision because of its incompatibility with the plain text and unmistakable purpose of the FSIA.

## STATEMENT OF THE CASE

### A.     Statutory Background.

The FSIA creates a federal cause of action directly against foreign governments and eliminates sovereign immunity for designated state sponsors of terrorism for (among other things) providing "material support or resources" for acts of "extrajudicial killing." 28 U.S.C. § 1605A(a)(1); *see also Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 819 (2018) ("[S]uch exception to jurisdictional immunity . . . applies where the foreign state is designated as a state sponsor of terrorism and the claims arise out of acts of terrorism.").

The Executive Branch controls the scope of liability under the terrorism exception in two respects. First, the exception applies only to those nations designated as state sponsors of terrorism by the Department of State. Second, the President may issue directives limiting liability. For example, the President has issued an Executive Order with respect to Libya and a Presidential Determination with respect to Iraq, limiting the liabilities of those foreign governments under the state-sponsor-of-terrorism exception. *See* 28 U.S.C. § 1605A note. No such Executive Order or Presidential Determination has been issued with respect to Iran.

---

[1] Although *Maalouf* is currently pending on appeal before the D.C. Circuit, this Court need not wait for the Court of Appeals' disposition given the independent grounds for distinguishing that decision outlined in Parts I and II, below.

To the contrary, Congress specifically provided that "[t]he court **shall** hear a claim under this section" under certain conditions, including when (i) the foreign state was a designated sponsor of terrorism when the act of terrorism occurred and when the claim was brought (as Iran was here); (ii) the victim or claimant was a national of the United States, a member of the armed forces, or otherwise an employee of the Government (a condition met with respect to all Plaintiffs here); and (iii) the act did not occur in the foreign state's own territory (a condition met here for all Plaintiffs). *See* 28 U.S.C. § 1605A(a)(2)(A)(i)(I), (ii)(I, II, III), (iii). In other words, the instant action falls into a specific category of claims over which Congress made federal jurisdiction exclusive and instructed that "[t]he court **shall** hear a claim." 28 U.S.C. § 1605A(a)(2). Congress did not include any exception to this mandatory jurisdiction based on the statute of limitations.

Instead, in a different section of the Act, Congress provided a 10-year limitations period, as follows:

> An action may be brought or maintained under this section if the action is commenced, or a related action was commenced under section 1605(a)(7) (before the date of the enactment of this section) ... not later than the latter of —
>
> (1) 10 years after April 24, 1996; or
>
> (2) 10 years after the date on which the cause of action arose.

*Id*. § 1605A(b).[2]

---

[2] The term "related action" is defined in § 1083(c)(3) of the Fiscal Year 2008 National Defense Authorization Act ("NDAA") (the Act that created § 1605A), which provides in relevant part:

> Related actions.—If an action arising out of an act or incident has been timely commenced under section 1605(a)(7) of title 28, United States Code, ... any other action arising out of the same act or incident may be brought under section 1605A of title 28, United States Code, if the action is commenced not later than the latter of 60 days after—
>
> (A) the date of the entry of judgment in the original action; or

Sen. Frank Lautenberg, a co-sponsor of the 2008 amendments adding the terrorism exception, explained that the legislation was intended "to provide justice for victims of state-sponsored terrorism, which has strong bipartisan support. I believe this legislation is essential to providing justice to those who have suffered at the hands of terrorists and is an important tool designed to deter future state-sponsored terrorism." 154 Cong. Rec. S54 (daily ed., Jan. 22, 2008). In fact, he singled out victims of Iranian terrorism as the intended beneficiaries of the bill: "Congress's support of my provision will now empower these victims to pursue Iranian assets to obtain this just compensation for their suffering. This is true justice through American rule of law." *Id.* at S55.

The 2008 amendments strengthened the 1996 Flatow Amendment, codified at 28 U.S.C. § 1605 note, which had created an initial version of the state-sponsored terrorism exception to the FSIA. However, Sen. Lautenberg explained, "Congress's original intent behind the 1996 legislation has been muddied by numerous court decisions," and the Flatow Amendment had been frustrated by "overly mechanistic" judicial interpretations. 154 Cong. Rec. at S54-55. He pointed to the statute of limitations in particular as a doctrine through which courts had frustrated Congress' intent:

> Another problem is that courts have mistakenly interpreted the statute of limitations provision that Congress created in 1996. In cases such as *Vine v. Republic of Iraq* and later *Buonocore v. Socialist People's Libyan Arab Jamahiriya*, the court interpreted the statute to begin to run at the time of the attack, contrary to our intent. It was our intent to provide a 10-year period from the date of enactment of the legislation for all acts that had occurred at any time prior to its passage in 1996. We also intended to provide a period of 10 years from the time of any attack which might occur after 1996. My provision clarifies this intent.

---

(B) the date of the enactment of this Act [Jan. 28, 2008].

Pub. L. No. 110-181, § 1083(c)(3), Jan. 28, 2008, 122 Stat. 3, 338 (codified at 28 U.S.C. § 1605A note).

*Id.* at S55. In short, the 2008 amendments were intended to facilitate redress against foreign governments designated as state sponsors of terrorism and to eliminate "overly mechanistic" judicial interpretations that were inhibiting victim recoveries.

More recently, Congress passed legislation, signed into law in December 2015, to create a "Victims' Compensation Fund" ("VCF") from which victims and families may receive partial payments of judgments against Iran and other sponsors of international terrorism. *See* Justice for United States Victims of State Sponsored Terrorism Act, Pub. L. 114-113, § 404, 129 Stat. 2242, 3007 (codified at 42 U.S.C. § 10609).[3]

## B.    Nature of this Action.

This is a civil action, filed on May 15, 2017, pursuant to the FSIA for wrongful death, personal injury, and related torts, by U.S. nationals and members of the U.S. armed forces (as defined in 10 U.S.C. § 101) killed or injured in terrorism attacks by Iran and its agents in Iraq, together with their estates and families. The United States officially designated Iran a State Sponsor of Terrorism on January 19, 1984, pursuant to section 6(j) of the Export Administration Act, section 40 of the Arms Export Control Act, and section 620A of the Foreign Assistance Act, and has renewed that designation annually.

The FAC details forty-three (43) separate terror attacks that occurred in Iraq between December 17, 2003 and October 12, 2011. *See* FAC ¶¶ 572-1115. Forty-six (46) Plaintiffs are

---

[3] Congress provided that the VCF will not sunset until January 2026, Pub. L. No. 114-113, § 404(e)(6)(A), 129 Stat. at 3015 (codified at 42 U.S.C. § 10609(e)(6)(A)), further demonstrating its understanding that an ongoing stream of terror victims will continue to seek compensation. There is no limitation in the Act excluding claimants like Plaintiffs. For example, Congress could have overruled Judge Lamberth's 2014 decision in *Worley* if it disagreed with his refusal to invoke the statute of limitations. It did not. Or Congress could have limited eligibility for the VCF to those with judgments already in place as of the date of its enactment. Again, it did not.

individuals who were injured in these attacks, four (4) Plaintiffs are decedents whose estates bring claims on their behalves, and the remaining seventy-four (74) plaintiffs are family members of the victims of those attacks.

The FAC alleges the attacks are the responsibility of the Islamic Republic of Iran ("Iran") by virtue of its material support (through the provision of, *inter alia*, money, weapons, training, and advisors) to foreign terrorist organizations such as Lebanese Hizbollah (or "Hezbollah"), Al Qaida, Ansar al Islam (aka Ansar al Sunna), and various "Special Groups," including a litany of Iraqi Shi'a terror groups. *See* FAC ¶¶ 41-164. Iran serves as a command, financial, and logistical conduit for various terrorist groups, including the Special Groups, and the FAC alleges that Iran's sponsorship of terrorism was part of a deliberate national policy. *See* FAC ¶¶ 142, 165-175, 334.

## ARGUMENT

## I.    *MAALOUF* IS NOT RELEVANT HERE BECAUSE PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED.

As previously noted, the claims in Part VI-A through Part VI-V of the FAC (¶¶ 572-826) are indisputably timely. Even if this Court were to apply the limitations period *sua sponte* — which it should decline to do for the reasons stated in Part II below — Plaintiffs submit that all the remaining claims would be found timely by virtue of various statutory and non-statutory tolling doctrines.

By contrast, the plaintiffs in *Maalouf* conceded their claims were untimely in their entirety. *See* 306 F. Supp. 3d at 207 ("Plaintiffs do not claim that their suits are timely. Indeed, Maalouf admits that his action falls outside of the statute of limitations. This fact is equally true of the Salazar suit."). Accordingly, this case does not present a *Maalouf* situation at all. At a minimum, even if the Court sua sponte applied the limitations period, it could not dismiss any of

Plaintiffs' claims without affording them the opportunity to demonstrate they are timely under numerous tolling doctrines.

> **A.      Plaintiffs' Claims Are Timely Because The Limitations Period Did Not Begin Running Until Iran's Involvement Was Reasonably Known.**

"[F]ederal statutes of limitations are generally subject to equitable principles of tolling." *Rotella v. Wood,* 528 U.S. 549, 560 (2000). A litigant is entitled to equitable tolling of a statute of limitations if he establishes "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Menominee Indian Tribe of Wisconsin v. United States*, 136 S. Ct. 750, 755 (2016) (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)).

In this case, Plaintiffs have alleged that:

Iran goes to great lengths to hide the fact that it funds terrorism, including funding the Special Groups and terrorists that perpetrated the terrorist attacks that resulted in the death or injury of Plaintiffs.

Additionally, even utilizing the utmost diligence, it can take months, or even years, before the terrorist group who perpetrated an act of international terrorism, or the type of weapon/explosive used by a terrorist group in a terrorist attack, can be identified.

Here, Plaintiffs did not know and did not have reason to know of their potential claims against Defendants until very recently, certainly not more than five years from the date of filing this Action.

As it concerns Plaintiffs' claims, and as outlined above, Iran has fraudulently concealed its involvement with any of the Terrorist Groups and terrorists responsible for perpetrating the Terrorist Attacks. Iran has further denied the fact it provided material support and resources to the Terrorist Groups responsible for perpetrating the Terrorist Attacks. As such, the doctrine of equitable tolling applies to this Action and all Plaintiffs.

11

FAC ¶¶ 567-70. Accordingly, Plaintiffs are entitled to invoke the discovery rule and the fraudulent concealment doctrine to show that the limitations period did not begin running until they had reason to suspect Iran's involvement in the particular attack at issue.[4]

The discovery rule is the general accrual rule in federal courts. *Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 342 (D.C. Cir. 1991). When a statute is silent as to the discovery rule, the discovery rule generally applies. *Rotella*, 528 U.S. at 555. This Court has opined that, under the discovery rule, "a claim does not accrue at the time of injury but, instead, accrues at the time the plaintiff 'know[s] (or by the exercise of reasonable diligence should know) (1) of the injury, (2) its cause in fact, and (3) of some evidence of wrongdoing' by the alleged tortfeasor." *Marzorati v. MedStar-Georgetown Med. Ctr., Inc*., 265 F. Supp.3d 24, 26 (D.D.C. 2017) (Moss, J.). As this Court has recognized, the application of the discovery rule leads to complex factual questions when the "evidence of wrongdoing by the alleged tortfeasor" is not immediately apparent:

> "[T]he standard of 'some evidence of wrongdoing' is far from a precise one," but the essential inquiry asks "'whether the plaintiff exercised reasonable diligence under the circumstances in acting or failing to act on whatever information was available to him.'" That inquiry, in turn, is fact-bound and, "'[u]nless the evidence regarding the commencement of the running of the statute of limitations is so clear that the court can rule on the issue as matter of law, the jury should decide the issue on appropriate instructions.'"

*Id.* at 29-30. Numerous cases in this Circuit have applied the discovery rule to find claims timely.[5]

---

[4] Ordinarily, Plaintiffs would need to invoke the discovery rule and fraudulent concealment doctrine only if faced with a properly raised affirmative defense of limitations, and otherwise Plaintiffs would not have the burden of demonstrating their application.

[5] *See, e.g., Swine Flu Immunization Products Liability Litigation*, 880 F.2d 1439, 1444 (D.C. Cir. 1989) (upholding district court's decision not to dismiss swine flu claim under discovery rule); *Beyond Pesticides v. Monsanto Co.*, No. 17-941, 2018 WL 2023508, at *3

12

Further, under the doctrine of fraudulent concealment, the limitations period was tolled until Plaintiffs learned of Iran's involvement. The D.C. Circuit has made it clear that "when a defendant fraudulently conceals the basis of a plaintiff's cause of action, the statute of limitations is tolled until the time that a reasonably diligent plaintiff could have discovered the elements of his claim." *Hohri v. United States*, 782 F.2d 227, 246 (D.C. Cir. 1986), *vacated and remanded on other grounds*, 482 U.S. 64 (1987). In order to establish fraudulent concealment and hence to toll the running of the statute of limitations, a plaintiff must show that the defendant took "some misleading, deceptive or otherwise contrived action" to conceal information material to the plaintiff's claim. *Hobson v. Wilson*, 737 F.2d 1, 34 (D.C. Cir. 1984). Plaintiffs have alleged, and are prepared to prove, that Iran's use of proxies and terrorist groups were an attempt to disguise and cover up its involvement in their injuries. Further, Iran's public denials of its role were misleading and deceptive actions designed to prevent proper identification of its culpability. If a defendant fraudulently conceals material facts related to its wrongdoing, then the limitations period does not begin running until the concealment has ended. *Richards v. Mileski,* 662 F.2d 65,

---

(D.D.C April 30, 2018) (declining to dismiss claims under discovery rule and opining that "[i]n all cases to which the discovery rule applies[,] the inquiry is highly fact-bound and requires an evaluation of all of the plaintiff's circumstances") (internal quotation marks and citation omitted); *Kemp v. Eiland*, 139 F. Supp. 3d 329, 351 (D.D.C. 2015) (applying discovery rule and denying motion to dismiss homeowner's claim on limitations); *Patteson v. AstraZeneca*, 876 F. Supp. 2d 27, 38-39 (D.D.C. 2012) (applying discovery rule to deny motion to dismiss claim against physician); *Lee v. Wolfson*, 265 F. Supp. 2d 14, 18-19 (D.D.C. 2003) ("[T]he relationship between [plaintiff's] and [defendant's] alleged wrongdoing was obscure at the time of the injury and the discovery rule must be applied to plaintiff's tort claims. Under the discovery rule, the statute of limitations for plaintiff's tort claims against [defendant] did not begin to run until she knew, or should have known, of the possibility of [defendant's] wrongdoing."); *Dawson v. Eli Lilly and Company*, 543 F .Supp. 1330, 1339 (D.D.C. 1982) (statute of limitations did not begin to run until "plaintiff learned, or in the exercise of due diligence should have learned, that her injuries were the result of some wrongdoing on the part of the defendant," and not at the time, many years earlier, when plaintiff was injured).

13

71 (D.C. Cir. 1981). Many cases in this Circuit have applied the fraudulent concealment principle to deny dismissal of claims.[6]

Plaintiffs submit that all of their claims are subject to equitable tolling – and would be timely – under both the discovery rule and the doctrine of fraudulent concealment.

### B.   Plaintiffs' Claims Are Tolled Under The Servicemembers Civil Relief Act.

The Servicemembers Civil Relief Act operates to toll all statutes of limitations for the period of a future plaintiff's military service. It provides that "[t]he period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court . . . by . . . the servicemember or the servicemember's heirs, executors, administrators, or assigns." 50 U.S.C. App. § 526(a). This provision "tolls any limitations period . . . appearing in any law for the bringing of any action before any court, board or bureau." *Giel v. Winter*, 503 F. Supp. 2d 208, 211 (D.D.C. 2011). Accordingly, all claims by Plaintiffs who were members of the armed forces would be tolled for the duration of their military service.

### C.   Plaintiffs' Claims Are Timely As A Result Of Class Action Tolling.

Another ground on which all of Plaintiffs' claims are timely is because a putative class action, *Mohammadi v. Islamic Republic of Iran,* 947 F. Supp. 2d 48, 58 (D.D.C. 2013), *aff'd*, 782 F.3d 9 (D.C. Cir. 2015), tolled the statute of limitations for the claims in this case for long enough to render even those that would otherwise be subject to § 1605A(b) timely.

---

[6] *See, e.g., Firestone v. Firestone*, 676 F.3d 1205, 1209 (D.C. Cir. 1996) (per curiam) (upholding denial of motion to dismiss and warning "courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint"; "because statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred"); *Adair v. England*, 183 F. Supp. 2d 31, 54 (D.D.C. 2002) (denying dismissal of Establishment Clause claim based on fraudulent concealment).

In *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Id.* at 554. The Court explained that such an approach promotes "efficiency and economy of litigation" while serving the interest behind statutes of limitations, which is to "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost memories faded and witnesses disappeared." *Id.* at 553-54. In *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983), the Court extended *American Pipe* to allow tolling not only where plaintiffs sought to intervene in a continuing action, but also where they sought to file an entirely new action. According to the Court, "[t]he filing of a class action tolls the statute of limitations as to all asserted members of the class ... not just as to interveners." *Id.* at 350 (internal quotations omitted). Again, the Court relied upon the dual purposes of class actions and statutes of limitations: to avoid "needless multiplicity of actions" and "to put defendants on notice of adverse claims." *Id.* at 351-52. The Court held that tolling was appropriate means of balancing these dual purposes: "[T]olling the statute of limitations ... creates no potential for unfair surprise, regardless of the method class members choose to enforce their rights upon denial of class certification." *Id.* at 353; *see also Menominee Indian Tribe of Wisconsin v. United States*, 764 F.3d 51, 59–60 (D.C. Cir. 2014) ("Class-action tolling is available to members of yet-to-be-certified class actions. Under that doctrine, the 'commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.'") (citation omitted), *aff'd*, 136 S. Ct. 750 (2016).[7]

---

[7] *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800 (2018), does not alter this analysis. *China*

*Mohammadi* was a putative class action filed against the Islamic Republic of Iran and other defendants in 2009. The named plaintiffs were individuals who had lived in Iran and been imprisoned, sentenced to death or tortured. Although the original Complaint did not define the putative class in a manner that would have encompassed Plaintiffs in the instant case (it included only Iranians and Iranian-Americans), the Second Amended Complaint, filed on September 22, 2010 (Dkt. 11 in No. 09-cv-1289 (D.D.C.)), defined the putative class more broadly:

> Lead Plaintiffs bring this complaint on their own behalf and on behalf of the other DOE Members of the Class which include United States servicemen stationed in Iraq, Afghanistan, Pakistan, and elsewhere, as well as, their families, and the survivors of deceased United States Servicemen who were murdered or harmed or threatened by or as a direct and proximate result of Defendants' actions as described herein.

Second Amended Complaint in *Mohammadi* ¶ 9. The actions "described therein" included use of "worldwide terrorist groups such as Hezbollah, Al Qaida, Defendant IRGC, and others . . . to initiate campaigns of violence against . . .Western individuals . . . both in Iran, and elsewhere in the region." *Id.* ¶ 16. The complaint alleged that Iran "planned and caused the death of United State Servicemen stationed in the Middle East, among whom are the Members of the Class of Plaintiffs herein." *Id.* ¶ 25. "Defendants, directly and by and through their agents, have provided substantial support to an assortment of terrorist organizations which have then carried out vicious acts against both civilians and military targets, to inflict the maximum amount of damage, with little regard for human life. This includes direct or indirect payments of $1000 bounty per head for the murder of United States Servicemen and $6000 for the destruction of United States Army vehicles and this support has been in the form of direct payments, training, equipping, and

---

*Agritech* presented the question whether *American Pipe* tolling applies to successive class actions. This case is not a class action. *China Agritech* reaffirmed that *American Pipe* tolling continues to apply in the instant situation: "*American Pipe* tolls the statute of limitations during the pendency of a putative class action, allowing unnamed class members to join the action individually or file individual claims if the class fails." *Id.* at 1804.

mobilizing." *Id.* ¶ 40. The complaint specifically cited terrorist attacks in Iraq: "The coercive threats and/or murders of . . . United States Servicemen in Pakistan, Afghanistan, Iraq and around the world were a direct and proximate result of the Defendants conspiring with and providing aid to a terrorist organizations." *Id.* ¶ 43. Count 1 of the causes of action was entitled "Engaging in Terrorism and/or Providing Material Support to a Terrorist Organization," and the suit cited the FSIA as a basis for concluding that Iran was subject to suit. *Id.* ¶ 13.

*Mohammadi* remained a putative class action for nearly 33 months. The Second Amended Complaint was filed on September 22, 2010, and the case proceeded as a class action until May 15, 2013, when the plaintiffs filed a Third Amended Complaint that did not include the class claims. Nevertheless, the filing of the Second Amended Complaint tolled the claims of instant Plaintiffs, which remained tolled while the *Mohammadi* putative class was pending. *See Barryman-Turner v. Dist. of Columbia*, 115 F. Supp. 3d 126, 134 (D.D.C. 2015) ("Under *American Pipe,* the filing of a class action thus functions as a pause button for the claims of all purported class members. The statute of limitations ceases to run for the entire period from the day a class action is filed until the class is decertified or the court declines to certify the class, after which it runs for the full number of days that were remaining on the statute when the class action was commenced."); *Mouzon v. Radiancy, Inc.*, 309 F.R.D. 60, 65 (D.D.C. 2015) ("[T]he statute of limitations is tolled for unnamed members of an asserted class between the filing of a class action complaint and the day the suit is conclusively not a class action.") (internal quotation omitted).[8]

---

[8] Alternatively, if the Court were to conclude that the *Mohammadi* class action did not toll Plaintiffs' claims, then many would be tolled under *Burks v. Iran*, No. 16-1102 (D.D.C.), a putative class action filed on June 13, 2016, with a class defined as

[a]ll United States nationals, members of the United States armed forces, or employees of the United States Government who, while acting within the scope of

Accordingly, Plaintiffs' claims are subject to tolling under *American Pipe.*

**D.      Claims Are Tolled Based On Post-Traumatic Stress Disorder ("PTSD").**

Many of the injured Plaintiffs suffer from PTSD, which can also serve as a basis for equitable tolling. The D.C. Circuit has instructed that equitable tolling "can fairly be read to encompass cases where a plaintiff has been unable to [timely file] because of disability." *Smith-Hayne v. Dist. of Columbia*, 155 F.3d 575, 579 (D.C. Cir. 1998). The Federal Circuit has held that a veteran suffering from PTSD is entitled to equitable tolling. *See Barrett v. Principi*, 363 F.3d 1316 (Fed. Cir. 2004). The Court of Appeals pointed to "[t]he widespread support for equitable tolling based on mental illness that has developed over the last fifteen years," as well as the special status of veterans. *Id.* at 1320. The Federal Circuit noted that veterans form a "special class of citizens, those who risked harm to serve and defend their country. This entire scheme is

---

their employment, were injured or killed by an [Explosively Formed Penetrator ('EFP')], and by no other form of improvised explosive device at any time on or after June 1, 2005 through the date of the filing of this complaint (the 'Class Period'), and their immediate family members as defined by the law of this Circuit, but excluding any such person(s) who has already individually retained counsel to bring the claims set forth herein.

*Burks* Complaint (Dkt. 1), ¶ 49. The *Burks* Complaint alleges:

Beginning in mid-2005, Defendants the Islamic Republic of Iran and the Iranian Revolutionary Guard Corps began supplying known terrorist groups in Iraq, proxies of Iran known as 'Special Groups,' with a uniquely lethal weapon that came to be called Explosively Formed Penetrators ('EFPs'). Those Special Groups included, but were not limited to, the Qazali Network, the Hezbollah Brigades, the Shebaini Network, the Promised Day Brigades, and the Badr Corps. Iran would subsequently provide equipment and education to Special Groups that would enable them to manufacture their own EFPs. EFPs, among all other forms of improvised or roadside explosive devises, were uniquely capable of cutting through heavy armor plating from a tactically meaningful distance. As a result, EFPs maimed and killed hundreds of U.S. service members in the years following Iran's introduction of these weapons to Iraq. Plaintiffs, on behalf of themselves and those similarly situated, bring this action against Iran for damages sustained as a result of the proliferation and use of these weapons throughout Iraq, a direct result of Iran's material support.

*Id.* at ¶ 2.

imbued with special beneficence from a grateful sovereign." *Id.* (internal quotation marks and citation omitted). Plaintiffs would be entitled to invoke this tolling doctrine on an individualized basis.

      **E.**    **Claims Of Minors Are Subject To Tolling.**

Twelve (12) of the Plaintiffs in the instant case are minors and are entitled to claim tolling based on their minority status. *See Osuchukwu v. Gallaudet Univ.*, 296 F.Supp.2d 1, 2 (D.D.C. 2002); *Foretich v. Glamour*, 741 F. Supp. 247, 250 (D.D.C. 1990). For these Plaintiffs, the 10-year statute of limitations will not even begin to start running until they reach the age of majority. Similarly, any Plaintiff who was underage at the time of their claim-specific attack will have the limitations period tolled during the time of their minority status.

      **F.**    **Even If The Court *Sua Sponte* Applied The Limitations Period, It Could Not Dismiss Any Of Plaintiffs' Claims Without Affording Them The Opportunity To Demonstrate That They Are Timely Under Various Tolling Doctrines.**

Because a substantial portion of Plaintiffs' claims are unquestionably timely and the remainder are subject to various tolling doctrines, this case does not present a *Maalouf* situation at all. At minimum, if this Court were to apply the limitations period *sua sponte*, Plaintiffs should be afforded a reasonable opportunity to make an evidentiary record on these and any other applicable tolling doctrines and to be heard before the Court. Most of the tolling doctrines of which Plaintiffs could avail themselves would, at a minimum, demand highly individualized, fact-intensive consideration that will require a Plaintiff-by-Plaintiff, claim-by-claim inquiry.

There is therefore no need for this Court to exercise its discretion to *sua sponte* apply the statute of limitations in 28 U.S.C. § 1605A(b); unlike in *Maalouf*, many of Plaintiffs' claims are timely on their face, and those that are not are subject to numerous statutory and non-statutory tolling doctrines.

## II.    EVEN IF *MAALOUF* WERE CORRECTLY DECIDED, THE COURT SHOULD NOT CONSIDER THE LIMITATIONS ISSUE *SUA SPONTE* HERE.

### A.    *Maalouf* Involved "Special Circumstances" Arising From Repeated Follow-On Beirut Bombing Cases.

Even if, contra the above analysis, this Court concludes that at least some of the Plaintiffs' claims are time-barred, it still should not invoke § 1605A(b) *sua sponte.* The "special circumstances" identified by Judge Bates in *Maalouf* are completely absent here, the policies and concerns expressed by Judge Bates in *Maalouf* have no application to this case, and there are numerous considerations weighing in favor of adjudicating the Plaintiffs' claims here that were not presented in *Maalouf*.

*Maalouf* involved two follow-on 2016 lawsuits regarding the 1983 and 1984 Beirut Embassy bombings. The lawsuits were nearly identical to two predecessor cases filed eight years and fourteen years previously. *See Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1 (D.D.C. 2011) (filed in 2008); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105 (D.D.C. 2005) (filed in 2002). The Court entered final judgments in the *Salazar* and *Doe* cases in May 2005 and May 2013, respectively, awarding a total of $18.3 million in compensatory damages in the former and over $8.4 billion in compensatory and punitive damages in the latter.

Judge Bates specifically noted that the follow-along suits in *Maalouf* were not filed until over three decades after the Beirut bombings and more than two decades after the expiration of the limitations period. The *Maalouf* plaintiffs acknowledged their suits were not timely, a concession Judge Bates found quite significant. *See Maalouf*, 306 F. Supp. 3d at 207.

Judge Bates noted other concerns not present in this case. For example, he observed that "*Maalouf* was filed thirty-one years and *Salazar* thirty-three years after the bombings giving rise to each suit, and they rely for most of their evidence on cases filed eight and fourteen years previously. In this way, plaintiffs can continue piggybacking off of older decisions for decades to

extract multimillion dollar judgments from absent sovereigns." *Id.* at 211. He explained that, "without some policing of time limits, plaintiffs may seek to exploit prior decisions finding nations liable for certain conduct to later pursue large damages awards decades after the fact." *Id.* Judge Bates warned of "claimants . . . dusting off old volumes of the Federal Supplement" and "racking up sizable damages awards for decades in response to a single act." *Id.* at 211-12.[9]

Judge Bates concluded his opinion by stressing the narrowness of his decision and once again emphasizing that plaintiffs had conceded the untimeliness of their claims:

> The Court's decision today ignores neither "the fundamental rule that statutes of limitations are generally treated as affirmative defenses that may be waived," nor "Congress's determination that the statute of limitations is not a requirement for exercise of subject matter jurisdiction." . . . **In this instance**, "where 'the facts supporting the statute of limitations defense are set forth *in the papers plaintiff[s] [themselves] submitted*,'" the Court will not grant default judgments because of the patent untimeliness of these actions.

*Id.* at 212 (citations omitted) (emphases added).

### B.     This Case Is Very Different From *Maalouf* And Does Not Present The Same "Special Circumstances."

This case is entirely different from *Maalouf* and does not present the "special circumstances" that led Judge Bates to consider the limitations period *sua sponte*.

### 1.     Plaintiffs Are Not "Piggybacking" On Stale Claims.

First, this action is not a Beirut barracks bombing case seeking to "piggyback" on stale judgments and asserting claims relating to a decades-old incident with no new allegations and no new evidence. Rather, this case involves new claims, new evidence, and new plaintiffs seeking to establish Iranian responsibility for acts of international terrorism committed against U.S.

---

[9] Despite Judge Bates' expressed concerns, it is worth noting that in 2008, Congress (at least according to co-sponsor Sen. Lautenberg) saw no issue with permitting suit by victims of the 1983 Beirut bombing and a 1986 Berlin discotheque bombing. Indeed, permitting such decades-old suits was a primary objective of the 2008 legislation, and Sen. Lautenberg described the 1983 Beirut bombing as "the inspiration for this new legislation." 154 Cong. Rec. S55 (daily ed., Jan. 22, 2008).

nationals in Iraq between December 2003 and October 2011. Plaintiffs here are members of the U.S. military, U.S. nationals, and their families, for whom Congress expressly created a cause of action against state sponsors of terrorism, while the plaintiff in *Maalouf* was a Lebanese citizen who was the older brother of Edward Maalouf, a security guard killed in the embassy annex bombing in 1984. *See* 306 F. Supp. 3d at 206. As discussed in Part II.C.2 below, the Supreme Court has held that the rights and interests of U.S. citizens are important thumbs on the scale in weighing comity concerns.

The *Maalouf* plaintiffs sought to rely on the evidence adduced in *Doe* and *Salazar* eight and fourteen years previously. In contrast, Plaintiffs here are not trying to bootstrap their claims onto an old judgment. They are not relying on any prior judgment holding Iran accountable for providing material support for terrorism in Iraq. The concerns expressed by Judge Bates in *Maalouf* about follow-on, "piggyback" filings do not apply here.

> **2.    The Court's Duty Under The FSIA To Examine The Evidence Independently Militates In Favor Of Allowing Plaintiffs' Claims To Proceed.**

Because this case does not seek to "piggyback" upon a prior judgment, the FSIA's requirement that a court independently consider a plaintiff's evidence weighs in favor of permitting the instant Plaintiffs' claims to proceed. Unlike the *Maalouf* claimants, Plaintiffs here are not seeking to rely on the evidence from *Doe* and *Salazar*; they are seeking to introduce new evidence concerning acts of international terrorism in Iraq between 2003 and 2011.

The FSIA provides that "[n]o judgment by default shall be entered ... against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). Judge Bates reasoned this "independent screening requirement" cuts against the

22

plaintiffs in *Maalouf* because it "places the burden on the plaintiff to establish her claim even in the case of a default." 306 F. Supp. 3d at 210.

But here that provision cuts in Plaintiffs' favor and against *sua sponte* invocation of the limitations defense. Plaintiffs will not rest merely on old outdated judgments from prior lawsuits. Rather, they will present evidence to the Court to establish their claims. The FAC details voluminous evidence of Iran's support for terrorism, much of it unquestionably arising during the time within the limitations period.

What Judge Bates described as "strong policies favoring the resolution of genuine disputes on their merits" (*id.* at 210) (internal quotation marks and citation omitted) therefore weigh in Plaintiffs' favor. They seek the opportunity to present "evidence satisfactory to the court" (28 U.S.C. § 1608(e)) to prove their allegations. Judicial time and resources are better spent, and any comity appropriately provided, weighing the evidence on the substantive issues remaining in the case.

### 3. Many Of Plaintiffs' Claims Are Indisputably Timely And The Remaining Claims Would Require Analysis And Fact-Finding Before They Could Be Dismissed As Untimely.

This case is far different from *Maalouf* in another important respect: the *Maalouf* plaintiffs conceded their claims were ***untimely***, as Judge Bates repeatedly stressed. 306 F. Supp. 3d at 205, 207 & nn.4-5. Plaintiffs here make no such concession and, in fact, dispute that ***any*** of their claims are time-barred. Judge Bates' decision was closely tied to Plaintiffs' concession: "In this instance, where the facts supporting the statute of limitations defense are set forth in the papers plaintiff[s] [themselves] submitted, the Court will not grant default judgments because of the patent untimeliness of these actions." *Id.* at 212 (internal quotation marks and citations omitted; alterations in original).

In contrast, in this case many of Plaintiffs' claims (specifically, Part VI-A through Part VI-V of the FAC, ¶¶ 572-826) are indisputably *timely* under the 10-year statute of limitations, and the remaining claims could not be dismissed as untimely without substantial analysis and fact-finding by the Court on a Plaintiff-by-Plaintiff basis, claim-by-claim basis as discussed in Part I, *supra.* All of Plaintiffs injuries were caused by acts of international terrorism between 2003 and 2011. By comparison, in *Maalouf*, 35 years had passed since the Beirut bombing.

Thus, this case is markedly different from *Maalouf*, which did not involve the kind of extensive analysis and fact-finding that would be required in this case if limitations were considered *sua sponte* by the Court. Because, unlike Plaintiffs in the instant matter, the *Maalouf* plaintiffs conceded that their claims were untimely, Judge Bates was able to resolve the issue without any substantial expenditure of judicial resources. This case would be very different.

Judge Bates cited "the interests of the judiciary" as one of the factors for a court to consider in deciding whether to consider limitations *sua sponte. Id*. at 209. Here, that factor militates strongly against *sua sponte* consideration of limitations. If this Court were to properly examine the timeliness of Plaintiffs' claims, it would need to devote substantial time and scarce judicial resources to considering the tolling arguments and evidence presented by Plaintiffs on a claimant-by-claimant basis — all to the benefit of a defendant that has been properly served and has elected to decline the opportunity to participate in this litigation and challenge the timeliness of these claims. Judge Bates opined that "it is appropriate for a district court to address *clear* violations of the FSIA statute of limitations." *Id.* at 210 (emphasis added). He did not hold it was appropriate, or even proper, for a court to invoke the FSIA's statute of limitations *sua sponte* where doing so would itself impose a burden on the judicial system — and where, even if all such claims were time-barred, the underlying lawsuit would still go ahead.

Confining *sua sponte* considerations of limitations to situations where plaintiffs' claims are concededly (or otherwise obviously) untimely is consistent with the D.C. Circuit's approach to a plaintiff's evidentiary burden under the terrorism exception. In *Owens*, for example, the D.C. Circuit opined that "Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both ***clearly*** inadmissible and essential to the outcome has it abused its discretion. This is part of the risk a sovereign runs when it does not appear and alert the court to evidentiary problems." 864 F. 3d at 785-86 (emphasis added). The Court of Appeals explained that "the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Id.* at 784 (internal quotation marks and citation omitted). "We will not accept a belated challenge to admissibility raised by a defaulting sovereign unless the contested evidence is ***clearly*** inadmissible and we seriously doubt the plaintiff could have provided alternative evidence that would have been admissible." *Id.* at 787 (emphasis added).

Similarly, in *Han Kim*, the D.C. Circuit opined that "courts have the authority—indeed, we think, the obligation—to adjust evidentiary requirements to differing situations" and therefore permitted the plaintiffs to recover absent direct evidence proving their claim. 774 F.3d at 1048 (internal alterations and quotation marks removed). The Court of Appeals reasoned that otherwise courts "would defeat the Act's very purpose: to give American citizens an important economic and financial weapon to compensate the victims of terrorism, and in so doing to punish foreign states who [sic] have committed or sponsored such acts and deter them from doing so in the future." *Id.* In *Han Kim*, the court actually lowered the evidentiary burden a plaintiff would ordinarily face. *Id.* at 1048. Here, Plaintiffs request merely that the Court do what a federal

tribunal court would ordinarily do in the case of a defaulting defendant — refrain from *sua sponte* raising the affirmative defense of limitations.

*Sua sponte* invoking a non-jurisdictional statute of limitations affirmative defense in a contested and factually complex situation would not only waste judicial resources; it would also undermine the adversarial system of justice, which presupposes that parties (and not the courts) are responsible for presenting facts and arguments to neutral and relatively passive decision-makers. *See United States v. Burke*, 504 U.S. 229, 246 (1992) (Scalia, J., concurring) ("The rule that points not argued will not be considered is more than just a prudential rule of convenience; its observance, at least in the vast majority of cases, distinguishes our adversary system of justice from the inquisitorial one."). The Supreme Court has cautioned that *sua sponte* consideration of defenses (even for the protection of sovereigns) should be undertaken sparingly by the trial courts, even in those narrow circumstances where it is authorized. *See Arizona v. California*, 530 U.S. 392, 412-13 (2000) (opining in case involving sovereign States that "trial courts must be cautious about raising a preclusion bar *sua sponte*, thereby eroding the principle of party presentation so basic to our system of adjudication").

For all these reasons, the *Maalouf* plaintiffs' concession that their claims were untimely is a dispositive difference that warrants a different outcome here.

### 4.   Plaintiffs Allege A Coordinated, Common Policy By Iran That Has Produced Interconnected Claims.

Another distinguishing feature of this case is that the FAC alleges a coordinated policy of terrorism by Iran involving common methods, policies, strategies, and weapons — not a disparate set of unrelated terror attacks. The interconnected nature of Plaintiffs' allegations means that any claims in the instant case that could appear to be time-barred are closely connected to the unquestionably timely claims. The claims all share common actors, a common

plan, a common intent, and a common site of operations. *See* FAC ¶¶ 41-175. All claims arise out of Iran's policy of funding terror groups in Iraq to target U.S. military personnel. This pattern of continued material support for terrorism by Iran spanned the entire period covered by the statute of limitations, and beyond. Any comity concerns should be greatly diminished when a foreign state that is a designated sponsor of terrorism has demonstrably continued to support the same sort of terrorist acts within the limitations period as it also supported outside the limitations period.

Under the Court of Appeals' decision in *Van Beneden v. Al-Sanusi*, 709 F.3d 1165 (D.C. Cir. 2013), any comity concerns should be greatly reduced when a group of claims is the product of a coordinated, unified policy of terror. *Van Beneden* reversed the dismissal on limitations grounds of terrorism claims arising from separate 1985 attacks in the Vienna and Rome airports. In the course of overruling the district court's decision that the claims were time-barred, the Court of Appeals explained that it would be "[g]uided by the statute's text and purpose" and would "interpret its ambiguities flexibly and capaciously." *Id.* The D.C. Circuit instructed that, in determining whether two or more attacks should be deemed part of the same "act or incident," a court should "look not to single points of congruence but to the full spectrum along which discrete actions increasingly relate." *Id.* at 1168. The Court acknowledged that the Vienna and Rome attacks involved "two airports, nearly 500 miles apart," "distinct physical facilities," different terrorists, different law enforcement agents, and different victims. *Id.* at 1167 (internal quotation marks omitted). But "[t]he two groups used the same type of weapons (Kalashnikov submachine rifles and type F1 hand grenades), which came from a single source (the grenades in each attack bore the same markings), and they executed the same strategy." *Id.*

27

The Court of Appeals concluded that a defendant's interest in a limitations defense is greatly diminished when the basis for its liability is a common plan or policy. The court analogized its reasoning to Federal Rule of Civil Procedure 15(c), where "Congress has allowed relation back of newly filed claims when doing so assures defendants notice within the limitations period." *Id.* at 1168. By the same token, when a foreign state pursues a consistent, coherent policy that exposes itself to liability under § 1605A, it has little basis for complaining about the assertion of related claims falling just outside the limitations period. Given the interconnected nature of the claims, the foreign state has been put "on notice" regarding its potential liability. *Id.* at 1168.

Moreover, because Plaintiffs can demonstrate that similar terrorist attacks, carried out pursuant to a common plan, continued into the limitations period, their claims are similar to ones often permitted in U.S. courts under theories of "continuing violations." This further diminishes any interest by Iran in a limitations defense. When a plaintiff is injured as a result of a continuing practice by a defendant, the plaintiff may often recover for the entire injury even though the injury arose in part outside the limitations period. "If such a violation is alleged, the plaintiff may rely on conduct that took place outside the limitations period so long as some conduct on which the claim is based took place within the limitations period." *Earle v. Dist. of Columbia*, 707 F.3d 299, 307 (D.C. Cir. 2012). For example, an employment discrimination suit is timely so long as a pattern of discriminatory acts fell partly within the limitations period. *Smith v. American President Lines, Ltd.*, 571 F.2d 102, 105-06 (2d Cir. 1978).

In short, the ordinary concerns that might justify *sua sponte* application of limitations periods are reduced when the defendant's practice is a continuing one. This distinction also establishes another limiting principle found lacking in *Maalouf*. A plaintiff seeking to recover

28

outside the limitations period would need to show that the foreign state's support for similar terrorist attacks had continued under a common plan into the period covered by the statute of limitations.

\* \* \*

All of these factors demonstrate that this case is starkly different from *Maalouf.* It does not present the "special circumstances" that led Judge Bates to apply the limitations statute *sua sponte.* Indeed, there are compelling reasons for this Court to exercise its discretion ***not*** to apply the statute of limitations here.[10]

### C.     Comity Does Not Require *Sua Sponte* Consideration of the Limitations Period In This Case.

On the other side of the ledger, the principle of comity does not require this Court to *sua sponte* apply the statute of limitations in this case.

#### 1.     Judge Bates' Comity Analysis Was Specific To The Facts Of *Maalouf* And Does Not Apply Here.

Judge Bates cited "respect for other sovereign nations" as a reason for *sua sponte* invoking the limitations period. 306 F. Supp. 3d at 205. But the D.C. Circuit has taken a dim view of the comity to be accorded to "state sponsors of terrorism" as defined by the U.S. State Department. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya,* 376 F.3d 1123, 1128-29 (D.C. Cir. 2004) ("[W]e are not moved by the plight of Libya's hypothetical foreign state. We see no reason why there would be a greater justification for — or why Congress would have a

---

[10] Unlike in *Maalouf*, many of the Plaintiffs in this case are in possession of classified information that may be relevant to the litigation — and therefore have been required to proceed cautiously to avoid "sanction from the Executive Branch for violation of security agreements that restrict disclosure of classified information," *De Sousa v. Dep't of State*, 840 F. Supp. 2d 92, 104 n.4 (D.D.C. 2012), given the absence of "authority that directly controls a plaintiff's right to present classified information in a civil action." *Id.* at 104. Whether or not these concerns provide an additional reason why the Court should not apply § 1605A(b) *sua sponte*, they once again underscore the material respects in which the plaintiffs here are differently situated from the plaintiffs in *Maalouf*.

greater interest in — protecting a party haled into court under § 1605(a)(7) than one trying to resist admiralty jurisdiction. After all, the only defendants that are subject to § 1605(a)(7) in the first place are those that the State Department has designated as 'state sponsor(s) of terrorism.'").

In any event, the comity concerns that led Judge Bates to invoke § 1605A(b) *sua sponte* in *Maalouf* are absent here. This is not a case where a foreign sovereign faces potentially endless repetitive liability based upon stale judgments. Unlike the plaintiffs in *Maalouf*, the Plaintiffs here do not seek to rely solely on prior judgments to prove their case. Unlike the *Maalouf* plaintiffs, they do not "rely for most of their evidence on cases filed eight and fourteen years previously." 306 F. Supp. 3d at 211. They are not part of a pattern of cases seeking to "continue piggybacking off of older decisions for decades to extract multimillion dollar judgments from absent sovereigns." *Id.* Iran's interests in this case are therefore already protected. Its interests are further accommodated by the FSIA requirement that Plaintiffs establish their "claim or right to relief by evidence satisfactory to the court," 28 U.S.C. § 1608(e); the interests need not be elevated above Plaintiffs' right to recover by *sua sponte* invoking an affirmative defense that Defendants deliberately waived.

Further, many of Plaintiffs' claims in this case are unquestionably timely under the 10-year statute of limitations. The question here is whether ***all*** of Plaintiffs' claims— or only a portion thereof — should be permitted to go forward. There is surely less of a comity concern in adding what would be merely ***incremental*** liability, particularly in light of the coordinated, common policy by Iran that has produced interconnected claims.

*Maalouf* cited the Supreme Court's decision in *Day*, 547 U.S. 198, as an example where *sua sponte* invocation of the statute of limitations would be appropriate. But *Day* illustrates that such invocation is unwarranted on the facts of this case. In *Day*, the defendant failed to raise the

limitations defense due to a clerical mistake regarding the computation of time: "[N]othing in the record suggests that the State 'strategically' withheld the defense or chose to relinquish it. From all that appears in the record, there was merely an inadvertent error, a miscalculation that was plain under Circuit precedent." *Id.* at 211.

Here, Iran's decision not to appear and not to raise limitations as an affirmative defense must be treated as a knowing and intelligent strategic choice. As Judge Bates noted, "Iran is perfectly happy to litigate cases that do not involve terrorism charges." *Maalouf*, 306 F. Supp. 3d at 211. Iran routinely appears through counsel when it is a plaintiff in U.S. courts, and in other capacities as well. *See, e.g., Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366 (2009); *McKesson HBOC, Inc. v. Islamic Republic of Iran*, 271 F.3d 1101 (D.C. Cir. 2001), *vacated in part*, 320 F.3d 280 (D.C. Cir. 2003); *Islamic Republic of Iran v. Boeing Co.*, 716 F.2d 910 (9th Cir. 1983) (table). Conversely, Iran has repeatedly declined to appear in terrorism-related cases in this District.[11]

Hence, there would be a deep irony in citing "comity" as the basis for *sua sponte* considering an affirmative defense in this case — when Iran has ***deliberately*** declined to assert that defense. In effect, the Court would be second-guessing Iran's litigation strategy and granting Iran precisely what it has intentionally decided to forgo. That is the opposite of comity. Further, *sua sponte* consideration of limitations would reward Iran for its selective participation in the U.S. legal system. It would serve to lower the cost of sponsoring anti-American terrorism and hand Iran a bonus for thumbing its nose at this Court.

---

[11] *See, e.g., Burks v. Islamic Republic of Iran*, No.1:16-cv-01102-CRC; *Hake v. Bank Markazi*, No. 1:17-cv-00114; *Martinez v. Islamic Republic of Iran*, No. 1:16-cv-02193-EGS; *Brooks v. Bank Markazi*, No. 1:17-cv-00737-TJK; *Field v. Bank Markazi*, No. 1:17-cv-02126-TJK; *Karcher v. Islamic Republic of Iran*, No. 1:16-cv-00232-CKK.

In *Maalouf*, Judge Bates reasoned that *"[s]ua sponte* dismissals are more permissible in default judgment proceedings," 306 F. Supp. 3d at 209, but in this case the interests of justice counsel otherwise. By defaulting, Iran has robbed Plaintiffs of their full opportunity to litigate this case, conduct discovery, and cross-examine witnesses — all of which they are prepared to do (unlike the *Maalouf* plaintiffs). In this case, Iran's default strategy is intended to shun its victims — effectively rubbing salt into their wounds by refusing to recognize this legal proceeding and perpetuating the effect and psychological trauma of its terrorism.

### 2.    Judge Bates' Reasoning Was Carefully Limited And Should Not Be Expanded.

Judge Bates carefully calibrated his comity analysis to the facts of the case before him and repeatedly stated that dismissal was warranted "in this instance" (*id.* at 212) based on the "special" circumstances of the *Maalouf* case. *Id.* at 209. His decision should not be transplanted to the very different context of this case.

Judge Bates did not endorse an impressionistic or free-floating comity analysis by district courts, and indeed the authorities he cited made clear that such an approach would be improper. For example, *Maalouf* cited *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), which upheld a district court's refusal to provide international judicial assistance and opined that comity concerns could not be inserted into a statutory scheme created by Congress for the production of documents. *Id.* at 261 ("While comity and parity concerns may be important as touchstones for a district court's exercise of discretion in particular cases, they do not permit our insertion of a generally applicable foreign-discoverability rule into the text of § 1782(a).").

Similarly, *Maalouf* cited *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250 (2014), which upheld (over Argentina's strenuous objections) the enforcement of subpoenas served by a private party on banks for records relating to Argentina's global financial

transactions. Per Justice Scalia, the Court stressed that the FSIA's comprehensive framework eliminated the judge-made rules for deciding questions of foreign sovereign immunity:

> Congress abated the bedlam in 1976, replacing the old executive-driven, factor-intensive, loosely common-law-based immunity regime with the Foreign Sovereign Immunities Act's "comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state." The key word there—which goes a long way toward deciding this case—is comprehensive. We have used that term often and advisedly to describe the Act's sweep: "Congress established [in the FSIA] a comprehensive framework for resolving any claim of sovereign immunity." *Altmann*, 541 U.S., at 699. The Act "comprehensively regulat[es] the amenability of foreign nations to suit in the United States." *Verlinden*, 461 U.S. at 493. This means that "[a]fter the enactment of the FSIA, the Act—and not the pre-existing common law—indisputably governs the determination of whether a foreign state is entitled to sovereign immunity." *Samantar v. Yousuf*, 560 U.S. 305, 313. As the Act itself instructs, "[c]laims of foreign states to immunity should henceforth be decided by courts ... in conformity with the principles *set forth in this [Act]*." 28 U.S.C. § 1602 (emphasis added). Thus, any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text. Or it must fall.

*Id.* at 2255-56 (citations omitted). The Court noted that "Argentina and the United States urge us to consider the worrisome international-relations consequences of siding with the lower court," including the concern that discovery orders "will '[u]ndermin[e] international comity,'" "provoke 'reciprocal adverse treatment of the United States in foreign courts,'" or "threaten harm to the United States' foreign relations more generally." *Id.* at 2258. The Court responded: "These apprehensions are better directed to that branch of government with authority to amend the Act—which, as it happens, is the same branch that forced our retirement from the immunity-by-factor-balancing business nearly 40 years ago." *Id.*

Nothing in *Maalouf* requires this Court to conclude that the statutory rights of murdered and grievously injured U.S. nationals, U.S. military personnel, and their families are outweighed by comity regarding the abstract dignitary interests of Iran, a designated state sponsor of terrorism that has deliberately declined to appear in terrorism-related cases in the U.S. courts.

Judge Bates did not express any view on that question. Moreover, the FSIA terrorism exception and the pattern of legislative activity in this area show that the political branches have resolved the question in Plaintiffs' favor. Any role for comity is diminished where, as here, Congress has legislated in the field. *See United States v. Pink*, 315 U.S. 203, 230 (1942) (pointing to "the judgment of the [U.S.] political department" and warning that "[w]e would usurp the executive function if we held that that decision was not final and conclusive in the courts").

The D.C. Circuit has explained that "[i]t is well understood that, over the years, Congress has amended the FSIA to allow 'massive judgments of civil liability against nations that sponsor terrorism.'" *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 352 (D.C. Cir. 2018) (citation omitted). The Court of Appeals has instructed that "the statute's text and purpose" should guide courts to "interpret its ambiguities flexibly and capaciously." *Van Beneden*, 709 F.3d at 1167. This guiding principle counsels for exercising discretion in Plaintiffs' favor.

"Congress intended to deter state support for terrorism," *Owens*, 864 F.3d at 764, by "providing a cause of action against officials, employees, or agents of a designated state sponsor of terrorism" and "authoriz[ing] the award of punitive damages against such a defendant." *Id.* "These two changes marked a departure from the other FSIA exceptions, none of which provided a cause of action or allowed for punitive damages." *Id.* In 2008, Congress extended the cause of action to "claimants or victims" who were U.S. nationals, and for the first time, to members of the armed forces and to government employees or contractors acting within the scope of their employment." *Id.* at 765.

Further, Congress eliminated foreign sovereign immunity for such a claim and declined to make the statute of limitations jurisdictional or otherwise to require federal courts to apply it. Indeed, Congress specifically provided that "[t]he court ***shall*** hear a claim under this section if"

34

certain conditions were met (not including limitations). 28 U.S.C. § 1605A(a)(2). And Congress created the Victims' Compensation Fund to provide for recoveries.

As Sen. Lautenberg explained (*see* pp. 8- 9, *supra*), the 2008 amendments were aimed at facilitating recoveries by U.S. nationals, members of the armed services, and Government employees against foreign governments designated as state sponsors of terrorism. Congress sought to eliminate barriers to redress created by the courts, especially ***statutes of limitations***. In this case, *sua sponte* invocation of the statute of limitations to preclude Plaintiffs' claims would be precisely the kind of judicial interference that Congress attempted to override in enacting the 2008 amendments to the FSIA. Sen. Lautenberg further explained that curbing Iranian-sponsored terrorism was a primary objective of the 2008 amendments and singled out the statute of limitations as one of the examples of "overly mechanistic" judicial interpretations that had frustrated congressional intent. 154 Cong. Rec. at S55.

Even apart from the legislative scheme, which by itself should have a dispositive impact on any judicial comity analysis in this case, the Supreme Court has long held that comity must be applied with due regard for the rights of U.S. citizens – here, U.S. nationals, members of the U.S. military, and their families, for whom Congress expressly created a cause of action against state sponsors of terrorism. In *Hilton v. Guyot*, 159 U.S. 113 (1895), the Supreme Court explained that that the doctrine of international comity requires a nation to balance "international duty and convenience" with "the rights of its own citizens or of other persons who are under the protections of its laws." *Id.* at 163-64; *see also Oakey v. Bennett*, 52 U.S. (11 How.) 33, 44 (1851) ("[N]ational comity does not require any government to give effect to such assignment [of property], when it shall impair the remedies or lessen the securities of its own citizens.").

Accordingly, the Supreme Court frequently refuses to apply comity where it would prejudice the rights and interests of U.S. citizens. In *In re Vitamin C Antitrust Litigation*, 837 F.3d 175 (2d Cir. 2016), for example, the Second Circuit vacated an antitrust award, opining that "because the Chinese Government filed a formal statement in the district court asserting that Chinese law required Defendants to set prices and reduce quantities of vitamin C sold abroad, and because Defendants could not simultaneously comply with Chinese law and U.S. antitrust laws, the principles of international comity required the district court to abstain from exercising jurisdiction in this case." *Id.* at 179. The Supreme Court unanimously reversed. *Animal Science Products, Inc. v. Hebei Welcome Pharmaceutical Co. Ltd.*, 138 S. Ct. 1865 (2018). It recognized that, "[i]n the spirit of 'international comity,' a federal court should carefully consider a foreign state's views about the meaning of its own laws." *Id.* at 1873 (citation omitted). But it warned that "the appropriate weight in each case will depend upon the circumstances," and it held that comity did not require the judiciary to accept the Chinese government's statement of its own laws. *Id.* [12]

---

[12] In *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba (Bancec)*, 462 U.S. 611, 622, 632 (1983), for example, the Supreme Court declined to defer to the Cuban government's view of Cuban law as a matter of comity, where that view threatened the property rights of U.S. citizens. In *Disconto Gesellschaft v. Umbreit*, 208 U.S. 570, 578-79 (1908), the Court noted that "international comity does not require the enforcement of judgments" that would prejudice the rights of local creditors. In *Second Russian Ins. Corp. v. Miller*, 268 U.S. 552, 561 (1925), the Court found that "adoption of foreign law by comity" would be "much beyond its limits as at present defined" and there was "no basis for the contention that the principle of comity would require" such a result. *See Bank of Augusta v. Earle*, 38 U.S. (13 Pet.) 519, 589 (1839) (comity is "inadmissible when contrary to [a nation's] policy, or prejudicial to its interests"); Joseph Story, Commentaries on the Conflict of Laws § 25, at 31 (2d ed. 1841) ("No nation can . . . be required to sacrifice its own interests in favor of another; or to enforce doctrines which, in a moral or political view, are incompatible with its own safety or happiness, or conscientious regard for justice and duty.").

Thus, the Supreme Court has authoritatively established that comity has limits, especially where the rights of U.S. citizens are involved, and has frequently criticized the positions of foreign governments in litigation.[13] Regardless of whether comity warranted the *sua sponte* application of limitations in *Maalouf*, it surely does not do so here.

## III. THIS COURT SHOULD NOT FOLLOW *MAALOUF* BECAUSE IT WAS NOT CORRECTLY DECIDED.

Thus far, Plaintiffs have shown that (1) this case does not present a *Maalouf* situation at all because all of Plaintiffs' claims are timely either in their own right or under various tolling doctrines, and (2) even if this Court were to conclude otherwise, it should not consider the limitations period *sua sponte* because the justifications for doing so in *Maalouf* are absent here. If this Court disagrees, it still should not apply *Maalouf* because it was not correctly decided and failed to recognize the primacy of Congress in defining the metes and bounds of the cause of action in Section 1605A. *Worley* and *Spaulding* are more persuasive authorities.

*Maalouf* began by properly acknowledging that, "[b]ecause the FSIA's statute of limitations does not implicate the Court's jurisdiction, the Court is 'under no *obligation* to raise the time bar *sua sponte*.'" 306 F. Supp. 3d at 208 (quoting *Day*, 547 U.S. at 205 (footnote omitted)). However, *Maalouf* erred in opining that "'courts have the discretion . . . to raise on

---

[13] *See RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2108 (2016) ("refus[ing] to adopt" the position of the European Community and its member states, and referring to the position as a "double standard"). In *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp.*, 493 U.S. 400 (1990), the Court held that dismissal of a suit under the act of state doctrine was improper, thus allowing the suit to proceed despite the district court's finding that the suit could "impugn or question the nobility of a foreign nation's motivations." *Id.* at 408-10; *see also* Hannah L. Buxbaum, *Foreign Governments as Plaintiffs in U.S. Courts and the Case Against "Judicial Imperialism*,*"* 73 Wash. & Lee L. Rev. 653, 678 *et seq.* (2016) (discussing numerous other cases in which U.S. courts rejected claims of foreign sovereigns instead of deferring based on comity).

their own initiative certain nonjurisdictional barriers to suit,' including statutes of limitations."
*Id.* (quoting *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 277 n.14 (2010)).

That reasoning was incorrect in the specific context of FSIA, which is a finely reticulated statutory scheme leaving no room for judicial freelancing in deciding whether to apply the statute of limitations as a matter of discretion. *Espinosa* — the very case cited by *Maalouf* — demonstrates the mistake. That case involved a provision of the Bankruptcy Code in which Congress expressly required bankruptcy courts to address and correct a defect in a debtor's proposed plan even if no creditor raised the issue. *Espinosa* makes clear that Congress' decisions are controlling. Congress could have adopted a similar provision here (mandating *sua sponte* consideration of limitations) but did not. Instead of making limitations jurisdictional, it did the opposite. It made limitations **non-jurisdictional** and specifically provided that "[t]he court **shall** hear a claim under this section if" certain conditions were met (not including limitations). 28 U.S.C. § 1605A(a)(2).

There is no room in the statute for a judge-made rule of "discretion" in deciding whether to trigger *sua sponte* the FSIA limitations provision, which Congress did not make mandatory. In *Petrella v. Metro-Goldwyn-Mayer, Inc*., 134 S. Ct. 1962 (2014), the Court opined in the copyright context that courts may not invoke a judge-made rule (there, laches) to bar legal relief otherwise available under a statute of limitations because "courts are not at liberty to jettison Congress' judgment on the timeliness of suit." *Id*. at 1967. In *SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*, 137 S. Ct. 954 (2017), the Court again invoked the separation of powers to hold that courts cannot apply laches as a defense against a damages claim for infringement available under the Patent Act's limitations period:

> When Congress enacts a statute of limitations, it speaks directly to the issue of
> timeliness and provides a rule for determining whether a claim is timely enough

to permit relief. The enactment of a statute of limitations necessarily reflects a congressional decision that the timeliness of covered claims is better judged on the basis of a generally hard and fast rule rather than the sort of case-specific judicial determination that occurs when a laches defense is asserted. Therefore, applying laches within a limitations period specified by Congress would give judges a "legislation-overriding" role that is beyond the Judiciary's power.

*Id.* at 960 (citations omitted). *Maalouf* committed the same separation-of-powers mistake that the Supreme Court condemned in *Petrella* and *SCA Hygiene Products.*

The fact that a foreign sovereign is involved does not change the analysis. The Supreme Court has explained that "limitations principles should generally apply to the Government 'in the same way that' they apply to private parties." *Scarborough v. Principi*, 541 U.S. 401, 421 (2004) (refusing to adopt special limitations rules in cases against the Government) (quoting *Franconia Assocs. v. United States*, 536 U.S. 129, 145 (2002)). The D.C. Circuit has instructed that "[t]he courts are not authorized to craft a body of federal common law in deciding FSIA terrorism exception claims." *Fraenkel*, 892 F.3d at 353.

*Maalouf* invades the prerogatives of the political branches in another respect. *Maalouf* requires courts to make discretionary assessments balancing the interests of foreign sovereigns, and such case-by-case judicial determinations based on comity are more likely to trigger foreign policy concerns than is the *Worley* bright-line rule. *Maalouf* effectively reintroduced the case-by-case judicial determinations of immunity that the FSIA was meant to displace. *See NML Capital,* 134 S. Ct. at 2255-56. *Maalouf* flies in the face of the Supreme Court's repeated warning that a case-by-case judicial approach to comity is "too complex to prove workable." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 168 (2004); *see also RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2108 (2016) (rejecting "case-by-case inquiry"); *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 259 (2010) (criticizing the "methodology of balancing interests"). The Court has also cautioned that foreign policy concerns (as reflected in

39

the act of state doctrine) do not represent "some vague doctrine of abstention." *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990).

Instead of weighing international comity concerns — which are first and foremost the responsibility of the political branches — *Maalouf* should have confined itself to the traditional role of the judiciary. "The short of the matter is this: Courts in the United States have the power, and ordinarily the obligation, to decide cases and controversies properly presented to them." *Kirkpatrick*, 493 U.S. at 409. By *sua sponte* invoking an affirmative defense that Congress did not make mandatory or jurisdictional, *Maalouf* failed to fulfill the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976); *see also Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) (Marshall, C.J.) (Observing that federal courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given").

For all these reasons, *Worley* and *Spaulding* are more persuasive authority than *Maalouf*. Thus, even if this Court concludes that some of Plaintiffs' claims are both time-barred and not subject to tolling, and that *Maalouf* cannot be distinguished based upon the "special circumstances" that were central to Judge Bates's reasoning but absent here, it should hold that the FSIA itself does not allow courts to resolve a § 1605A(b) defense *sua sponte*.

## CONCLUSION

The Court should determine that none of Plaintiffs' claims is subject to dismissal under § 1605A(b), and the Court should specify that numerous reasons support this conclusion: Defendants have waived the limitations defense; the factors *Maalouf* articulated in support of raising the statute of limitations defense *sua sponte* are lacking here, and there are no special

circumstances warranting the exercise of judicial discretion to invoke limitations *sua sponte*; even if limitations were considered, all of Plaintiffs' claims would be timely; and *Maalouf* misread the text and purpose of the FSIA by concluding that it could ever be appropriate for a court to raise a § 1605A(b) defense on its own. Accordingly, the Court should hold that none of Plaintiffs' claims is subject to dismissal under § 1605A(b).

Dated: August 3, 2018                    Respectfully submitted,

By: */s/ Christopher G. Paulos*
Christopher G. Paulos (*Pro Hac Vice*)
Florida Bar No. 0091579
**LEVIN, PAPANTONIO, THOMAS, MITCHELL,
RAFFERTY AND PROCTOR, P.A.**
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
Telephone: 850.435.7000
Facsimile: 850.436.6123
Email: cpaulos@levinlaw.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served by electronic filing with the Clerk via the CM/ECF system, which electronically notifies all registered participants.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 3, 2018                              Respectfully submitted,

*/s/ Christopher G. Paulos*