## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSHUA L. HOLLADAY *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> ISLAMIC REPUBLIC OF IRAN *et al.*, <br><br> *Defendants*. | Civil Action No. 17-915 (RDM) |

## <u>MEMORANDUM OPINION AND ORDER</u>

More than one hundred Plaintiffs, including American soldiers and others injured or killed in forty-three separate terrorist attacks in Iraq between December 17, 2003 and November 20, 2009 and their family members, bring this action against the Islamic Republic of Iran ("Iran") and five Iranian entities.  Dkt. 16 (Amd. Compl.).  This is the Court's second opinion addressing whether Plaintiffs have complied with the service-of-process requirements of the Foreign Sovereign Immunities Act, §§ 1602–1611 ("FSIA").  In its prior opinion, the Court held that Plaintiffs had properly served four Defendants: Iran, its Islamic Revolutionary Guard Corps ("IRGC"), the Iranian Ministry of Intelligence and Security ("MOIS"), and Bank Melli Iran ("Bank Melli").  *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 64 (D.D.C. 2019) ("*Holladay I*").  But the Court withheld judgment to "await development of a more complete factual record before deciding whether Plaintiffs have successfully effected service" on the two remaining Defendants: the National Iranian Oil Company ("NIOC") and Bank Markazi Jomhouri Islami Iran ("Bank Markazi"), also known as the Central Bank of the Islamic Republic of Iran. *Id.*  Plaintiffs have renewed their motion for an order finding effective service of process on

those two Defendants.  Dkt. 99.  For the reasons explained below, the Court now concludes that

Plaintiffs have properly served Bank Markazi and NIOC under 28 U.S.C. § 1608(b).

## I.  BACKGROUND

**A.      Statutory Background**

The FSIA grants immunity to foreign states in U.S. courts, 28 U.S.C. § 1604, unless one

of the statute's enumerated exceptions applies, *see id.* §§ 1605–1607.  The FSIA "provides the

'sole basis' for obtaining jurisdiction over a foreign sovereign in the United States." *Republic of*

*Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992).  The statute delineates the scope of

immunity not only for foreign countries and their subdivisions, but also for their agencies or

instrumentalities.  28 U.S.C. §§ 1603, 1604.  The FSIA defines "agency or instrumentality of a

foreign state" to mean any entity that (1) "is a separate legal person, corporate or otherwise;"

(2) "is an organ of a foreign state or political subdivision thereof, or a majority of whose shares

or other ownership interest is owned by a foreign state or political subdivision thereof;" and

(3) "is neither a citizen of a State of the United States . . . nor created under the laws of any third

country."  *Id.* § 1603(b).

Much of the statutory scheme treats foreign states and their agencies or instrumentalities

as one and the same, but certain provisions draw distinctions between them.  One of those

distinctions, as relevant here, appears in § 1608, which governs service of process.  Plaintiffs

seeking to serve "a foreign state or political subdivision of a foreign state" must comply with the

dictates of § 1608(a), while Plaintiffs attempting to serve "an agency or instrumentality of a

foreign state" must comply with § 1608(b).  *See Holladay I*, 406 F. Supp. 3d at 59 (D.D.C.

2019); *Howe v. Embassy of Italy*, 68 F. Supp. 3d 26, 31 (D.D.C. 2014).

Those provisions set out similar but not identical options for effecting service, listed in order of precedence. *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 327 (D.D.C. 2014). That is, if the first-listed method is unsuccessful or unavailable, then a plaintiff may move to the second, and so on. *Id.* Under § 1608(a), "a foreign state or political subdivision of a foreign state" must be served:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
>
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
>
> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or
>
> (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a). By contrast, under § 1608(b), "an agency or instrumentality of a foreign state" must be served:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or
>
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or

(3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—

(A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

(B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

(C) as directed by order of the court consistent with the law of the place where service is to be made.

*Id.* § 1608(b).

The statute thus requires courts evaluating service under the FSIA first to categorize the defendants to determine whether they needed to be served under § 1608(a) or § 1608(b). Then, after deciding which provision governs as to each defendant, courts must determine whether the plaintiffs' attempts to effectuate service satisfied the applicable requirements.

## B. Procedural Background

In *Holladay I*, the Court held that Plaintiffs had properly served Iran, IRCG, and MOIS under § 1608(a). As the Court explained, "Iran is, of course, the foreign state itself," while IRCG and MOIS "must in all cases be considered as the 'foreign state' itself" based on their inherently governmental functions. *Holladay I*, 406 F. Supp. 3d at 59 (citations omitted). Plaintiffs were thus correct to attempt service of Iran, IRCG, and MOIS under § 1608(a). The first two mechanisms for service under § 1608(a) were unavailable because Plaintiffs had no "special arrangement for service" with Iran, 28 U.S.C. § 1608(a)(1), and because Iran is not a party to any "international convention on service of judicial documents," *id.* § 1608(a)(2). *Holladay I*, 406 F. Supp. 3d at 61–62 (citing *Hamen v. Islamic Republic of Iran*, 401 F.Supp.3d 85, 107 (D.D.C. 2019)). Plaintiffs therefore first attempted service under the third paragraph of

§ 1608(a), Dkt. 23; Dkt. 25, but the mailing from the Clerk of Court was returned as undeliverable, Dkt. 29. Because their attempt to serve process under the third paragraph failed, Plaintiffs proceeded to serve Iran, IRCG, and MOIS through diplomatic channels pursuant to § 1608(a)(4). The Department of State, with assistance from the Embassy of Switzerland in Tehran, was able to deliver the required materials to the Iranian Ministry of Foreign Affairs, thereby effecting service on Iran, IRCG, and MOIS in compliance with § 1608(a). *Holladay I*, 401 F. Supp. 3d at 62.

The Court also held that Plaintiffs had properly served Bank Melli under § 1608(b). The Court determined that Bank Melli was appropriately categorized as an "an agency or instrumentality of a foreign state," in light of its commercial banking activities. *Id.* at 59–60. Plaintiffs were, accordingly, correct to attempt service under § 1608(b). Once again, neither of the first two methods—a "special arrangement" between the parties or an "applicable international convention"—were available. *Id.* at 63. That left Plaintiffs with the three alternative options listed in § 1608(b)(3). Plaintiffs attempted service under § 1608(b)(3)(B), which requires a plaintiff to deliver a summons and a copy of the complaint, together with a translation of each, to the Clerk of the Court, who must then send the required materials to the defendant "by any form of mail requiring a signed receipt." 28 U.S.C. § 1608(b)(3)(B). As the Court explained, "Plaintiffs delivered to the Clerk of the Court the required materials," *see* Dkt. 23; "the Clerk filed a Certificate of Mailing, along with a copy of the DHL mailing receipt," *see* Dkt. 25; and "Plaintiffs received notice that the package was successfully delivered to and signed for by an agent of Bank Melli," *see* Dkt. 28-1. *Holladay I*, 406 F. Supp. 3d at 63. The Court thus concluded that Plaintiffs had properly served Bank Melli under § 1608(b). *Id.*

The Court declined, however, to decide on the record before it whether Plaintiffs'
attempts to serve Bank Markazi and NIOC under § 1608(b)(3)(B) had been effective.  *Id.*  The
Court lacked sufficient information to render a decision as to either step in the inquiry.  First, the
record included too little detail about the status of Bank Markazi and NIOC for the Court to
determine whether they should be treated as the "foreign state" itself or should instead be
categorized as "an agency or instrumentality of a foreign state."  *Id.* at 60–61.  Only in the latter
case, of course, would service under § 1608(b) have been proper.  Second, even assuming that
Bank Markazi and NIOC are agencies or instrumentalities of Iran amenable to service under
§ 1608(b), the record was unclear as to whether Plaintiffs' attempts at service had been
successful.  *Id.* at 63–64.  Although the required materials were delivered to Bank Markazi and
NIOC and although someone at each of those entities signed for the delivery, the packages "were
mailed back to the clerk's office."  *Id.* at 63.  Because the circumstances surrounding the return
of the materials was unclear from the record, the Court could not determine whether service was
"reasonably calculated to give actual notice."  28 U.S.C. § 1608(b)(3).  As such, the Court denied
without prejudice Plaintiffs' motion for an order finding effective service of process as to Bank
Markazi and NIOC.  *Holladay I*, 406 F. Supp. 3d at 64.  Plaintiffs have now renewed their
motion and have offered additional evidence to supplement the record.

## II.  LEGAL STANDARD

A court adjudicating an FSIA case against an absent defendant must "satisfy itself that it
has personal jurisdiction."  *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005).  Under the FSIA,
moreover, service of process is a key component of personal jurisdiction.  *See Foremost-
McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 442 (D.C. Cir. 1990) (citing 28 U.S.C.
§ 1330(b)). "In the absence of an evidentiary hearing," plaintiffs may satisfy their burden of

demonstrating personal jurisdiction by making "only a prima facie showing of jurisdiction"

based on "their pleadings" and "bolstered by such affidavits and other written materials as they

can otherwise obtain." *Mwani*, 417 F.3d at 6–7 (internal citation and quotation marks omitted).

The required showing at this stage is lower than a "preponderance of the evidence standard," *id.*

but "conclusory statement[s]" are insufficient, *Naartex Consulting Corp. v. Watt*, 722 F.2d

779, 787 (D.C. Cir. 1983).  Rather, to make a prima facie showing that they properly served the

defendants, plaintiffs must present some "concrete evidence." *First Chicago Int'l v. United*

*Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988).

### III.  ANALYSIS

**A.    Whether § 1608(a) or § 1608(b) Applies to Bank Markazi and NIOC**

As noted above, the FSIA defines "agency or instrumentality of a foreign state" as any

entity that (1) "is a separate legal person, corporate or otherwise," (2) "is an organ of a foreign

state or political subdivision thereof, or a majority of whose shares or other ownership interest is

owned by a foreign state or political subdivision thereof," and (3) "is neither a citizen of a State

of the United States . . . nor created under the laws of any third country."  28 U.S.C. § 1603(b).

Only entities that meet these three requirements can be served under § 1608(b).  With respect to

the first prong of the definition, whether the entity "is a separate legal person" from the foreign

state itself, the D.C. Circuit has developed a "categorical" test that looks to the entity's "core

functions." *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994).

Under the categorical test, courts must ask "whether the core functions of the foreign entity are

predominantly governmental or commercial." *Id.*  In applying this test, judges in this circuit

have concluded that a country's military, ministry of foreign affairs, and embassies are properly

considered "foreign states" for purposes of the FSIA.  *See id.* at 153 (military); *Roeder v. Islamic*

*Republic of Iran*, 333 F.3d 228, 234–35 (D.C. Cir. 2003) (ministry of foreign affairs); *Howe v. Embassy of Italy*, 68 F. Supp. 3d 26, 33 (D.D.C. 2014) (embassy).  On the other hand, this Court recently held that Hungarian National Asset Management Inc., which, as its name suggests, manages the government's assets but is structured as a separate joint-stock company, was properly considered an agency or instrumentality.  *de Csepel v. Republic of Hungary*, No. 10-cv-01261, 2020 WL 2343405, at *10 (D.D.C. May 11, 2020).  Judges in this district have divided, however, on the question whether a museum is a foreign state or an agency or instrumentality of a foreign state.  *Compare Taylor v. Kingdom of Sweden*, No. 18-cv-1133, 2019 WL 3536599, at *3–4 (D.D.C. Aug. 2, 2019) (holding that Sweden's National Museums of World Culture were part of the foreign state itself), *with Smith v. Overseas Korean Cultural Heritage Found.*, 279 F. Supp. 3d 293, 297 (D.D.C. 2018) (holding that the Overseas Korean Cultural Heritage Foundation was an agency or instrumentality).

At the threshold, Plaintiffs raise two arguments directed at the governing test itself.  First, Plaintiffs "respectfully submit there is no basis in the FSIA for the existence, or the application, of the 'core functions test.'"  Dkt. 99 at 8 n.2.  For support, Plaintiffs rely on a dissent from the Second Circuit that criticized the test as "cut from judicial whole cloth" and argued that "[t]here is nothing in the statute or legislative history that makes commercial activity the ultimate touchstone for FSIA analysis in all respects."  *Garb v. Republic of Poland*, 440 F.3d 579, 600 (2d Cir. 2006) (Straub, J., dissenting) (internal quotation marks and citations omitted).  According to Plaintiffs, the inquiry "should begin and end" with the statutory text.  Dkt. 99 at 8 n.2.  Although *Transaero* held that the core functions test "best captures the statutory meaning," *Transaero*, 30 F.3d at 151, Plaintiffs are correct that nothing on the face of either § 1603 or § 1608 ties an entity's status as an agency or instrumentality to its commercial function.

Even so, Plaintiffs are barking up the wrong tree.  Perhaps they raised this argument in a footnote merely to preserve it for a potential appeal, but *Transaero* is binding precedent, and this Court is powerless to depart from the test that it announces.  And, beyond that, Plaintiffs' suggestion that the test is unmoored from the statutory text is incorrect.  As the D.C. Circuit observed, the central textual question is whether the putative defendant is the "foreign state" itself or instead "is a separate legal person," and the distinction between entities that perform governmental functions and those that perform commercial functions provides a sound dividing line.  28 U.S.C. § 1603.  The Oxford English Dictionary defines "state" as those entities or individuals "regarded as part of the body politic, and as such participating in its government." *State*, Oxford English Dictionary (3d Ed. 2012).  If a government-owned business is primarily commercial, that is a good indication that the entity in question is "separate" from the body politic.

Plaintiffs' second argument does not take aim at the D.C. Circuit's decision in *Transaero*, and it is more persuasive.  They contend that the Court's application of the test should be guided by the definition of "commercial activity" that applies elsewhere in the FSIA.  Dkt. 99 at 11–12. As noted above, the statute grants immunity to foreign states unless one of several enumerated exceptions applies.  One of the most substantial exceptions strips a foreign state's sovereign immunity in cases that are based on the foreign state's "commercial activity," provided there is a nexus between that activity and the United States.  28 U.S.C. § 1605(a)(2).  In this context, the FSIA's definition of "commercial activity" provides that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* § 1603(d).  When an entity is an organ of a foreign state or owned by a foreign state, its market activities will often serve public

purposes, either by aiming to achieve a policy goal or by seeking to raise revenue for

government coffers.  But by focusing on the nature of the activity, a court can nevertheless

distinguish commercial actions and actors from governmental ones.

Plaintiffs contend that the Court should employ this same understanding of "commercial

activity," as used for purposes of § 1605(a)(2), in applying the core functions test, used for

purposes of § 1608.  Dkt. 99 at 11.  Although these provisions employ different language,

*Transaero* offers some support for that view.  In explaining the statutory scheme, the D.C.

Circuit observed that the "distinction between foreign states and their instrumentalities"

referenced in § 1608 "establishes two categories of actors that correspond" to the "two categories

of acts" that define the scope of the commercial activity exception.  *Transaero*, 30 F.3d at 152.

The D.C. Circuit went on to explain that one benefit of the core functions test would be its "ease

of administration in the district courts."  *Id.*  The test would be easy to administer because "[t]he

district courts have perforce acquired expertise in delineating the categories of 'governmental'

and 'commercial' under the immunity provisions of the Act, and if section 1608 is construed to

turn on a similar distinction that expertise will benefit all concerned."  *Id.* at 152–53.  The D.C.

Circuit, in short, construed §§ 1603(b) and 1608 against the backdrop of—and consistent with—

§ 1605(a)(2), in both circumstances looking to the nature (and not the purpose) of the activity to

distinguish governmental from commercial activity.  And prior opinions from this Court confirm

that understanding, looking to the nature of an activity rather than its purpose in assessing service

under § 1608.  *See Smith*, 279 F. Supp. 3d at 297; *de Csepel*, 2020 WL 2343405, at *9–10.

With this understanding of the controlling test in mind, the Court turns to applying the

test to facts of this case.

1.      *NIOC*

The Court begins with NIOC because it presents a more straight-forward question.  In support of their argument that NIOC is an agency or instrumentality of Iran, Plaintiffs rely on a new declaration from Patrick L. Clawson, who is Director of Research at the Washington Institute for Near East Policy and an expert on Iran.  Dkt. 99-2 (Clawson Decl.).  Clawson explains that "NIOC is responsible for exploration, drilling, production, research and development, refining, distribution and export of oil, gas, and petroleum products."  *Id.* at 4 (Clawson. Decl. ¶ 18) (internal citation and quotation marks omitted).  Indeed, NIOC is one of the world's largest oil companies, *id.* at 5 (Clawson Decl. ¶ 20), and "generates billions of dollars in revenue each year," *id.* at 7 (Clawson Decl. ¶ 23).   The production, distribution, and exportation of oil are commercial functions.

To be sure, NIOC serves some governmental or quasi-governmental purposes.  First and foremost, after funding its own operations and making investments in Iran's oil industry, its revenue goes to fund the Iranian government.  According to Clawson, depending on the price of oil, "revenue from NIOC is between one-third and two-thirds of the Iranian government's total revenue."  *Id.* at 7 (Clawson Decl. ¶ 23).  But that does not undermine the company's status as a government agency or instrumentality.  As explained above, it is not the purpose, but the nature, of the activity that controls.  Indeed, most—if not all—successful, government-owned enterprises generate revenue for the government.  The relevant question is whether the nature of the underlying activity is governmental or commercial, and where, as here, it is commercial, the entity is properly characterized as "an agency or instrumentality" of the foreign state—and not as the foreign state itself.

Beyond generating revenue for Iran, NIOC also promotes state policy by "encouraging the development of the Iranian oil industry." *Id.* at 4 (Clawson Decl. ¶ 18). As Clawson explains:

> NIOC, in accordance with Article 44 of the Constitution, gives authority to different sectors, while supervising oil industry activities. The company has taken major steps toward establishing business enterprises, funded financial resources for development, helped to update technologies for exploration, drilling[,] and production with reliance on the knowledge of Iranian experts.

*Id.* at 4–5 (quotation marks and citation omitted). But as Clawson also explains, these functions serve both governmental and commercial interests. Iran certainly has an interest in supervising and supporting its oil industry, while "it is [in] NIOC's commercial interest" to encourage the development of "Iranian suppliers of oil field equipment and oil services, as well as Iranian companies with which it can partner for drilling oil wells and developing oil fields." *Id.* at 5 (Clawson Decl. ¶ 19). Notably, "Iran has been subject" to sanctions "for most of the last 40 years" and thus "cannot count on regular, uninterrupted access to foreign equipment, technology, and investment." *Id.* NIOC's efforts to develop and to support the Iranian oil industry are thus as much about advancing NIOC's own economic interests as they are about advancing Iran's policy goals. Overall, the Court is persuaded that NIOC's commercial functions predominate over its governmental functions and that the company is not "so closely bound up with the structure of the state" that it should be considered the state itself. *Transaero*, 30 F.3d at 153.

Finally, NIOC also meets the other two elements of the statutory definition of an "agency or instrumentality of a foreign state:" it is "owned by a foreign state," and it "is neither a citizen of a State of the United States" nor was it "created under the laws of any third country." 28 U.S.C. § 1603. NIOC is wholly owned by Iran. Dkt. 99-2 at 5 (Clawson Decl. ¶ 21). The

record also makes clear that NIOC is neither a citizen of a state nor was it created under the laws of any third country. *Id.*

The Court therefore concludes that NIOC is an agency or instrumentality of Iran and may be served according to the requirements of § 1608(b).

2.    *Bank Markazi*

The status of Bank Markazi presents a closer question.  To be sure, there is little doubt that Bank Markazi is wholly owned by the government of Iran and was formed under the laws of Iran, such that it clearly satisfies the second and third prongs of the FSIA's definition of "agency or instrumentality of a foreign state."  Dkt. 99-1 at 6–7 (Kleiman Decl. § 18).  But whether Bank Markazi performs predominantly commercial functions, and whether it is thus "a separate legal person, corporate or otherwise" within the meaning of the statute, 28 U.S.C. § 1603(b)(1), is difficult to discern.  Central banks, by their nature, straddle the line between governmental and commercial activity; they often both set the parameters for financial markets and operate within those markets.  Central banks thus defy the D.C. Circuit's expectation that the core functions test's "categorical approach" would lead to "ease of administration in the district courts." *Transaero*, 30 F.3d at 152.  Plaintiffs take a kitchen-sink approach in their effort to show that Bank Markazi is predominantly commercial, advancing a variety of alternative arguments.  The Court finds some of Plaintiffs' contentions more persuasive than others.  Ultimately, however, the Court concludes that Plaintiffs have cleared the low bar of making a prima facie showing that Bank Markazi is properly categorized as an agency or instrumentality of Iran.

To supplement the record that was before the Court at the time of its earlier decision, Plaintiffs have submitted an updated and expanded declaration from Gary Kleiman, a consultant who specializes in "global emerging economy and financial market analysis" and who professes

familiarity "with the Iranian banking system[] and the operations of Defendant[] Bank Markazi." Dkt. 99-1 at 1–2 (Kleiman Decl. ¶¶ 1, 4).  Kleiman provides additional analysis of Bank Markazi's activities and its role within Iran's economic system.  As the declaration explains, Bank Markazi, as the central bank of Iran, was formed "under enabling acts that date to 1960 and 1972."  *Id.* at 3 (Kleiman Decl. ¶ 8).  Its founding legislation grants the bank "dual responsibility for 'monetary and credit policies' and 'granting loans to state enterprises and agencies.'"  *Id.* (quoting Bank Markazi's website).  Since the Iranian Revolution in the late 1970s, the bank's dual purposes have been reflected in successive five-year plans that cover both "economic management and commercial and industrial sector priorities."  *Id.*  Bank Markazi determines "sector credit allocation" for industries including agriculture, manufacturing, and mining.  *Id.* at 4.  But it also administers an "affordable mortgage scheme" for individual borrowers and loans money to corporations and other banks.  *Id.*  The bank's "latest public balance sheet (March 2017) shows assets from loans to government institutions and corporations and banks at 302,329 Billion Rials and 1,000.65 Billion Rials respectively."[1]  *Id.*

According to Kleiman, "[u]nlike other political or ministerial arms of the Iranian government, Bank Markazi is a distinct corporate entity that possesses assets and liabilities, reports its profits and losses, pays income taxes, and issues small loans and letters of credit to public and private customers."  *Id.* at 5 (Kleiman Decl. ¶ 13).  And as the Iranian economy has struggled in the face of economic sanctions, "Bank Markazi has expanded into new industries," by rescuing oil ventures and increasing loans to startups.  *Id.* at 5–6 (Kleiman Decl. ¶ 14).  Bank Markazi has a role in setting Iran's monetary and credit policy, but does so "through the wider

---

[1]  One American dollar is worth more than 42,000 Iranian Rials.  *See Convert from United States Dollar (USD) to Iranian Rial (IRR)*, The Money Converter (last visited Feb. 11, 2021), https://themoneyconverter.com/USD/IRR.

Money and Credit Council (MCC), with [Bank Markazi's] governor [sitting] as a member [of the MCC] along with other government ministers, including from Finance, Industry[,] and Planning." *Id.* at 5 (Kleiman Decl. ¶ 12).

Looking at Bank Markazi's various responsibilities, it is difficult to disentangle the commercial and governmental strands.  In this context, the FSIA's focus on the "nature" of the activity, rather than its "purpose," is significant.  *See Smith*, 279 F. Supp. 3d at 297 (citing *Weltover*, 504 U.S. at 614) ("Although the Defendant's interests and objectives may align with, or be directed by, a foreign state, I must look to the 'nature' of the act, rather than its 'purpose.'").  In the *Weltover* case, the Supreme Court was asked to decide whether the Republic of Argentina was subject to suit in U.S. courts after it defaulted on bonds issued in an effort to stabilize its currency.  504 U.S. at 609.  Argentina and its central bank, Banco Central, had "instituted a foreign exchange insurance contract program (FEIC), under which Argentina effectively agreed to assume the risk of currency depreciation" in certain transactions by "agreeing to sell to domestic borrowers . . . United States dollars to repay their foreign debts when they matured."  *Id.*  Ultimately, however, Argentina lacked "sufficient reserves of United States dollars to cover the FEIC contracts" and thus refinanced "the FEIC-backed debt by issuing to the creditors government bonds."  *Id.*  When Argentina failed to make payment on the bonds, certain foreign bond holders brought suit in the United States, relying on the commercial activity exception to the FSIA to establish jurisdiction.  *Id.* at 610.

The Supreme Court agreed that Argentina was subject to suit because it acted, "not as regulator of a market, but in the manner of a private player within it."  *Id.* at 614.  In particular, the Court "perceive[d] no basis for concluding that the issuance of debt should be treated categorically different from other activities of foreign states" and that there was "nothing about

15

the issuance of the[]" bonds "that [was] not analogous to a private commercial transaction." *Id.*
at 615–16. The same reasoning applies to Bank Markazi's issuance of loans, which, like the
issuance of bonds, is analogous to private commercial activity.

Of course, this reasoning goes only so far. Notably, the question at issue in *Weltover* was
whether a specific activity—there, the issuance of the bonds—fell within the commercial activity
exception to the FSIA, while the question currently before the Court is whether Bank Markazi's
activities, in general, are predominantly commercial in nature. After two rounds of briefing and
two rounds of evidentiary submissions, the exact proportion of the bank's activities that are
properly considered commercial, as compared to those that are best viewed as governmental,
remains opaque. Although Plaintiffs' motion thus presents a close question, the Court concludes
that they have produced enough evidence of Bank Markazi's commercial activity to make a
prima facie showing that the bank's activities are predominantly commercial. As explained
above, the bank has well over a trillion Rials in loans outstanding, while it principally shares
regulatory duties with other Iranian agencies through the bank governor's seat on the MCC.
Bank Markazi's own descriptions of its role within the Iranian system, moreover, further
supports the view that it performs predominantly commercial functions. Although Bank Markazi
chose not to respond to the present lawsuit, it has appeared in other cases and argued (albeit in a
different context) that it is an agency or instrumentality of Iran, rather than the foreign state
itself. In briefing before the U.S. Supreme Court, Bank Markazi argued that it "is an
independent and distinct legal entity, separate from the Iranian government." Brief for
Petitioner, *Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016) (No. 14-770), 2015 WL 7294865,
at *9 (Nov. 16, 2015). "Under Iranian law, it is treated as a joint stock company except as
otherwise provided by Iran's Monetary and Banking Law." *Id.*; *see also Peterson v. Islamic*

*Republican of Iran*, No. 10-cv-4518, 2013 WL 5538652, at *3 (S.D.N.Y. Oct. 8, 2013) ("Bank

Markazi does not dispute that it is an instrumentality of Iran. . . . Indeed, its acknowledgement of

that fact forms the premise of its motion that it is entitled to FSIA immunity.").[2]  Taken together,

these materials are sufficient to carry Plaintiffs' burden at this stage of the litigation.

　　　The legislative history of the FSIA confirms the Court's conclusion.  The House Report

explained:

> As a general matter, entities which meet the definition of an 'agency or
> instrumentality of a foreign state' could assume a variety of forms, including a
> state trading corporation, a mining enterprise, a transport organization such as a
> shipping line or airline, a steel company, *a central bank*, an export association,
> a governmental procurement agency or a department or ministry which acts and
> is suable in its own name.

H.R. Rep. No. 1487, at 15–16 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6614.  Congress

thus contemplated that a central bank could qualify as an agency or instrumentality of a foreign

state.  In *Transaero*, the D.C. Circuit was unimpressed with the FSIA's legislative history, but its

criticism was focused on an alternative legal test that the House Report proposed and did not take

issue with the examples of agencies and instrumentalities that the Report proffered.  *Transaero*,

30 F.3d at 152.  The legislative history thus lends some support to the Court's conclusion that

Bank Markazi is an agency or instrumentality of Iran.

　　　Further, as Plaintiffs note, courts in the Second Circuit have held that state-owned central

banks qualify as agencies or instrumentalities of foreign states under the FSIA.  *See Weininger v.*

*Castro*, 462 F. Supp. 2d 457, 498 (S.D.N.Y 2006) (holding that "state-owned central banks

indisputably are included in the 1603(b) definition of 'agency or instrumentality'" in a case

involving the central bank of Cuba) (citations and quotation marks omitted); *see also S&S Mach.*

---

[2]  Earlier in that same case, Bank Markazi filed a motion to dismiss for lack of subject-matter jurisdiction without challenging its service under § 1608(b).  *See Peterson v. Islamic Republic of Iran*, No. 10-cv-4518, 2013 WL 1155576, at *19–20 (S.D.N.Y. Mar. 13, 2013).

*Co. v. Masinexportimport*, 706 F.2d 411, 414 (2d Cir. 1983) (holding that the Romanian Bank for Foreign Trade was an agency or instrumentality).  These cases, however, did not apply the core functions test, which limits their persuasive force in this circuit.

Finally, Plaintiffs devote much of their brief to detailing executive branch actions taken against Bank Markazi, including sanctions imposed against the bank for its ties to terrorist organizations, as proof of its commercial activities.  *See* Dkt. 99 at 13–19.  To the extent the bank engaged in transactions—including the transfer of assets between financial institutions—in a manner analogous to typical commercial transactions, some of this activity might further support the Court's conclusion.  And the fact that the bank might have engaged in these activities for criminal purposes does not preclude reliance on the transactions to support Plaintiffs' argument.  If required to categorize this criminal activity, at least portions of it—like transferring money through subsidiaries to Hezbollah or setting up front companies—seem more commercial than governmental or regulatory in nature.  *Id.* at 13–14.

Pulling these various strands together, the Court is still left with some unanswered questions.  Although Plaintiffs have presented substantial evidence of Bank Markazi's commercial activities, they have provided less proof that Bank Markazi's commercial activities predominate over its governmental ones.  But after two rounds of briefing and a good faith effort from Plaintiffs to answer the Court's questions, the evidence tends to support Plaintiffs' view, and the remaining gaps in the record are neither Plaintiffs' fault nor their problem.  At this stage of the litigation, in the absence of an adversarial hearing or opportunity to take discovery, Plaintiffs have done enough to make a prima facie showing, which requires less than a preponderance of the evidence, that the bank's activities are predominantly commercial in character.  *Mwani*, 417 F.3d at 7.  Defendants cannot avoid the Court's jurisdiction by defaulting

and thereby depriving Plaintiffs of the opportunity to make a more detailed showing regarding

the precise allocation of governmental and commercial activities in the day-to-day affairs of the

bank.

For all the foregoing reasons, the Court concludes that Bank Markazi is an agency or

instrumentality of Iran and may be served according to the requirements of § 1608(b).

**B.      Whether Plaintiffs Served NIOC and Bank Markazi in Accordance with § 1608(b)**

Having concluded that NIOC and Bank Markazi are amenable to service under § 1608(b),

the Court must consider whether Plaintiffs' efforts to serve them complied with the requirements

of that provision.  Plaintiffs attempted to serve NIOC and Bank Markazi under § 1608(b)(3)(B),

which permits service "by delivery of a copy of the summons and complaint, together with a

translation of each into the official language of the foreign state" through "any form of mail

requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency

or instrumentality to be served," so long as service is "reasonably calculated to give actual

notice."  28 U.S.C. § 1608(b)(3)(B).  In its prior opinion, the Court could not determine whether

service had been successful because, although the recipients had signed for the deliveries, the

packages were subsequently returned to the clerk's office in uncertain circumstances.

*Holladay I*, 406 F. Supp. 3d at 63–64.  As the Court noted, courts are divided on whether a

signature alone is sufficient to show effective service if a package is rejected immediately upon

delivery.  *Id.* at 63 n.2.

To clear up any confusion, Plaintiffs conducted a deposition of DHL representative

Robert Nielson pursuant to Fed. R. Civ. P. 30(b)(6).  *See* Dkt. 99-17 (Nielson Dep Part I); Dkt.

99-18 (Nielson Dep. Part II).  With respect to NIOC, Nielson testified that the packages were

delivered to the company's address in Tehran on December 2, 2017, at 10:37 a.m. and were

signed for by someone named "Norafkan." Dkt. 99-17 at 43 (Nielson Dep. 41:1–21); *id.* at 46–48 (Nielson Dep. 44:3–46:9). Importantly, the packages were not rejected upon delivery but, rather, were transferred to NIOC's custody. *Id.* Even more importantly, NIOC retained possession of the packages for nineteen days before mailing them back to the clerk's office. *Id.* at 50–51 (Nielson Dep. 48:5–49:16). Nielson provided similar testimony with respect to Bank Markazi. DHL delivered the service packages to Bank Markazi's address in Tehran on November 20, 2017, at 11:25 a.m., where someone with initials "D.S." signed for the delivery. *Id.* at 19–20 (Nielson Dep. 17:2–18:18); *id.* at 23–25 (Nielson Dep. 21:11–23:3). As with NIOC, the Bank Markazi packages were not rejected upon delivery, *id.* at 20–22 (Nielson Dep. 18:19–20:17); *id.* at 26–27 (Nielson Dep. 24:16–25:11), and Bank Markazi retained possession of the packages for twenty-three days before returning them, *id.* at 29–32 (Nielson Dep. 27:4–30:3). Additionally, as Plaintiffs emphasize, when NIOC and Bank Markazi returned their packages to the clerk of court, they did so with new waybills, which "would only have been created and used by DHL if NIOC and Bank Markazi proactively sought to return the packages after actually possessing the packages." Dkt. 99 at 24 (emphasis omitted).

In light of this new information, especially the fact that NIOC and Bank Markazi were each in possession of the service materials for more than two weeks, the Court is satisfied that service was "reasonably calculated to give actual notice." 28 U.S.C. § 1608(b)(3). Plaintiffs have therefore properly served NIOC and Bank Markazi pursuant to 28 U.S.C. § 1608(b)(3)(B).

## CONCLUSION

For the reasons explained above, it is hereby **ORDERED** that Plaintiffs' renewed motion for an order finding effective service of process as to NIOC and Bank Markazi, Dkt. 99, is **GRANTED**.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: February 11, 2021