## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOSHUA L. HOLLADAY, *et al.*,

      *Plaintiffs*,

    v.

ISLAMIC REPUBLIC OF IRAN, *et al.*,

      *Defendants*.

Civil Action No. 17-915 (RDM)

**FILED UNDER SEAL**

## MEMORANDUM OPINION

This case arises from 42 terrorist attacks perpetrated against United States servicemembers and contractors serving in Iraq between 2003 and 2011. Plaintiffs are the victims of the attacks and their family members. Defendants are the Islamic Republic of Iran ("Iran") and five Iranian state-owned or state-controlled institutions: The Islamic Revolutionary Guard Corp ("IRGC"), the Iranian Ministry of Intelligence & Security ("MOIS"), Bank Markazi Jomhouri Islami Iran ("Bank Markazi"), Bank Melli Iran ("Bank Melli"), and the National Iranian Oil Company ("NIOC"). Plaintiffs allege that Defendants caused their injuries by providing material support to several terrorist groups in Iraq. Plaintiffs seek compensatory and punitive damages under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A. Defendants have not answered or otherwise appeared in this action. Consequently, at Plaintiffs' request, the Clerk of the Court entered default against Defendants. Dkt. 43 (NIOC); Dkt. 45 (Bank Markazi); Dkt. 52 (MOIS, Iran, IRGC); Dkt. 71 (Bank Melli).

To facilitate the efficient resolution of their claims, Plaintiffs sought, and this Court approved, a case management plan. *See* Min. Order (Nov. 1, 2018); Dkt. 72. That plan set out "three phases" of litigation following the entry of default judgment. Dkt. 72 at 4. The first phase allowed Plaintiffs to engage in discovery to gather additional evidence to support their claims. *Id.* In the second phase, Plaintiffs presented evidence showing Defendants' legal responsibility for the 42 attacks. *Id.* at 5. In the third phase, a Court-appointed Special Master will recommend findings of fact on each plaintiff's damages resulting from any attacks for which Defendants are found to be legally responsible. *Id.* at 10. The Court will review those recommendations and will separately consider Plaintiffs' request for the award of punitive damages.

The pending motion concerns the second phase. Before the Court is the Plaintiffs' motion for default judgment for the 15 attacks in the case that Plaintiffs allege involved a fully completed extrajudicial killing. Dkt. 187. In light of the D.C. Circuit's opinion in *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053 (D.C. Cir. 2024), the Plaintiffs have not moved for a default judgment with respect to the other attacks in this case. For the reasons explained below, the Court will grant the Plaintiffs' motion for default judgment as to liability with respect to the 15 attacks at issue, Dkt. 187, with limited exceptions discussed below.

This opinion will proceed in three parts. Parts I and II will provide an overview of the litigation and present the Court's findings of fact regarding the connection between Defendants and the groups that allegedly perpetrated the attacks: Ansar al Islam ("AAI"), Al Qaeda in Iraq ("AQI"), and several Shia militia groups including Jaysh al-Mahdi ("JAM") and Kataib Hezbollah ("KH"). These sections will include the Court's findings regarding the likely perpetrator of each of the 15 relevant attacks. Part III will set forth the Court's legal conclusions regarding Defendants' responsibility for the Plaintiffs' injuries.

# I. INTRODUCTION

Plaintiffs bring this action for damages that resulted from 42 attacks against U.S. servicemembers and contractors in Iraq allegedly perpetrated by terrorist groups supported by the Iranian regime.  In the present motion, Plaintiffs have followed the instructions of the Court by moving for default judgment only for those claims arising from the 15 attacks that involved a completed (as opposed to an attempted) extrajudicial killing.  Dkt. 187 at 11 n.1.  Within this subset of claims, 38 plaintiffs, or their estates, seek to recover for devastating—and, in some cases, fatal—injuries that they directly sustained from the attacks.  *Id.* at 11.  An additional 59 plaintiffs seek to recover for the solatium damages resulting from the extrajudicial killing or wounding of their family members.  *Id.* at 182–84.[1]  Plaintiffs claim that Defendant Iran, through its agencies and co-defendants IRGC, NIOC, MOIS, Bank Markazi, and Bank Melli, "trained, armed, supplied and funded [an array of Shia militias], Al Qaida, and Ansar Al Islam—Iran's terrorist agents in Iraq—in carrying out their attacks against Plaintiffs and their family members."  Dkt 129 at 23–24 (Consol. Am. Compl. ¶ 47).  To establish subject matter jurisdiction, Plaintiffs invoke the state-sponsored terrorism exception to the FSIA.  28 U.S.C. § 1605A(a); Dkt. 129 at 19 (Consol. Am. Compl. ¶ 19).  On the merits, they rely on the federal cause of action established in § 1605A(c).  *Id.* at 224–29 (Consol. Am. Compl. ¶¶ 1283–307).

Plaintiffs effected service on Defendant Bank Markazi on November 20, 2017, Defendant NIOC on December 2, 2017, Defendant Bank Melli on December 17, 2017, and Defendants Iran, IRGC, and MOIS on March 18, 2018.  Dkt. 44; Dkt. 45; Dkt. 52; Dkt. 71.  Defendants have not answered, filed a motion under Federal Rule of Civil Procedure 12, or otherwise appeared.

---

[1] Although the text of Plaintiffs' Motion for Default Judgment indicates that there are 55 solatium plaintiffs, Dkt. 187 at 11, the Court counts 59 solatium plaintiffs in the attached list, *id.* at 182–84.

Accordingly, at Plaintiffs' request, the Clerk of the Court declared all Defendants in default. Dkt. 44; Dkt. 45; Dkt. 52; Dkt. 71.

Pursuant to Federal Rule of Civil Procedure 55, Plaintiffs now seek entry of a default judgment with respect to liability against Defendants for the 15 attacks involving a completed extrajudicial killing. Dkt. 187. Even in a garden variety case, the entry of a default judgment "is not automatic," *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005), and requires the exercise of "sound discretion," *Boland v. Yoccabel Const. Co., Inc.*, 293 F.R.D. 13, 17 (D.D.C. 2013) (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)). Most notably, the Court must—at a minimum—satisfy itself that it has subject-matter jurisdiction over the claims and personal jurisdiction over the defendants. *See Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) ("A default judgment rendered in excess of a court's jurisdiction is void."); *Mwani*, 417 F.3d at 6 (explaining that the Court must "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant").

In cases brought against a foreign state or instrumentality, moreover, the Court's discretion to enter a default judgment is more narrowly circumscribed. By statute, no federal or state court may enter a default judgment against a foreign state or instrumentality "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This is the same standard that applies to default judgments against the United States under Federal Rule of Civil Procedure 55(d). *See Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) ("*Owens VI*"), *vacated in part and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020); *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003). In a case like this one, which alleges that a foreign state materially supported acts of terrorism, the district court must determine "how much and what kinds of evidence the

4

plaintiff must provide." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014). But the Court must do so in light of Congress's purpose in enacting § 1605A—that is, to "compensat[e] the victims of terrorism [so as to] punish foreign states who have committed or sponsored such acts and [to] deter them from doing so in the future," *id.* at 1048 (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88–89 (D.C. Cir. 2002)) (first alteration in original). The Court must also consider the difficulty in obtaining "firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign," *Owens VI*, 864 F.3d at 785.

This means that, to obtain a default judgment against Defendants, Plaintiffs must (1) carry their burden of producing evidence sufficient to show that their claims fall within the state-sponsored terrorism exception to the FSIA, *see* 28 U.S.C. § 1605A(a); *Owens VI*, 864 F.3d at 784; (2) establish their right to relief under federal law by offering evidence "satisfactory to the court," 22 U.S.C. §§ 1605A(c), 1608(e) and (3) establish that defendants were served in accordance with the FSIA, *see id.* § 1608(a).

Plaintiffs endeavor to meet this burden using three types of evidence: First, Plaintiffs have submitted declarations, medical and psychiatric evaluations, and personal fact sheets that recount their injuries. *See generally* Dkt. 248-1 (Am. Ex. List). Second, Plaintiffs have proffered supporting documentary evidence, including government reports. *Id.* Finally, Plaintiffs have submitted detailed expert reports and declarations from 13 experts. Dkt. 187 at 23–38. Overall, Plaintiffs have prepared an impressive, extensive, and detailed record. The Court commends counsel for their extraordinary efforts, which have aided the Court in resolving the pending motion.

In the course of reviewing the evidence, the Court has applied the Federal Rules of Evidence, but has done so on the understanding, first, that it has "the authority—indeed, . . . the obligation—to 'adjust [evidentiary requirements] to . . . differing situations,'" *Han Kim*, 774 F.3d at 1048 (alterations in original) (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)), and, second, that the Court need not "step into the shoes of the defaulting party and pursue every possible evidentiary challenge," *Owens VI*, 864 F.3d at 785. Expert testimony, moreover, is not only entirely proper, but often sufficient, *id.* at 788, and even indispensable in "terrorism cases . . . because firsthand evidence of terrorist activities is difficult, if not impossible to obtain," *id.* at 787.

In lieu of holding an evidentiary hearing, the Court relies on Plaintiffs' declarations, exhibits, and the expert reports and declarations. *See Kim*, 774 F.3d at 1047 (explaining that "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court.'" (quoting 28 U.S.C. § 1608(e))); *see also Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017) (noting that "[c]ourts may rely on uncontroverted factual allegations that are supported by affidavits" as evidence to support an entry of default judgment); *accord Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 157 (D.D.C. 2017); *Salzman v. Islamic Republic of Iran*, 2019 WL 4673761, at *5 (D.D.C. Sept. 25, 2019) (relying on family members' declarations "detailing their mental anguish and emotional suffering"); *Hake v. Bank Markazi Jomhouri Islami Iran*, 2022 WL 4130837, at *13 (D.D.C. Sept. 12, 2022) (relying on exhibits of plaintiffs' birth certificates to demonstrate U.S. citizenship).

Moreover, although the expert reports and declarations "recount potentially inadmissible facts," these facts are necessary "to establish the basis for their admissible opinions" and, thus,

6

are properly before the Court. *Owens VI*, 864 F.3d at 790; *see Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 93 n.3 (D.D.C. 2019). The Court has an obligation "to engage with the underlying facts in order to explain why" it finds the experts' opinions credible. *Owens VI*, 864 F.3d at 790. And to the extent the Court relies on sources cited in the reports, the Court notes that the government reports that they cite fall within the public records exception to the hearsay rule, which provides that "a record or statement of a public office" is admissible if it contains "factual findings . . . from a legally authorized investigation" and does not "indicate a lack of trustworthiness." Fed. R. Evid. 803(8).

Based on this record, the Court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

As noted above, Plaintiffs have provided the Court with reports from 13 experts, declarations from the Plaintiffs, and hundreds of exhibits. *See generally* Dkt. 248-1 (Am. Ex. List). Based on that evidence, and as explained in the following sections, the Court finds as follows:

*First*, Iran provided AQI, AAI, JAM, and an array of Shia militia groups that the U.S. military refers to by the moniker "Special Groups" ("SGs") with significant material support in the form of arms, funding, training, and technical expertise.

*Second*, it is more likely than not that AAI carried out three of the 15 terror attacks at issue: (1) the April 9, 2004 complex ambush attack in the city of Baiji, which wounded Plaintiff Dominick Alagna and killed three other U.S. servicemembers; (2) the June 21, 2004 mortar attack in the Adhamiyah neighborhood of Baghdad which wounded Plaintiff Arthur Stokenbury and killed one U.S. servicemember; and (3) the December 21, 2004 suicide bombing at Forward

Operating Base ("FOB") Marez that killed Plaintiff David Ruhren and wounded Plaintiffs Mark Pratt, Evan Byler, Teray Bundy, Jeff Wright, Brima Turay, Daniel Bivens, Quentin Collins, George Williams, Jonathan Hogge, James Ohrt, Antonio Ward, James Gilbert, Angela Konen, Victoria Phillippi, Joseph Greenalch, Eric Atkinson, Charles Griffiths, Sr., and Christopher Anderson.

*Third*, it is more likely than not that AQI carried out four of the 15 terror attacks at issue: (1) The November 9, 2004 improvised explosive device ("IED") attack near Camp Kalsu in Babil Province that killed Plaintiff Nicholas Nolte; (2) the January 1, 2005 complex ambush attack near the town of Haditha that wounded Plaintiff Jonathan Kuniholm and killed one U.S. servicemember; (3) the April 19, 2005 complex IED attack in al-Anbar Province that wounded Plaintiffs Antonio Frederick, Terrence Elizenberry, Melvin Gatewood, Wyman Jones, and Rodney McBride, and killed one U.S. servicemember; and (4) the May 17, 2007 complex IED attack in Baghdad that killed Plaintiff Aaron Gautier.

*Fourth*, it is more likely than not that JAM and other Iranian-supported SGs carried out eight of the 15 terror attacks at issue: (1) the April 28, 2008 improvised rocket-assisted munition ("IRAM") attack at FOB Loyalty that wounded Plaintiff Thomas Milton Coe II and killed three U.S. servicemembers; (2) the July 10, 2011 rocket attack at FOB Garry Owen that wounded Plaintiffs William Chinn and Sean Niquette and killed one U.S. servicemember; (3) the August 13, 2005 explosively formed penetrator ("EFP") attack in Sadr City that wounded Plaintiff Brad Schwarz and that killed an Iraqi child; (4) the January 18, 2006 EFP attack in Basra province that wounded Plaintiff Ayad Majeed and killed two civilians; (5) the February 3, 2007 EFP attack in the Adhamiyah District of Baghdad that wounded Plaintiff Travis Bass and killed a U.S. servicemember; (6) the February 26, 2007 EFP attack in Qadisiya Province that wounded

8

Plaintiff Joshua Bradley-Wolfe and killed a U.S. servicemember; (7) the September 4, 2007 EFP attack near Sadr city that wounded Plaintiff Joseph Mixson and killed three U.S. servicemembers; (8) the December 4, 2006 EFP attack in the Jisr Diyala neighborhood of Baghdad that wounded Plaintiff Brian Portwine.

*Fifth*, it is not likely that the responsible terror groups would have been able to effectuate the attacks described above without the assistance of Iran, and it is more likely than not that the attacks were a foreseeable result of Iran's material support.

The Court ultimately concludes that Iran supported the 15 attacks described above and thereby caused each of the injuries for which the Plaintiffs now seek to recover. With a handful of exceptions, the Court also concludes that Plaintiffs have established subject-matter jurisdiction and their entitlement to recover damages under the FSIA. Those exceptions are as follows:

To start, four plaintiffs (I.C.C., Jessica Nolte, Melissa Netznik, and Virginia Mixson) have failed to offer sufficient evidence that they are U.S. nationals, members of the U.S. armed forces, or government employees or contractors who were acting within the scope of their employment. It is possible that this is simply an administrative oversight in a case of unusual complexity, which can be easily corrected through a supplemental production. Nor would it, in any event, preclude these plaintiffs from suing under a common law cause of action (as opposed to the federal cause of action) for solatium damages arising from the injury or death of a family member who was a U.S. national, member of the U.S. armed forces, or a government employee or contractor who was acting within the scope of his or her employment. *See* 28 U.S.C. § 1605A(a)(2)(A)(ii).

In addition, the Court will defer deciding whether another set of plaintiffs, the estate of PFC Portwine, his mother (Peggy Portwine), and his aunt (Melissa Netznik), are entitled to

recover. Their claims turn on the difficult question: whether a suicide that occurred years after a terrorist attack constitutes an extrajudicial killing for purposes of the FSIA. That question is currently pending before the D.C. Circuit, and, given the minimal briefing from Plaintiffs and the absence of opposition briefing before this Court, the Court will wait for guidance from the D.C. Circuit before reaching the issue.

In all other respects the Court concludes that Plaintiffs have carried their burden of establishing both jurisdiction and liability.

A.    **Qualification of Expert Witnesses**

Plaintiffs present evidence from thirteen expert witnesses, eleven of whom have provided opinions relevant to the pending motion.[2] Plaintiffs' first expert is Dr. Patrick Clawson, Dkt. 188 (Clawson Decl.), the Director of Research at the Washington Institute for Near East Policy. Plaintiffs offer Dr. Clawson as "an expert on the Islamic Republic of Iran," including "its sponsorship of terrorism, its economy, and its politics." Dkt. 188 at 4 (Clawson Decl. ¶ 2). Dr. Clawson has been previously qualified as an expert in dozens of cases, *see* Dkt. 188 at 6 (Clawson Decl. ¶¶ 7–8) (collecting cases), and this Court is, once again, persuaded that Mr. Clawson is qualified to testify as an expert on the relevant subjects.

Plaintiffs' second expert is Dr. Matthew Levitt, Dkt. 188-1 (Levitt Report), the Director of the Reinhard Program on Counterterrorism and Intelligence at the Washington Institute for Near East Policy. Plaintiffs offer Dr. Levitt as an "expert in international terrorism, with a focus

---

[2] The other three, Dr. Terrance Keane, Dr. Shean Phelps, and Dr. Rael Strous, are medical experts who provided opinions related to Plaintiffs' damages, an issue reserved for the third phase of this litigation. The Court, however, at times, relies on Dr. Strous's declarations and reports regarding the attacks and injuries experienced by Plaintiffs. As explained below, the Court finds Dr. Strous qualified to testify as an expert on matters of Plaintiffs' psychiatric conditions.

on Middle East terrorist groups and particular expertise in their logistical and financial support networks." Dkt. 188-1 at 3 (Levitt Report ¶ 6). This Court has previously qualified Dr. Levitt as an "expert witness on the issue of Iranian sponsorship of terrorism including Hamas and Palestine Islamic Jihad." *See Force v. Islamic Republic of Iran*, No. 16-cv-1468, Dkt. 104 (Oct. 16, 2018 Hrg. Tr. at 10:19–22). The Court again finds Dr. Levitt qualified to opine on the topics for which he is being offered as an expert.

Plaintiffs' third expert is Peter Medvedev Piatetsky, Dkt. 188-2 (Piatetsky Decl.), who previously worked as a Policy Advisor for Iran in the Treasury's Office of Terrorist Financing and Financial Crimes. Plaintiffs offer Mr. Piatetsky as "an expert on terrorist financing and methods employed by Iran to finance terrorism through the Islamic Revolutionary Guard Corps ("IRGC"), the Islamic Revolutionary Guards Quds Force ("IRGC-QF"), its proxy Hezbollah and other terrorist groups," among other issues. Dkt. 188-2 at 4. The Court has reviewed his declaration and is persuaded that he is highly qualified to testify as an expert on these topics.

Plaintiffs' fourth expert is Dr. Daveed Gartenstein-Ross, Dkt. 188-3 (Gartenstein-Ross Report, Shia Militant Groups); Dkt. 188-4 (Gartenstein-Ross Report, Sunni Militant Groups),[3] the Chief Executive Officer of Valens Global, Senior Advisor on Asymmetric Warfare at the Foundation for Defense of Democracies, and former Senior Advisor to the Director of the U.S. Department of Homeland Security's Office for Community Partnerships. This Court has previously qualified Dr. Gartenstein-Ross as "an expert on (1) violent non-state actors . . . ; (2) Iran's use of proxy organizations in Iraq from the 1990s to 2012," and related subject matters. *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 59 n.2 (D.D.C. 2018). Here, Plaintiffs

---

[3] Dr. Gartenstein-Ross also provided several attack attribution reports. *See* Dkt. 207-10; Dkt. 208-5; Dkt. 208-15; Dkt. 243-3; Dkt. 243-4; Dkt. 220-7.

offer Dr. Gartenstein-Ross as an expert on "Iran's historical use of violent non-state actors (VNSAs) as proxy forces," including "the emergence and evolution of Shia militant groups" and "Iran's material support to Shia and Sunni VNSAs in Iraq, including the Zarqawi Organization and Ansar al-Islam/Ansar al-Sunna," among other issues. Dkt. 188-3 at 4 (Gartenstein-Ross Report, Shia Militant Groups); Dkt. 188-4 at 4 (Gartenstein-Ross Report, Sunni Militant Groups). The Court is, once again, persuaded that he is highly qualified to testify as an expert on these matters.

Plaintiffs' fifth expert is Dr. Michael Rubin, Dkt. 188-5 (Rubin Decl.), a Resident Scholar at The American Enterprise Institute and a Senior Editor of the Middle East Quarterly who previously served as a Political Adviser to the Coalition Provisional Authority in Baghdad and a country advisor for Iraq and Iran in the Office of the Secretary of Defense at the Department of Defense. Plaintiffs offer Dr. Rubin as an expert on "Iran's operational support of al Qaeda, Ansar al-Islam, Hezbollah, JAM, and the Special Groups; Iran's funding of terrorist groups targeting Americans; and Iran's training of terrorists." Dkt. 187 at 28. The Court has reviewed Dr. Rubin's declaration and is persuaded that he is highly qualified to testify as an expert on these topics.

Plaintiffs' sixth expert is Michael Pregent, Dkt. 188-9 (Pregent Decl.),[4] a former intelligence officer, Senior Fellow at the Hudson Institute, and Visiting Fellow at the Institute for National Strategic Studies at the National Defense University. This Court has also previously qualified Mr. Pregent as an expert on related subject matters. *See Hamen*, 401 F. Supp. 3d at 91 n.1; *Coombs v. Islamic Republic of Iran*, 2022 WL 715189, at *2 (D.D.C. Mar. 10, 2022). As

---

[4] Mr. Pregent also provided several attack attribution reports. *See* Dkt. 207-12; Dkt. 242-3; Dkt. 208-7; Dkt. 208-17; Dkt. 215-2; Dkt. 215-8; Dkt. 217-12; Dkt. 218-1; Dkt. 218-11; Dkt. 219-9; Dkt. 219-17; Dkt. 220-9; Dkt. 220-15; Dkt. 222-1, Dkt. 222-10.

several judges on this Court have recognized, Mr. Pregent has extensive relevant experience and expertise. *See* Dkt. 187 at 30 (collecting cases); Dkt. 188-9 at 5–10 (Pregent Decl. ¶¶ 4–16). Here, Plaintiffs offer Mr. Pregent as an expert on "Iranian influence in Iraq and . . . Islamist terrorist special groups operating in Iraq." Dkt. 38-2 at 2 (Pregent Decl. ¶ 2). The Court is— once again—persuaded that Mr. Pregent is eminently qualified to testify as an expert.

Plaintiffs' seventh expert is Colonel Ray Fitzgerald, Dkt. 242 (Fitzgerald Decl.), who served as the Vice Director of the Joint Improvised Explosive Device Defeat Organization from 2010 to 2018 and was deployed multiple times to both Iraq and Afghanistan. *Id.* at 3. In that role, he "provid[ed] scientific and technical exploitation" to counter "all aspects of improvised weapons," as well as "forecasting worldwide threats, including threats in Iraq." *Id.* Plaintiffs offer Col. Fitzgerald as an expert on "Iran's support for Shia-related terrorist groups in Iraq and the threats encountered by Coalition Forces from such groups, including the threats from [IEDs], [EFPs], [IRAMs], rockets, mortars, and other weapons used against U.S. forces" and on "the methodology by which Coalition Forces gathered intelligence and determined the extent of the malign Iranian influence in Iraq." *Id.* The Court is persuaded that Col. Fitzgerald's professional experience qualifies him to serve as an expert on these topics.

Plaintiffs also seek to qualify as experts three retired members of the U.S. military: Colonel M. Lee Walters, Chief Warrant Officer 4 Ronald Evans, and Chief Warrant Officer 3 David Sultzer (hereinafter "the WES team"), as experts on "the evolution of the U.S. military's understanding of the central role the Iranian Islamic Revolutionary Guard Corps ("IRGC") and Iran's Lebanese terrorist proxy Hezbollah played in supporting Sunni Iraqi terrorist groups, including Al Qaed (AQ) and Al Qaeda in Iraq (AQI), as well as Shia Iraqi terrorist groups, including Badr Corps, Jaysch al Mahdi (JAM), Asa'ib Ahl al-Haq (AAH), Promise Day Brigades

(PDB), and Kata'ib Hizballah (KH), through the provision of financial, logistical, transportation, supply and training support, resulting in the injury or death of United States Servicemen during Operation Iraqi Freedom (OIF)." Dkt. 188-8 at 5.  These three experts, all of whom served in intelligence roles during their service, prepared attribution reports with respect to several of the attacks at issue in this case, using "basic principles of military intelligence" and drawing on, collectively, "over thirty years of military service." Dkt. 188-8 at 5.  The Court finds that they are well qualified to present evidence as to the nature and attribution of the attacks at issue.

Finally, the Court, at this stage, qualifies one of Plaintiffs' medical experts, Dr. Rael Strous, to testify as an expert.  Dr. Strous is a U.S. Board Certified Psychiatrist, Director of the Department of Psychiatry at Maayenei Hayeshua Medical Center, and a Professor and Faculty of Medicine at the Department of Psychiatry at Tel Aviv University.  Dkt. 208-13 at 20 (Strous Decl. (Turay)).  Dr. Strous has been the principal investigator of numerous psychiatric research projects, including those regarding post-traumatic stress disorder ("PTSD") and schizophrenia, has won several awards for his scholarship in the field of psychiatry, and holds several positions on academic, medical, and scientific journal committees related to psychiatry.  *Id.* at 20–30 (Strous Decl. (Turay)).  Dr. Strous has been qualified as an expert witness in twelve federal civil cases, *id.* at 31 (Strous Decl. (Turay)) (collecting cases), mostly in this Court and in FSIA cases. *Id.*  The Court is once again persuaded that Dr. Strous  is qualified to serve as an expert on Plaintiffs' psychiatric and emotional conditions.

**B.    Iran's Material Support to Terrorist Groups**

1.    *Overview of Iran's Proxy Strategy*

Iran has an extensive and well-documented history of relying on VNSAs as proxies to advance its policy goals.  Dkt. 188-4 at 67 (Gartenstein-Ross Report, Sunni Militant Groups). From at least 2003 to 2011, Iran supported multiple terrorist organizations who attacked

14

American and Iraqi nationals in Iraq. Dkt. 188-5 at 9 (Rubin Decl. ¶ 21). Iran supports terrorist groups through, among others, the IRGC, the IRGC Quds Force ("IRGC-QF"), its MOIS, and its Lebanese proxy group, Hezbollah. *Id.* Iran and the IRGC also use Iranian state-controlled banks, including Bank Melli and Bank Markazi, to fund terrorist groups, *id.*, and they use state-owned businesses including the NIOC to provide funds to support terrorism and to provide cover for terrorist operations, *id* at 10. In addition, Iran has utilized an array of both Sunni and Shia terrorist groups to carry out attacks in Iraq. Dkt. 188-4 at 4 (Gartenstein-Ross Report, Sunni Militant Groups). The Sunni terrorist groups in question include AQI[5] and AAI.[6] The primary Shia groups involved include JAM and several "Special Groups" ("SGs"), a term that the U.S. Military uses to refer to certain Shia terrorist militia groups that are often connected with Iran, JAM, and Lebanese Hezbollah. Dkt. 188-2 at 69–82 (Piatetsky Decl. ¶¶ 179–219). These SGs include, among others, KH. *Id.* at 71 (Piatetsky Decl. ¶ 184).

---

[5] Plaintiffs also refer to AQI as the "Zarqawi Organization" because it was founded by Abu Musab al-Zarqawi. Dkt. 188-4 at 14–15 (Gartenstein-Ross Report, Sunni Militant Groups). AQI, or the Zarqawi Organization, has undergone several name changes since its emergence in the early 1990s. It has been known by the following names: Bayat al-Imam (c. 1993–1999), Jund al-Sham (c. 1999–2004), Jamaat al-Tawhid wal-Jihad ("JTJ") (2004), Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn (al-Qaeda in Iraq or "AQI") (2004–2006), Majlis Shura al-Mujahedin fi-l-Iraq (Mujahedin Shura Council or "MSC") (2006), Islamic State of Iraq ("ISI") (2006–April 2013), Islamic State of Iraq and al-Sham ("ISIS") (April 2013–June 2014), and Islamic State (June 2014–present). *Id.* Plaintiffs have demonstrated to the satisfaction of the Court that these name changes do not undermine the existence of a single, continuously operating organization. The Court will refer to the organization as the "Zarqawi Organization" when discussing its development in its historical context but will otherwise refer to the organization as "AQI."

[6] Plaintiffs similarly use AAI to refer to both Ansar al-Islam and Ansar al-Sunnah ("AAS"), an organization that grew out of AAI and that features overlapping membership. Dkt. 188-4 at 38 (Gartenstein-Ross Report, Sunni Militant Groups). The Court is also persuaded that sufficient continuity and overlap exists between AAI and AAS to treat them as a single organization, and, will use AAI and AAS interchangeably.

Iran's backing of these militant groups was part of "a wider strategy aimed at accelerating the eviction of U.S. troops from Iraq" and "creating instability in Iraq that would impose political, economic, and human costs on the United States." Dkt. 188-4 at 65 (Gartenstein-Ross Report, Sunni Militant Groups). The United States has, since 1984, continuously designated Iran as a state sponsor of terrorism. *See* U.S. Dep't of State, *State Sponsors of Terrorism,* https://perma.cc/5S2L-2M9K.

2. *Iran's Use of Agents and Political Subdivisions*

a. IRGC

The IRGC is an arm of the Iranian military that reports directly to the Supreme Leader of Iran. This Court has already determined that the IRGC is a political subdivision of the Iranian state. *See* Dkt. 81 at 3. Within the IRGC, the IRGC-QF is responsible for international operations. Plaintiffs' experts describe the IRGC-QF as "the main Iranian organization supporting and directing those in Iraq attacking Americans." Dkt. 188-2 at 15 (Piatetsky Decl. ¶ 28). The IRGC-QF was designated by the U.S. Department of the Treasury as a Specially Designated Global Terrorist entity in October 2007, and the IRGC was designated as a Foreign Terrorist Organization in April 2019. *See* Dkt. 189-10 at 5–6; Dkt. 202-1 at 2.

b. MOIS

MOIS is Iran's foreign and domestic intelligence service, which constitutes a political subdivision of Iran. *See* Dkt. 81 at 3. Along with the IRGC, MOIS is "the other principal organization Iran has used to carry out its terrorist support activities." Dkt. 188 at 32 (Clawson Decl. ¶ 95). It employees approximately 30,000 people and is the largest intelligence agency in the Middle East. *Id.* (Clawson Decl. ¶ 95) The U.S. State Department has long recognized that MOIS plays a role in facilitating terrorist attacks. *Id.* at 33 (Clawson Decl. ¶ 98). According to Dr. Clawson, the relative roles of MOIS and the IRGC have fluctuated over the years. After

2009, the "IRGC's intelligence arm appeared to be eclipsing MOIS's role in some areas," but "MOIS appears to have made something of a comeback" after "serious operational missteps by the IRGC" in 2011 and 2012. *Id.* (Clawson Decl. ¶ 97).

### c.  Bank Melli

Bank Melli Iran—which means "National Bank of Iran"—"is Iran's largest commercial bank" and "the largest provider of banking services to the Iranian government." Dkt. 188-2 at 34–35 (Piatetsky Decl. ¶¶ 90, 93). The Court has already determined that Bank Melli operates as an agent or instrumentality of Iran. *See* Dkt. 81 at 3. According to the U.S. Treasury Department, Bank Melli provides banking services to both the IRGC and the IRGC-QF. Dkt. 189-10 at 4. Bank Melli "was used to send at least $100 million to the" IRGC-QF between 2002 and 2006. *Id.* Plaintiffs' experts have opined that, during the time period relevant to Plaintiffs' claims, "Bank Melli provided banking services that provided significant funding to the IRGC-QF to support terrorist activities." Dkt. 188-2 at 38 (Piatetsky Decl. ¶ 99).

### d.  Bank Markazi

Bank Markazi is the central bank of Iran. "[T]here is little doubt that Bank Markazi is wholly owned by the government of Iran," and this Court previously concluded that it "is an agency or instrumentality of Iran." Dkt. 113 at 13, 19. It is "a tool of the government of Iran and operates as the Iranian government's banker." Dkt. 188 at 35 (Clawson Decl. ¶ 106). Government revenue is deposited in Bank Markazi, and government expenditures—including the funding for ministries such as MOIS and the IRGC—are carried out through Bank Markazi. *Id.* at 34 (Clawson Decl. ¶ 103). As a result, Bank Markazi "has been the route by which the Iranian government has provided many millions of dollars to terrorist groups." *Id.* at 35 (Clawson Decl. ¶ 103). It also funnels money to terrorist organizations, including Hezbollah, and engages in deceptive practices in order to hide those activities. *Id.* at 36–37 (Clawson Decl. ¶ 108).

e. NIOC

NIOC is an oil company entirely owned by the Iranian state through the Iranian Ministry

of Petroleum. Dkt. 191-7 at 2. The current Chairman of NIOC, as well as his predecessors, have

concurrently served as Petroleum Minister of Iran. Dkt. 188-2 at 39 (Piatetsky Decl. ¶ 102). As

the Court has already found, NIOC operates as an agency or instrumentality of Iran. Dkt. 113 at

13. NIOC has supported attacks on U.S. forces in Iraq in two ways. First, NIOC has provided

the Iranian state with U.S. Dollars, which were needed to fund Iran's terrorist network. "[T]o

support its operations in Iraq and elsewhere, Iran needed to move money using dollars." Dkt.

188-2 at 106 (Piatetsky Decl. ¶ 274). "NIOC generates billions of dollars in revenue each year

for the Iranian government." Dkt. 188 at 58 (Clawson Decl. ¶ 166). Second, NIOC has provided

logistical support and cover to terror groups, including by using its helicopters and border guards

to engage in Iranian intelligence gathering on the Iran-Iraq border. *Id.* at 57 (Clawson Decl.

¶ 163).

3. *Iran's Material Support to Shia Terrorist Groups*

a. Lebanese Hezbollah as a Proxy

The Court finds that Iran used Lebanese Hezbollah ("Hezbollah") as a proxy and liaison

to support other Shia militant groups in Iraq. Iran has been an essential supporter of Hezbollah

since the organization's founding in 1982. That same year, the IRGC established camps in

Lebanon's Bekaa Valley to train Hezbollah members. Dkt. 188-1 at 13 (Levitt Report ¶ 47).

Since then, Iran has provided extensive training and financial support to the organization. By

1987, there were reportedly 1,500 IRGC advisors assisting Hezbollah forces in Lebanon. *Id.*

(Levitt Report ¶ 47); Dkt. 188-3 at 15 (Gartenstein-Ross Report, Shia Militant Groups). In 2018,

a senior Israeli defense official estimated that Iran provides $700 million to $1 billion a year to

Hezbollah. Dkt. 188-1 at 14 (Levitt Report ¶ 47). Hezbollah works closely with the IRGC,

particularly with the IRGC-QF and MOIS. MOIS is widely recognized as providing financial, technological, and logistical support for Hezbollah operations in Lebanon and around the world. *Id.* at 20–21 (Levitt Report ¶¶ 64–71). Iran also uses Bank Markazi and Bank Melli to send funds to Hezbollah. *Id.* at 21–23 (Levitt Report ¶¶ 72–78). Just as Hezbollah receives significant support from Iran, it also receives direction from Iran. In 1985, Hezbollah proclaimed in its organizational platform that "[w]e abide by the orders of one single wise and just leadership . . . personified by [Iranian Supreme Leader Ayatollah] Khomeini." *Id.* at 13–14 (Levitt Report ¶ 47). Hezbollah remains under the authority of current Iranian Supreme Leader Ayatollah Khamenei. *Id.* at 16 (Levitt Report ¶ 55). Two of the nine members of Hezbollah's consultative council (Majlis al-Shura) are Iranian government officials. Dkt. 188-3 at 15 (Gartenstein-Ross Report, Shia Militant Groups).

Based on the unrebutted testimony offered by Plaintiffs' experts, the Court finds that Lebanese Hezbollah operated at the relevant times as an Iranian proxy.

### b. Jaysh al-Mahdi and the Promised Day Brigades

JAM grew out of the Sadrist movement, the Shia followers of Ayatollah Mohammed Sadiq al-Sadr. Dkt. 188-3 at 18 (Gartenstein-Ross Report, Shia Militant Groups). JAM was founded in June of 2003 by Muqtada al-Sadr, Mohammed al-Sadr's son and successor as leader of the Sadrists. *Id.* at 21 (Gartenstein-Ross Report, Shia Militant Groups). Al-Sadr "sought to model his organization on Lebanese Hezbollah, combining a political party with an armed militia and an organization providing social services." *Id.* (Gartenstein-Ross Report, Shia Militant Groups) (citation omitted). JAM began engaging in serious attacks against Coalition forces in 2004 during two failed uprisings in the city of Najaf. *Id.* (Gartenstein-Ross Report, Shia Militant Groups). By 2008, JAM had been weakened by the formation of splinter groups and a Coalition offensive. Dkt. 188-2 at 77–78 (Piatetsky Decl. ¶ 204). Al-Sadr, who was increasingly focusing

on electoral politics, reoriented the organization towards providing social services. *Id.* (Piatetsky

Decl. ¶ 204); Dkt. 188-3 at 27–28 (Gartenstein-Ross Report, Shia Militant Groups). Al-Sadr

organized a new, smaller militia from the remnants of JAM: the Promised Day Brigade ("PDB").

PDB would avoid sectarian violence and "exclusively attack U.S. forces." Dkt. 188-2 at 78

(Piatetsky Decl. ¶ 205). For purposes of this analysis, the Court will consider JAM and PDB as a

single organization based on their shared membership and shared leader, Muqtada al-Sadr.

Iran has supported JAM since its founding. In the summer of 2003, shortly before al-

Sadr announced the formation of JAM, he travelled to Tehran where he met with several leaders

including Ayatollah Khamenei and IRGC-QF commander Qasem Soleimani. Dkt. 188-3 at 29

(Gartenstein-Ross Report, Shia Militant Groups). After this meeting, the IRGC began training

"al-Mahdi army personnel in the hundreds" in Iran. *Id.* (Gartenstein-Ross Report, Shia Militant

Groups)(citation omitted). In 2003, Iran was providing between $750,000 and $3,000,000 per

month to JAM. Dkt. 188-2 at 79 (Piatetsky Decl. ¶ 208). Iran continued this funding by

providing hundreds of millions of dollars to support the PDB upon JAM's reorganization in 2008

and at least up until 2011. Dkt. 188-1 at 39 (Levitt Report ¶ 134). A 2009 RAND Corporation

report estimated that Iran's financial support to al-Sadr may have grown to as much as $80

million per month. Dkt. 188-3 at 43–44 (Gartenstein-Ross Report, Shia Militant Groups).

Beyond finance, Iran also provided JAM and PDB with weapons. Most notably, the IRGC-QF

provided JAM with EFPs, sophisticated anti-armor explosive devices that JAM used to

devastating effect against certain Coalition forces. *See infra* Part II.F.

In addition to providing JAM and PDB with funding and weapons, Iran also utilized

Hezbollah to train and to arm the militias. This relationship goes back as far as JAM's founding.

Immediately after the March 2003 invasion of Iraq, Hezbollah began establishing links with al-

Sadr. By late August of that year, according to a U.S. military report, "Hezbollah had assembled a team of 30 to 40 operatives in Najaf . . . recruiting and training new members of the Mahdi Army." Dkt. 199-5 at 15; *see also* Dkt. 188-1 at 33 (Levitt Report ¶ 115). Hezbollah established Unit 3800, "a unit dedicated to supporting Iraqi Shia terrorist groups targeting multinational forces in Iraq." *Id.* (Levitt Report ¶ 114). Hezbollah took JAM and other SG fighters to Lebanon and Iran to train them in the use of complex weapons, including EFPs and rockets, against Coalition forces. *Id.* at 40–43 (Levitt Report ¶¶ 136–50).

The Court, accordingly, finds that Iran provided material support in the form of weapons, training, funds, logistical support and operational assistance to JAM and PDB, both directly and indirectly through Hezbollah, during the time period relevant to the attacks.

### c.  Special Groups

Beyond JAM and PDB, Iran has invested extensively in supporting a network of Shia insurgent groups in Iraq. These relationships go back to at least 1983, when Iran established the Badr Corps, an Iraqi Shia militia following the same model as Hezbollah. Dkt. 188-1 at 24 (Levitt Report ¶¶ 84–86); Dkt. 188-3 at 16 (Gartenstein-Ross Report, Shia Militant Groups). Throughout the 1980s and 1990s, Iran supported and directed the Badr Corps in attacks against the Iraqi regime. Dkt. 188-3 at 16 (Gartenstein-Ross Report, Shia Militant Groups). After the U.S. invasion, Iran continued to support the Badr Corps, which began to operate primarily in electoral politics. *Id.* at 17 (Gartenstein-Ross Report, Shia Militant Groups). But it also developed a web of other Shia militias. The complexity of this web proliferated after the February 2006 bombing of the Shia al-Askari Mosque by AQI. *Id.* at 25 (Gartenstein-Ross Report, Shia Militant Groups). This bombing set off a wave of sectarian violence across Iraq. *Id.* (Gartenstein-Ross Report, Shia Militant Groups). Many Shia militants left JAM in order to form their own groups that would target both Sunni Iraqis and Coalition Forces. *Id.*

21

(Gartenstein-Ross Report, Shia Militant Groups). The United States military began to refer to these groups as "Special Group Criminals" or just "Special Groups" or "SGs." *Id.* (Gartenstein-Ross Report, Shia Militant Groups). One of the most notable of these SGs was KH. Founded in 2007 by a former Badr Corps commander, Abu Mahdi al-Muhandis, KH became "a vehicle through which the IRGC Qods Force could deploy its most experienced operators and its most sensitive equipment" against Coalition forces. *Id.* at 26 (Gartenstein-Ross Report, Shia Militant Groups) (citation omitted).

Like JAM, Iran invested heavily in funding and arming the SGs. Through the IRGC-QF, Iran provided 107 mm and 240 mm rockets. This enabled the Shia militias to carry out indirect fire attacks on Coalition bases. *Id.* at 33 (Gartenstein-Ross Report, Shia Militant Groups). Iran further provided EFPs to the SGs "on an industrial scale." *Id.* at 35. (Gartenstein-Ross Report, Shia Militant Groups). The IRGC-QF also established four training camps in Iran for SG fighters. *Id.* at 37 (Gartenstein-Ross Report, Shia Militant Groups). General Kevin Bergner summarized the process at a 2007 press conference, asserting: "They are being taught how to use EFPs, mortars, rockets, as well as intelligence, sniper and kidnapping operations . . . . [w]ithout this support, these Special Groups would be hard pressed to conduct their operations in Iraq." Dkt. 195-5 at 4.

Hezbollah served as an integral tool through which Iran trained the SGs. KH founder Abu Mahdi al-Muhandis stated in a 2017 interview that Hezbollah military leaders Imad Mughniyeh and Mustafa Badreddine played a "central role" in "organizing . . . resistance cells against the Americans" in Iraq in 2003 and 2004. Dkt. 199-10 at 3 (internal quotation marks omitted). Around 2005, Iran asked Lebanese Hezbollah to form a group dedicated to training Iraqis. Dkt. 188-3 at 39 (Gartenstein-Ross Report, Shia Militant Groups). Then-Hezbollah

Secretary General Hassan Nasrallah agreed, and the unit provided training to thousands of Iraqi Shia militia members in Iraq, Iran, and Lebanon. *Id.*

The Court, accordingly, finds that Iran provided material support in the form of weapons, training, funds, logistical support and operational assistance to the SGs, both directly and indirectly through Hezbollah, during the time period relevant to the attacks at issue in this case.

    4.    *Iran's Material Support to Sunni Terrorist Groups*

        a.    <u>Al-Qaeda as a Proxy</u>

The Court also finds that Iran used Al-Qaeda as a proxy and liaison between Iran and other Sunni militant groups, including AQI and AAI, by providing those groups with funding, training, weaponry, and operational and logistical support. The relationship between Iran and al-Qaeda started in the early 1990s. Ayman al-Zawahiri, the emir of Egyptian Islamic Jihad ("EIJ"), brokered a deal with Iran in which Iran provided $2 million in funding and training to EIJ to support its fight against Egypt's Hosni Mubarak regime. Dkt. 188-4 at 44 (Gartenstein-Ross Report, Sunni Militant Groups); Dkt. 188-9 at 24–25 (Pregent Decl. ¶¶ 72–79). EIJ and al-Qaeda were "closely linked" by virtue of Zawahiri's connections to al-Qaeda's leader, Osama bin Laden, and in 2001, EIJ and al-Qaeda merged. Dkt. 188-4 at 44 (Gartenstein-Ross Report, Sunni Militant Groups). Zawahiri subsequently rose "through the ranks" of al-Qaeda, eventually "becoming its emir after bin Laden's 2011 death." *Id.* (Gartenstein-Ross Report, Sunni Militant Groups).

Iran provided material support to its proxy al-Qaeda in the form of funding, weapons, "training of its operatives," "sanctuary and refuge," "travel facilitation," and "financial and infrastructure assistance." Dkt. 188-4 at 59–61 (Gartenstein-Ross Report, Sunni Militant Groups). Senior al-Qaeda operatives and trainers "traveled to Iran to receive training in explosives," while others received "advice and training from [Iran's proxy] Hezbollah in

Lebanon." Dkt. 188-9 at 25 (Pregent Decl. ¶ 79) (citation omitted). Iran also facilitated the movement of al-Qaeda operatives "into Afghanistan, Pakistan, and Iraq." *Id.* at 29 (Pregent Decl. ¶ 93).

Iranian-backed militants provided the technical expertise and explosives training for al-Qaeda to carry out terror attacks, including the 1998 U.S. East African Embassy attacks. Dkt. 188-4 at 45–48 (Gartenstein-Ross Report, Sunni Militant Groups). Iran also provided safe passage through its territory for al-Qaeda members transiting between Afghanistan and Yemen, which "helped the terrorist group to execute the 9/11 attacks." *Id.* at 47 (Gartenstein-Ross Report, Sunni Militant Groups); *accord Havlish v. Bin Laden*, 2011 WL 13244047, at *16 (S.D.N.Y Dec. 22, 2011). The 9/11 Commission Report describes the relationship between al-Qaeda and Iran as "an informal agreement to cooperate in providing support . . . for actions carried out primarily against Israel and the United States." Dkt. 188-4 at 46 (Gartenstein-Ross Report, Sunni Militant Groups) (quoting Nat'l Comm'n on Terrorist Attacks upon the United States, *The 9/11 Commission Report* 61 (2004)).

"On July 28, 2011, a U.S. Treasury Department designation revealed the extensive relationship between al-Qaeda and Iran, citing the importance of Iranian finance and recruitment facilitation," as well as providing a transit point for al-Qaeda to "mov[e] money, arms, and fighters." Dkt. 188-9 at 27 (Pregent Decl. ¶ 87). According to the Treasury Department, this support was memorialized in an agreement between al-Qaeda and the Iranian government, under which Iran promised to provide al-Qaeda with "freedom of operation and uninhibited ability to travel for extremists and their families." Dkt. 188-4 at 60 (Gartenstein-Ross Report, Sunni Militant Groups) (quoting U.S. Dep't of Treasury, *Treasury Further Exposes Iran-Based Al-Qa'ida Network* (Oct. 18, 2012), https://perma.cc/KN4J-QVUU).

Based on the unrebutted testimony offered by Plaintiffs' experts, the Court finds that al-Qaeda operated at the relevant times as an Iranian proxy.

### b. The Zarqawi Organization/AQI

The Zarqawi Organization ("AQI") was founded in Afghanistan under the names Tawhid wa-al-Jihad or Bayat al-Imam. Dkt. 188-4 at 16 (Gartenstein-Ross Report, Sunni Militant Groups). Although the organization used many names over the years, it was led by its founder, Abu Musab al-Zarqawi, until his death in 2006. *Id.* at 14–15, 23 (Gartenstein-Ross Report, Sunni Militant Groups). Even after Zarqawi's death, the organization sustained continuity through other leaders, including Abu al-Ghadiyah. *Id.* at 21 (Gartenstein-Ross Report, Sunni Militant Groups). The Zarqawi Organization relocated to Iraq in May of 2002. *Id.* at 19 (Gartenstein-Ross Report, Sunni Militant Groups). From its inception, the Zarqawi Organization was closely allied with al-Qaeda, receiving substantial and long-standing support from the group. *Id.* at 16–17 (Gartenstein-Ross Report, Sunni Militant Groups). Zarqawi "formally pledged allegiance to al-Qaeda in October 2004." *Id.* at 20 (Gartenstein-Ross Report, Sunni Militant Groups).

Iran provided direct material support to the Zarqawi Organization in the form of funding, weapons, sanctuary, travel facilitation, and intermediary services. Zarqawi "continu[ally] reli[ed] on logistics networks traversing Iran." *Id.* at 63 (Gartenstein-Ross Report, Sunni Militant Groups) (citation omitted). Iran used these networks to funnel weapons and mines to Zarqawi strongholds in the al-Anbar Province. *Id.* (Gartenstein-Ross Report, Sunni Militant Groups). In 2006, for example, two IRGC-QF operatives arrested in Baghdad were found with lists of weapons, telephone records, and maps relating to shipments of Iranian weapons into Iraq. *Id.* (Gartenstein-Ross Report, Sunni Militant Groups). According to a U.S. intelligence official,

this showed that the IRGC-QF was working directly "with individuals affiliated with [AQI and AAI]." *Id.* at 64 (Gartenstein-Ross Report, Sunni Militant Groups) (citation omitted).

The evidence also shows that Iranian support included the provision of weapons and logistical support. In 2008, Mubarak Mushakhas Sanad al-Bathali, one of al-Qaeda's primary fundraisers with connections to both AQI and Iran, claimed in an interview that Iran directly provided money, weapons, and logistical support to AQI. *Id.* (Gartenstein-Ross Report, Sunni Militant Groups). In 2012, the Treasury Department reported that MOIS provided money, weapons to AQI, along with "intermediary services" to get their operatives released from prison. *Id.* (Gartenstein-Ross Report, Sunni Militant Groups) (citation omitted).

Aside from weapons and funding, Iran provided "safe houses and travel facilitation" for Zarqawi Organization leaders and fighters. *Id.* at 67 (Gartenstein-Ross Report, Sunni Militant Groups). In 2003, Iran facilitated Zarqawi's entry into Iraqi Kurdistan and on to Baghdad. Dkt. 188-9 at 35 (Pregent Decl. ¶ 117). It further allowed Zarqawi to set up a network of safe houses in Iran that were used to "send forged passports, money and operational orders across the Middle East" and give sanctuary to AQI operatives. Dkt 188-4 at 63 (Gartenstein-Ross Report, Sunni Militant Groups). Although Iran differed from AQI with regards to religious views and interest in the future of Iraq, the relationship helped Iran to harm their common enemy, the United States. *Id.* (Gartenstein-Ross Report, Sunni Militant Groups). Iran made use of its influence on AQI's operations as a bartering tool with the United States, placing and removing restrictions on AQI's operations as leverage or retaliation, respectively, against the United States. *Id.* at 64–65 (Gartenstein-Ross Report, Sunni Militant Groups).

Iran also provided support to the Zarqawi Organization using al-Qaeda as a proxy. Throughout its existence, and especially after its formal pledge of allegiance to al-Qaeda in 2004,

the Zarqawi Organization received significant financial support from the international al-Qaeda network. Abu Musab al-Zarqawi was trained in al-Qaeda camps in Afghanistan as early as 1989. *Id.* at 15–16 (Gartenstein-Ross Report, Sunni Militant Groups). Upon his release from prison in Jordan in 1999, Zarqawi travelled to Afghanistan, where he used al-Qaeda funding to establish a training camp and terrorist cell. *Id.* at 17–18 (Gartenstein-Ross Report, Sunni Militant Groups). In November of 2003, bin Laden began "sending $1.5 million a month to the Iraqi Insurgency, [identifying] Zarqawi as al-Qaeda's man on the ground." Dkt 188-9 at 27 (Pregent Decl. ¶ 86).

The Court, accordingly, finds that Iran provided material support in the form of weapons, training, funds, logistical support and operational assistance to the Zarqawi Organization, both directly and indirectly through al-Qaeda, during the time period relevant to the attacks.

### c.  Ansar Al-Islam

AAI is a Kurdish Salafist militant group that was formed in 2001. Dkt. 188-4 at 32 (Gartenstein-Ross Report, Sunni Militant Groups). From 2001 to 2003, AAI held a small territorial enclave in Iraqi Kurdistan near the Iranian border. *Id.* at 32–33 (Gartenstein-Ross Report, Sunni Militant Groups). Coalition and Kurdish forces captured the enclave in Operation Viking Hammer in March of 2003, killing and capturing hundreds of AAI fighters. *Id.* at 35 (Gartenstein-Ross Report, Sunni Militant Groups). The organization nonetheless survived with Iranian assistance and continued attacking Coalition forces throughout Iraq. *Id.* at 36–37 (Gartenstein-Ross Report, Sunni Militant Groups).

Iran provided direct material support and resources to AAI in the form of training and operational assistance. Iran's permissive environment for Sunni militant groups was essential for AAI to function, "given that the group's military supplies came in from Iran (the mountainous region they controlled touches the Iranian border), veterans from Afghanistan joined them via Iran, and their cadres (including [their leader] Mullah Krekar himself) entered and left the area

27

via Iran." *Id.* at 34 (Gartenstein-Ross Report, Sunni Militant Groups) (citation omitted). After Coalition forces launched "Operation Viking Hammer" against AAI in March 2003, the IRGC facilitated the escape of surviving AAI members into Iran, "provided medical treatment," and provided those who wanted to return to Iraq with fake identification. *Id.* at 36 (Gartenstein-Ross Report, Sunni Militant Groups). "The survival of Ansar al-Islam as a coherent organization," after Operation Viking Hammer, "is largely a function of the support it received from the IRGC." *Id.* (Gartenstein-Ross Report, Sunni Militant Groups). After August 2003, "attacks conducted by Ansar al-Islam members were claimed under the name Ansar al-Sunna (AAS)." *Id.* at 38 (Gartenstein-Ross Report, Sunni Militant Groups). Iran further helped the organization rebuild by reportedly training AAI/AAS members in camps along the Iranian border and in Iran near the city of Marivan. Dkt. 198 at 3.

According to a United States Treasury report, AAI "came into being with the blessing of bin Laden after its leaders visited [al-Qaeda] in Afghanistan in 2000 and 2001. Bin Laden provided [AAI] with an estimated $300,000 to $600,000 in seed money." Dkt. 188-4 at 33 (Gartenstein-Ross Report, Sunni Militant Groups) (quoting U.S. Dep't of Treasury, *Treasury Department Statement Regarding the Designation of Ansar al-Islam* (Feb. 20, 2003), https://perma.cc/PV6L-SPSN). According to former high-ranking members of AAI, bin Laden regularly provided the group with installments of $10,000 via courier from 2001 to 2003. *Id.* (Gartenstein-Ross Report, Sunni Militant Groups). Furthermore, while there was at times tension between AQI and AAI/AAS, in November of 2004 they signed a joint statement pledging to continue fighting the Coalition. *Id.* at 40 (Gartenstein-Ross Report, Sunni Militant Groups). After this, including at the time of the suicide bombing at FOB Marez, the two

organizations were coordinating their attacks and comingling funds and fighters. Dkt. 231 at 392–95.

The Court, accordingly, finds that Iran provided material support in the form of safe haven, training, funds, military supplies, and operational assistance to AAI, both directly and indirectly through al-Qaeda, at least during the time period in which the attacks occurred.

**C.    Attacks Attributed to AAI**

    1.    *April 9, 2004 Complex Ambush in Baiji, Salah al Din Province*

        a.    <u>Injury to U.S. Army Specialist Domenick Jared Alagna</u>

On April 9, 2004, Specialist ("SPC") Domenick Jared Alagna was setting up a formation with his unit in the city of Baiji in Salah al-Din Province. Dkt. 207 at 3 (Alagna Decl. ¶¶ k, m). As they set up, SPC Alagna's unit was attacked with at least three rocket-propelled grenade ("RPG") rounds and small arms fire. *Id.* (Alagna Decl. ¶ m). The attack killed three U.S. soldiers and injured SPC Alagna, who suffered blast and shrapnel injuries to the left side of his body, knee, and leg. *Id.* at 3–4 (Alagna Decl. ¶¶ m, n, p.); Dkt. 207-10 at 3 (Gartenstein-Ross (Alagna)) (confirming three U.S. servicemembers died); Dkt. 207-11 at 4 (WES Decl. (Alagna)); Dkt. 201-2 (SSG Toby W. Mallett Obituary); Dkt. 201-3 (SSG Raymond E. Jones Jr. Obituary).

As a result of the attack, SPC Alagna now suffers from PTSD, ███████████ and iliotibial band syndrome. These conditions have caused him ███████████, as well as severe headaches and knee pain that require him to miss work three to five days of work per month. *Id.* (Alagna Decl. ¶¶ n, o). He seeks damages for "past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity." Dkt. 129 at 218 (Consol. Am. Compl. ¶ 1244).

b.  Attribution to AAI

Plaintiffs' experts the WES team, Mr. Pregent, and Dr. Gartenstein-Ross each

independently concluded that AAI committed the attack that injured SPC Alagna.  Dkt. 207-11 at

3 (WES Decl. (Alagna)); Dkt. 207-12 at 2 (Pregent Decl. (Alagna)); Dkt. 207-10 at 3

(Gartenstein-Ross Decl. (Alagna)).  They offer two main reasons in support of this conclusion:

*First*, AAI was operating against U.S. forces in the Baiji area at the time.  They claimed

responsibility for numerous attacks in the area.  Dkt. 207-10 at 3–4 (Gartenstein-Ross Decl.

(Alagna)).  Other AAI attacks in the area also used sophisticated explosives, including RPGs.  *Id.*

at 4 (Gartenstein-Ross Decl. (Alagna)).  Some of these attacks used similar tactics, techniques,

and procedures to those used in the attack that injured SPC Alagna.  *Id.* at 5 (Gartenstein-Ross

Decl. (Alagna)).

*Second*, AAI had a motive to retaliate against U.S. forces in the area.  In March of 2003,

the U.S. initiated Operation Viking Hammer, an offensive that resulted in significant AAI losses.

*Id.* (Gartenstein-Ross Decl. (Alagna)).  On March 26, 2004, U.S. forces discovered a suspected

AAI weapons cache containing 19 RPG launchers and nearly 50 AK-47 rifles.  Dkt. 207-12 at 4

(Pregent Decl. (Alagna)).

The Court, accordingly, finds that it is more likely than not that AAI was responsible for

the April 9, 2004 ambush.

2.  *June 21, 2004 Mortar Attack in Adhamiyah District*

a.  Injury to U.S. Army Staff Sergeant Arthur Stokenbury

On June 21, 2004, Staff Sergeant ("SSG") Arthur Stokenbury was conducting an escort

mission near Camp Apache, a U.S. base in the Adhamiyah District of Baghdad.  SSG

Stokenbury and his team were attacked by indirect fire from a mortar.  SSG Stokenbury was

knocked unconscious, and SSG Gregory V. Pennington was killed.  Dkt. 201-4 at 2 (Stokenbury

Decl. ¶¶ e, f); Dkt. 228-12 (DOD Army Casualty, SSG Gregory V. Pennington); Dkt. 228-6 at 2

(June 21, 2004 SIGACT Report, confirming one killed in action ("KIA")).

    SSG Stokenbury suffered a traumatic brain injury (TBI), PTSD, nerve damage caused by

shrapnel entering his left calf, and further injuries from shrapnel in his neck and shoulder.  SSG

Stokenbury continues to struggle with migraine headaches, ███████████ shrapnel and

fragment wounds, tinnitus, and insomnia as a result of the attack.  Dkt. 201-4 at 2–3 (Stokenbury

Decl. ¶¶ h, j, l).

### b.  Attribution to AAI

    Plaintiffs' experts, Dr. Gartenstein-Ross and Mr. Pregent, each independently concluded

that AAI committed the attack that injured SSG Stokenbury.  Dkt. 207-14 at 3–5 (Gartenstein-

Ross Decl. (Stokenbury)); Dkt. 242-3 at 2 (Pregent Decl. (Stokenbury)).

    AAI had freedom of movement and operational dominance in the Adhamiyah

neighborhood, particularly because it was a Sunni enclave in Baghdad at the time.  Dkt. 242-3 at

2 (Pregent Decl. (Stokenbury)); Dkt. 207-14 at 3–4 (Gartenstein-Ross Decl. (Stokenbury)).  AAI

had also claimed responsibility for several attacks in the area that used similar tactics,

techniques, and procedures—six highly accurate and synchronized mortar rounds that originated

from an area within the Adhamiyah neighborhood.  Dkt. 242-3 at 6 (Pregent Decl.(Stokenbury));

Dkt. 207-14 at 3–4 (Gartenstein-Ross Decl. (Stokenbury)).  "Successful mortar attacks that occur

in broad daylight and include the successful evasion of capture, [] involving multiple individuals

and munitions[,] require precise coordination and planning indicative of specialized training,

experience and knowledge.  It also requires freedom of movement, knowledge of the local area,

and control or intimidation of the local population."  Dkt. 242-3 at 5 (Pregent Decl.

(Stokenbury)).  Most of the activity along the relevant corridors leading into northern Baghdad

and Adhamiyah was reported to be undertaken by AAI, whereas there are few reports of AQI or JAM activity in the area during the relevant time period. *Id.* (Pregent Decl. (Stokenbury)).

The Court, accordingly, finds that it is more likely than not that AAI was responsible for the April 9, 2004 mortar attack.

3. *December 21, 2004 Suicide Bombing on FOB Marez*

a. Overview

On December 21, 2004, a suicide bomber disguised as an Iraqi Security Force Officer detonated an explosive vest in the dining facility of FOB Marez in the city of Mosul. Dkt. 208-16 at 5 (WES Decl. (FOB Marez)). Twenty-two people were killed including U.S. servicemembers, U.S. civilian contractors, and Iraqi security forces. *Id.* (WES Decl. (FOB Marez)). Ninety others were injured. Dkt. 208-17 at 2 (Pregent Decl. (FOB Marez)). When the wounded were taken to the nearby hospital at FOB Diamondback, the FOB was attacked with mortar and small arms fire. Dkt. 208-16 at 5 (WES Decl. (FOB Marez)).

b. Attribution to AAI

There are at least three reasons to conclude that AAI was responsible for the attack on FOB Marez.

*First*, AAI directly claimed responsibility for the attack through multiple online statements and a video of the attack. Plaintiffs' expert Dr. Gartenstein-Ross viewed a copy of the video and determined that it was authentic. Dkt. 208-15 at 9–11 (Gartenstein-Ross (FOB Marez)). He further notes that the fact that AAI operatives began filming the location of the attack prior to the initial explosion indicates that they had foreknowledge of the attack. *Id.* at 11 (Gartenstein-Ross Decl. (FOB Marez)).

*Second*, AAI member Muhammad Amir Husayn Mari confessed to U.S. Army investigators that he had insider knowledge of the bombing. *Id.* (Gartenstein-Ross Decl. (FOB

Marez)).  Mari had knowledge of the bombers' route into the base which was not otherwise publicly known, and his statements were corroborated by other witnesses.  *Id.* at 11 (Gartenstein-Ross Decl. (FOB Marez)).  A declassified intelligence assessment concluded that Abu Israh, an AAI leader, gave the orders to carry out the bombing.  *Id.* at 12 (Gartenstein-Ross Decl. (FOB Marez)).

*Third*, AAI had operational dominance in Mosul at the time.  Hundreds of AAI members had settled in Mosul where they enjoyed freedom of movement and access to a network of weapons and fighters crossing the Syrian border.  *Id.* at 12–13 (Gartenstein-Ross Decl. (FOB Marez)).  AAI claimed responsibility for 40 attacks in and around Mosul in 2004.  *Id.* at 13 (Gartenstein-Ross Decl. (FOB Marez)).

The Court, accordingly, finds that it is more likely than not that AAI was responsible for the December 21, 2004 suicide bombing.

### c.  Death of U.S. Army Specialist David Ruhren

SPC David Ruhren was in the FOB Marez dining facility during the initial explosion.  *See* Dkt. 208-10 at 3 (Crippen Dec. ¶¶ i, m); Dkt. 246-1 at 3 (S. Ruhren Decl. ¶ i).  He died as a result of extensive skull and brain injury from the bomb's shrapnel.  Dkt. 209-16 at 3–4 (D. Ruhren Final Autopsy Report).  He is survived by his mother, Plaintiff Sonja Ruhren, and his aunt, Plaintiff Peggy Rutkoskie.  Dkt. 129 at 185 (Consol. Am. Compl. ¶¶ 1008, 1010).  Sonja Ruhren and Rutkoskie have experienced "severe mental anguish, extreme emotional pain and suffering, and loss of [David Ruhren's] society, companionship, comfort, advice, and counsel."  *Id.* (Consol. Am. Compl. ¶ 1011).  Sonja Ruhren brings an action individually, and on behalf of the Estate of her son David.  *Id.* (Consol. Am. Compl. ¶ 1009).

### d.  Injury to U.S. Army Staff Sergeant Mark Pratt

SSG Mark Pratt was in the FOB Marez Dining facility during the initial explosion. Dkt. 211-1 at 2 (Pratt Decl. ¶ g).  He was seated approximately thirty feet from the suicide bomber. *Id*. (Pratt Decl. ¶ g).  SSG Pratt was knocked unconscious by the blast. *Id*. (Pratt Decl. ¶ h).  He sustained a TBI, spinal injuries, tinnitus hearing loss, and PTSD from the blast. *Id*. at 3 (Pratt Decl. ¶ j).  SSG Pratt has had multiple surgeries related to his injuries ███████████████ ██████████████████ *Id*. (Pratt Decl. ¶ k).  His wife, Plaintiff Rosa Pratt, is his primary caregiver. Dkt. 211-9 at 2 (R. Pratt Decl. ¶ f).  Plaintiff Rosa Pratt seeks "past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services." Dkt. 129 at 187 (Consol. Am. Compl. ¶ 1020).

### e.  Injury to Sergeant Evan Byler

Sergeant ("SGT") Evan Byler was in the FOB Marez dining facility during the initial explosion. *See* Dkt. 210-16 at 2 (Byler Decl. ¶ g).  He was seated approximately thirty feet from the suicide bomber. *Id.* (Byler Decl. ¶ h).  SGT Byler was knocked unconscious by the attack. *Id.* (Byler Decl. ¶ h).  According to Dr. Strous, who conducted a clinical interview and formal psychiatric evaluation of Byler, Byler sustained a TBI that causes him migraines, seizures, speech aphasia, tinnitus, and memory problems. Dkt. 210-16 at 2, 3 (Byler Decl. ¶¶ j, n); Dkt. 210-20 at 100–09 (Strous Decl. (Byler)) (progress notes documenting memory problems).  SGT Byler has also suffered from PTSD and hearing problems since the explosion. Dkt. 210-16 at 2, 3 (Byler Decl. ¶¶ j, n).

### f.  Injury to U.S. Army Specialist Teray Bundy

SPC Teray Bundy was near the FOB Marez dining facility during the initial explosion. *See* Dkt. 209-8 at 2–3 (Bundy Decl. ¶ h).  He responded by rendering first aid to the victims. *Id.*

34

at 3 (Bundy Decl. ¶ i).  He witnessed the extensive damage the explosion had caused to his

colleagues.  *Id.* (Bundy Decl. ¶ i).  He has since suffered from PTSD, and accompanying

symptoms including headaches, nightmares, inability to sleep, flashbacks and an inability to be

in large crowds.  *Id.* (Bundy Decl. ¶ k); Dkt. 209-10 at 10 (Strous Decl. (Bundy)) ("He exhibits

███████████████████████ and post-traumatic stress disorder").

### g.  Injury to U.S. Army Specialist Jeff Wright

SPC Jeff Wright was in the FOB Marez dining facility during the initial explosion.  *See*

Dkt. 209 at 3 (Wright Decl. ¶ j).  He was hit with shrapnel in his shoulder, stomach and legs.  *Id.*

at 3–4 (Wright Decl. ¶¶ m, n).  He had 24 pieces of shrapnel removed from his body.  *Id.* at 4

(Wright Decl. ¶ n).  He also suffered an ankle injury and hearing loss.  *Id.* (Wright Decl. ¶ n).  He

now suffers from PTSD, sleep apnea, and leg pain.  *Id.* (Wright Decl. ¶ n).

### h.  Injury to U.S. Army Specialist Brima Turay

SPC Brima Turay was in the FOB Marez dining facility during the initial explosion.  Dkt.

208-9 at 3 (Turay Decl. ¶ j).  He now suffers from PTSD, ██████████████ because of his

proximity to the attack.  *Id.* at 3–4 (Turay Decl. ¶ m); Dkt. 208-13 at 10–11 (Strous Decl.

(Turay)).  His mother, Plaintiff Ruth Turay also seeks "past and future noneconomic damages,

including severe mental anguish, extreme emotional pain and suffering, loss of consortium, and

past and future economic damages, including loss of services."  Dkt 129 at 190 (Consol. Am.

Compl. ¶ 1050).

### i.  Injury to Private First Class Daniel Bivens

Private First Class ("PFC") Daniel Bivens was in the FOB Marez dining facility during

the initial explosion, sitting approximately 15 feet away.  Dkt. 212 at 2 (Bivens Decl. ¶ f).  He

was knocked unconscious by the attack.  *Id.* (Bivens Decl. ¶ g).  He sustained a TBI and a right

knee injury.  *Id.* at 3 (Bivens Decl. ¶ i).  He also suffers from PTSD, memory loss, mixed tension

and migraine headaches, and tinnitus. *Id.* (Bivens Decl. ¶ i); *see also* Dkt. 212-7 at 8–9

(Department of Veterans Affairs Rating Decision for Daniel Bivens, Feb. 9, 2021).  PFC

Bivens's wife, Jeanetta Dawn Bivens also seeks "past and future noneconomic damages,

including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of

consortium, and past and future economic damages, including loss of services."  Dkt. 129 at 192

(Consol. Am. Compl. ¶ 1061).

j.   <u>Injury to Captain Quentin Collins</u>

Captain ("CPT") Quentin Collins worked as a Chaplain in the U.S. Air Force and was

outside the FOB Marez dining facility waiting to enter when the initial explosion happened. *See*

Dkt. 209-18 at 4 (Collins Decl. ¶¶ k, l); Dkt. 209-19 at 4 (Kaibetoney Decl. ¶ j).  He immediately

entered the facility to provide first aid.  Dkt. 201-6 at 2 (Collins Bronze Star Award

Recommendation).  After the bombing, he went to the hospital at FOB Diamondback to counsel

the victims as a chaplain.  Dkt. 209-18 at 4 (Collins Decl. ¶ n).  CPT Collins was at FOB

Diamondback when the follow-on mortar attack hit.  *Id.* (Collins Decl. ¶ n); Dkt. 201-6 at 2

(Collins Bronze Star Award Recommendation).  A mortar round hit immediately behind him,

knocked him unconscious, and sprayed him with shrapnel.  Dkt. 209-18 at 4–5 (Collins Decl.

¶¶ n, p).  He sustained a TBI, extensive lower back issues, and now requires a wheelchair.  Dkt.

209-18 at 5–6 (Collins Decl. ¶¶ r, s).  He also suffers from PTSD ████████.  *Id.* at 6

(Collins Decl. ¶ s).  In addition to CPT Collins's claims, his wife, Plaintiff Melida Collins, and

his children, Plaintiffs Sierra Nicole Collins, Shawn Christopher Alan Collins, Michael Anthony

Collins, and I.C.C., a minor,  seek "past and future noneconomic damages, including severe

mental anguish, extreme emotional pain and suffering, loss of consortium, and past and future

economic damages, including loss of services."  Dkt. 129 at 194 (Consol. Am. Compl. ¶ 1075).

### k.  Injury to Captain George Williams

CPT George Williams was in the FOB Marez dining facility during the initial explosion. Dkt. 213-14 at 2–3 (Williams Decl. ¶ f).  He was knocked unconscious by the blast and sustained several wounds on his head, neck, arms, and leg.  *Id.* at 2–3 (Williams Decl. ¶¶ f, g, h).  His left humerus was broken into twelve pieces, which required him to undergo multiple surgeries.  *Id.* at 3 (Williams Decl. ¶ h).  He still suffers from a lack of physical strength due to his injuries.  *Id.* (Williams Decl. ¶ h).  CPT Williams's wife, Elizabeth Grace Williams, and his children, Kayleigh Ann Weaver and Nickolas Alan Williams also seek damages.  Dkt. 129 at 195 (Consol. Am. Compl. ¶ 1086).

### l.  Injury to Sergeant Jonathan Hogge

Sergeant Jonathan Hogge was near the FOB Marez dining facility during the initial explosion.  *See* Dkt. 214 at 2–3 (Hogge Decl. ¶ e).  He was knocked off his feet by the explosion. *Id.* at 2 (Hogge Decl. ¶ e).  He then entered the dining facility to provide aid to the victims.  *Id.* at 2–3 (Hogge Decl. ¶¶ e, f).  He now suffers from PTSD ████████ as a result of the attack. *Id.* at 3–4 (Hogge Decl. ¶¶ h, i); Dkt. 214-2 at 10 (Strous Decl. (Hogge)).  SPC Hogge's children, Taylor B. Hogge and K.A.H., a minor, also seek damages.  Dkt. 129 at 197 (Consol. Am. Compl. ¶ 1096).

### m.  Injury to U.S. Army Specialist James Ohrt

SPC James Ohrt was immediately outside the FOB Marez dining facility preparing to enter during the initial explosion.  Dkt. 213-17 at 2–3 (Ohrt Decl. ¶ c).  He entered the dining hall to provide aid to the victims.  *Id.* (Ohrt Decl. ¶ c).  He now suffers from PTSD, ████████ ████████ as a result of the attack.  *Id.* at 3 (Ohrt Decl. ¶¶ d, e); Dkt. 213-20 at 11–12 (Strous Decl. (Ohrt)).

### n. Injury to U.S. Army Specialist Antonio Ward

SPC Antonio Ward was near the FOB Marez dining facility during the initial explosion. Dkt. 210 at 2 (Ward Decl. ¶ i). He went to give aid to the victims and helped put a tourniquet on a soldier who lost his leg in the attack. *Id.* at 3 (Ward Decl. ¶ j); Dkt. 210-2 at 4 (Strous Decl. (Ward)). He now suffers from PTSD, ████████████████ as a result of the attack. Dkt. 210-2 at 10 (Strous Decl. (Ward)). SPC Ward's father, Plaintiff Dennis H. Ward, and his mother, Plaintiff Dalis B. Ward, also seek damages. Dkt. 129 at 199 (Consol. Am. Compl. ¶¶ 1111–13).

### o. Injury to U.S. Army Specialist James Gilbert

SPC James Gilbert was exiting the FOB Marez dining facility during the initial explosion. *See* Dkt. 210-9 at 3 (Gilbert Decl. ¶ k). The explosion threw him into a wall, and he was knocked unconscious. *Id.* (Gilbert Decl. ¶ k). SPC Gilbert sustained a TBI. *Id.* (Gilbert Decl. ¶ m); Dkt. 210-10 at 4 (Strous Decl. (Gilbert)). He also suffers from PTSD. Dkt. 210-10 at 11 (Strous Decl. (Gilbert)).

### p. Injury to Captain Angela Konen

CPT Angela Konen was in the FOB Marez dining facility during the initial explosion. Dkt. 212-8 at 2 (Konen Decl. ¶ g). She was knocked unconscious by the blast. *Id.* (Konen Decl. ¶ g). She sustained a ruptured eardrum and a concussion. *Id.* at 3 (Konen Decl. ¶ i); Dkt. 212-11 at 2 (Angela Konen Theater Medical Record, Dec. 21, 2004). CPT Konen now suffers from migraines, hearing loss, ████████████, and PTSD. Dkt. 212-8 at 3 (Konen Decl. ¶ i); Dkt. 212-9 at 11 (Strous Decl. (Konen)).

### q. Injury to U.S. Army Specialist Victoria Phillippi

SPC Victoria Phillippi was a Health Care Specialist who was at FOB Diamondback (which is immediately adjacent to FOB Marez) during the initial explosion at FOB Marez. Dkt. 213-2 at 2 (Phillippi Decl. ¶¶ c, d). As victims from the FOB Marez explosion were transferred

to FOB Diamondback, Phillippi was called to the trauma center to treat victims. *Id.* (Phillippi

Decl. ¶ e). As she treated the victims, FOB Diamondback was hit by mortars, at least one of

which landed near SPC Phillippi. *Id.* (Phillippi Decl. ¶ e). She now suffers from PTSD. *Id.* at 4

(Phillippi Decl. ¶ r); *see also* Dkt. 213-3 at 12 (Strous Decl. (Phillippi)). SPC Phillippi's mother,

Plaintiff Teresita Sapitula Castillo, her father, Plaintiff Wilfredo Ramirez Castillo, and her sister,

Maria Luisa Castillo, also seek damages. Dkt. 129 at 202 (Consol. Am. Compl. ¶¶ 1133–36).

Notably, Maria Castillo is not listed among the solatium plaintiffs seeking to recover based on

the present motion. *See* Dkt. 187 at 182.

r.  Injury to Sergeant First Class Joseph Greenalch

Sergeant First Class ("SFC") Joseph Greenalch was in the dining hall at FOB

Diamondback  during the initial explosion at FOB Marez. Dkt. 212-17 at 2 (Greenalch Decl.

¶ f). The FOB Diamondback dining facility was around 500 meters from the site of the

explosion, and SFC Greenalch and his unit were sent to FOB Marez to respond to the bombing

and to move the casualties. Dkt. 212-18 at 4 (Strous Decl. (Greenalch)). SFC Greenalch now

suffers from PTSD as a result of the bombing. *Id.* at 11 (Strous Decl. (Greenalch)); *see also* Dkt.

243-2 at 2–3 (Greenalch VA Disability Determination).

s.  Injury to Staff Sergeant Eric Atkinson

SSG Eric Atkinson was in the FOB Marez dining facility during the initial explosion.

*See* Dkt. 211-10 at 2–3 (Atkinson Decl. ¶ h). There were two other soldiers sitting across from

him at the table: one of them was killed and the other was badly injured. *Id.* at 3 (Atkinson Decl.

¶ h). SSG Atkinson "helped assess casualties, evacuate wounded, and move the deceased from

the dining facility" and was asked to clean off the equipment of the two soldiers who had been

sitting across from him. *Id.* (Atkinson Decl. ¶ h). He had to "pull[] pieces of flesh off the

weapons" and "remember[s] seeing blood all over the bottom of the shower." *Id.* (Atkinson

Decl. ¶ i).  SSG Atkinson now suffers from PTSD, ██████████████████████  Dkt.
211-11 at 11 (Strous Decl. (Atkinson)).

### t.  Injury to Sergeant Christopher Anderson.

SGT Christopher Anderson was in the FOB Marez dining facility during the initial
explosion.  Dkt. 213-10 at 2 (Anderson Decl. ¶ 6).  He was thrown 15 feet by the blast and
knocked unconscious.  *Id.* (Anderson Decl. ¶ 8).  He was later diagnosed with a TBI related to
the blast at FOB Marez, and he continues to suffer from PTSD due to what he witnessed that
day.  *Id.* at 3–4 (Anderson Decl. ¶¶ 11, 18).  SGT Anderson's wife, Plaintiff Tahnee Anderson,
and their minor children, T.K.A., T.M.A., and K.T.A. also seek damages.  *Id.* (Consol. Am.
Compl. ¶¶ 1169–73).  SGT Anderson's minor children, T.K.A., T.M.A., and K.T.A., are not
listed among solatium plaintiffs seeking to recover on the present motion.  *See* Dkt. 187 at 182.

### u.  Injury to Master Sergeant Charles Griffiths

Master Sergeant ("MS") Charles Griffiths was at FOB Marez during the initial explosion,
sleeping about a mile away from where the explosion occurred.  Dkt. 213-6 at 2 (Griffiths Decl.
¶ 8).  He had planned to meet some of his fellow soldiers at the dining hall that day, but he
overslept.  *Id.* (Griffiths Decl. ¶ 8).  The blast woke him up.  *Id.* (Griffiths Decl. ¶ 8).  Although
he was initially "held back" from going near the dining hall, he was eventually able to approach,
where he witnessed "a massive hole in the middle" of the dining hall, "blood all over the floor,"
and "vehicles removing bodies in body bags."  Dkt. 213-8 at 4 (Strous Decl. (Griffiths)).  He
now suffers from ██████████████ and PTSD.  *Id.* 5–7, 13, 14 (Strous Decl. (Griffiths)).
Although MS Griffiths was not at the dining hall, he attributes his PTSD to the events of that
day, because the dining hall "was the one safe place where [the soldiers] could all relax" and its
destruction led him to the "revelation that there is no place in this world where he could be safe."
*Id.* at 4 (Strous Decl. (Griffiths)).

**D.    Attacks Attributed to AQI**

1.    *November 9, 2004 IED Attack in Babil Province*

a.    <u>Death of Sergeant Nicholas Nolte</u>

On November 9, 2004, SGT Nicholas Nolte was traveling in an HMMWV (or "humvee"
for short) approximately two kilometers north of Camp Kalsu in Babil Province, when his
vehicle was hit by a remotely detonated IED.  Dkt. 208-5 at 3 (WES Decl. (Nolte)); Dkt. 208-7 at
2 (Pregent Decl. (Nolte)); *see also* Dkt. 228-15 at 2 (Report of Casualty (Nolte)).  SGT Nolte
sustained blast injuries and shrapnel to his entire body.  Dkt. 208-4 at 3–4 (Autopsy Report
(Nolte)); Dkt. 208 at 2–3 (M. Nolte Decl. ¶ f).  He was medically evacuated first to a field
hospital in Baghdad, then to a military hospital in Germany, and ultimately to the National Naval
Medical Center in Maryland.  Dkt. 208-1 at 3 (Mercer Decl. ¶ k); Dkt. 208-4 at 2 (Autopsy
Report (Nolte)); Dkt. 241-2 at 2; *see also* Dkt. 208 at 2–3 (M. Nolte Decl. ¶ f).  Despite extensive
medical interventions, including the amputation of SGT Nolte's lower leg and forearm, he died
from his injuries on November 24, 2004.  Dkt. 208 at 2–3 (M. Nolte Decl. ¶ f); Dkt. 208-4 at 2
(Autopsy Report (Nolte)); Dkt. 241-2 at 2.  The bombing resulted in other casualties as well.
Dkt. 225-8 (Nov. 9, 2004 SIGACT Report documenting "all other casualties").  SGT Nolte is
survived by his wife, Plaintiff Melina Rose Nolte, his daughter, Plaintiff Alanna Rose Nolte, his
mother, Anita Nolte, and his sister, Plaintiff Jessica Nolte.  Dkt 129 at 211 (Consol. Am. Compl.
¶¶ 1199–203).  They seek damages.  *Id.* (Consol. Am. Compl. ¶ 1204).  Plaintiff Melina Rose
Nolte also brings an action on behalf of the Estate of Nicholas S. Nolte.  *Id.* (Consol. Am.
Compl. ¶ 1200).

b.    <u>Attribution to AQI</u>

Plaintiffs' experts, the WES team, Dr. Gartenstein-Ross, and Mr. Pregent each
independently concluded that AQI was responsible for the attack.  Dkt. 208-6 at 13 (WES Decl.

41

(Nolte)); Dkt. 208-5 at 3 (Gartenstein-Ross Decl. (Nolte)); Dkt. 208-7 at 2 (Pregent Decl. (Nolte)). They provide two primary reasons for their conclusion.

*First*, Babil Province as a whole was dominated by AQI at the time. Dkt. 208-6 at 3 (WES Decl. (Nolte)); Dkt. 208-5 at 3–4 (Gartenstein-Ross Decl. (Nolte)); Dkt. 208-7 at 2 (Pregent Decl. (Nolte)). AQI used the area to move weapons and insurgents from al-Anbar province into Baghdad. Dkt. 208-6 at 3 (WES Decl. (Nolte)). AQI considered the area critical to their strategy. Dkt. 208-7 at 2 (Pregent Decl. (Nolte)).

*Second*, the type of IED employed in the attack—a string of mortar shells linked by detonation cord—was known to be used by AQI insurgents in the area at the time of the attack. *Id.* (Pregent Decl. (Nolte)).

The Court, accordingly, finds that it is more likely than not that AQI was responsible for the November 9, 2004 IED attack.

2. *January 1, 2005 Complex Ambush in Haditha*

a. Injury to Captain Jonathan Kuniholm

On January 1, 2005 CPT Jonathan Kuniholm was accompanying a Marine platoon responding to reports of an attack against another patrol. Dkt. 214-3 at 3 (Kuniholm Decl. ¶ k). When CPT Kuniholm's patrol reached the site of the previous attack, an insurgent detonated an IED hidden in a can, nearly severing CPT Kuniholm's right arm. *Id.* (Kuniholm Decl. ¶ k). Insurgents then began firing at the patrol with small arms and RPGs as part of a coordinated L-shaped ambush. *Id.* at 3, 4–5 (Kuniholm Decl. ¶¶ k, p). CPT Kuniholm was medically evacuated to Germany and then to Bethesda, Maryland, where he underwent surgery for the injury to his right arm. *Id.* at 4 (Kuniholm Decl. ¶ n). He "sustained a partial amputation to his right forearm" as a direct result of the IED explosion. Dkt. 214-6 at 3 (Casualty Status Report (Kuniholm)); *see also* Dkt. 215-1 at 7 (WES Decl. (Kuniholm)). One Marine was killed in the

42

explosion. Dkt. 214-3 at 3 (Kuniholm Decl. ¶ k); Dkt. 214-7 at 3 (Rubio Decl. ¶ k) ("The medics were frantically working to save LCPL Parello, but I found out he later died."); Dkt. 226-7 at 5 (Dreany Decl. ¶ f) ("the death of Lance Brian Parrello"). Captain Kuniholm's wife, Plaintiff Michele Terese Quinn, his son, Plaintiff Samuel Kuniholm, his father, Plaintiff Bruce Kuniholm, his mother, Plaintiff Elizabeth Kuniholm, and his sister, Plaintiff Erin Kuniholm also seek damages. Dkt. 129 at 183 (Consol. Am. Compl. ¶ 992–97).

### b. Attribution to AQI

Plaintiffs' experts, the WES team, Mr. Pregent, and Dr. Gartenstein-Ross each independently concluded that the attack was perpetrated by AQI. Dkt. 215-1 at 16–17 (WES Decl. (Kuniholm); Dkt. 215-2 at 2 (Pregent Decl. (Kuniholm)); Dkt. 215 at 3 (Gartenstein-Ross Decl. (Kuniholm)). They provide two main reasons for this conclusion.

*First*, AQI had operational dominance in the Haditha area where the attack took place. Dkt. 215 at 4 (Gartenstein-Ross Decl. (Kuniholm)). That area was essential to AQI's strategy because it was part of a route AQI used to move weapons and insurgents from Syria, across al-Anbar province, and to Ramadi and Baghdad. *Id.* at 8 (Gartenstein-Ross Decl. (Kuniholm)). The attack occurred shortly after the conclusion of a major coalition offensive that retook Fallujah from insurgents. *Id.* at 4 (Gartenstein-Ross Decl. (Kuniholm)). This gave AQI a reason to be particularly aggressive in protecting their supply route in order to prevent further coalition offensives. *Id.* at 8 (Gartenstein-Ross Decl. (Kuniholm)).

*Second*, the complex tactics, techniques, and procedures used in the attack were a "signature" of AQI. Dkt. 215-1 at 17 (WES Decl. (Kuniholm)). The insurgents used an initial small scale "bait attack" in order to draw a larger response force. They then coordinated the explosion of the IED with a barrage of fire, which included RPGs. *Id.* (WES Decl. (Kuniholm)); *see also* Dkt. 215 at 6–7 (Gartenstein-Ross Decl. (Kuniholm)); Dkt. 215-2 at 2 (Pregent Decl.

(Kuniholm)). The successful execution of such a complex operation further indicates that AQI was responsible. Dkt. 215 at 6 (Gartenstein-Ross Decl. (Kuniholm)).

The Court, accordingly, finds that it is more likely than not that AQI was responsible for the January 1, 2005 ambush.

3.  *April 19, 2005 IED Attack along ASR Midland in al-Anbar Province*

a.  Overview

On April 19, 2005, a patrol convoy was traveling from FOB Lima in the city of Karbala to FOB Dogwood near the city of Iskandariyah. Dkt. 215-6 at 2 (Frederick Decl. ¶ f); Dkt. 215-7 at 5 (WES Decl. (Apr. 19, 2005 attack)). An IED detonated under one of the vehicles in the convoy, throwing it in the air, flipping it over, and causing it to catch fire. Dkt. 215-7 at 5 (WES Decl. (Apr. 19, 2005 attack)). While soldiers from other vehicles rushed to give aid to the wounded, they came under small arms fire. *Id.* (WES Decl. (Apr. 19, 2005 attack)). A quick reaction force was dispatched to help the ambushed soldiers and was also hit with an IED. *See* Dkt. 201-8 at 2–3 (Apr. 19, 2005 SIGACT Report). Several soldiers were wounded and one, SSG Tommy Little, later died from his injuries. Dkt. 215-6 at 3 (Frederick Decl. ¶¶ j, k, n); Dkt. 215-7 at 5 (WES Decl. (Apr. 19, 2005 attack)); Dkt. 226-11 (SSG Tommy Little Obituary).

b.  Attribution to AQI

Plaintiffs' experts, the WES team, Mr. Pregent, and Dr. Gartenstein-Ross each independently concluded that the attack was perpetrated by AQI. Dkt. 215-7 at 16–17 (WES Decl. (Apr. 19, 2005 attack)); Dkt. 215-8 at 2 (Pregent Decl. (Apr. 19, 2005 attack)); Dkt. 243-4 at 3–4 (Gartenstein-Ross Decl. (Apr. 19, 2005 attack)). They provide two main reasons for this conclusion.

*First*, AQI wanted to protect its freedom of movement in al-Anbar Province by attacking U.S. forces there. In early 2005, after the Second Battle of Fallujah, AQI began to grow in the

44

area, spiking the number of IED attacks against coalition forces. *See* Dkt. 243-4 at 4–6

(Gartenstein-Ross Decl. (Apr. 19, 2005 attack)); Dkt. 215-8 at 3 (Pregent Decl. (Apr. 19, 2005

attack)); *see also* Dkt. 215-7 at 17 (WES Decl. (Apr. 19, 2005 attack)). AQI was the insurgent

group with the most freedom of movement in the region. Such freedom of movement would

have been required to "bury an IED" of the size used in the attack "in the middle of the road."

Dkt. 215-7 at 17 (WES Decl. (Apr. 19, 2005 attack)).

 *Second*, the sophisticated tactics, techniques, and procedures utilized indicate AQI

responsibility. The insurgents were able to observe the road and time the initial detonation to hit

the middle of the convoy, causing maximum damage. *See* Dkt. 243-4 at 6 (Gartenstein-Ross

Decl. (Apr. 19, 2005 attack)). They showed further sophistication by successfully detonating the

second IED to hit the quick reaction force. Dkt. 215-8 at 2–3 (Pregent Decl. (Apr. 19, 2005

attack)). The immediate ambush of small arms fire after the detonation also indicated

sophistication and relative freedom of movement in the area. Dkt. 243-4 at 6 (Gartenstein-Ross

Decl. (Apr. 19, 2005 attack)).

 The Court, accordingly, finds that it is more likely than not that AQI was responsible for

the April 19, 2005 IED attack.

### c.   Injury to Sergeant Antonio Frederick

 SGT Antonio Frederick was in the vehicle immediately following the one that was hit by

the initial IED. Dkt. 215-6 at 3 (Frederick Decl. ¶ h); *see also* Dkt. 215-7 at 6 (WES Decl. (Apr.

19, 2005 attack)). He rushed to assist and pulled the burning vehicles doors off its hinges in

order to free SSG Little. Dkt. 215-6 at 3 (Frederick Decl. ¶¶ i, j); *see also* Dkt. 215-7 at 6 (WES

Decl. (Apr. 19, 2005 attack)). In the process he aggravated a prior lower back injury. Dkt. 215-6

at 3 (Frederick Decl. ¶ m); *see also* Dkt. 215-7 at 6 (WES Decl. (Apr. 19, 2005 attack)). SGT

Frederick also suffers from PTSD as a result of the attack. Dkt. 215-9 at 23 (Strous Decl.

(Frederick)).  SGT Frederick's wife, Plaintiff Sara Margaret Kennel-Frederick, his son, Plaintiff

Antonio Markeize Kinnel, and his minor child, A.M.K. 2, all seek damages.  Dkt. 129 at 162

(Consol. Am. Compl. ¶ 948–51).

### d.  Injury to Corporal Melvin Gatewood

Corporal ("CPL") Melvin Gatewood was in the vehicle that was thrown into the air,

flipped over, and set on fire by the initial blast.  Dkt. 216-4 at 2 (Gatewood Decl. ¶ g).  He was

temporarily stuck in the vehicle by his seatbelt and had to attempt to extinguish the flames near

his face by using his arm.  *Id.* (Gatewood Decl. ¶ g).  He ultimately was able to crawl out of the

vehicle.  *Id.*  (Gatewood Decl. ¶ g).  CPL Gatewood sustained burns to his back, arm, and hand,

and further cuts on his arm.  *Id.* at 3 (Gatewood Decl. ¶ h).  He also sustained impact injuries to

his head, back, and knee.  *Id.* (Gatewood Decl. ¶ h).  CPL Gatewood's deployment ended shortly

thereafter due to the onset of PTSD symptoms.  *Id.* (Gatewood Decl. ¶¶ m–n); Dkt. 201-9 at 2

(Certificate of Release or Discharge from Active Duty for Melvin Jerome Gatewood); Dkt. 216-3

at 3 (Melvin Gatewood's Medical Records dated 06/14/05 and 06/15/05, describing his injuries

and trauma from April 19, 2005 attack).  He still suffers from PTSD as a result of the attack.

Dkt. 216-5 at 8 (Strous Decl. (Gatewood)) ("Despite the 18 years since the tragedy, Mr.

Gatewood is clearly still suffering from his emotional injuries post Iraq trauma."); *id.* at 11

("Scores indicate . . . , significant signs of PTSD").

CPL Gatewood's mother, Plaintiff Mildred Lue Smith, and his brother, Plaintiff Ronald

Lynn Gatewood, Jr., also seek damages.  Dkt. 129 at 164 (Consol. Am. Compl. ¶ 967).

### e.  Injury to Sergeant Wyman Jones

SGT Wyman Jones was in the vehicle that was thrown into the air, flipped over, and set

on fire by the initial blast.  Dkt. 216-7 at 2 (Jones Decl. ¶ 7).  He was thrown out of the vehicle,

and his entire body was set on fire.  *Id.* (Jones Decl. ¶ 7).  SGT Jones tried to extinguish the fire

on his body by throwing sand on himself, and he needed assistance from several other service members. *Id.* (Jones Decl. ¶ 7). He was evacuated to a local hospital to receive emergency treatment, and, later, he was transferred to the United States for further medical treatment. *Id.* at 3 (Jones Decl. ¶ 8).

SGT Jones sustained "third degree burns over 31% of his body, first degree burns over 8% of his face, a fracture of his left humerus, a torn rotator cuff, nerve damage on his left leg and left arm, eye damage, and a [traumatic brain injury]." Dkt. 187 at 217 (citing Dkt. 216-7 at 3 (Jones Decl. ¶ 9) & Dkt. 216-14 at 3 (Jones Theater Medical Record dated 04/19/05, Jones VA Pensacola CBOC, pp. 818–20)). SGT Jones also suffers from PTSD as a result of the IED attack. Dkt. 216-7 at 3 (Jones Decl. ¶ 9). These injuries ended his military career, and he now requires "day-to-day care" from his wife and stepdaughters. *Id.* (Jones Decl. ¶ 15).

### f. Injury to Sergeant Rodney McBride

SGT Rodney McBride was in the vehicle immediately following the one that was hit by the initial IED. Dkt. 215-14 at 3 (McBride Decl. ¶ g); Dkt. 215-10 at 7 (McBride Pl. Fact Sheet, § III.4). He exited the vehicle and, in the process, injured his ankle by hitting it on the door. Dkt. 215-14 at 3 (McBride Decl. ¶ k). SGT McBride gave aid to the wounded. Dkt. 215-15 at 4 (Strous Decl. (McBride)); Dkt. 215-10 at 7 (McBride Pl. Fact Sheet, § III.4). He remembers seeing a massive hole in SSG Little's chest. Dkt. 215-15 at 4 (Strous Decl. (McBride)); Dkt. 215-10 at 7 (McBride Pl. Fact Sheet, § III.4). Along with his left foot injury that required subsequent surgery, Dkt. 215-10 at 7 (McBride Pl. Fact Sheet, § V.1), SGT McBride continues to suffer from PTSD as a result of the attack. Dkt. 215-15 at 10 (Strous Decl. (McBride)) ("Scores indicate presence of, . . . significant signs of PTSD").

47

g.  Injury to Sergeant Terrence Elizenberry

SGT Terrence Elizenberry was in the vehicle that was thrown into the air, flipped over, and set on fire by the initial blast. Dkt. 216-16 at 2 (Elizenberry Decl. ¶ 7). He was knocked unconscious and he woke up hanging upside down in the burning vehicle. *Id.* (Elizenberry Decl. ¶ 7). He was eventually airlifted, but not before being severely burned. *Id.* at 2–3 (Elizenberry Decl. ¶ 7). SGT Elizenberry was medically evacuated first to a hospital in Baghdad, then to a regional hospital in Germany, and ultimately back to the United States. *Id.* at 3 (Elizenberry Decl. ¶ 8). He stayed in the burn unit at Brooke Army Hospital in San Antonio, Texas for seven months after the attack. *Id.* (Elizenberry Decl. ¶ 8). SGT Elizenberry sustained "third degree burns to [his] face; second degree burns to [his] hands and arms; a concussion; a Traumatic Brain Injury (TBI); a degenerated disc in lower back, tinnitus, [and] hearing loss in [his] left ear." *Id.* (Elizenberry Decl. ¶ 9); Dkt. 216-15 at 13 (Elizenberry Pl. Fact Sheet § V.1). He also suffers from migraines and PTSD. Dkt. 216-16 at 3 (Elizenberry Decl. ¶ 9); Dkt. 216-15 at 13 (Elizenberry Pl. Fact Sheet § V.1).

4.  *May 17, 2007 Complex IED Attack in al-Rashid District, Baghdad*

a.  Death of Private First Class Aaron Gautier

On May 17, 2007, PFC Aaron Gautier was seated in the gunner's turret of a Stryker Infantry Armored Vehicle in a convoy of several Strykers. Dkt. 220 at 2 (Brown III Decl. ¶ g). The convoy was involved in a search of a busy marketplace in Baghdad. *Id.* (Brown III Decl. ¶ f). An IED exploded directly under PFC Gautier's Stryker, which was launched ten to fifteen feet into the air. *Id.* (Brown III Decl. ¶ g). The convoy was almost simultaneously ambushed by small arms fire coming from all directions. *Id.* (Brown III Decl. ¶ g).

After the explosion, PFC Gautier landed on top of the Stryker. *Id.* (Brown III Decl. ¶ h). His body was on fire. *Id.* (Brown III Decl. ¶ h). He lost his left foot and right leg above his

knee. *Id.* (Brown III Decl. ¶ h). Medics did their best to administer first aid, but they could not immediately evacuate him because of the subsequent ambush. *Id.* (Brown III Decl. ¶ h). PFC Gautier was eventually evacuated to a local Army hospital where he died. *Id.* (Brown III Decl. ¶ h); Dkt. 235-13 at 2 (Casualty Report (Gautier)); Dkt. 220-1 at 3-4 (May 17, 2007 SIGACT Report confirming one KIA).

PFC Gautier's mother, Plaintiff Tina Louise Houchins, his father, Plaintiff Daniel Gautier, his sister, Plaintiff Patricia A. Gautier, and his stepsister, Plaintiff Alexis Houchins, seek damages. Dkt. 129 at 159–160 (Consol. Am. Compl. ¶¶ 834–39). Plaintiff Tina Louise Houchins brings an action both individually and on behalf of the estate of Aaron Gautier. *Id.* at 159 (Consol. Am. Compl. ¶ 835).

### b.  Attribution to AQI

Plaintiffs' experts, the WES team, Mr. Pregent, and Dr. Gartenstein-Ross, each independently concluded that the attack was perpetrated by AQI. Dkt. 220-8 at 3, 16 (WES Decl. (Gautier)); Dkt. 220-9 at 2 (Pregent Decl. (Gautier)); Dkt. 220-7 at 3–4 (Gartenstein-Ross Decl. (Gautier)). A U.S. Army intelligence officer also assessed that AQI was the likely perpetrator. Dkt. 220-7 at 4 (Gartenstein-Ross Decl. (Gautier)). In so concluding, Plaintiffs' experts provide two main reasons.[7]

*First*, the type of IED used was consistent with reports of contemporary AQI attacks in the area. Dkt. 220-9 at 2 (Pregent Decl. (Gautier)). The use of Deep Buried Improvised Explosive Devices ("DBIED")—the same tactic used in the attack that killed PFC Gautier— had

---

[7] Although the operative complaint alleges that KH took responsibility for this attack, Dkt. 129 at 159 (Consol. Am. Compl. ¶ 833), Plaintiffs' experts attribute responsibility to AQI and make no mention of KH.

been used by the local AQI cell previously. *Id.* (Pregent Decl. (Gautier)). Members of AQI had been trained in the use of DBIEDs in a training camp in Iran. *Id.* (Pregent Decl. (Gautier)).

*Second*, Dora, where the attack occurred, was a stronghold of AQI. *Id.* at 3 (Pregent Decl. (Gautier)). It was an area "highly-saturated with AQI members who were well-supplied with personnel, material and weapons, including Iranian munitions." *Id.* (Pregent Decl. (Gautier)). They used the neighborhood as a staging area for foreign fighters coming into Baghdad from Syria and Iraq. *Id.* (Pregent Decl. (Gautier)). Analysis on the attack by coalition forces indicated that it was intended to protect AQI's communication lines and supply chains in Dora. *Id.* at 4 (Pregent Decl. (Gautier)).

The Court, accordingly, finds that it is more likely than not that AQI was responsible for the May 17, 2007 IED attack.

**E.      Attacks Attributed to the Special Groups**

　　1.      *April 28, 2008 Rocket Attack at FOB Loyalty*

　　　　a.      <u>Injury to Sergeant Thomas Milton Coe</u>

On April 28, 2008, SGT Thomas Coe was walking from the dining facility to his workspace at FOB Loyalty in Baghdad, Dkt. 221-8 at 2 (Coe Decl. ¶¶ d, f), when the base and surrounding area was hit by a series of IRAM attacks, *id.* (Coe Decl. ¶ f). SGT Coe initially took cover under a building, then began to move towards the FOB's tactical operations center ("TOC"). *Id.* (Coe Decl. ¶ f). As he moved to the TOC, he was hit by falling debris. *Id.* at 2–3 (Coe Decl. ¶ f). In the chaos of the attack, a moving pickup truck that had been abandoned by its occupants hit SGT Coe, running over his foot and pinning his shoulder to the ground. *Id.* (Coe Decl. ¶ f). SGT Coe had to "wiggle out from underneath the truck" using the gravel around him. *Id.* at 3 (Coe Decl. ¶ f). After the attack, SGT Coe had visible tire marks across his body, and was bleeding from his head. *Id.* (Coe Decl. ¶ f). He now suffers from post-traumatic headaches,

50

PTSD, and constant pain in his left shoulder after unsuccessful surgeries and attempts at physical therapy. *Id.* (Coe Decl., ¶¶ j, n); Dkt. 221 at 4 (Coe Pl. Fact Sheet § I) (Coe "sustained injuries to his left shoulder, left foot/ankle, neck, back, a traumatic brain injury, and has Post-Traumatic Stress Disorder."). A total of 14 IRAMs were fired at FOB Loyalty. Dkt. 222 at 7 (WES Decl. (Coe)). Three servicemembers were killed, and 16 others, including SGT Coe, were injured. *Id.* (WES Decl. (Coe)); Dkt. 221-5 at 3 (Apr. 28, 2008 SIGACT Report, confirming three KIAs).

SGT Coe's Wife, Plaintiff Heather Nicole Coe, and his minor son, V.T.C. also seek damages. Dkt. 129 at 135–36 (Consol. Am. Compl. ¶¶ 676–78).

### b. Attribution to JAM and KH

Plaintiffs' expert, the WES team, concluded that the attack was perpetrated by KH. Dkt. 222 at 22–23 (WES Decl. (Coe)). Plaintiffs' expert, Mr. Pregent, adds that the "attack was planned, committed, and/or authorized by the Iranian-supported Shia terrorist organization FTO Hezbollah working in concert with, Jaysh al Mahdi (JAM) and Special Group Kata'ib Hezbollah (KH)." Dkt. 222-1 at 2 (Pregent Decl. (Coe)). Furthermore, a Department of Defense National Ground Intelligence Center report found that a local KH leader, Shaykh Adnan al-Hamidawi, was "directly connected to the IRAM attack on FOB Loyalty" and is connected to IRGC, MOIS, and Iran. Dkt. 222 at 20 (WES Decl. (Coe)); Dkt. 221-1 at 3 (Pregent Decl. (Coe)) (agreeing that Adnan was "responsible for the 28 April 2008 attack"). Plaintiffs' experts offer three main reasons for their conclusion that these groups were responsible for the attack.

*First,* KH posted a video on the internet claiming responsibility for the attack. Dkt. 222 at 22 (WES Decl. (Coe)).

*Second,* the area of Baghdad where the rockets were fired was a known stronghold of Shia SGs, including KH, *id.* at 23 (WES Decl. (Coe)), and JAM, Dkt. 222-1 at 2 (Pregent Decl. (Coe)) (the attack "occurred in an area controlled by Hezbollah and IRGC-QF trained, equipped,

and directed Shia Special Groups (SG).”); *id.* (Pregent Decl. (Coe)) (“area in which this attack

occurred was, on this date, an established JAM/SG enclave that offered safe haven to JAM/SG

members operating in Baghdad.”).

   *Third*, the attack rockets—the IRAMs— were Iranian-designed.  Dkt. 222 at  17 (WES

Decl. (Coe)); Dkt. 222-1 at 3 (Pregent Decl. (Coe)) (“JAM/SG/SG [sic] were frequently

engaging CF with EFPs and IDF attacks during that time, including an attack on FOB Loyalty

only one month prior using Iranian 107 mm rockets.”).  “Among the weapons the IRGC Quods

Force was providing their Shia Special Group surrogates included the munitions to make the

IRAM rockets,” Dkt. 222 at 15 (WES Decl. (Coe)).  This supports the inference that the rockets

used in the attack were provided by Iran to their proxies, KH and JAM.

   The Court, accordingly, finds that it is more likely than not that JAM and KH were

responsible for the April 28, 2008 rocket attack.

   2.   *July 10, 2011 Rocket Attack at FOB Garry Owen*

          a.   Overview

   At approximately 4:00 a.m. on July 10, 2011, two 107 mm rockets was fired at FOB

Garry Owen in Maysan Province.  Dkt. 222-6 at 4 (WES Decl. (Niquette/Chinn)); Dkt. 222-4 at

2 (Niquette Decl. ¶¶ c, d); Dkt. 222-8 at 2 (Chinn Decl. ¶¶ d, e).  One of the rockets directly hit

and killed SGT Steven L. Talamantez.  Dkt. 222-4 at 2 (Niquette Decl. ¶ d); Dkt. 222-8 at 2

(Chinn Decl. ¶ e); Dkt. 227-20 (July 10, 2011 SIGACT Report, confirming one KIA); Dkt. 227-

21 (DOD Press Release, Army Casualty, SGT Steven L. Talamantez).

          b.   Injury to First Lieutenant Sean Niquette

   First Lieutenant (“1LT”) Sean Niquette was awoken by an alarm.  Dkt. 222-4 at 2

(Niquette Decl. ¶ d).  He got up and began to run towards a bunker on the FOB.  *Id.* (Niquette

Decl. ¶ d).  He was about 15 yards away from the rocket that killed SGT Talamenetz when it

landed. *Id.* (Niquette Decl. ¶ d). 1LT Niquette suffered a concussion from the blast and was aware of shrapnel passing through him. *Id.* (Niquette Decl. ¶ d). He received immediate medical attention, but continuing symptoms led him to seek treatment for TBI. *Id.* at 4 (Niquette Decl. ¶ h). 1LT Niquette continues to suffer from PTSD as a result of the attack. *Id.* at 5 (Niquette Decl. ¶ n). 1LT Niquette's wife, Lauren Niquette, his father, Plaintiff Thomas Niquette, and his mother, Plaintiff Mary Niquette, also seek damages. Dkt. 129 at 125–26 (Consol. Am. Compl. ¶¶ 614–17).

### c.  Injury to Staff Sergeant William Chinn

SSG Chinn was awoken by a mortar round that landed approximately five feet from his bunk. Dkt. 222-8 at 2 (Chinn Decl. ¶ e). He ran to the same bunker as 1LT Niquette, having to crawl at some points. *Id.* (Chinn Decl. ¶ e). SSG Chinn sustained shrapnel wounds to his head and chest along the left side of his body. *Id.* at 3 (Chinn Decl. ¶ f). He still has a piece of shrapnel in is chest and scarring on his forehead from the attack. *Id.* (Chinn Decl. ¶ f). He was diagnosed with TBI and PTSD. *Id.* (Chinn Decl. ¶ g).

### d.  Attribution to Shia Extremist Groups

Plaintiffs' expert, the WES team, concluded that the attack was carried out by the Promised Day Brigade ("PDB"), an Iranian-aligned Shia militant group. Dkt. 222-6 at 3 (WES Decl. (Niquette/Chinn)). Plaintiffs' expert Mr. Pregent concluded that it was "planned, committed, and/or authorized by the Iranian-supported terrorist organizations FTO Hezbollah, working in concert with Jaysh al Mahdi (JAM)/Special Groups AAH and the Promised Day Brigade (PDB)." Dkt. 222-10 at 2 (Pregent Decl. (Niquette/Chinn)); *see id.* at 5 (Pregent Decl. (Niquette/Chinn)) ("Credible information connects both PDB and AAH to the attack"). An Army intelligence report also determined with "high confidence" that the attack was carried out by PDB associates. Dkt. 222-6 at 6 (WES Decl. (Niquette/Chinn)).

The experts base this conclusion on the location and origin of the attack, as well as the frequency of similar attacks. The attack was in a PDB-support zone and JAM/SG stronghold. Dkt. 222-6 at 11 (WES Decl. (Niquette/Chinn)); Dkt. 222-10 at 3 (Pregent Decl. (Niquette/Chinn)); *see id.* (Pregent Decl. (Niquette/Chinn)) ("At the time of the attack, al Amarah was within an area controlled by these Hezbollah and IRGC-QF trained, equipped, and directed SGs."). Amarah was a point of origin for several prior SG/JAM attacks on FOB Garry Owens. Dkt. 222-6 at 6 (WES Decl. (Niquette/Chinn)); Dkt. 222-10 at 4 (Pregent Decl. (Niquette/Chinn)). The high frequency of these attacks demonstrates "JAM/SGs were able to maintain their primacy and control of the area" and that they were "well supplied with personnel, material, and weapons" from Iran. Dkt. 222-10 at 4 (Pregent Decl. (Niquette/Chinn)). Furthermore, reports "associated the rocket attack with a known Explosively Formed Penetrator (EFP) maker and possible cell leader in Al Amarah." Dkt. 222-6 at 6 (WES Decl. (Niquette/Chinn)).

The Court, accordingly, finds that it is more likely than not that Iranian-backed SGs, including Asa'ib Ahl al-Haq ("AAH"), JAM, and PDB, were responsible for the July 10, 2011 rocket attack.

## F.    EFP Attacks

Plaintiffs contend that the Court should presume that any attack that utilized an EFP was proximately caused by Defendants' material support. *See, e.g.*, Dkt. 187 at 230 ("As this is a confirmed EFP attack, Iran and the co-defendants should be held liable."). This presumption is justified, in their view, because these explosives (or their base components) were almost exclusively manufactured and brought to Iraq by the IRGC-QF or its proxy, Hezbollah.

The uncontroverted evidence supports Plaintiffs' contention that the EFPs used in Iraq during this time were closely associated with Iran, the IRGC-QF, and Hezbollah. EFPs are

sophisticated explosive devices made from copper discs placed over a tube of explosives. Dkt. 188-3 at 33–34 (Gartenstein-Ross Report, Shia Militant Groups). When the charge is detonated, the disc forms a high-speed projectile that can move over one thousand meters per second and is capable of penetrating armored vehicles. *Id.* (Gartenstein-Ross Report, Shia Militant Groups). Dr. Gartenstein-Ross echoes the conclusion that this Court has reached in several previous cases: "Iranian expertise was necessary for the sophisticated manufacturing and deployment of EFPs." *Id.* at 36 (Gartenstein-Ross Report, Shia Militant Groups) (quoting *Karcher v. Islamic Republic of Iran*, No. 16-cv-232, 2021 WL 133507, at *66 (D.D.C. Jan. 14, 2021)); *see also Fritz*, 320 F. Supp. at 63 ("The Quds Force, in particular, provided Iraqi militants with Iranian-produced . . . explosively formed projectiles" (citation omitted)); *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 483 (D.D.C. 2021) ("one of Iran's primary forms of material support to the Special Groups was financing, manufacturing and deploying EFPs." (citation omitted)); *Stearns v. Islamic Republic of Iran*, 633 F. Supp. 3d 284, 295 (D.D.C. 2022) ("The U.S. military's forensic analysis [of the origins of EFPs in Iraq] also pointed squarely at Iran."). This conclusion is further supported by Dr. Levitt, who attests that Iran "prioritized" the provision of sophisticated EFPs to militants in Iraq, and Hezbollah's use of Iranian EFPs against Israel in the 2006 Lebanon War provided training opportunities for Iraqi Shia militants. Dkt. 188-1 at 27, 29 (Levitt Report ¶¶ 97, 101). Similarly, General Stanley McChrystal, at the time, the head of Joint Special Operations Command, said in an interview that "[t]here was zero question where [the EFPs] were coming from. We knew where all the factories were in Iran. The [EFPs] killed hundreds of Americans." Dkt. 188-3 at 34 (Gartenstein-Ross Report, Shia Militant Groups) (quoting Dexter Filkins, "The Shadow Commander," *The New Yorker* (Sept. 30, 2013), https://perma.cc/ZZ5K-7CPQ).

Based on similar evidence presented in other cases, multiple decisions from this Court have found that, "absent any indication that any of [the] EFPs was *not* backed by Iran," it is appropriate to infer "that Iran was indeed the provider of the EFP(s)." *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 30 (D.D.C. 2019) (emphasis in original); *see also Fissler v. Islamic Republic of Iran*, No. 18-cv-3122, 2022 WL 4464873, at *2 (D.D.C. Sept. 26, 2022) (incorporating *Karcher's* factual findings to conclude that "the use of an EFP in an attack on U.S. servicemembers during the occupation all but necessitates the inference that Iran was responsible for the attack" (citation omitted)); *Pennington v. Islamic Republic of Iran*, 19-cv-796, 2021 WL 2592910, at *4 (D.D.C. June 24, 2021) (same). But, as Dr. Gartenstein-Ross also notes, not every EFP was made alike, and the provision of EFPs by Iran was limited to Shia militias. Sunni groups like AQI or Islamic State made cruder "knock-offs of the Iranian EFPs" that did not benefit from "Iranian material support." Dkt. 188-3 at 36 (Gartenstein-Ross Report, Shia Militant Groups) (quoting David Morgan, "Iraqi Sunni Insurgents Turn to Armor-Piercing Bombs," *Reuters* (Feb. 7, 2008)). These knock-offs lack "signature[]" features, such as quality and sophistication, that distinguish the device's origins. *Id.* (Gartenstein-Ross Report, Shia Militant Groups).

Based on this evidence, the Court finds that it is more likely than not (1) that the EFP attacks at issue in this case (2) that were perpetrated by a Shia militant group, were supported by Iran, but (3) that this inference is subject to rebuttal if the evidence suggests that the EFP at issue was a domestic "knock-off" that was not produced in whole or in part in Iran.

      1.    *August 13, 2005 EFP Attack in Sadr City, Baghdad*

          a.    <u>Injury to Private Brad Schwarz</u>

On August 13, 2005, Private ("PVT") Brad Schwarz was in a Bradley Infantry Fighting Vehicle travelling in a convoy in the Sadr City area of Baghdad. Dkt. 217-10 at 7 (Schwarz Pl.

Fact Sheet § III.4); Dkt. 217 at 2 (Schwarz Decl. ¶¶ f, g).  As the convoy crossed a highway

intersection, an EFP detonated and struck the Bradley vehicle immediately following PVT

Schwarz's.  *Id.* (Schwarz Decl. ¶ h).  PVT Schwarz felt like he had been punched in his chest and

head, and his ears began ringing loudly.  *Id.* (Schwarz Decl. ¶ h).  An incoming radio call

reported that "the Bradley is on fire," and PVT Schwarz believed the call was about his Bradley.

Dkt. 217-2 at 4 (Strous Decl. (Schwarz)).  He began banging on the door of the Bradley, fearing

that he was going to be burned alive.  *Id.* (Strous Decl. (Schwarz)).  He was let out eventually.

*Id.* (Strous Decl. (Schwarz)).  PVT Schwarz heard that an Iraqi civilian child died from the

attack.  Dkt. 217 at 2–3 (Schwarz Decl. ¶ i).  The Army's Significant Activity Report from the

incident documents that one local national ("LN") was killed in action.  Dkt. 226-21 at 3 (Aug.

13, 2005 SIGACT Report).

   Months after the attack, PVT Schwarz learned from his bunkmates ███████████

███████████████████████████████████  Dkt. 217 at 3 (Schwarz Decl.

¶ k).  He also began experiencing migraines and memory issues.  *Id.* (Schwarz Decl. ¶ k).  His

symptoms progressively worsened over the next few years, and by 2008, he was not allowed to

carry or fire weapons.  Dkt. 217-2 at 9 (Strous Decl. (Schwarz)).  PVT Schwarz now suffers

from ████████████ PTSD, TBI, migraines, and tinnitus as a result of the attack.  Dkt. 217

at 3 (Schwarz Decl. ¶ k); Dkt. 217-2 at 10 (Strous Decl. (Schwarz)).

### b.  Attribution to Iranian-Supplied EFP

   Plaintiffs' experts, the WES team and Mr. Pregent, each concluded that the explosion was

caused by an EFP and by a Shia Militia Group (JAM, KH, AAH).  Dkt. 217-11 at 3 (WES Decl.

(Schwarz)); Dkt. 217-12 at 2 (Pregent Decl. (Schwarz)) ("the attack involved a command

detonated EFP" "planned, committed, and/or authorized by the Iranian-supported Shia Special

Group FTO Hezbollah in concert with Jaysh al-Mahdi (JAM) and Special Groups (SG.").  The

WES team concluded the attack EFP was Iranian-made based on the damage to the vehicle "with numerous distinct penetration points," which indicates the EFP was "precision manufactured and copper-lined." Dkt. 217-11 at 15 (WES Decl. (Schwarz)). This conclusion is further corroborated by a U.S. Army investigation, which concluded that the explosive used was a complex four-array EFP. Dkt. 226-21 at 3 (Aug. 13, 2005 SIGACT Report). The Court has not been presented with any evidence to suggest that the EFP was a knock-off, or that the attack was conducted by a Sunni militant group, which is more likely to employ knock-off EFPs. The Court, accordingly, finds that it is more likely than not that the August 13, 2005 attackers used an Iranian-supplied EFP.

2.    *January 18, 2006 EFP Attack in Basra Province*

a.    Injury to Plaintiff Ayad Majeed

Ayad Majeed was an employee of DynCorp International, a U.S. government contractor. Dkt. 217-14 at 2 (Majeed Decl. ¶ c). In January of 2006, he was working as a translator assisting coalition forces based out of FOB Shatt in Basra Province. *Id.* (Majeed Decl. ¶¶ e–f). On January 18, 2006, he was in the front car of a two-car convoy travelling to FOB Shatt from the U.S. Consulate in Basra.[8] *Id.* (Majeed Decl. ¶¶ h–j). As they were driving, a roadside EFP detonated, hitting Majeed's car. *Id.* (Majeed Decl. ¶ j). The EFP propelled the vehicle forward by 50 meters and off the road. *Id.* (Majeed Decl. ¶ j). Two of the other occupants in his vehicle were killed. Dkt. 217-13 at 2 (Jan. 18, 2006 Ops. Report confirming two KIAs); Dkt. 230-2 at 2 (Dyncorp Serious Incident Report (Majeed)) (confirming deaths of Richard Hickman and Roland

---

[8] The Court assumes, from context, that the reference to the "U.S. Embassy" in Majeed's Declaration, Dkt. 217-14 at 2 (Majeed Decl. ¶ h), is intended to refer to the U.S. Consulate then-existing in Basra. *See* Noor Wazwaz, *U.S. Closes Consulate in Basra, Citing Iran-Backed Violence*, National Public Radio (Sept. 29, 2018).

Barvels).  Majeed was evacuated to a nearby hospital, where his right arm was amputated due to irreparable neurovascular injury.  Dkt. 217-14 at 3 (Majeed Decl. ¶ l).  He also sustained severe lacerations and nerve injuries to his left arm, and further lacerations on his thigh and abdomen. *Id.* (Majeed Decl. ¶ l); Dkt. 217-17 at 4–10 (Oct. 26, 2007 Vetted International Medical Report).

Mr. Majeed's wife, Plaintiff Sana Ali, and his three children, Mohammed Ayad Majeed, Mariam A. Majeed, and S.M. also seek damages.  Dkt. 129 at 171 (Consol. Am. Compl. ¶¶ 916–20).

b.  <u>Attribution to Iranian-Supplied EFP</u>

Plaintiffs' experts, the WES team and Mr. Pregent, each concluded that the attack involved an EFP and was committed or authorized by Iranian-backed Shia militia groups.  Dkt. 218-1 at 2 (Pregent Decl. (Majeed)); Dkt. 218 at 11–12 (WES Decl. (Majeed)).  The U.S. military and DynCorp also investigated the attack and determined that an EFP was used.  Dkt. 217-13 at 2 (Jan. 18, 2006 Ops. Report); Dkt. 230 (Dyncorp Serious Incident Report (Majeed)).  The WES team indicated that the nature of the damage to the heavily-armored vehicle supports a conclusion that "an IRGC-sponsored Shia Militia Group was likely involved in the assembly and emplacement of the EFP device."  Dkt. 218 at 12 (WES Decl. (Majeed)).  The Court has not been presented with any evidence to suggest that the EFP was not supplied by Iran.  The Court, accordingly, finds that it is more likely than not that an Iranian-supplied EFP was used in the January 18, 2006 attack.

3.  *December 4, 2006 EFP Attack in Karadah District, Baghdad*

a.  <u>Injury to Private First Class Brian Portwine</u>

On December 4, 2006, PFC Brian Portwine was in the first vehicle of a four-vehicle convoy of Bradley Infantry Fighting Vehicles travelling through Baghdad.  Dkt. 218-10 at 4 (WES Decl. (Portwine)); Dkt. 218-2 at 2 (Hinson Decl. ¶ f).  His vehicle was struck by an EFP.

Dkt. 218-10 at 4 (WES Decl. (Portwine)); Dkt. 218-2 at 2 (Hinson Decl. ¶ h).  Shrapnel

penetrated the Bradley's troop compartment and the vehicle caught on fire.  Dkt. 218-10 at 4

(WES Decl. (Portwine)); Dkt. 218-2 at 2 (Hinson Decl. ¶ h).  The soldiers inside were unable to

open the emergency exit due to damage from the EFP.  Dkt. 218-10 at 4 (WES Decl.

(Portwine)); Dkt. 218-2 at 2–3 (Hinson Decl. ¶ h).  They were trapped in the burning vehicle

until they were finally able to open the exit ramp.  Dkt. 218-10 at 4 (WES Decl. (Portwine));

Dkt. 218-2 at 2–3 (Hinson Decl. ¶ h).  No one was immediately killed by the explosion.  PFC

Portwine, however, sustained a concussion and lacerations to his face and legs from shrapnel.

Dkt. 218-2 at 3 (Hinson Decl. ¶¶ h, l).  He was later diagnosed with TBI and PTSD.  Dkt. 218-10

at 4 (WES Decl. (Portwine)); Dkt. 243-6 at 4 (P. Portwine Decl. ¶¶ e, n).  His symptoms

included ███████████████████████████████████████████████

███████████████████████████  Dkt. 243-6 at 4 (P. Portwine Decl. ¶ m).  In 2011, he

died from ████████████████████  *Id.* at 2, 5 (P. Portwine Decl. ¶¶ e, q).  Dr. Strous

reviewed PFC Portwine's medical records and recorded statements, interviewed PFC Portwine's

mother, and concluded that the EFP attack was the primary event resulting in PFC Portwine's

████████████████████  PTSD, and that it was a direct contributing factor to his suicide.  Dkt.

218-6 at 15–16 (Strous Decl. (Portwine)).  PFC Portwine's mother, Plaintiff Peggy Jean

Portwine, and his aunt, Plaintiff Melissa C. Netznik also seek damages.  Dkt. 129 at 166 (Consol.

Am. Compl. ¶¶ 882–85).[9]  Plaintiff Peggy Jean Portwine brings an action both individually and

on behalf of the estate of Brian Portwine.  *Id.* (Consol. Am. Compl. ¶ 883).

---

[9] The Complaint refers to Melissa C. Netznik as David Ruhren's aunt, rather than Brian
Portwine's.  *See* Dkt. 129 at 166 (Consol. Am. Compl. ¶ 884).  The Court assumes from context,
however, that this is a mistake, and that Ms. Netznik is the aunt of Brian Portwine.

b.  Attribution to Iranian-Supplied EFP

Plaintiffs' expert, the WES team and Mr. Pregent, each independently concluded that the

EFP attack was committed by a Shia Militia Group. Dkt. 218-10 at 3 (WES Decl. (Portwine));

Dkt. 218-11 at 2 (Pregent Decl. (Portwine)). The Weapons Intelligence Team report also

concluded that the attack was caused by "a multi-array, copper-lined EFP." Dkt. 218-9 at 2

(WIT Report for December 4, 2006 Attack). The WES team further concluded that "the large

penetration hole of the Bradley's armor is indicative of a well-manufactured EFP that was a

signature of EFPs provided by Iranian-backed terror groups in Iraq." Dkt. 218-10 at 14 (WES

Decl. (Portwine)); Dkt. 218-11 at 4 (Pregent Decl. (Portwine)) (stating that the "107mm

rockets . . . were most often Iranian in origin"). The Court has not been presented with any

evidence to suggest that the EFP was not supplied by Iran. The Court, accordingly, finds that it

is more likely than not that an Iranian-supplied EFP was used in the December 4, 2006 attack.

4.  *February 3, 2007 EFP Attack in Adhamiyah District, Baghdad*

a.  Injury to Sergeant Travis Bass

On February 3, 2007, SGT Travis Bass was in the third humvee in a seven-humvee

convoy travelling through Baghdad. Dkt. 218-17 at 2 (Bass Decl. ¶ g). SGT Bass's vehicle was

behind the vehicle that was hit with an EFP. *Id.* at 3 (Bass Decl. ¶ h). The concussive blast and

shrapnel from the explosion was so powerful that it hit SGT Bass's vehicle. *Id.* (Bass Decl. ¶ i).

SGT Bass was temporarily knocked unconscious. *Id.* (Bass Decl. ¶ i). When he regained

consciousness, he rushed to give aid to a soldier from the lead vehicle, SSG Ronnie L. Sanders,

who had been wounded by the blast, *id.* (Bass Decl. ¶ i), and who later died from his injuries,

Dkt. 218-12 at 3 (Feb. 3, 2007 SIGACT report, confirming casualty); Dkt. 227-1 at 2. SGT Bass

sustained wounds to his face and was later diagnosed with TBI and PTSD due to ongoing

symptoms that started after the blast. Dkt. 218-17 at 4 (Bass Decl. ¶¶ l–m). SGT Bass's father,

Harold Bass, his mother, Mary L. (Bass) Milton, his stepfather, Harold Allen Milton, his

brothers, Aaron Bass and Adam Christopher Bass, and his sister, Lisa Lambert, also seek

damages.  Dkt. 129 at 162 (Consol. Am. Compl. ¶¶ 854–860).

### b.  Attribution to Iranian-Supplied EFP

Plaintiffs' experts, the WES team and Mr. Pregent, each concluded that the attack

involved an EFP executed by Iranian-backed Shia militant groups.  Dkt. 219-8 at 3 (WES Decl.

(Bass)); Dkt. 219-9 at 2 (Pregent Decl. (Bass)).  A military Weapons Intelligence Team report

concluded that the attack utilized a multi-array copper-lined EFP.  Dkt. 219-8 at 6 (WES Decl.

(Bass)); Dkt. 218-12 at 3 (Feb. 3, 2007 SIGACT Report).  The WES team further indicated that

the damage and injury caused to the armored vehicle and the use of "aiming point to ensure the

accuracy of the attack" together support the conclusion that the attack was through an EFP and

conducted by trained Shia Militant Groups.  *See* Dkt. 219-8 at 12 (WES Decl. (Bass)).  The

Court has not been presented with any evidence to suggest that the EFP was not supplied by Iran.

The Court, accordingly, finds that it is more likely than not that an Iranian-supplied EFP was

used in the February 3, 2007 attack.

5.    *February 26, 2007 EFP Attack in Qadisiya Province*

### a.  Injury to U.S. Army Specialist Joshua Wolfe

On February 26, 2007, SPC Joshua Wolfe was in the third vehicle of a convoy travelling

through Qadisiya Province to Tallil Air Base.  Dkt. 219-11 at 3 (Wolfe Decl. ¶ i).  The convoy

was hit from the front by an EFP.  *Id.* (Wolfe Decl. ¶ i).  The EFP's projectile penetrated the first

and second vehicles in the convoy.  *Id.* (Wolfe Decl. ¶ i).  SGT Wolfe rushed to help extract a

dead soldier, SSG William J. Beardsley, and help other injured servicemembers from the two

preceding vehicles.  *Id.* (Wolfe Decl. ¶ i); Dkt. 219-12 at 2 (Feb. 26, 2007 NGIC Report

confirming one KIA); Dkt. 230-14 at 2 (DOD Press Release, Army Casualty, SSG William

Beardsley).  As the result of the attack, SPC Wolfe had a concussion and has since ███████

███████████████████ and been diagnosed with TBI and PTSD.  Dkt. 219-11 at 3 (Wolfe

Decl. ¶ k); Dkt. 219-14 at 9–11 (July 9, 2018 VA Progress Notes); Dkt. 219-15 at 8 (Strous Decl.

(Wolfe)) ("scores indicate presence of █████████████████████ moderate PTSD.").

### b. Attribution to Iranian-Supplied EFP

Plaintiffs' experts, the WES team and Mr. Pregent, each concluded that the attack

involved an EFP and was executed by an Iranian-backed Shia militia group.  Dkt. 219-18 at 3

(WES Decl. (Wolfe)); Dkt. 219-17 at 2 (Pregent Decl. (Wolfe)).  A military EOD team also

concluded that the attack utilized a multi-array EFP with a passive infrared trigger.  Dkt. 219-18

at 6 (WES Decl. (Wolfe)).  The Court has not been presented with any evidence to suggest that

the EFP was not supplied by Iran.  The Court, accordingly, finds that it is more likely than not

that an Iranian-supplied EFP was used in the February 26, 2007 attack.

### 6. *September 4, 2007 EFP Attack near Sadr City, Baghdad*

### a. Injury to U.S. Army Specialist Joseph Mixson

On September 4, 2007, SPC Joseph Mixson was in the first vehicle of a convoy travelling

towards Sadr City.  Dkt. 220-12 at 2 (Mixson Decl. ¶¶ f–g).  An EFP exploded and hit his

vehicle.  *Id.* at 2–3 (Mixson Decl. ¶ h).  SPC Mixson was ejected from the vehicle.  *Id.* at 2

(Mixson Decl. ¶ h).  The vehicle then caught fire and burned to the ground, setting off further

explosions of stored ammunition.  Dkt. 220-12 at 2 (Mixson Decl. ¶ h); Dkt. 243-9 at 2 (Ruark

Decl. ¶ h).  Three other servicemembers in the vehicle were killed in the explosion.  Dkt. 220-12

at 2 (Mixson Decl. ¶ h); Dkt. 220-19 at 13 (AR 15-6 Investigation Report confirming three

KIAs); Dkt. 230-29 at 2 (DOD News Release, Army Casualties, SGT Joel Murray, SPC David

Lane, PVT Randol Shelton).  SPC Mixson, the only survivor, was severely wounded.  *Id.* at 3

(Mixson Decl. ¶ j).  He was medically evacuated to a hospital in Balad, where both of his legs

had to be amputated. Dkt. 220-12 at 3 (Mixson Decl. ¶ j). He also sustained an open skull fracture, a TBI, and nerve damage to one of his ocular nerves. *Id.* at 3 (Mixson Decl. ¶ j). When he returned to the United States for medical treatment for injuries sustained in the attack, he received many surgeries including a reconstruction of his left elbow, several skin and bone grafts in his arms, and further surgeries related to his amputation and amputation-induced blood clots. *Id.* at 3–4 (Mixson Decl. ¶¶ k, r). He had to be resuscitated multiple times in the days following the attack. *Id.* at 3 (Mixson Decl. ¶ j). He requires ongoing medical treatments related to his injuries and suffers ███████████ PTSD, and chronic pain. *Id.* at 3–4 (Mixson Decl. ¶¶ k, r); Dkt. 220-17 at 5–7 (Dec. 29, 2008 Mixson VA PTSD Examination); Dkt. 220-18 at 2 (Mixson Service-Connected Ratings).

SPC Mixson's spouse, Plaintiff Virginia BreAnn Mixson, his father, Plaintiff Joseph Johnson Mixson Jr., his mother, Plaintiff Karon Wilson Mixson, and his sister, Plaintiff Alicia Milan Mixson also seek damages. Dkt. 129 at 149 (Consol. Am. Compl. ¶¶ 763–767).

### b. Attribution to Iranian-Supplied EFP

Plaintiffs' experts, the WES team and Mr. Pregent, each independently concluded that the attack utilized an EFP and was executed by a Shia Militia Group. Dkt. 220-14 at 3, 13 (WES Decl. (Mixson)); Dkt. 220-15 at 2 (Pregent Decl. (Mixson)). A U.S. military investigation also concluded that it was an EFP attack. Dkt. 220-19 at 13 (Sept. 4, 2007 AR 15-6 Report). The WES team further concludes that "the sheer force of the explosive required to penetrate an 'up-armored' HMMWV and cause the damage necessary to instantly kill three passengers" supports a conclusion that it was an Iranian EFP. Dkt. 220-14 at 13 (WES Decl. (Mixson)). Furthermore, KH claimed responsibility for the attack. Dkt. 220-12. The Court has not been presented with any evidence to suggest that the EFP was not supplied by Iran. The Court, accordingly, finds

that it is more likely than not that an Iranian-supplied EFP was used in the September 4, 2007 attack.

## III. CONCLUSIONS OF LAW

Under the Foreign Sovereign Immunity Act, 28 U.S.C. § 1604, a foreign state, including its instrumentalities, is immune from suit in state or federal court unless the case falls within an express statutory exception. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004). For present purposes, the sole relevant exception is found in the "state-sponsored terrorism exception," 28 U.S.C. § 1605A, which both confers subject matter jurisdiction on federal district courts to hear certain terrorism-related claims, *see* 28 U.S.C. § 1330(a), and recognizes a federal cause of action against those foreign states subject to the exception, *see Owens VI*, 864 F.3d at 764–65. The FSIA also addresses personal jurisdiction and specifies precise procedures that a plaintiff must follow—at times with the assistance of the clerk of the court and the U.S. Department of State—to effect service on a foreign state. *See* 28 U.S.C. § 1608.

The Court must satisfy itself that an FSIA plaintiff has cleared each of these hurdles, even if the defendant fails to appear. First, because the FSIA deprives courts of subject-matter jurisdiction in the absence of a relevant exception, a failure to appear does not waive the defense, and courts are "obligated to consider *sua sponte*" whether they have jurisdiction to hear the case and to order any relief. *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012); *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 n.20 (1983) (even where a defendant foreign state does not appear, the Court "still must determine that immunity is unavailable"). Second, with respect to the substance of a plaintiff's state or federal law claims, as noted above, the FSIA precludes courts from entering a default judgment against a foreign state unless the plaintiff has established

her "right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Owens VI*, 864 F.3d at 784–86. Finally, because "the entry of a default judgment is not automatic," courts must "satisfy [themselves] that [they have] personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6 (footnote omitted).

Each of these inquiries, in turn, implicates a slightly different standard of proof. To establish subject-matter jurisdiction, a FSIA "plaintiff bears an initial burden of production to show [that] an exception to immunity, such as § 1605A, applies." *Owens VI*, 864 F.3d at 784. "Although a court gains jurisdiction over a claim against a defaulting defendant when a plaintiff meets his burden of production, the plaintiff must still prove his case on the merits." *Id.* To do so, the plaintiff must "establish his . . . right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This provision's "protection against an unfounded default judgment" does not altogether "relieve[] the sovereign from the duty to defend" but, nonetheless, requires that the plaintiff offer "admissible evidence" sufficient to "substantiate [the] essential element[s]" of her claim. *Owens VI*, 864 F.3d at 785–86 (quotations omitted). Finally, to establish personal jurisdiction over a defaulting defendant, the plaintiff must make "a prima facie showing of [personal] jurisdiction." *Mwani*, 417 F.3d at 6.

As explained below, the Court finds that it has subject-matter jurisdiction over most, but not all, of Plaintiffs' claim and personal jurisdiction over Iran and its instrumentalities, the IRGC, MOIS, Bank Markazi, Bank Melli, and NIOC. The Court also finds that most, but not all, of the Plaintiffs have carried their burden of establishing a right to relief under the federal cause of action established in § 1605A. Finally, the Court will defer until the damages stage the determination whether each of the Plaintiffs has established the necessary familial relationship to recover individual damages and, if so, the damages to which each is entitled.

### A.    Subject-Matter Jurisdiction and Liability for § 1605A(c) Claims

"[T]he [federal] district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" asserting "any claim for relief in personam with respect to which the foreign state is not entitled to immunity under" the FSIA. 28 U.S.C. § 1330(a). The Court, accordingly, has subject-matter jurisdiction over the present "nonjury civil action" against Iran if, and only if, the conditions for the waiver of immunity found in 28 U.S.C. § 1605A are satisfied. As explained below, Plaintiffs have carried their burden of establishing the Court's subject-matter jurisdiction.

Under the state-sponsored terrorism exception, 28 U.S.C. § 1605A(a)(1), a foreign state is not immune from the jurisdiction of the federal and state courts in cases in which

> [(1)] money damages are sought against a foreign state [(2)] for personal injury or death [(3)] that was caused by [(4)] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is [(5)] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). The exception, moreover, applies only to suits in which two additional requirements are met. First, the claimant or victim must be a U.S. national, a member of the U.S. armed forces, or a U.S. government employee or contractor at the time the act of terrorism occurred. 28 U.S.C. § 1605A(a)(2)(A)(ii). Second, the foreign state must be designated as a state sponsor of terrorism both at the time the act occurred (or was so designated as a result of the act) and at the time the lawsuit was filed (or was so designated within the six-month period preceding the filing of the suit).[10] *Id.* § 1605A(a)(2)(A)(i)(I); *see also Owens VI,* 864 F.3d at 763–64.

---

[10]  Section 1605A(a)(2) also requires that the foreign state have received "a reasonable opportunity to arbitrate the claim," but only if the act of terrorism "occurred in the foreign state

Several of the conditions for subject-matter jurisdiction are easily addressed in this case. First, Plaintiffs expressly seek only monetary relief, prejudgment interest, costs and expenses, and attorneys' fees. *See* Dkt. 129 at 231 (Consol. Am. Compl.). Second, Iran was designated as a state sponsor of terrorism in 1984, *see* 49 Fed. Reg. 2741, 2836 (Jan. 23, 1984) (statement of Secretary of State George P. Shultz), and remains so designated to this day, *see* U.S. Dep't of State, *State Sponsors of Terrorism*, https://perma.cc/QJ84-EX2J. Moreover, because the MOIS and IRGC are properly considered "an integral part" of the "foreign state[]" of Iran's "political structure," *TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 300 (D.C. Cir. 2005) (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994)), and because § 1605A focuses on whether "the foreign state was designated"—and not whether each named defendant was separately designated—the Court concludes that the designation of Iran as a state sponsor of terrorism is sufficient to satisfy the designation requirement as to MOIS and IRGC as well. *See* 28 U.S.C. § 1605A(a)(2)(A)(i)(I). Furthermore, the Court has previously concluded that each of the three remaining defendants, Bank Melli, Bank Markazi, and NIOC, is an agency or instrumentality of Iran, *see* Dkt. 81 at 4 (Bank Melli); Dkt. 113 at 13 (NIOC); *id.* at 19 (Bank Markazi). Thus, the designation of Iran as a state sponsor of terrorism is sufficient to satisfy the designation requirement as to these three defendants as well. *See* 28 U.S.C. § 1605A(a)(2)(A)(i)(I).

Third, all plaintiffs meet the jurisdictional status requirement. At the time the relevant acts occurred, all of the direct victim Plaintiffs were members of the U.S. armed forces, except Plaintiff Ayad Majeed who was "an individual performing a contract awarded by the United

---

against which the claim has been brought." 28 U.S.C. § 1605A(a)(2)(A)(iii). That requirement is inapplicable to the facts of this case because none of the alleged acts of terrorism occurred in Iran.

States Government, acting within the scope of the employee's employment" at the time of the attack on his convoy. *See supra* Part II.C–F; 28 U.S.C § 1605A(a)(2)(A)(ii)(III). Because all of the solatium plaintiffs bring claims based on their relationship to qualified "victims," they too satisfy the jurisdictional requirement. Unlike the federal cause of action, which is discussed below, the jurisdictional provision is disjunctive, and asks whether the "claimant *or* victim" qualified at the relevant time, *see id.* § 1605A(a)(2)(A)(ii) (emphasis added). *See Fritz*, 320 F. Supp. 3d at 89–92 (discussing claim brought by non-U.S. national for intentional infliction of emotional distress under D.C. law arising from abduction, torture, and murder of his brother).

As a result, the only substantial jurisdictional question left for the Court is whether Plaintiffs' claims are for "personal injury or death that was caused by . . . act[s] of torture, extrajudicial killing . . . hostage taking, or the provision of material support or resources" by an "official, employee, or agent of" Iran. 28 U.S.C. § 1605A(a)(1). For the reasons explained below, the Court finds as follows: (1) AQI, AAI, JAM, and the relevant SGs committed acts of "extrajudicial killing" within the meaning of the International Convention Against the Taking of Hostages and the Torture Victim Protection Act; (2) Iranian officials and their agents provided "material support or resources" for the extrajudicial killings that caused Plaintiffs' injuries within the meaning of 18 U.S.C. § 2339A; and (3) Iran's provision of material support to AQI, AAI, JAM, and the relevant SGs caused the injuries or deaths of at least 37 direct victims. Most of Plaintiffs' claims against Defendants, therefore, fall within the state-sponsored terrorism exception of 28 U.S.C. § 1605A(a)(1). The Court discusses one exception below.

1.    *"Personal Injury or Death . . . Caused By" Defendant's Conduct*

The FSIA effects a waiver of sovereign immunity for claims seeking to recover for "personal injury or death that was caused by" certain terrorist acts or the provision of material support for such acts. 28 U.S.C. § 1605A(a)(1).

First, the Court must determine that all Plaintiffs are seeking to recover for personal injury or death. Here, the direct victim Plaintiffs are seeking to recover for personal injuries to themselves, while the solatium Plaintiffs are seeking to recover for injuries resulting from the injuries to or killing of their relatives. The direct victim Plaintiffs can be grouped into three categories: (1) individuals who were physically injured or killed during a terrorist attack, (2) individuals who were present during an attack and suffered only psychological injuries, and (3) individuals who were not present during an attack but were involved in its aftermath and experienced psychological injury as a result. Courts in this District have held that similarly situated plaintiffs in all three categories suffered personal injuries caused by the terrorist acts or the provision of material support for such acts within the meaning of 28 U.S.C. § 1605A(a)(1). *See Estate of Fishbeck v. Islamic Republic of Iran*, 2024 WL 5375595, at *2 (D.D.C. 2024) (concluding that plaintiff's non-mortal physical injuries, suffered in attack that killed another, were "caused" by the killing); *Taitt v. Islamic Republic of Iran*, 664 F. Supp. 3d 63, 88, 101, 105–10 (D.D.C. 2023) (determining that sailors aboard ship during deadly bombing who suffered PTSD without physical injuries had sufficiently established the bombing caused their injuries); *Ayres v. Islamic Republic of Iran*, 2022 WL 1438605, at *1, 2–4 (D.D.C. 2022) (identifying no jurisdictional issue with case brought under § 1605A by plaintiffs not present at attack but involved in recovery efforts).

One Plaintiff, however, differs from these similarly situated cases. Plaintiff Charles Griffiths was sleeping approximately one mile from the site of the FOB Marez attack when the explosion occurred, but visited the scene afterward and witnessed the aftermath, subsequently developing depression, anxiety, and PTSD. Griffiths nonetheless satisfies the personal injury requirement of § 1605A(a)(1), given his close proximity to the explosion and his direct exposure

to its immediate aftermath. *See Ayres*, 2022 WL 1438605, at *6–7 (awarding damages to plaintiff stationed one mile from explosion, who did not participate in rescue efforts but witnessed carnage days later and suffered psychological injuries); *cf. Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 37 n.12 (D.D.C. 2018) (dismissing claims of plaintiff stationed at attack site but in different country during bombing, despite plaintiff's emotional loss from death of close friends).

Moreover, because the statute is understood to encompass claims by family members for the distress caused by a relative's injuries or death, also known as solatium actions, *see* 28 U.S.C. § 1605A(c); *see also Salzman*, 2019 WL 4673761, at *12, the relatives of the victims who died or were injured as a result of terrorist attacks also satisfy the personal injury requirement of § 1605A(a)(1). Family members seeking solatium damages are entitled to recover based on a theory that parallels a common law claim for intentional infliction of emotional distress, and they are therefore considered to be bringing claims for "personal injury." *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54–55 (D.D.C. 2012).

2.  *The Insurgent's Acts of Extrajudicial Killing*

To fall within the FSIA's waiver of sovereign immunity, Plaintiffs' "personal injur[ies] or death[s]" must also have been "caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1). The FSIA looks to the Torture Victim Protection Act of 1991 ("TVPA") to define "extrajudicial killing." 28 U.S.C. § 1605A(h)(7). Under the TVPA, "extrajudicial killing" means

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

71

TVPA, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1991) (codified at 28 U.S.C. § 1350 note).  As

the D.C. Circuit has explained, this definition "contains three elements: (1) a killing; (2) that is

deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly

constituted court." *Owens VI*, 864 F.3d at 770.

### a.  Killing

Three of the 38 direct victim plaintiffs—David Ruhren, Nicholas Nolte, and Aaron

Gautier—were killed in the attacks and indisputably suffered extrajudicial killings such that

§ 1605A(a)(1) is satisfied.  Accordingly, these plaintiffs' claims fall within the FSIA's waiver of

sovereign immunity.

Furthermore, 34 direct victim plaintiffs were not killed, but were injured in attacks that

resulted in the deaths of fellow servicemembers, contractors, or Iraqi civilians.  Several decisions

from this district have held that individuals who are injured but not killed in an attack that results

in the death of others may recover for their injuries under § 1605A.  *See, e.g.*, *Karcher*, 396 F.

Supp. 3d at 58 ("material support for an attack that extrajudicially killed someone other than the

injured servicemember . . .is sufficient for jurisdictional purposes."); *Salzman*, 2019 WL

4673761, at *12; *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017);

*Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 14 (D.D.C. 2011).  Those injuries

were, in the ordinary sense, "caused by" the "act of . . . extrajudicial killing." *Salzman*, 2019

WL 4673761 at *12 (citations omitted).  A bombing, for example, might kill some of the victims

and maim others.  In that scenario, both sets of victims would suffer "personal injury or

death . . . caused by an act of . . . extrajudicial killing," 28 U.S.C. § 1605A(a)(1)—that is, the

bombing was, in fact, an act of extrajudicial killing, and that act caused both the deaths and the

injuries.  "Congress enacted the terrorism exception expressly to bring state sponsors of

terrorism . . . to account for their repressive practices," *Han Kim*, 774 F.3d at 1048, and that

rationale extends to both injured and killed victims, *see Salzman*, 2019 WL 4673761, at *12. The claims of these 33 surviving direct victim Plaintiffs to recover for their "personal injur[ies] . . . caused by an act of . . . extrajudicial killing" satisfy the requirement of § 1605A(a)(1).[11]

One direct victim plaintiff's claim, however, warrants further discussion. The Court starts with the D.C. Circuit's recent decision in *Borochov*, which held that the Court cannot find that Iran provided material support for an act of "extrajudicial killing" unless an actual killing occurred; FSIA's waiver of sovereign immunity does not apply to attempted acts of extrajudicial killing. 94 F.4th at 1057, 1061; *see also Force v. Islamic Rep. of Iran*, 610 F. Supp. 3d 216 (D.D.C. 2022). Where no "extrajudicial killing"—including the extrajudicial killing of a third party—occurs, the Court cannot find that the foreign state provided "material support or resources for such an act." 28 U.S.C. § 1605A(a)(1). This rule has important implications for Plaintiff Brian Portwine's claims.

Neither PFC Portwine nor any other victim of the December 4, 2006, attack on his convoy was killed at the scene or suffered mortal physical injuries during the attack. Plaintiffs, instead, premise PFC Portwine's claim (and the derivative claims of his family members) on the fact that he suffered severe physical and psychological injuries as a result of the attack, and he committed suicide five years later, in 2011. Dr. Strous, who reviewed PFC Portwine's medical and military records, concluded that the EFP attack on his convoy was "a direct and substantial

---

[11] The D.C. Circuit has held that attacks in which no one was killed do not constitute "extrajudicial killings" within the meaning of the FSIA. *See Borochov*, 94 F.4th at 1057, 1061. Nothing in that decision, however, casts doubt on the long line of authority holding that "extrajudicial killing" encompasses claims brought by those who suffer non-mortal injuries from attacks that resulted in the death of others. The distinction between cases in which no killing occurs, and those in which someone other than the plaintiffs or a relative of the plaintiffs is killed, is addressed in *Force*, 610 F. Supp. 3d at 216.

contributing factor to Mr. Portwine's death." Dkt. 218-6 at 16 (Strous Decl. (Portwine)).
Plaintiffs ask the Court to "find this evidence sufficient to hold that Mr. Portwine's death
qualifies as an extrajudicial killing and that the claims fall within the scope of FSIA's terrorism
exception to immunity." Dkt. 187 at 230. The Court is not yet persuaded that these facts
establish an "extrajudicial killing" within the meaning of the FSIA and TVPA.

Plaintiffs have not provided any argument addressing whether a suicide years after an
attack itself constitutes an extrajudicial killing. Two prior decisions from this Court, however,
have considered the issue and have concluded that an uncoerced suicide does not constitute an
extrajudicial killing within the meaning of FSIA and TVPA. In *Kar v. Islamic Republic of Iran*,
No. 19-2070, 2022 WL 4598671 (D.D.C. Sept. 30, 2022), Siamak Pourzand, an Iranian journalist
critical of the Iranian regime, was held in extended home detention under "constant
surveillance." *Id.* at *3. His "mental health was extremely poor in his final years," *id.* at *13,
and he eventually "committed suicide by jumping off his balcony," *id.* at *3. Although Judge
Bates held that Iran's treatment of Pourzand amounted to a "hostage taking" and "torture," *id.* at
*7–12, he held that the suicide did not constitute an "extrajudicial killing" because Iran did not
"act with the goal and expectation of killing" Pourzand, *id.* at *13 (citations and quotation marks
omitted). The facts of that case are, admittedly, unlike those at issue here.

The facts of the second case, *Hansen v. Islamic Republic of Iran*, No. 22-477, 2024 WL
3026517 (D.D.C. June 17, 2024), however, bear a closer resemblance to this case. The plaintiffs
in that case offered proof that the IRGC "fired at least eleven ballistic missiles" at an airbase, *id.*
at *1, causing numerous and devastating injuries to servicemembers, *id.* at *2. One plaintiff,
Sergeant Jason Quitugua, "developed post-traumatic stress disorder and mild depression after the
attack," and in October 2021, he "took his own life," *id.* Against this factual backdrop, Judge

Friedrich concluded that the "plain text and background principles of immunity" "foreclose[]" the possibility that a suicide of this kind qualifies as an extrajudicial killing within the meaning of the FSIA. *Id.* at *3. First, Judge Friedrich concluded that the plain meaning of "extrajudicial killing," which, in turn, requires a "deliberate" "killing" "without judicial authorization," *id.* at *4 (internal quotations and alterations omitted), does not include a non-coerced suicide, *id.* Second, she held that the *noscitur a sociis* canon further "supports the interpretation that the foreign state must be the direct cause of another person's death." *Id.* Third, she looked to "background principles of tort and criminal law," under which "[s]uicide is usually an intervening break in the causal chain," and to the Model Penal Code, which provides "that a 'person may be convicted of criminal homicide for causing another to commit suicide only if he purposely causes such suicide by force, duress or deception.'" *Id.* at *5 (quoting Model Penal Code § 210.5(a)).

The plaintiffs in *Hansen* have appealed Judge Friedrich's decision, and the question whether and when a suicide can satisfy the killing requirement for purposes of the FSIA's waiver of sovereign immunity is currently pending before the D.C. Circuit. Civil Docketing Statement, *Hansen v. Islamic Republic of Iran*, No. 24-7101 (D.C. Cir. July 17, 2024); Statement of the Issues to Be Raised at 1, *Hansen v. Islamic Republic of Iran*, No. 24-7101 (D.C. Cir. July 23, 2024). Because resolution of that appeal is likely to provide important guidance in this case, and because Plaintiffs in this case have yet to brief the question whether death by uncoerced suicide can qualify as an "extrajudicial killing" for purposes of the FSIA, the Court will defer ruling on PFC Portwine's claim and the derivative claims asserted by his family members. Following a decision from the D.C. Circuit in the *Hansen* case, Plaintiffs are welcome—if appropriate—to renew their motion for entry of a default judgment in this proceeding. Putting this significant

question aside, the Court is persuaded that the Portwine estate and family members are otherwise entitled to recover.

### b.  Deliberated

Plaintiffs must show that the attacks that caused each death were "deliberated" in order for the deaths to qualify as "extrajudicial killing[s]." A "deliberated" killing is "simply one undertaken with careful consideration, not on a sudden impulse." *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 263 (D.D.C. 2016) ("*Owens V*") (citing Webster's Third New International Dictionary 596 (1993); 4 The Oxford English Dictionary 414 (2d ed. 1989); Black's Law Dictionary 492 (9th ed. 2009)), *aff'd*, 864 F.3d 751 (D.C. Cir. 2017), *vacated in part and remanded on other grounds sub nom. Opati*, 590 U.S. at 418. Here, there is ample evidence that the attacks in question were planned. Any attack in which an IED or EFP is planted in advance necessarily requires deliberation and planning. These attacks require the perpetrator to acquire explosives, identify a route where Coalition forces are likely to pass, and plant the explosives in advance with a triggering mechanism. Some of the IED attacks in this case, furthermore, show extensive preplanning. The attack that killed PFC Gautier involved, for example, explosives buried deep beneath the ground to avoid detection. Dkt. 220-9 at 2 (Pregent Decl. (Gautier)). The April 19, 2005 IED attack involved the deployment of a second IED left in reserve to harm the Quick Reaction Force. Dkt. 201-8 at 2–3 (Apr. 19, 2005 SIGACT Report). Complex ambushes involved attacking Coalition forces at critical points in their missions, required similar levels of prior planning and knowledge of Coalition forces' mission. The ambush at Haditha, for example, required the insurgents to launch an initial small-scale attack to draw a response force, then to assemble into a planned formation around a planted IED. Dkt. 214-3 at 3 (Kuniholm Decl. ¶ k). Indirect fire attacks require insurgents to be familiar with the location and occupation of their target U.S. military bases. The suicide bombing at FOB Marez, perhaps the most

extensively planned of the attacks, required the bomber to obtain an Iraqi Security Forces uniform, study the layout of the FOB to gain access, and coordinate to plan for an indirect fire attack on the victims as they were transported to the hospital. Dkt. 208-15 at 3–4 (Gartenstein-Ross Decl. (FOB Marez)). Furthermore, in that case, AAI pre-positioned a camera to film the explosion. *Id.* at 7 (Gartenstein-Ross Decl. (FOB Marez)). All of the attacks, moreover, required obtaining and using specific types of weapons, such as IEDs, EFPs, and IRAMs, which required prior training. The expert reports on attack attribution overwhelmingly demonstrate that the attacks were planned. *See supra* Part II.B–F.

Finally, there is no evidence whatsoever that any of these attacks were authorized "by a prior judgment affording judicial guarantees o[f] due process." *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 202 (D.D.C. 2017); *see also Owens VI*, 864 F.3d at 770. Nor is there evidence that these attacks were "lawfully carried out under the authority of a foreign nation." TVPA § 3(a). To the contrary, and as the Court turns to next, the Court has found that Iranian-supported insurgent groups were responsible for the attacks, not the lawful authority of Iraq or Iran. *See supra* Parts II.C–F.

The Court, accordingly, finds that all of the attacks, except for the attack affecting Plaintiffs Estate of Brian Portwine, Peggy Jean Portwine, and Melissa C. Netznik, qualify as "extrajudicial killing[s]" under 28 U.S.C. § 1605A(a)(1). Accordingly, although the Court moves on with the analysis, it will deny the motion for default judgment with respect to the claims of Plaintiffs Estate of Brian Portwine, Peggy Jean Portwine, and Melissa C. Netznik for lack of jurisdiction. That decision is without prejudice, and these Plaintiffs may renew their motions as appropriate.

3. *Iran's Provision of Material Support for the Terrorist Groups' Acts of Extrajudicial Killing*

The FSIA's terrorism exception applies when a plaintiff seeks money damages for "personal injury or death that was caused by . . . the provision of material support or resources for" an "act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking," so long as that support was provided by "an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1). Section 1605A(h)(3) defines "material support or resources" by reference to 18 U.S.C. § 2339A, the criminal material support statute. Section 2339A defines "material support or resources" to mean

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

The Court has found that, during the years leading up to and surrounding the attacks at issue, Iran (directly and indirectly) provided substantial financial support to the AQI, AAI, and the network of Shia militia groups (SGs) that including JAM and KH. *See supra* Part II.B. Iran also provided substantial operational capacity to these groups, including IEDs and other weapons, weapons technology, safe passage, and training of operatives. *See id.*; *supra* Part II.F (concluding that absent contrary evidence, Iran provided the EFPs in Shia militant groups' EFP attacks at issue). The Court therefore concludes that Iran provided the AQI, AAI, JAM, KH, and the SGs with "material support" in the form of, "currency," "training," "operational assistance," and "weapons," among other things, within the meaning of the FSIA. 28 U.S.C. § 1605A(h)(3); 18 U.S.C. § 2339A(b)(1).

78

4.    *Causation*

The Court must also consider whether Plaintiffs' injuries were "caused by" Defendants' provision of material support. 28 U.S.C. § 1605A(a)(1). Plaintiffs need not show that Iran "specifically knew of or intended its support to cause" the particular attacks in question, *Owens VI*, 864 F.3d at 798, or even that Iran's material support was a "but for" cause of their injures, *Kilburn*, 376 F.3d at 1128. Instead, the FSIA requires only a "showing of 'proximate cause,'" which is satisfied where a Plaintiff can show "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Id.* (quoting Prosser & Keeton on the Law of Torts 263 (5th ed. 1984)). This inquiry thus "contains two similar but distinct elements." *Owens VI*, 864 F.3d at 794. "First, the defendant's actions must be a 'substantial factor' in the sequence of events that led to the plaintiff's injury." *Id.* (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)). "Second, the plaintiff's injury must have been 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Id.* (quoting same).

With respect to the first element, Plaintiffs need not prove that Iran's support was directly tied to each of the attacks that caused their injuries. Such a "nexus" is not necessary because funds—and, in certain instances, arms, training, safe passage, and other support—are fungible, and the FSIA could hardly be interpreted to condition Plaintiffs' recovery on the insurgents' "careful bookkeeping." *Kilburn*, 376 F.3d at 1130. The Court previously concluded that Iran's financial and military aid to the groups was essential to their operating capacity and that, without Iran's backing, the groups would be substantially weakened. Iran provided significant amounts of funds to each of the groups in question and further provided the very weapons that were used in many of the attacks. *See supra* Part II.B–F & Part III.A.3. Thus, Iran's support to the AQI,

79

AAI, JAM, KH, and the other SGs was a substantial factor in the 15 attacks that caused Plaintiffs' injuries.

This, then, leaves the question whether Plaintiffs' injuries resulting from the attacks at issue were "reasonably foreseeable" or "natural consequence[s]" of Defendants' conduct. *Owens VI*, 864 F.3d at 794. On this issue, too, the record is clear. Iran, the IRGC, and MOIS supplied terrorist organizations with lethal weapons and training on how to use them. *See supra* Part II.B. The death and injury to servicemembers and contractors, and the suffering of their families was, by any measure, foreseeable. *See Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009) ("From defendants' actions of supplying resources and training to Hezbollah for this attack, it was entirely foreseeable that innocent people would be killed or injured."); *Owens VI*, 864 F.3d at 797–98 (finding the 1998 embassy bombings by al Qaeda to be a reasonably foreseeable consequence of Sudan's offer in 1991 to shelter Osama Bin Laden); *see also Salzman,* 2019 WL 4673761, at *14. As for Bank Melli, Bank Markazi, and NIOC, they enabled Iran to fund their terrorist network through the raising of revenue and laundering of funds. *See generally* Dkt. 188-2 (Piatetsky Decl.); *see also Hake*, 2022 WL 4130837, at *11 (finding that Bank Markazi, Bank Melli and NIOC were the proximate cause of attacks when they enabled Iran to launder money to fund its terrorist network).

For reasons similar to those addressed above, however, the Court will defer deciding whether Defendants proximately caused PFC Portwine's death or the derivative injuries suffered by his family members. Again, Plaintiffs have not briefed this issue, and the D.C. Circuit is likely to offer helpful guidance in the near future.

The Court, accordingly, concludes that all plaintiffs except Plaintiffs Estate of Brian Portwine, Peggy Jean Portwine, and Melissa C. Netznik have established that the Defendants'

material support to the terrorist groups' extrajudicial killings caused their personal injuries or

death within the meaning of the FSIA's waiver of sovereign immunity.

    5.    *Federal Cause of Action*

    Having concluded that the Court possesses subject-matter jurisdiction, for most of the

Plaintiffs, little else is required to show that they are entitled to relief under the federal cause of

action Congress enacted in 2008 as part of the National Defense Authorization Act. *See* Pub. L.

No. 110-181 § 1083, 122 Stat. 339–40 (2008) (codified at 28 U.S.C. § 1605A(c)). Although the

federal cause of action was added to the FSIA in 2008, "§ 1605A(c) operates retroactively" and

"plainly applies . . . to the pre-enactment conduct of a foreign sovereign." *Owens VI*, 864 F.3d at

815; *see also Opati*, 590 U.S. at 425–29. There is almost total "overlap between the elements of

[§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity,"

*Foley*, 249 F. Supp. 3d at 205, and a plaintiff that offers proof sufficient to establish a waiver of

foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a

matter of federal law—with one minor exception: the waiver of sovereign immunity turns on the

status (*e.g.*, U.S. national, member of the armed forces, or employment) of the "claimant *or the*

victim," while the federal cause of action turns solely on the status of the claimant. *Compare* 28

U.S.C. § 1605A(a)(2)(ii) (emphasis added) *with* 28 U.S.C. § 1605A(c).

    All of the direct victim plaintiffs at issue in the instant motion were either members of the

armed forces or U.S. government contractors at the time of the relevant attack. *See supra* Part

II.C–F. Most of the solatium Plaintiffs have also proffered evidence sufficient to show that they

are U.S. nationals,[12] including two minor children who were born shortly after the relevant

---

[12] Dkt. 234-1 (Melina Rose Nolte Birth Certificate); Dkt. 234-2 (Alanna Rose Nolte Birth Certificate); Dkt. 234-3 (Anita Nolte Birth Certificate); Dkt. 234-4 (Ruth Turay Birth Certificate); Dkt. 234-5 (Peggy Rutkoskie Birth Certificate); Dkt. 234-7 (Melida Collins

attacks, but who nonetheless qualify for solatium damages under FSIA's private cause of

action.[13]  These solatium Plaintiffs are qualified claimants under 28 U.S.C. § 1605A(c)(1).  As to

---

Certificate of Naturalization); Dkt. 234-8 (Siera N. Collins Birth Certificate); Dkt. 234-9
(Michael A. Collins Birth Certificate); Dkt. 234-10 (Shawn Collins Birth Certificate); Dkt. 234-
11 (Dennis Ward Birth Certificate); Dkt. 234-12 (Dalis Ward Certificate of Naturalization); Dkt.
234-13 (Rosa Pratt Certification of Naturalization); Dkt. 234-14 (Jeanetta Bivens Birth
Certificate); Dkt. 234-15 (Teresita Castillo Passport); Dkt. 234-16 (Wilfredo Castillo Passport);
Dkt. 234-17 (Tahnee Anderson Birth Certificate); Dkt. 234-19 (Elizabeth Williams Birth
Certificate); Dkt. 234-20 (Kayleigh Williams Birth Certificate); Dkt. 234-21 (Nickolas Williams
Birth Certificate); Dkt. 234-22 (Jonathan B. Hogge Decl. for Taylor B. Hogge); Dkt. 234-23
(K.A.H. Birth Certificate); Dkt. 234-24 (Michele T. Quinn Birth Certificate); Dkt. 234-25
(Samuel Kuniholm Birth Certificate); Dkt. 234-26 (Bruce Kuniholm Birth Certificate); Dkt. 234-
27 (Elizabeth Kuniholm Birth Certificate); Dkt. 234-28 (Erin Kuniholm Passport); Dkt. 234-29
(Sara Kinnel-Frederick Birth Certificate); Dkt. 234-30 (Antonio Markeize Kinnel Birth
Certificate); Dkt. 234-31 (A.M.K. 2 Birth Certificate); Dkt. 234-33 (Mildred Smith Birth
Certificate); Dkt. 235 (Ronald Gatewood Birth Certificate); Dkt. 235-3 (Sana Ali Certificate of
Naturalization); Dkt. 235-4 (Mohammed A. Majeed Passport); Dkt. 235-5 (Mariam A. Majeed
Passport); Dkt. 235-6 (S.M. Passport); Dkt. 235-7 (Peggy Portwine Birth Certificate); Dkt. 235-8
(Mary L. Milton Birth Certificate); Dkt. 235-9 (Harold Allen Milton Birth Certificate); Dkt. 235-
10 (Adam Christopher Bass Birth Certificate); Dkt. 235-11 (Harold Bass, Lisa Lambert Decl.);
Dkt. 235-12 (Aaron Bass Hospital Birth Certificate); Dkt. 235-14 (Tina Houchins Birth
Certificate); Dkt. 235-15 (Daniel Gautier Birth Certificate); Dkt. 235-16 (Patricia A. Gautier
Birth Certificate); Dkt. 235-17 (Alexis Houchins Birth Certificate); Dkt. 235-19 (Alicia Milan
Mixson Birth Certificate); Dkt. 235-20 (Joseph Johnson Mixson Jr. Birth Certificate); Dkt. 235-
21 (Karon Wilson Mixson Birth Certificate); Dkt. 235-22 (Heather Nicole Coe Birth Certificate);
Dkt. 235-23 (V.T.C. Birth Certificate); Dkt. 235-25 (Lauren Niquette Birth Certificate); Dkt.
235-26 (Thomas Niquette Birth Certificate); Dkt. 235-27 (Mary Niquette Birth Certificate); Dkt.
234-6 (Sonja Ruhren Decl. Re: Birth Certificate).

[13] In *K.E.F.V. ex rel. Vickers v. Islamic Republic of Iran*, the D.C. Circuit held that "the Foreign
Sovereign Immunities Act's terrorism exception allows" a minor born "two months" after "Iran
helped the Taliban kill her father" "to recover solatium for the loss of her father's comfort and
society." 135 F.4th 988, 992 (D.C. Cir. 2025). K.E.F.V. had established all the elements of
FSIA subject matter jurisdiction based on the terrorism exception, and the elements of FSIA's
cause of action. *Id.* at 991. Looking to state wrongful death statutes, the D.C. Circuit concluded
that a child who was conceived before a parent was killed in a terrorist attack and who was born
after the attack may, nonetheless, seek solatium under the FSIA. *Id.* at 995.

Here, K.A.H (the minor daughter of Jonathan Hogge), and V.T.C. (the minor son of Thomas
Milton Coe), were born after the attacks.  K.A.H. was born in May 2005, but the attack causing
personal injury to her father occurred in December 2004.  Dkt. 234-23 (K.A.H. Birth
Certificate); *see supra* Part II.C.3.1 (Injury to Jonathan Hogge).  V.T.C. was born in May 2008,

these Plaintiffs, the Court concludes that, subject to a showing that they have suffered

compensable losses, for the same reasons that the Court has subject-matter jurisdiction, they also

have a statutory claim to relief under § 1605A(c).

A handful of solatium Plaintiffs, however, have failed to produce evidence sufficient to

show that they were U.S. nationals, members of the armed services, or covered contractors at the

relevant time,[14] although it is possible that this is merely an administrative error, which counsel

can readily correct. The Court also notes an apparent inconsistency between declarations

submitted by one solatium Plaintiff, Sonja Ruhren.[15] Because one of her declarations, Dkt. 246-

1 at 2 (S. Ruhren Decl. ¶ b), does establish that she is a U.S. national, the Court will not exclude

her from the group of solatium Plaintiffs granted relief in this decision. But because another

declaration raises a question about her citizenship, the Court will direct that Plaintiffs submit

confirmation that Sonja Ruhren is, in fact, a U.S. national before submitting her claims to the

Special Master for damages.

---

but the attack causing personal injury to his father occurred in April 2008. Dkt. 235-23 (V.T.C. Birth Certificate); *see supra* Part II.E.1.a. (Injury to Thomas Milton Coe).

K.A.H was born within five months of the attack injuring her father, and V.T.C. was born about a month after the attack injuring his father; both had been conceived before the relevant attacks. In addition, both minors have submitted evidence that they are U.S. Nationals. Having "satisfied [the] statutory elements," *K.E.F.V.*, 135 F.4th at 991, for subject matter jurisdiction and for the private cause of action, both minors thus qualify for solatium damages under the FSIA.

[14] These solatium Plaintiffs include I.C.C. (the minor son of Quentin D. Collins), Jessica Nolte (the sister of Nicholas Nolte), Melissa Netznik (aunt of Brian Portwine), and Virginia BreAnn Mixson (spouse of Joseph Catlin Mixson).

[15] In particular, in the document titled "Declaration of Sonja Ruhren re Birth Certificate," *see* Dkt. 248-1 at 12 (Am. Ex. List), she attests that she is a "resident of the United States," and that she was born "in Germany when [her] father was stationed overseas in the U.S. Army," Dkt. 234-6 (Sonja Ruhren Decl.), but she does not attest or otherwise demonstrate that she is a U.S. national. In her declaration in support of solatium damages, however, Dkt. 246-1, she attests that she is either "a United States Citizen or Naturalized Citizen." *Id.* at 2 (S. Ruhren Decl. ¶ b).

Of course, even if these solatium Plaintiffs are not U.S. nationals, members of the armed services, or covered contractors, that fact would not deprive the Court of jurisdiction to consider any common law claims that they might decide to pursue. As explained above, unlike the jurisdictional provision, which requires only that the claimant *or* the victim fall within one of the qualifying categories, the federal cause of action requires that the *claimant* qualify. But that does not preclude a non-qualifying, non-U.S. national from asserting a common law claim, so long as the Court has jurisdiction over that claim and the common law cause of action is otherwise available. *See Fritz*, 320 F. Supp. 3d at 89–92. The solatium Plaintiffs who have yet to document that they are U.S. nationals, members of the armed forces, or covered employees or contractors (I.C.C., Jessica Nolte, Melissa Netznik,[16] and Virginia Mixson), accordingly, have three options: they can submit evidence sufficient to show that they are U.S. nationals, members of the armed forces, or qualifying employees or contractors; they can seek to recover under an appropriate common law cause of action; or they can notify the Court that they no longer intend to pursue their claims.

The Court, accordingly, concludes that those Plaintiffs who have properly invoked the Court's subject-matter jurisdiction, *see supra* Part III.A.1–4, and who have proffered proof of their status as a U.S. national, member of the armed forces, or covered employee or contractor, *supra* n.12, and who suffered a covered injury, are entitled to recover under the federal cause of action. The Court will deny the federal claims asserted by the remaining Plaintiffs, *supra* n.15,

---

[16] Melissa Netznik faces a double hurdle; (1) her claims are dependent on PFC Portwine's rights to recover, which will require the Court to determine whether his suicide can qualify as an extrajudicial killing, and (2) she has yet to demonstrate that she is a U.S. national, member of the armed forces, or a covered employee or contractor.

without prejudice but will afford each of them the opportunity to present additional evidence in support of their claims.

**B.    Personal Jurisdiction**

The Court also concludes that it has personal jurisdiction over Iran, MOIS, and IRGC. Under the FSIA, the Court has personal jurisdiction over a foreign state "as to every claim for relief over which the [Court] ha[s] jurisdiction . . . where service has been made under section 1608." 28 U.S.C. § 1330(b). Thus, "[i]n order to sue a foreign state or one of its political subdivisions, a plaintiff must effect service in compliance with" 28 U.S.C. § 1608(a). *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015). The Court has already determined that "the Plaintiffs['] efforts to serve Iran, MOIS, and IRGC satisfied the requirements of § 1608(a)(4)." Dkt. 81 at 8.

Finally, the Court concludes that it has personal jurisdiction over Bank Melli, Bank Markazi, and NIOC as well. The Court has previously concluded that each of these three entities is an agency or instrumentality of Iran, *see id.* at 4 (Bank Melli); Dkt. 113 at 13 (NIOC); Dkt. 113 at 19 (Bank Markazi). The rules for serving an agency or instrumentality of a foreign state under § 1608(b) are similar, but not identical, to the rules applicable to service of a foreign state or political subdivision, and the Court has already determined that Plaintiffs' efforts at service satisfied the requirements of § 1608(b) with respect to each of these three defendants. *See* Dkt. 81 at 10 (Bank Melli); Dkt. 113 at 20 (Bank Markazi & NIOC).

Because Plaintiffs accomplished service pursuant to 28 U.S.C. § 1608(a) or § 1608(b), as appropriate, on Iran, MOIS, IRGC, Bank Melli, Bank Markazi, and NIOC, the Court possesses personal jurisdiction over each of these defendants. *See* 28 U.S.C. § 1330(b).

## CONCLUSION

For the foregoing reasons, the Court will **DENY** Plaintiffs' Motion for Default Judgment, Dkt. 187, as to the claims of Plaintiffs Peggy Portwine, Melissa C. Netznik, the Estate of Brian Portwine, I.C.C., Jessica Nolte, and Virginia Mixson without prejudice, but will **GRANT** Plaintiffs' motion in all other respects. Although the Court **GRANTS** Plaintiffs' motion as to claims by Sonja Ruhren, it is hereby **ORDERED** that Plaintiffs submit confirmation that Sonja Ruhren is, in fact, a U.S. national before submitting her claims to the Special Master for damages. Consistent with the Case Management Plan, *see* Min. Order (Nov. 1, 2018), the Court will appoint a Special Master to consider the damage claims asserted by each of the prevailing Plaintiffs and to issue proposed findings of fact with respect to those claims.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: September 30, 2025

86